## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| GLOBAL POWER EQUIPMENT GROUP ) | Case No. 06-11045 (BLS) |
| INC., et al., ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| ) | |
| SNC-LAVALIN POWER ONTARIO, INC. ) | |
| ) | |
| Appellant, ) | Civil No. 1:08-cv-00024 (JFF) |
| ) | |
| v. ) | |
| ) | |
| GLOBAL POWER EQUIPMENT GROUP ) | |
| INC., et al., ) | |
| ) | |
| Appellees. ) | |
| ) | |

## APPELLANT'S OPENING BRIEF

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

-- and --

SULLIVAN & WORCESTER LLP
Patrick P. Dinardo, Esq.
Paul E. Summit, Esq.
Pamela Smith Holleman, Esq.
One Post Office Square
Boston, MA 02109
Tel: (617) 338-2800
Fax: (617) 338-2888

Dated: May 15, 2008
Wilmington, Delaware

*Attorneys for Appellant,*
*SNC-Lavalin Power Ontario, Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF ISSUES ON APPEAL ......................................................... 2

III.    STATEMENT OF THE CASE............................................................................ 3

IV.     STATEMENT OF FACTS ................................................................................. 4

V.      THE BANKRUPTCY COURT'S DECISION ...................................................26

VI.     STANDARD OF APPELLATE REVIEW..........................................................28

VII.    SUMMARY OF ARGUMENT ..........................................................................29

VIII.   ARGUMENT......................................................................................................30

        A.  The Bankruptcy Court Erred in Failing to Credit SNC's Fraud and Willful
            Misconduct Arguments Against Deltak..................................................................30

            1.  The Bankruptcy Court Erred As a Matter of Law in Failing to Accord
                SNC the Benefit of All Inferences That Arise in Favor of a Beneficiary
                in an Action for Fraud Against its Fiduciary. ................................................30

                a.  The Bankruptcy Court improperly denied SNC the benefit of specific
                    inferences of reliance, knowledge and intent to defraud in connection
                    with SNC's claims of fraud and willful misconduct..............................32

                b.  Affording SNC the benefit of specific inferences to which it was
                    entitled, SNC clearly proved all of the elements of a fraud claim........33

                c.  Having erred as a matter of law in failing to rule in SNC's favor on
                    the issue of liability, the Bankruptcy Court erred again in failing to
                    afford SNC an appropriate remedy under New York law. ...................39

            2.  In the alternative, the Bankruptcy Court erred as a matter of law by
                failing to consider that the Debtors' willful misconduct invokes the
                exception to the waiver and step-down provisions contained in the
                Completion Agreement.................................................................................40

        B.  The Bankruptcy Court Erred in Failing to Credit SNC's Arguments that
            It Was Entitled to the Benefit of GPEG's Promised Guaranty.........................41

1. The Bankruptcy Court's finding that GPEG's Senior Vice President, Monte Ness, did not promise SNC a parent guaranty was clearly erroneous in light of all of the evidence and the Court's own findings of Tardanico's credibility...........................................................................................41

2. The Bankruptcy Court also erred in failing to consider the multiple documents that evidenced the GPEG guaranty...........................................................42

3. The Bankruptcy Court also erred as a matter of law in failing to consider SNC's legal argument that GPEG is liable to SNC on its guaranty on an agency theory, based upon the promise given to SNC by Monte Ness, a Senior Vice President of GPEG, who had apparent (if not actual) authority to grant SNC such a guaranty...................................................................44

4. The Bankruptcy Court erred as a matter of law in failing to apply the "wider interest" exception or an estoppel theory to take the GPEG guaranty out of the Ontario Statute of Frauds..............................................46

5. The Bankruptcy Court erred as a matter of law in failing to apply, on behalf of SNC, the equitable maxim that treats "as done that which should be done" in order to relieve a victim of the consequences of a wrongdoer's failure to act. .......................................................................................................48

IX.    CONCLUSION....................................................................................................49

## TABLE OF AUTHORITIES

### FEDERAL CASES

Anderson v. Cryovac, 862 F.2d 910 (1st Cir 1988).........................................................................41

Camp v. Boyd, 229 U.S. 530 (1913).................................................................................................49

Construction Management Services, Inc. v. Manufacturers Hanover Trust Co.
(In re Coastal Group Inc.), 13 F.3d 81 (3d Cir. 1994).........................................................30, 32

In re Cumberland Farms, Inc., 249 B.R. 341 (Bankr. D. Mass. 2000)..........................................49

Ethypharm S.A. France v. Bentley Pharmacies, Inc., 388 F. Supp. 2d 426 (D. Del. 2005)..........45

F & M Marquette National  Bank v. Emmer Brothers Co. (In re Emmer Brothers Co.),
52 B.R. 385 (D. Minn. 1985).....................................................................................................31

Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc., 55 F.3d 181 (5th Cir. 1995)............................42

Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms),
284 F.3d 216 (1st Cir. 2002).......................................................................................................31

Hoge v. Moore (In re Railworks), 345 B.R. 529 (Bankr. D. Md. 2006) ........................................41

Independent Wireless Telephone Co. v. RCA, 269 U.S. 459, 472-73 (1926)................................49

Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
186 F.3d 1356 (Fed. Cir. 1999)...................................................................................................49

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC,
337 F.3d 314 (3d Cir. 2003)......................................................................................30, 31, 32,
33, 38, 39

LaSalle National Bank v. Perelman, 82 F. Supp. 2d 279 (D. Del. 2000) ......................................45

Montgomery Ward Holding Corp. v. Meridian Leasing Corp., 269 B.R. 1 (D. Del. 2001)..........28

In re New Orleans Paddlewheels, Inc., 350 B.R. 667 (Bankr. E.D. La. 2006)..............................32

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988).........................30

Ortlieb v. Hudson Bank, 312 F. Supp. 2d 705 (E.D. Penn. 2004)..................................................30

In re PHP Healthcare Corp., 128 Fed. Appx. 839 (3d Cir. 2005)..................................................34

P.T. Bank Central Asia v. ABN AMRO Bank N.V.,
    754 N.Y.S.2d 245 (N.Y. App. 1st Dep't 2003) ........................................................40

Pierce v. Richard Ellis & Co., 310  N.Y.S.2d 266 (N.Y. Civ. Ct. 1970).......................................34

Rivera v. Vickers, 421 N.Y.S.2d 918 (N.Y. App. 2d Dep't 1979)..................................................40

Rosenblatt v. Getty Oil Co., 493 A.2d 929 (Del. 1985) .........................................................35, 36

Small v. Lorillard Tobacco Co., 679 N.Y.S.2d 593 (N.Y. App. 1st Dep't 1998) ....................32, 34

Thives v. Holmes Ambulance Serv. Corp., 432 N.Y.S.2d 235 (N.Y. App. 2d Dep't 1980)..........39

Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170 (1931)..................................................34

Trans-Continental Credit & Collection Corp. v. Foti,
    704 N.Y.S.2d 106 (N.Y. App. Div. 2d Dep't 2000)................................................39

Zirn v. VLI Corp., 621 A.2d 773 (Del. 1993).......................................................................33, 35

Zirn v. VLI Corp., 681 A.2d 1050 (Del. 1996).....................................................................33, 35

## CANADIAN CASES

Active Customs Brokers Ltd. v. Sack, [1987] 37 B.L.R. 229 .......................................................48

Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.),
    [2003] O.J. No. 2320..................................................................................................47

Harvie v. Gibbons, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.).......................................................42

Paquette v. Smith, [1989] 70 O.R. (2d) 449 ...............................................................................42

Pullano v. Yellowhead Timber Ltd., [1994] B.C.J. No. 1317 (QL) ..............................................47

SPX Canada Inc. v. Watts, [1995] A.C.W.S.J. 630732 ................................................................47

Travel Machine Ltd. v. Madore, [1983] 143 D.L.R. (3d) 94.........................................................47

## FEDERAL STATUTES

11 U.S.C. § 105..........................................................................................................................16

11 U.S.C. § 105(a) ......................................................................................................................49

11 U.S.C. § 1102(b)(3) ...............................................................................................................16

11 U.S.C. § 1103(c) ....................................................................................................16

28 U.S.C. § 158(a) .......................................................................................................3

**MISCELLANEOUS**

S. M. Waddams, <u>The Law of Contracts</u>, 5th ed. (Toronto: Canada Law Book, 2005)..................47

J.D. McCamus, <u>The Law of Contracts</u> (Toronto: Irwin Law, 2005) ...........................................47

Restatement (2d) of Agency ........................................................................44, 45, 46

## I.    __INTRODUCTION__

This case is about fiduciary fraud:  a pattern of partial and misleading disclosures, omissions, misrepresentations and willful misconduct evincing a disturbing breach by Global Power Equipment Group, Inc., *et al.* (the "Debtors") of the fiduciary duties they owed to their unsecured creditors, including SNC-Lavalin Power Ontario, Inc. (collectively with its subsidiaries and affiliates, "SNC").  SNC has brought this appeal from a ruling after trial by the United States Bankruptcy Court that simply cannot stand scrutiny.  Remarkably, the Bankruptcy Court made key factual findings that were dispositive *for* SNC under applicable Third Circuit precedent that was equally dispositive *for* SNC.  Then, the Court ignored those factual findings, ignored controlling legal principles, and found *against* SNC.  It is simply impossible logically to sustain this decision.

The material facts are uncontroverted.  As reflected in the Bankruptcy Court's findings, SNC proved that the Debtors induced SNC (their fiduciary beneficiary) to waive and "step-down" its rejection damages claims against the estates of debtors-in-possession Deltak, LLC ("Deltak") and Deltak's corporate parent, Global Power Equipment Group, Inc. ("GPEG") by intentionally concealing an enormous asset through misrepresentation, fraudulent omission, or other willful misconduct.  By reason of the Debtors' fraudulent inducement and/or other intentional fraud and willful misconduct, SNC is entitled to be relieved of the waiver and step-down of its claims against Deltak, but the Bankruptcy Court erred in failing to grant SNC that relief.  Moreover, GPEG is liable to SNC on the guaranty GPEG promised on behalf of its subsidiary Deltak (in order to obtain the original purchase contract from SNC), but the Court erred in disallowing SNC's claim.

The incontrovertible evidence acknowledged by the Bankruptcy Court includes:

- written confirmation that Debtors' decision __not__ to disclose information on a

1

massive intercompany receivable owed to Deltak by GPEG was "intentional";

- the fact that Debtors' stated reason for omitting Deltak's asset from its Statements and Schedules filed on November 27, 2006 was simply false;

- testimony that Debtors' disclosure of Deltak's asset would have transformed the parties' negotiation of a "Completion Agreement" with SNC;[1] and

- specific testimony and documentary evidence confirming GPEG's promise to guarantee Deltak's obligations.

Despite finding in SNC's favor on these critical facts, and despite Debtors' fiduciary duty to SNC, the Bankruptcy Court nevertheless ruled against SNC.

## II.    STATEMENT OF ISSUES ON APPEAL

A.    Where, as here, Debtors owed statutory and fiduciary duties of full disclosure to creditor SNC during the course of negotiation of the Completion Agreement with SNC; and where, as here, the Bankruptcy Court explicitly found that the information withheld by Debtors in negotiations with SNC would have changed the Completion Agreement agreed to by SNC with Deltak; and where, as here, the Bankruptcy Court acknowledged that the Debtors may have engaged in what the Bankruptcy Court termed "strategic behavior" with regard to withholding that information, did the Bankruptcy Court err as a matter of law in sustaining the objections by the Estate Representatives[2] to SNC's Proof of Claim No. 1099 filed against the estate of Deltak, and in giving effect to the disputed waiver and step-down?

B.    Did the Bankruptcy Court err as a matter of law and fact in sustaining the Estate

---

[1] Reference is made to that certain Completion Agreement entered into by SNC and Deltak on November 30, 2006 (as amended and restated, the "Completion Agreement"). See Appendix of Exhibits to Appellant's Opening Brief (in three volumes) (the "Appendix" or "App.") at Vol. II A-915 et seq.

[2] The Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Official Committee of Equity Security Holders in these Chapter 11 cases (together, the "Committees"), together with the Debtors are referred to herein as the "Estate Representatives".

Representatives' objections to SNC's Proof of Claim No. 1100 filed against the estate of

GPEG, which was predicated on GPEG's specific promise to guarantee Deltak's

obligations?

### III.  STATEMENT OF THE CASE

This is an appeal pursuant to 28 U.S.C. §158(a) from the order of the United States

Bankruptcy Court for the District of Delaware (Shannon, J.) entered in the above-captioned

Chapter 11 case on December 21, 2007 (Order Sustaining Estate Parties' Objections to Proofs of

Claim Nos. 1099 and 1100 Filed by SNC-Lavalin Power Ontario Inc., Bankr. D.I. 2236) (the

"Claims Order"); App. at Vol. I A-346.  SNC filed its Notice of Appeal of the Claims Order on

December 27, 2007.[3]  App. at Vol. I A-350.

The issues here arise in connection with two proofs of claim timely filed by SNC on

March 25, 2007 in the Chapter 11 cases of Deltak and GPEG (Claim Nos. 1099 and 1100,

respectively).[4]  App. at Vol. I A-1 and A-8.  Over five months later, on August 29, 2007, the

Debtors filed objections to each of the Claims (Bankr. D.I. 1579 and 1581).  The Committees

then joined in the Debtors' objections (Bankr. D.I. 1732 and 1774).  SNC opposed the objections

(Bankr. D.I. 1703).  Subsequent rounds of briefing by the Estate Representatives followed.[5]

---

[3] This appeal was docketed by the District Court Clerk on January 14, 2008 (D.I. 3).  Efforts at mediation on this appeal were unsuccessful and, on April 8, 2008, the mediator submitted his *Notice of Mediation Impasse, Concurrence of All Interested Parties* (D.I. 8) to the Court, concluding his efforts.

[4] The claims against Deltak and GPEG were accurate in their recitations and estimates of damages as of their filing, but SNC reserved the right to provide an updated assessment of the damages.

[5] SNC extensively briefed the factual and legal bases for its claims against Deltak and GPEG before the Bankruptcy Court in various filings and a trial memorandum.  The Estate Representatives, in turn, barraged SNC with rounds of objections to its claims, filing (inter alia), in addition to the Debtors' two initial briefs objecting to the claims (Bankr. D.I. 1579 and 1581) and the Committees' joinders (Bankr. D.I. 1732 and 1774), the Estate Representatives' reply to SNC's opposition to such objections (D.I. 1822); a motion to estimate SNC's Claim No. 1099 for voting purposes (Bankr. D.I. 1943) that did not, by the terms of the Bankruptcy Court's Order approving the Disclosure Statement, result in the issuance of a provisional ballot to SNC (until SNC filed its own estimation motion); a supplemental objection invoking Fed. R. Bankr. P. 9024, in which the Estate Representatives argued – incorrectly – that SNC sought to avoid or "undo" the entire Completion Agreement (Bankr. D.I. 1944); and the Estate Representatives' objections to each of SNC's estimation motions, filed on Sunday, December 9, which essentially reiterated their argument that SNC is bound by the Completion Agreement because it was "heavily negotiated" – and thus, somehow, withstood the fraudulent inducement. (Bankr. D.I. 2146 and 2147).

Those claims, and the related objections, were heard at an evidentiary hearing before the Bankruptcy Court held on December 14, 2007 and December 17, 2007 (the "Evidentiary Hearing").[6] At the Evidentiary Hearing, the Bankruptcy Court ruled on the merits of Claim 1100 (disallowing SNC's claim against GPEG on the promised parent guaranty), and estimated Claim 1099 at 15% of the liability cap stated in the Completion Agreement, or $6,999,326.80 (in Canadian Dollars) (rejecting SNC's claim of fraudulent inducement and willful misconduct). App. at Vol. I A-795-96.

## IV.    STATEMENT OF FACTS

SNC's dispute with the Estate Representatives grows out of a prepetition agreement by Deltak to supply certain "HRSG" ("heat recovery steam generator") units and services to SNC that were to form a key portion of SNC's scope of supply in connection with a contract SNC has to build the Sithe Global Power Goreway ULC Project (a Combined-Cycle Power Generation Facility in the City of Brampton, Ontario, Canada) (the "Project").[7]

In January, 2006, following a hotly contested procurement in which Deltak faced vigorous competition from two competitors, SNC awarded a fixed price subcontract to Deltak for the HRSG equipment for the Project with a contract price of approximately CDN$46 million (the "HRSG Purchase Order"). App. at Vol. II A-810 et seq.

To induce SNC to enter into the HRSG Purchase Order, Monte Ness, the President of Deltak and the Senior Vice President of Deltak's parent GPEG, specifically promised SNC that

---

[6] The transcripts of the Evidentiary Hearing are in the Appendix at Vol. I A-355 and A-619. The Evidentiary Hearing was held after the Bankruptcy Court allowed only a few weeks of extremely accelerated discovery into the Debtors' post-petition activities. Debtors produced many thousands of pages of documents, often on the eve of, or even after, many depositions, rendering it virtually impossible for SNC to assimilate and explore in depth, in the timeframe allowed, the vast quantities of information. Nevertheless, SNC was still able to build a factual record of key material facts that should have led to a ruling for SNC.

[7] It is undisputed that delays caused by Deltak and its non-debtor affiliate Deltak Power Equipment (China) Co. Ltd. ("DPEC") have plagued the Project. See, e.g., App at Vol. II A-1083 (242 days delay). SNC filed claims against the estates of both Deltak and GPEG for estimated damages totaling at least USD $55,179,700 (seeking only a single recovery from the combined estates). App. at Vol. I A-1 and A-8.

4

GPEG would provide SNC with a guaranty of Deltak's performance of its obligations if SNC were to award the subcontract to Deltak.  App. at Vol. II A-942, A-946 (Tardanico's notes of his conversation with Ness).  The HRSG Purchase Order reflects that parent guaranty commitment. App. at Vol. II A-822 and A-888-890.  Ness did not rebut the specific testimony adduced concerning the parties' conversation in which he made the promise.  App. at Vol. III A-1619-20 (couldn't remember "one way or the other").

More than two months after Deltak, GPEG and certain of their affiliated Debtors (not including DPEC) filed their Chapter 11 cases on September 28, 2006, the Debtors rejected the HRSG Purchase Order and entered into a "Completion Agreement" with SNC, negotiated post-petition.  App. at Vol. II A-915.  The Completion Agreement provided for a waiver and "step-down" of SNC's rejection damage claims against Deltak (as the HRSG equipment passes certain milestones), but included further provisions containing an exception to the waiver and step-down in the event of "willful misconduct and/or intentional fraud".  App. at Vol. II A-923-24 (Completion Agreement at §§ 2.1 and 2.2).

At trial, SNC adduced evidence that the Completion Agreement (and the "wind-down" of the Debtors' HRSG business) benefited the holders of GPEG equity at the expense of Deltak's HRSG creditors (including SNC), and that SNC was entitled to an inference that the Completion Agreement was part of a conscious scheme by the Debtors.  As an integral part of that scheme, the Debtors actively concealed from Deltak's creditors (including SNC) a shocking **$182 million intercompany cash balance owed by GPEG to Deltak**, thereby causing creditors, including SNC, to believe that rejection damages claims against Deltak were worthless.[8]

---

[8] Deltak's Summary of Schedules (totaling its assets and liabilities), filed November 27, 2006, showed total assets of $61,983,500.  App. at Vol. I A-170.  Against the $182 million cash obligation due from GPEG to Deltak, the Estate Representatives asserted an offsetting $54 million "non-cash" obligation owing from Deltak to GPEG for corporate overhead.  Even with the offset, the net (undisclosed) $128 million intercompany debt owed by GPEG to Deltak still effectively *trebled* the amount of Deltak's stated assets.

The Debtors withheld this information not out of concern for the reliability of the data, but rather to induce SNC and other HRSG creditors to enter into a completion agreement that waived the claims. As the Debtors' own financial advisers admitted:

> Intercompany liabilities were ***intentionally*** not included in the schedules ***because of the potential plan implications***....

App. at Vol. II A-1055 (Affidavit of Stephen B. Darr ("Darr Aff"), Exhibit C) (email from J. Franks dated March 15, 2007) (emphasis added) (discussed further *infra.*). This particular email (sent four months after the fact in an effort to explain the omissions) goes on to cite the "sentiment" that the Debtors' reconciliation of their accounting records was "a work in progress" in the Fall of 2006; but as the Bankruptcy Court found (App. at Vol. I A-786), and as discussed in detail below (*infra* at pp. 21-26), hard accounting data on the intercompany obligation was available and reliable at the time. Notwithstanding, the Debtors had determined to withhold it from their bankruptcy schedules, ***"regardless of whether they close[d] the books or not."*** App. at Vol. II A-936. The record is crystal clear that the Debtors' advisors ***did not*** distrust the Debtors' then available accounting data. App. at Vol. II A-1058. What is equally clear from the Debtors' internal email (discussed *infra*) is that the Debtors and their advisors decided to withhold this information in part to buy time to decide how to deal with its "implications" and "ramifications". App. at Vol. II A-1056, A-1058. Of course, GPEG equity could not remain "in the money" (as it ultimately did in Debtors' confirmed Plan), if unsecured creditors' claims were not paid in full.

### *The HRSG Purchase Order and*
### *the Parent Guaranty*

SNC entered into the HRSG Purchase Order with Deltak totaling approximately

CDN$46,000,000 on January 26, 2006.  App. at Vol. II A-810.  Among other things, the HRSG

Purchase Order (at § 20) states that –

> Seller shall provide to Buyer's reasonable satisfaction, financial
> securities as contained in the referenced article within Exhibit A
> "General Terms and Conditions of Purchase" as follows:
>
> . . . Article 21.3    Parent Company Guaranty (in accordance with
> Exhibit T [thereto] "Seller's Form of Parent Company Guarantee
> Agreement")

See App. at Vol. II A-822, A-889-90 (HRSG Purchase Order, § 20 and Exhibit T (form of parent

guaranty)).

Monte Ness (of Deltak and GPEG) admitted at his deposition that the HRSG Purchase

Order required the parent guaranty from GPEG.  In his words:  "Yes, it [the parent guaranty] was

one of the contract deliverables."  App. at Vol. III A-1547 (Transcript of Deposition of Monte E.

Ness dated December 6, 2007 ("Ness Tr.") at 19.)

The history of the GPEG guaranty is this:  Gregory Tardanico, Vice President-

Procurement/Contracts for SNC-Lavalin Thermal Power, oversees all subcontracts and purchases

of any kind for the Project.  App. at Vol. II A-941 (Second Affidavit of Gregory J. Tardanico

dated December 11, 2007 ("Second Tardanico Aff.") at ¶¶ 1, 3).  Tardanico was deeply involved

in the negotiation of the HRSG Purchase Order between SNC and Deltak.  Id.

Ness, an officer of Deltak *and* GPEG, was Tardanico's counterpart in the negotiation.

App. at Vol. II A-941; App. Vol. III at A-1544.  At the time of the negotiations, Tardanico had

already known Ness for years, and had dealt with him extensively in previous transactions.  App.

at Vol. II A-942.

Tardanico also knew at the time of the HRSG Purchase Order negotiations that Ness was

7

a GPEG Senior Vice President. App. at Vol. II A-941-942. Deltak had been acquired years earlier by GPEG, and it was a wholly-owned subsidiary. Id. Shortly thereafter, Ness had told Tardanico that, at about the time of the acquisition, Ness had become the President of Deltak, and also a Senior Vice President of GPEG.[9] App. at Vol. II A-942. Thus, in January, 2006, when Tardanico was negotiating the final terms of the HRSG Purchase Order between Deltak and SNC, Tardanico was well aware that Monte Ness was not only the President of Deltak, but also the Senior Vice President of GPEG. Id.

From the outset of the negotiations, SNC required Deltak to provide SNC financial security for its future performance. App. at Vol. III A-1544-1545. Among the forms of security discussed, the GPEG guaranty was simply "essential" if SNC was to enter into the contract, particularly if a standby letter of credit was not available. App. at Vol. II A-942. Ness knew it. App. at Vol. III A-1546 (Ness Tr. at 18, et seq.).[10]

Indeed, GPEG preferred issuing a guaranty to providing a letter of credit, since a guaranty did not have the same cost associated with a letter of credit; and, in fact, GPEG's bank was requiring in early 2006 that any letter of credit be fully collateralized. App. at Vol. III A-1546; App. at Vol. II A-1284-1286, A-1288.

SNC and Ness' staff discussed the form of parent guaranty to be offered, and Scott Neumeister, who reported to Ness, discussed the form with GPEG corporate counsel. App. at Vol. III at A-1550-51 (Ness Tr. at 22-23).[11] Neumeister provided Tardanico's staff with

---

[9] Monte Ness was actually one of three "senior vice-presidents" of GPEG, and a GPEG "executive officer." See App. at Vol. III A-1957 (excerpt from GPEG Annual Report 2004)).

[10] There was substantial overcapacity in the HRSG market at this time, and Ness knew that, if Deltak was to win the business over its competitors it was essential that GPEG provide a guaranty. App. Vol. III A-1547, A-1555; see also App. at Vol. II A-1300 (Transcript of Deposition of Larry Edwards dated December 4, 2007 ("Edwards Tr."), at 52-53). GPEG CEO Larry Edwards also recognized that it was essential that GPEG provide security to obtain contracts. App. at Vol. II A-1308.

[11] Candice Cheeseman, General Counsel of GPEG, testified that Neumeister of Deltak did contact her about the guaranty, and that she received the form of the GPEG guaranty for SNC, but had no recollection beyond that. App.

extensive comments to the HRSG Purchase Order form, but wrote "No comments" regarding Exhibit T to the HRSG Purchase Order, SNC's proposed form of guaranty. App. Vol. III at A-1551; see also App. at Vol. III A-1663 (Ness Tr., Exhibit 2).

This history is not surprising. As reflected in GPEG's own 2004 Annual Report, financial security requirements are standard for large HRSG contracts. See App. at Vol. III A-1956. At over forty six million dollars, the HRSG Purchase Order here was a very substantial one. App. at Vol. II A-942 (Second Tardanico Aff. at ¶ 8). It was absolutely vital to SNC to obtain GPEG's commitment to guarantee Deltak's performance of such a large contract, and GPEG made that commitment here to win the bidding. Id.

Tardanico personally negotiated the GPEG parent guaranty with Ness by telephone on the date of execution of the Purchase Order with Deltak. App. at Vol. II A-942. Tardanico told Ness, in substance, that a parent guaranty was absolutely essential. Id. Ness replied, in substance, that Deltak was not in a position to absorb the cost of a letter of credit, but was willing to offer a letter of credit at a price; and, moreover, that Deltak would provide its parent company guaranty. Id. Tardanico told Ness that Tardanico did not want any issues with the parent company guaranty, and that he wanted to be sure SNC wouldn't have any problem getting it from GPEG. Id. Ness responded that he would not have a problem getting SNC the parent guaranty, because he was a Senior Vice President of GPEG as well. App. at Vol. II A-942 (Second Tardanico Aff. at ¶ 9).

Tardanico testified that he absolutely and without question recalled that he asked Ness if SNC could count on the parent guaranty, and Ness replied that he was speaking as a GPEG

---

at Vol. III A-1992-95 (Transcript of Deposition of Candice Cheeseman dated December 7, 2007 ("Cheeseman Tr.") at 30-33). There was no "formal procedure" at GPEG for such guarantees. App. at Vol. III A-1990.

representative (using the term GPEG), and that the parent guaranty would be provided.[12] App. at Vol. II A-942 (Second Tardanico Aff. at ¶ 10). The HRSG Purchase Order issued by SNC to Deltak reflects precisely that "deliverable." See id. at ¶ 12; see also App. at Vol. III A-1547.

The Bankruptcy Judge specifically found that Tardanico, "testified credibly regarding his belief that he had been promised a parent guaranty by Mr. Ness." App. at Vol. I A-780.

Ness testified that he has no memory of that conversation with Tardanico, "one way or the other." App. at Vol. III A-1620 (Ness Tr. at 92). GPEG admits, however, that the form of guaranty attached to the Purchase Order (at Exhibit T) was a common form. App. at A-1995 (Cheeseman Tr. at 33) (acknowledging that form of guaranty proposed by SNC was a basic form). As a result, the only witness with both personal knowledge and memory of the guarantee is Tardanico, and he stated unequivocally that GPEG promised the guaranty.

### GPEG fails to deliver the promised guaranty, then contends it never promised it.

Notwithstanding its promise, GPEG never delivered the signed guaranty. (Ness has "no idea" why it was not delivered.) App. at Vol. III A-1563 (Ness Tr. at 35). Then – compounding its breach of promise – GPEG denied that the guaranty had ever been promised in the first place.

As the record reflects, parent guarantees are almost always delivered *after* the purchase order is signed, as a deliverable under the contract. App. at Vol. II A-942 (Second Tardanico Aff. at ¶ 13.) Neither Tardanico nor his project team had ever had to follow-up with the "parent" offering the guaranty in order to obtain the guaranty. Id. Based upon Tardanico's 25 years of experience, once such a guaranty had been promised and committed, no follow-up was necessary.

SNC was purchasing approximately half a billion dollars worth of equipment for the

---

[12] As Tardanico put it, "There is not the slightest doubt or hesitation in my mind that the GPEG identification and representation just referenced occurred in that conversation, and that Ness promised the GPEG guaranty as a representative of GPEG." App. at Vol. II A-942 (Second Tardanico Aff. at ¶ 10).

Project in the course of almost 75 days and it never in the past had had any problem in having a parent honor its commitment. Id. at ¶ 14. Although SNC did not follow up with the Debtors to ensure that the promised guaranty would, in fact, be delivered, id., SNC was and is still entitled to that guaranty. And GPEG remains liable on its promises to SNC.

### The Debtors Misrepresented the Existing Assets and Financial Status of Deltak, and Its HRSG Operations, to the Creditor Body and to the Bankruptcy Court.

The record demonstrates that Deltak's financial situation on the eve of the Petition Date was dire. GPEG had been sweeping cash daily from Deltak's bank accounts for years, see App. at Vol. III A-1564-1565 (Ness Tr. at 36-37), *with over $30 million swept by GPEG within just the last nine months prior to the bankruptcy filing*. App. at Vol. III A-1903. Unbeknownst to SNC in September of 2006, the systematic cash sweeps by Deltak's corporate parent left Deltak equitably insolvent and incapable of performing its obligations under the HRSG Purchase Order. App. at Vol. III A-1568 (Ness Tr. at 40) ("we were beginning to run out of cash").

Any "liquidity problems" confronting Deltak arose, naturally enough, from GPEG's $30 million dollar sweep. Id. The HRSG Purchase Order with SNC was profitable. App. Vol. III at 1564. Deltak intended to continue, not terminate, aspects of the HRSG business and kept its HRSG technology (App. Vol. III at A-1579-80), but GPEG and Deltak concealed this from Deltak's creditors and the Bankruptcy Court.

To the contrary, in a press release announcing the filing of their Chapter 11 cases, GPEG CEO Larry Edwards announced that Deltak had commenced Chapter 11 proceedings to "address the ongoing cash drain from Deltak's Heat Recovery Steam Generator (HRSG) business." App. at Vol. II A-894. He said that the Debtors had been "actively exploring options to recapitalize our businesses for the last nine months"; and that "ultimately, this effort led us to the difficult conclusion that Chapter 11 would provide the best opportunity to maximize value for all of our

stakeholders." Id. He said that Deltak had experienced "escalating losses related to large scale HRSG projects within Deltak"; and that, as a result, Deltak's "liquidity" had recently become "significantly constrained." App. at Vol. IIA-895.

Edwards also said Deltak would begin an "orderly wind down of its HRSG business, unless it is able to obtain material concessions from its customers regarding the terms on which it would complete its major ongoing projects." See App. at Vol. II A-894.

The intended and very real effect of these statements was to advise SNC and any other HRSG contract parties that the "ship was going down:" Deltak was failing; the HRSG business was a debt sink; Deltak was heading out of the HRSG business; major concessions were essential, or the projects would be abandoned. *All* the Debtors' public statements to this effect were either misrepresentations or, at best, misleading half truths, as they failed to disclose that GPEG had swept $30 million in just the past nine months out of Deltak, and that GPEG owed Deltak approximately $182,000,000 in the aggregate.[13]

Similar misleading representations were repeated to the Bankruptcy Court in many of the Debtors' "first day" filings. Thus, in a sworn affidavit filed on September 29, 2006, GPEG President John Matheson stated:

> 19. ... [T]he Deltak Group has little to no going concern value in the absence of a substantial infusion of capital beyond its current ability to raise. Accordingly, the Deltak Group intends to wind down the operations of the domestic affiliated Debtors of the Deltak Group relating to the HRSG business ...
>
> 25. ... [T]he Company has sustained losses primarily at the Deltak Group. The Deltak Group expects continued losses and predicts future negative cash usage of approximately $50 million. ...

App. at Vol. I A-53-55.

Reiterating the theme that Deltak's HRSG business was unprofitable and bleeding cash,

---

[13] In prior years, much of this money had been used to fund dividends to GPEG's shareholders. App. at Vol. IA-712.

the Debtors contemporaneously filed a motion with the Bankruptcy Court, seeking authority to enter into the "completion agreements" with their HRSG customers, including SNC (the "Wind-Down Motion")[14] at ¶ 3 ("Importantly, absent the relief requested herein, the HRSG Business expects continued losses and, absent a cash infusion, predicts future negative cash usage of approximately $22 million for the completion of its HRSG projects"). The Court granted the Wind-Down Motion in part on October 3, 2006.[15]

The Debtors' public statements (some wrong, some simply deliberately misleading) were clear and consistent: Deltak was bleeding cash and had "little to no going concern value"; the rejection damages that might be sought by its HRSG contract parties were a chimera; Deltak's contract parties had better run to the table, forget their worthless claims, and take whatever terms were offered if they expected ever to see their projects completed by Deltak.[16] And the conclusion is *inescapable* that the truthful disclosure of an asset of some $182,000,000 owed by GPEG to Deltak would have utterly transformed SNC's view of its claim, and its negotiation with Deltak. Indeed, one of the remarkable aspects of the Bankruptcy Court's opinion (discussed more fully below) is that it acknowledged precisely that --- and yet still held against SNC.

### *Deltak Enters into Completion Agreements*

SNC and Deltak entered into the Completion Agreement (as amended and restated) on

---

[14] Reference is made to the Motion to Authorize Debtors, Pursuant to 11 U.S.C. Sections 105, 363 and 365, to (i) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (ii) Reject Certain Executory Contracts in Connection Therewith, and (iii) Implement Procedures for the Orderly Completion of Work in Progress (Bankr. D.I. 12).

[15] Reference is made to the Order Granting in Part Debtors' Motion for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress (Bankr. D.I. 64).

[16] In this regard, the Debtors knew full well their exposure to SNC for potential rejection damages and the need to secure a waiver. On November 14, 2006, Kevin McGill (one of Debtors' counsel) wrote to Bank of America and estimated SNC's "amount of rejection damage claims in the absence of the Completion Agreement" at $40.9 million. App. at Vol. III A-2183-85. (Affidavit of Paul Summit dated December 13, 2006 ("Summit Aff."), Exhibit A). But, of course, if Deltak had little or no assets, the distribution in bankruptcy on this unsecured claim would have been worth next to nothing – which is exactly what the Debtors caused creditors such as SNC to think.

November 30, 2006, pursuant to which Deltak agreed to perform certain remaining performance obligations under the HRSG Contract "as and to the extent requested by [SNC]," provided that SNC financed the cost of such performance on a time and materials basis (all as more fully set forth in the Completion Agreement). App. at Vol. II A-916 (Completion Agreement at § 1.2). On November 15, 2006, the Debtors moved for authority to enter into the original version of the Completion Agreement, which had been signed on November 13, 2006,[17] and the Bankruptcy Court granted that motion by order dated December 4, 2006, approving the amended and restated version which incorporated additional terms required by the Creditors' Committee.[18] Contemporaneously, the Debtors rejected SNC's HRSG Purchase Order and the Court approved the rejection by order dated December 4, 2006.[19]

### The Debtors Delay the Filing of their Bankruptcy Schedules and Statements of Financial Affairs, Hiding the Massive Intercompany Debt, While Negotiating Completion Agreements.

Based upon a September 28, 2006 Petition Date, the Debtors were required to file their bankruptcy schedules and statements of financial affairs by October 28, 2006. See Fed. R. Bankr. P. 1007(c) and L.R. 1007-1(b) (schedules and statements due 30 days postpetition). On September 29, 2006, however, the Debtors requested a 60-day extension, so that their schedules and statements would not be due until 90 days postpetition, or December 27, 2006. (Bankr. D.I. 5). In their motion, the Debtors cited their need for the extension due to "the complexity and diversity of their operations" and the need to collect information "relating to a multitude of transactions". (Bankr. D.I. 5 at ¶¶ 23-24). Notably, the Debtors also stated that "[t]he Deltak

---

[17] See the Emergency Motion to Approve Certain Heat Recovery Steam Generation Completion Agreements Filed by Global Power Equipment Group Inc. (Bankr. D.I. 323).

[18] Reference is made to the Order Granting Debtors' Emergency Motion to Approve SNC-Lavalin Power Ontario Inc. HRSG Completion Agreement (Bankr. D.I. 457).

[19] Reference is made to the Order Approving Rejection of SNC-Lavalin Power Ontario, Inc. HRSG Contract (Bankr. D.I. 458).

Group expects continued losses and negative cash usage of approximately $22 million for the completion of its heat recovery projects." Id. at ¶ 14. On October 3, 2006, the Bankruptcy Court granted the Debtors an extension, but only for 15 days, moving the deadline to November 12, 2006. (Bankr. D.I. 60).

Then, on October 19, 2006, the Debtors requested a further extension, now seeking an additional 15 days to file their schedules and statements, through November 27, 2006. (Bankr. D.I. 131). In that motion, the Debtors cited, as a basis for the extension, "*negotiating accommodation agreements with customers in the Braden Group and Deltak Group*." Bankr. D.I. 131 at ¶ 10 (emphasis added). On November 6, 2006, over the objection of the United States Trustee (Bankr. D.I. 236), the Bankruptcy Court signed an order granting that motion. (Bankr. D.I. 262).

The Debtors had accomplished their goal. They had concealed the massive intercompany account balance in favor of Deltak pending the negotiation of the Completion Agreement.

***Intercompany Transactions Revealed***

On or about November 27, 2006, the Debtors finally filed their Statements and Schedules, including with them the "Global Notes and Statement of Limitation, Methodology and Disclaimer Regarding Debtors' Statements and Schedules." App. at Vol. 1 A-171-73. These voluminous accounts and schedules contained a few bland sentences about the intercompany accounts:

> Prior to the Petition Date, the Debtors routinely engaged in intercompany transactions resulting in intercompany accounts payable and receivable. *The respective intercompany accounts payable and receivable as of the Petition Date have not been quantified.* Accordingly, intercompany account balances are not listed in the Schedules.

See App. at Vol. I A-172. Thus, the Debtors represented to their creditors that information regarding intercompany cash balances was not "quantified" or simply not available.

15

These several opaque sentences cloaked the massive asset that *dwarfed* the reported

Deltak assets; and they were also the source of considerable internal debate and anxiety among

the Debtors and their allies. In the context of the Debtors' overt delay in filing their bankruptcy

schedules, their choice of words demonstrates an intent to mislead.

Indeed, at the close of trial, the Bankruptcy Court made a specific finding that "The

[D]ebtors clearly knew or should have known of the line item for intercompany claims." App. at

Vol. I A-786. The Debtors' statement that the intercompany obligations "have not been

quantified" was false.

### SNC Repeatedly Sought Information
### about Deltak's Financial Condition

Efforts by parties in interest to ascertain Deltak's true financial condition were repeatedly

stonewalled by the Debtors. The United States Trustee appointed the Creditors' Committee on

October 10, 2006. (Bankr. D.I. 104). On October 30, 2006 – three days after the Bankruptcy

Court entered its October 27, 2006 Interim Order Regarding Creditor Access to Information and

Setting and Fixing Creditor Information Sharing Procedures and Protocols under 11 U.S.C.

§§ 105, 1102(b)(3) and 1103(c), Bankr. D.I. 193 – SNC's counsel wrote to Jeffrey Sabin,

counsel to the Creditors' Committee. In that letter, citing the Court's Interim Order, SNC

specifically requested information pertaining to the Debtors' contemplated rejection of its HRSG

supply contracts and their proposal to enter into a Completion Agreement with SNC. Committee

counsel refused the request, advising SNC that it could obtain discovery in due course in

connection with a contested matter. App. at Vol. I A-289-90 (Affidavit of Patrick P. Dinardo

filed October 16, 2007 (Bankr. D.I. 1827) at Exhibit D) (letter from Creditors' Committee

counsel Jeffrey Sabin to Patrick P. Dinardo, dated November 4, 2006). SNC renewed its request

after the commencement of the contested matter over SNC's claims between SNC and the Estate

16

Representatives, but was again denied any cooperation.[20]

What SNC did not know at that time was that, in the Fall of 2006, even the Creditors'
Committee – just like Deltak's HRSG customers – was being kept in the dark regarding the
Debtors' intercompany accounts payable and receivable. Creditors' Committee counsel had
repeatedly demanded this information from the Debtors, and was repeatedly told that the
information was not available. For example, in an e-mail dated October 19, 2006, Creditors'
Committee counsel (Adam Harris) complained to Debtors' counsel that the Committee was
"frankly mystifie[d]" as to why "two simple items" concerning these intercompany accounts
could not be made available to the Committee. App. at Vol. II A-1452 (Transcript of Deposition
of James P. Wilson dated December 4, 2007 ("Wilson Tr."), at Wilson Exhibit 5). There are
numerous other examples of frustration, both by Creditors' Committee and by their financial
advisers, Chanin Co., as the Debtors' unwillingness to share the information was particularly
inexplicable at the time in light of its ready availability on the Debtors' general ledger.[21] Given

---

[20] SNC repeatedly sought information about Deltak's financial condition, to no avail. Thus, SNC obtained Deltak's
Dun and Bradstreet report and combed the public reports of the Debtors' financial condition. Within ten days after
the Petition Date, SNC's Project Manager traveled to Deltak's offices to ascertain the status of the subcontracted
work. Throughout the course of negotiating the Completion Agreement, SNC and its counsel repeatedly requested
information concerning the financial condition of Deltak. SNC President Jacques Lamarre specifically requested a
meeting with GPEG CEO Larry Edwards, but Edwards refused to meet with him. See generally App. at Vol. II A-
802 to A-804 (Affidavit of Gilles Laramee).

[21] Even in the limited time for discovery that SNC had in this matter, it uncovered dozens of emails between and
among Debtors, their accountants and advisors, and the Creditors' Committee, and its advisers, expressing concern,
disagreement, anger, and equivocation with regard to the intercompany balances. Some examples include:

On October 13, 2006, after an inquiry from the Creditors' Committee, Robert Caruso of Alvarez & Marsal
[financial advisors to the Debtors] asks Brian Lavarnway of GPEG:

"What is the status of getting the inter-company analysis completed?" App. at Vol. III A-2187 (Summit
Aff., Exhibit B).

And Lavarnway answers: "There has been no specific request for an inter-company
analysis." (Id.).

Then, on October 19, 2006, Adam Harris, one of the Creditors' Committee Counsel, emails Debtors'
Counsel:

"On financial reporting, your position frankly mystifies me. Are the Debtors
going to prepare the reports or not?... If they are not going to prepare the reports,
we have a much bigger issue. Frankly, what we are talking about here is two

simple items. A report (debtor by debtor) of cash and intercompany account balances as of the Petition Date.... I have no doubt that A&M has the capability to provide these report with little or no incremental effort." App at Vol. II A-1452. (emphasis added).

On November 2, 2006 Creditors' Committee Counsel writes:

"Such relief implicates issues of the separate financial condition of the various Debtors, and the Committee is troubled by the Debtors' failure to supply certain due diligence that it has requested.... that would help the Committee to evaluate the separate financial position of each of the Debtors." App. at Vol. III A-2189-90.

Next, on November 3, 2006, Creditors' Committee counsel attaches a draft pleading to an email to White & Case, Debtors' Counsel, threatening a motion unless certain intercompany account balance issues are resolved.

"The Committee will not wait until the filing of your schedules and needs the base line information immediately to understand and track the movement of cash and non-cash consideration *among debtors and as between debtors and non-debtor affiliates*. If this information is not available or will not be made available by Monday, it is likely that the Committee will seek emergency relief from the Court...." App. at Vol. III A-2192 (Summit Aff., Exhibit D) (emphasis added).

On November 3, 2006, Creditors' Committee counsel writes to White and Case, commenting on the intercompany balance issue:

"Quite frankly, we don't understand the delay. Let us know when we can expect to receive the requested data." App. at Vol. III A-2194.

On that same day, there is an email from Chanin, the financial advisers to the Creditors' Committee, writing to Debtors' counsel White & Case:

In the interest of not letting Chanin get thrown under the bus here, let me say a few things....We have told [Alvarez & Marsal] that we need I/C balances as of the petition date and that we need to be able to track I/C movements post-petition. We recognize that the books with regard to I/C balances have not been closed as of the petition date. As such, we realize that we cannot receive that data at this point (however, we have emphasized that we need it asap....). App. at Vol. III A-2196 (Summit Aff., Exhibit F (Bates No. DO49660)).

And finally, remarkably, on November 7, 2006, there is the following exchange initiated by Timothy Sambrano, of Alix Partners [another of the Debtors' financial advisors] with a response provided by John Franks of Alix Partners:

"I saw the item about intercompany not needing to be included. When talking with Kim tonight, she mentioned they are working on closing September. If we have the balances for [September] do you think we should list them?"

And Franks' response:

"On intercompany, I think we are headed toward simply footnoting for each debtor and not showing any counterparties owed with a CUD or anything like that. According to the current position of counsel and Meade [Monger, another person with Alix Partners], we will not be showing intercompany *regardless of*

18

the massive size of the intercompany transfers, and all the behind-the-scenes agitation about the intercompany accounts (of which SNC knew *nothing* in the Fall of 2006*)*, how could it have been remotely defensible for Debtors then merely to have said, on November 27, 2006, that these accounts "*have not been quantified*"?

### Believing it Had No Economically Better Alternative, SNC Agreed to "Step-down and Waive" Its Rejection Damages Claims and Enter into the Completion Agreement

When Deltak announced its intention to wind-down the HRSG business and reject the HRSG Purchase Order, Deltak's actions had already started causing significant delays and costs in completion of the Simple-Cycle/Combined Cycle portions of the Project. See App. at Vol. II A-1064 (Bridges Aff. at 87). As a result of those delays, and more generally Deltak's failure to complete under the Purchase Order, SNC would have a very significant "rejection damages" claim against Deltak, and Debtors knew it. See footnote 16, above; App. at Vol. III A-2183. But SNC believed – based on the information available at the time – that recovery on its rejection damage claim was to be very low. App. at Vol. 1 A-784. And therefore, the most financially advantageous course for SNC, based on the flawed information that it had received from its fiduciary, was to proceed with Deltak rather than with one of the other HRSG manufacturers. The Bankruptcy Court recognized this fact. App. at Vol. I A-784-85.

As soon as SNC's senior officers learned of the Debtors' bankruptcy filing either in late September or early October of 2006, SNC's Chief Executive Officer, Jacques Lamarre; its CFO, Gilles Laramee; and its Vice President-Procurement/Contracts, Greg Tardanico, and others, began considering SNC's options. See App. at Vol. II A-802 (Laramee Aff. at ¶ 9); see also

---

*whether they close the books or not*." App. at Vol. II A-2198 (Summit Aff., Exhibit G.) (emphasis added).

These are only a selection of the e mails, but they give the flavor. None of this, of course, was revealed *at all* to SNC at the time. None of these professionals seemed to recognize that the creditors at large, and HRSG counter-parties in particular, were entitled to this information in order to assess whether or not to compromise their claims.

App. at Vol. II A-943. (Second Tardanico Aff. at ¶ 20). At a meeting on or about October 20, 2006, they considered at least three options: (a) continuing the relationship with Deltak; (b) coordinating an arrangement whereby SNC would obtain access to Deltak's engineering and obtain from others from the manufacturing services necessary to complete the HRSGs; or (c) finding another vendor entirely to supply the HRSGs needed for the Project. The group soon concluded that the choice was only between the first and the third options. App. at Vol. II A-802 (Laramee Aff. at ¶ 10). SNC had located at least three alternate vendors of HRSGs, including Alstom, Vogt Power, and CMI. See App. at Vol. II-A-943 (Second Tardanico Aff. at ¶ 22). SNC explored options with these other vendors. Each of them had the capabilities and the capacity to undertake the supply of HRSGs needed for the Project. Furthermore, SNC believed these alternate vendors would be acceptable suppliers to its customer, Sithe. Id.

In weighing these options, SNC was led to believe – based on the Debtors' public disclosures – that its rejection damage claim against Deltak would be worth little if anything. App. at Vol. II A-806. And that was, of course, precisely the picture that Debtors had sought to create. SNC concluded its analysis believing that SNC's best economic choice was to enter into the Completion Agreement on the Debtors' terms. See id.; see also App. at Vol. II A-1090. (Affidavit of Roger P. Bridges dated December 12, 2007, Exhibit B at 10).

### SNC Learns of the Intercompany Cash
### Balance Owed to Deltak

SNC was therefore astounded to learn, months after entering into the Completion Agreement, that the Debtors' books and records reflected the $182 million intercompany cash balance due Deltak from GPEG as of the Petition Date. Vol. II A-807 (Laramee Aff. at ¶ 28). While SNC needed to meet its supply obligations on the Project, which included Deltak's subsupply, SNC was already in negotiation with other HRSG vendors. Had SNC known then what the Debtors knew – that Deltak held a claim against a solvent GPEG in the gross amount

20

of $182 million, see App. at Vol. I A-282 and A-310, it would have utterly transformed the negotiation. App. at Vol. I A-271-72. (Tardanico Aff. at ¶ 6); App. Vol. II A-808 (Laramee Aff. at ¶ 32). Thus, had SNC known in November, 2006 what it knows now regarding Deltak's claim against GPEG – and what the Debtors knew at the time of the negotiations – SNC would have insisted on retaining its rejection damages claim. App. at Vol. I A-272

***Formation of the Completion Agreement***

In entering into the Completion Agreement, SNC drew two lines in the sand. First, it insisted on retaining rights to its claim against GPEG, by virtue of the promised parent guaranty (which GPEG never delivered). See App. at Vol. I A-271. SNC did so because it believed that GPEG's failure to deliver the signed guaranty was wrongful, and that a claim against GPEG was the only way SNC might see any distribution in the case, given Deltak's supposed lack of assets. Id. The Debtors resisted but ultimately agreed to this. See App. at Vol. III A-1581 (Ness. Tr. at 53) and App. at Vol. II A-926 (Ness Exhibit 6 (Completion Agreement at ¶ 3.5). SNC also insisted on retaining its warranty rights with respect to Deltak's non-Debtor affiliates, including DPEC.[22] Again, the Debtors resisted, but were forced to agree. See App. at Vol. III A-1583-84 (Ness. Tr. at 55-56) and App. Vol. II A-925. SNC's ability to prevail in negotiations on these two hotly contested issues demonstrates that SNC had significant leverage in the negotiations of the Completion Agreement (perhaps more than it knew at the time) and, even as it chose to complete the HRSG equipment with Deltak, SNC could have retained all or some significant portion of its rejection claim against Deltak, had it not been induced into believing the claim was worthless, or nearly so.

***By a Pattern of Partial Truths, Omissions and Misleading Statements,***
***the Debtors Induced their HRSG Creditors to Waive Valuable Claims***

---

[22] DPEC, the Debtors' Chinese affiliate, was kept out of the bankruptcy and it was manufacturing key components of the HRSG equipment, though not without its own problems. App. at Vol. II A 1090.

The data concerning the intercompany *cash* balances (fully reconciled as of July 31, 2006), was available in the Debtors' general ledger accounts at least as early as November 15, 2006, and the cash balances as of September 28, 2006, were known or should have been known on or before November 27, 2006. App. at Vol. II A-993 (Darr Aff. at ¶ 7. The Bankruptcy Court stated: "It [the line item for intercompany claims] was there in their financial statements." App. at Vol. I A-786.

The Debtors' false statement about these accounts not being quantified proved to be only the tip of the iceberg. Rapidly proliferating evidence of the internal communications among this group – produced to SNC only days before the Evidentiary Hearing[23] – proved that the Debtors and their advisors acted with conscious intent to conceal the intercompany balances:

- The Debtors were fully aware that they benefited by rejecting their fixed price HRSG contracts and substituting time-and-materials terms and then prevailing upon the creditors to waive their claims upon completion. App. at Vol. II A-1267-69 (Edwards Tr. at 14-16) (stating that benefit to the Debtors was the result, but "not the focus" of the Debtors' strategy).

- When asked in her deposition whether it ever occurred to them, as they were discussing this completion agreement strategy, that in order to ask creditors to compromise their claims, the Debtors had to make full disclosure of all assets, the answer of Candice Cheeseman, GPEG's general counsel, was a resounding "No." App. at Vol. III A-1972 (Cheeseman Tr. at 10).

- The Debtors had engaged Alvarez & Marsal to look into the intercompany account balances. App. at Vol. II A-1281. (Edwards Tr. at 36). In an e-mail to Jay Bradford of Alvarez & Marsal and GPEG CFO Michael Hanson dated November 3, 2006, GPEG's Corporate

---

[23] Indeed, as already noted, the Estate Representatives waited until the last possible moment to object to SNC's proofs of claim. Then they fought in the Bankruptcy Court against any discovery at all. Finally, they produced thousands of documents *within the week of trial* after about twenty depositions had already been taken, and when they knew that an in-depth review of those documents would be virtually impossible.

Controller, Brian Lavarnway, explained "the status of the intercompany reconciliations":

> Our normal process is to reconcile the inter-company cash and non-cash balances at the corporate office on a monthly basis, as part of our monthly closing procedures.    Unfortunately, due to employee turnover and the activities surrounding our Chapter 11 filing, this reconciliation has not been timely completed for subsequent periods. ***We have now dedicated a corporate resource to complete the August 31, 2006 reconciliation by ~Mon., Nov 8 and would hope to have September 28, 2006, reconciliation by ~Mon., Nov 13***.   We typically do not have significant adjustments as a result of these reconciliations due to the fact that the majority of the intercompany transactions are related to the consolidation/movement of cash which is recorded and monitored daily.   As you know, ***we have comfort*** in our daily cash procedures and ***have continued to monitor them diligently throughout the entire bankruptcy process***.

App. at Vol. II A-1057 (Darr Aff., Exhibit C (e-mail dated November 3, 2006)) (emphasis added).   The reconciliations promised by mid-November were not done, and were <u>delayed</u> for some six weeks, though once a person was assigned the task in December 2006, they took only a few weeks to complete.[24]   App. at Vol. I A-699 (Tr. at 81).

●    The Debtors admitted that they regularly reconciled their intercompany accounts on a monthly basis, and that Deltak held a "potential Asset" (Debtors' words) against a solvent GPEG in the amount of $182 million.  <u>See</u> Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization for Global Power Equipment Group Inc. and its Affiliated Debtors (Bankr. D.I. 1912) at 37-38.  App. at Vol. I A-310.

●    The Debtors and their advisors also admitted that they did not withhold the intercompany data because the data were somehow untrustworthy.  In a series of e-mails dated December 21, 2006, Alvarez & Marsal discussed the "pressure" being applied by the Creditors' Committee to disclose the Debtors' data and concluded that –

> If we are under pressure from the committee, I would prefer to publish by entity

---

[24] Alvarez & Marsal assigned Donald Harer to perform the reconciliation in early December 2006, and the results were filed with the Bankruptcy Court in the Debtors' October 2006 Monthly Operating Report on January 8, 2007. App. at App. at Vol. I A-253 (listing intercompany accounts payable and receivable).  No material discrepancies were found in the reconciliation of Deltak's undisputed intercompany accounts with GPEG, with the numbers off by only a "few hundred dollars."  App. at Vol. I A-697 (Tr. at 79).

> the post petition balances … ***The reason is not that I do not trust the data*** (I do as much as we could in this environment, especially since I reconciled it to the consolidating financial statements and traced to supporting journal entries); ***rather, that I would prefer to have more time to understand the inter company ramifications to the committee and to prepare for questions that will likely follow … [T]he schedules … are fairly straight forward***.

App. at Vol. II A-1058 (Darr Aff., Exhibit C (e-mail from Donald Harer in response to e-mail from Robert Caruso, Managing Director of Alvarez & Marsal)) (emphasis added).

•     At or about the same time, yet another of the Debtors' financial advisors, Blackstone Advisory Services, L.P. ("Blackstone"), had prepared an analysis of the possible recovery of Deltak's unsecured creditors showing an ***86% distribution in the event that Deltak received 100% on its intercompany claims against GPEG***. App. at Vol. I A-714-16. That same analysis showed nothing left for equity if the intercompany claims were paid in full. App. at Vol. I A-714 (Tr. at 96-97) (equity value shown as "N/A", not applicable).[25]

•     Not until the Debtors' October, 2006 monthly operating reports were submitted on January 8, 2007 – after virtually all of the Debtors' Completion Agreements had been executed – did the Debtors disclose publicly ***for the first time*** the intercompany receivable due to Deltak as of the Petition Date. See App. at Vol. I A-253; Vol. I A-172. The Debtors' Schedules were later amended in March of 2007, but not to include this information. App. at Vol. I A-258, A-264.

•     On March 15, 2007, GPEG CFO Michael Hanson e-mailed GPEG Corporate Legal Assistant Elayna Conner, with a copy to GPEG General Counsel Candice Cheeseman. In his e-mail, Hanson stated: "I don't see Braden Europe [a Debtor affiliate] as a pre-petition creditor for Deltak or Braden. That's a problem as we know that they both owe BE money." App. at Vol. IIA-1056 (Darr Aff., Exhibit C (Hanson e-mail dated March 15, 2007)). Ms. Conner passed the inquiry along to John Franks of Alix, which had prepared the Debtors' schedules and statements

---

[25] Alvarez & Marsal's Caruso acknowledged that the Equity Committee was "not very happy" with the prospect of little or no recovery.   App. at Vol. I A-696 (Tr. at 78).

of financial affairs. Franks responded:

> Intercompany liabilities were ***intentionally not included in the schedules because of the potential plan implications*** as well as the sentiment that the intercompany numbers were still a work in progress at the time of filing the schedules; this focus was primarily directed to inter-Debtor liabilities but my recollection is that this would likely have also covered international intercompany liabilities.

App. at Vol. II A-1055 (Darr Aff., Exhibit C (Bates Nos. 48491-92) (e-mail from J. Franks dated March 15, 2007)) (emphasis added). More accurately, however (as the Bankruptcy Court acknowledged), the "numbers" were well known and available; only the Debtors' ***strategy*** for dealing with the problem they presented for GPEG's equity owners was a "work in progress."

●      Alvarez & Marsal produced a report on March 16, 2007 entitled "GPEG Inter-Company Cash Account Summary". App. at Vol. III A-1895 (Hanson Tr., Exhibit 4 (report dated March 16, 2007)). The report includes a historic summary of GPEG net activity which reflects the accrual of the intercompany liability of GPEG to Deltak, including the fact that over the course of nine months in 2006 approximately $30 million in cash flowed from Deltak to GPEG. Id. at 1903. See also App. at Vol. II A-1282-1284 (Edwards Tr. at 37-39).

●      Matheson's representations in his first-day affidavit that the Deltak Group had no going-concern value, that Deltak expected continued losses and predicted future "negative cash usage" of $50 million – without revealing the known fact that GPEG drew $30 million in liquidity from Deltak in the first 9 months of 2006 alone – was materially misleading.

●      Even the Debtors' representations that they intended to withdraw from the HRSG business were not truthful. GPEG CEO Larry Edwards has testified that GPEG concluded that there was no financing available to capitalize the large HRSG business, and GPEG's bank wanted the large HRSG business to be wound down. App. at Vol. II A-1271 (Edwards Tr. at 18). Accordingly, GPEG moved to wind down its large HRSG business but retained its HRSG technology and thus, its ability to manufacture small to medium HRSGs. Id. See also App. at

Vol. III A-1579-1580.

• The Debtors' belated (and obscure) "explanation" of the intercompany accounts (speaking in terms of GPEG's "negative" cash balance) in their proposed Disclosure Statement filed with the Bankruptcy Court in September of 2007 (App. at Vol. I A-284) is evidence that the Debtors considered the information to be material to creditors, though the explanation offered was too little, too late. Compare App. Vol. I at A-306 (final form of Disclosure Statement).

## V.    THE BANKRUPTCY COURT'S DECISION

The substantive findings and conclusions of law made by the Bankruptcy Court in reaching its decision and entering the Order are revealed in the transcript of the December 17, 2007 Evidentiary Hearing. App. at Vol. I A-778. Thus, the transcript reflects the Bankruptcy Court's findings of fact and assumptions upon which it relied in reaching its conclusions that SNC was not entitled to enforce a parent guaranty claim against GPEG, and that SNC's claim against Deltak should be reduced in accordance with the waiver and step-down provisions contained in the Completion Agreement, as follows:

• The Bankruptcy Court recognized that the Debtors' statement in their Statements and Schedules, filed on November 27, 2006, that intercompany payables and receivables owed by GPEG to Deltak had not been "quantified" was not true at the time it was made. App. at Vol. I A-786 ("the [D]ebtors clearly knew … the line item for intercompany claims.").

• Notwithstanding the Debtors' statutory and fiduciary duties of full disclosure, the Bankruptcy Court denied SNC – one of the beneficiaries of these duties – the favorable inferences that flow from the Debtors' misrepresentation that their intercompany accounts payable and receivable had not been "quantified." See App. at Vol. I A-786-787.

• The Bankruptcy Court found, contrary to the evidence, and contrary to the presumption it was obligated to make in SNC's favor, that there was reason to doubt the "validity or accuracy"

of the net intercompany receivable, as if the Debtors did not have confidence in the undisputed figures carried on the Debtors' own general ledgers. App. at Vol. I A-787-788. The Court disregarded Lavarnway and Harer's statements to the contrary as well as Franks' admission that the figures would be withheld whether or not the books were closed. App. at Vol. III A-2198.

- The Bankruptcy Court expressly stated that: "I am confident that with more information, SNC probably would have negotiated a somewhat different deal." App. at Vol. I A-784 (emphasis added). Indeed, the Court noted that SNC's witness Greg Tardanico testified credibly that there was "no way" SNC would have entered into that Completion Agreement had it known of the enormous intercompany receivable due to Deltak. App. at Vol. I A-784.

- Similarly, the Bankruptcy Court acknowledged that Tardanico "testified credibly regarding his belief that he had been promised a parent guaranty by Mr. Ness." App. at Vol. I A-780. [26]

- The Bankruptcy Court found that, based on the limited information available to it, SNC believed its claims against Deltak were "either worthless or likely to recover no more than 10%". App. at Vol. I A-784. At the same time, the Court disregarded evidence of the Debtors' internal analysis showing that unsecured creditors (Deltak's "Class Five") would have recovered up to 86% if intercompany debts were paid at 100%, leaving equity holders nothing. App. at Vol. I A-714.

- The Bankruptcy Court stated that SNC's only "practical option" may have been to complete the Project using Deltak's HRSG equipment, but drew improper inferences from that fact, as if SNC had no leverage in the negotiation of the Completion Agreement. See App. at Vol. I A-785.

---

[26] At the same time, the Bankruptcy Court considered it somehow significant that other witnesses (having absolutely no personal knowledge of, or involvement in, the negotiation) disputed that Ness made such a promise to SNC. App. Vol. I A-780.

• Despite all the evidence to the contrary, and despite finding Tardanico's testimony "credible," the Bankruptcy Court somehow found that the HRSG Purchase Order "does not include a parent guaranty," and that the "only documentary evidence" of the parent guaranty is Tardanico's handwritten four-word note of the promise made by Ness. App. at Vol. I A-780. The Court also acknowledged that Deltak's executive wrote "no comment" concerning the form of the parent guaranty, and that his doing so was "not insignificant," but concluded that that fact "standing alone" was insufficient. App. at Vol. I A-781.

• Finally, the Bankruptcy Court held the Debtors to the wrong standard of conduct – as if fiduciary standards did not apply, crediting the Debtors and their advisors with "legitimate business and judgment calls," all while recognizing that they had withheld information material to SNC. App. at Vol. I A-789. In doing so, the Bankruptcy Court ignored binding and directly applicable Third Circuit precedent.

## VI.    STANDARD OF APPELLATE REVIEW

Pursuant to Federal Rule of Bankruptcy Procedure 8013, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The Bankruptcy Court's factual determinations are subject to deference but may be set aside if clearly erroneous. E.g., Montgomery Ward Holding Corp. v. Meridian Leasing Corp., 269 B.R. 1, 6 (D. Del. 2001) (Farnan, J.), aff'd and remanded, 326 F.3d 383 (3d Cir. 2003), citing In re Gutpelet, 137 F.3d 748, 750 (3d Cir. 1998). The Bankruptcy Court's conclusions of law are subject to plenary review and should be considered de novo by this Court. Meridian Leasing Corp., 269 B.R. at 6, citing Meespierson, Inc. v. Strategic Telecom, Inc., 202 B.R. 845, 847 (D. Del. 1996). Mixed questions of law and fact are subject to a "mixed standard of review" under which this Court accepts findings of historical or narrative facts unless clearly erroneous, but exercises plenary review of the Bankruptcy Court's

28

choice and interpretation of legal precepts and its application of those precepts to the facts.

Meridian Leasing Corp., 269 B.R. at 6, citing Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945

F.2d 635, 641-42 (3d Cir. 1991) (further citations omitted).

## VII.    SUMMARY OF ARGUMENT

The record demonstrates that, by means of an audacious pattern of misstatements,

omissions and outright lies, the Debtors fraudulently induced their HRSG creditors, including

SNC, to surrender their rights under Section 365(g) of the Bankruptcy Code so as to reduce

HRSG claims and preserve value for GPEG equity.  In entering the Order disallowing and

reducing SNC's Claims, the Bankruptcy Court ignored binding Third Circuit precedent,

improperly denied SNC of legal inferences to which it was entitled – as a beneficiary of the

Debtors' statutory and fiduciary duty to disclose – as to key elements of its fraudulent

inducement claim, and impermissibly disregarded its own findings as to the credibility of SNC's

witnesses.

The Third Circuit Court of Appeals has repeatedly and quite clearly held that a

Chapter 11 debtor-in-possession has both a "statutory and fiduciary duty to disclose" assets of

the estate during the pendency of its bankruptcy case.  Moreover, Delaware courts have held that

fiduciaries may not negotiate contracts and agreements with their beneficiaries without making

full disclosure of all facts that the beneficiaries might consider relevant in deciding whether to

waive their rights.  Following Third Circuit precedent, the Bankruptcy Court had no choice but

to conclude that the Debtors – as fiduciaries – were obligated *either* to have deferred negotiation

of any completion agreements pending the filing of their bankruptcy schedules, *or* to have made

specific disclosure of the material facts to any creditor with whom such negotiations were

undertaken.

Instead, the Bankruptcy Court allowed the Debtors to make the impermissible choice of

withholding information from Deltak's HRSG creditors – and even from the Creditors'

Committee for some time, in order to induce the HRSG creditors to surrender their rejection

damages claims against Deltak. Accordingly, the Bankruptcy Court committed reversible legal

error (i) in failing to hold the Debtors to the appropriate fiduciary standard, (ii) in failing to strike

from the Completion Agreement all provision(s) that purport to waive SNC's rejection damages

claim, and finally, (iii) in failing to hold GPEG liable on its promised guaranty of Deltak's

obligations.

## VIII.  ARGUMENT

### A.  The Bankruptcy Court Erred in Failing to Credit SNC's Fraud and Willful Misconduct Arguments Against Deltak.

#### 1.  The Bankruptcy Court Erred As a Matter of Law in Failing to Accord SNC the Benefit of All Inferences That Arise in Favor of a Beneficiary in an Action for Fraud Against its Fiduciary.

A Chapter 11 debtor-in-possession must fully disclose all of its assets and fully and fairly

represent its financial position. As stated in this Circuit:

> It is an established principle of bankruptcy law that one seeking benefits under its
> terms must fulfill certain reciprocal duties, which include filing a schedule of
> assets and liabilities ... and a statement of the debtor's financial affairs. ...
> Because both creditors and the court must rely heavily on these disclosure
> statements, a court "cannot overemphasize" the importance of the debtor's
> obligation to accurately represent its financial position.

Ortlieb v. Hudson Bank, 312 F. Supp. 2d 705, 714 (E.D. Pa. 2004), aff'd, 2005 U.S. App. LEXIS

5175 (3d Cir. 2005), quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414,

416-17 (3d Cir. 1988). The Third Circuit Court of Appeals has repeatedly held that a Chapter 11

debtor-in-possession has both a "statutory and fiduciary duty to disclose" assets of the estate

during the pendency of its bankruptcy case. Oneida, 848 F.2d at 415, cited in Constr. Mgmt.

Servs., Inc. v. Mfrs. Hanover Trust Co. (In re Coastal Group Inc.), 13 F.3d 81, 86 (3d Cir. 1994)

(judicially estopping debtors from pursuing undisclosed asset); see also Krystal Cadillac-

Oldsmobile GMC Truck, Inc. v. GMC, 337 F.3d 314, 324-25 (3d Cir. 2003) (debtor may not enhance its bargaining position by making the pot that creditors look to for recovery appear smaller than it really is, particularly where debtor's owner negotiated substantial compromises of creditors' claims against the debtor). Accord Haseotes v. Cumberland Farms (In re Cumberland Farms), 284 F.3d 216, 231 (1st Cir. 2002) ("[A] trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions.") (internal quotation omitted); F & M Marquette Nat'l Bank v. Emmer Bros. Co. (In re Emmer Bros. Co.), 52 B.R. 385, 393-94 (D. Minn. 1985) (reversing bankruptcy court order dismissing creditor's action for damages or rescission of settlement agreement allegedly procured by debtor's misrepresentation and concealment of assets). As the Emmer Bros. court explained:

> The debtor-in-possession does have a fiduciary responsibility to the bankruptcy court and its creditors. A debtor who fraudulently conceals an asset during the course of the bankruptcy proceedings surely violates this duty.

52 B.R. at 394.

Of course, Delaware law does not permit fiduciaries to negotiate contracts and agreements with their beneficiaries *without making full disclosure of all facts that the beneficiaries might consider relevant in deciding whether to waive their rights*. See, e.g., Bren v. Capital Realty Group Senior Hous., Inc., No. Civ. A. 19902-NC, 2004 WL 370214 (Del. Ch. Feb. 27, 2004) (creditor survives motion to dismiss on allegation that insolvent limited partnership and its general partner breached fiduciary duty by failing to disclose material facts when negotiating waivers of creditors' rights).[27]

Thus, the Bankruptcy Court committed reversible legal error by denying SNC the benefit of favorable inferences to which it was entitled in proving fraud or willful misconduct in

---

[27] Compare Blue Chip Emerald LLC v. Allied Partners Inc., 750 N.Y.S.2d 291, 294-95 (N.Y. App. Div. 1st Dep't 2002) (noting that neither New York and Delaware law "give effect to a waiver of a fiduciary's duty of full disclosure that the fiduciary obtained by means of its breach of that very duty, even where the party that gave the waiver was … commercially sophisticated and advised by its own counsel").

connection with the Completion Agreement. That was an error in light of the presumptions and inferences of reliance, knowledge and intent in connection with SNC's fraud-in-the-inducement claim; and the presumption of "bad faith" arising under Krystal Cadillac, in circumstances where a debtor fails to disclose a known asset.

> **a.     The Bankruptcy Court improperly denied SNC the benefit of specific inferences of reliance, knowledge and intent to defraud in connection with SNC's claims of fraud and willful misconduct.**

Such inferences and presumptions are applicable here where the debtor has a fiduciary duty to disclose, or the creditor is compelled to rely on the disclosures of a debtor who controls the relevant information. Instead of crediting SNC with these inferences, the Bankruptcy Court improperly shifted the burden to SNC – the beneficiary of the Debtors' statutory and fiduciary duty to disclose – to show reliance, knowledge and intent to defraud. See, e.g., Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc., 45 N.Y.2d 692 (1978); compare Di Maio v. State, 517 N.Y.S.2d 675 (Ct. Cl. 1987) (recognizing principle that fiduciary duty creates presumption in favor of plaintiff); see also Small v. Lorillard Tobacco Co., 679 N.Y.S.2d 593, 600 (N.Y. App. Div. 1st Dep't 1998) (reliance on fraudulent statements or actions readily inferred where "defendants effectively controlled all the information about the transaction"), order aff'd, 698 N.Y.S.2d 615 (1999).

According to binding Third Circuit precedent – which the Bankruptcy Court failed to apply – a debtor's nondisclosure of an asset – even a "potential" asset – is indefensible. See Coastal Group, 13 F.3d at 86, citing Oneida, 848 F.2d at 416-17; Krystal Cadillac, 337 F.3d at 324-25. See also In re New Orleans Paddlewheels, Inc., 350 B.R. 667, 679-80 (Bankr. E.D. La. 2006) (failure to disclose intercompany claims for diverted funds constituted significant breach of insider's duty to court and creditors).

In Krystal Cadillac, the Court of Appeals elaborated on the reasoning underlying the rule

of obligatory, full disclosure, as follows:

> [N]ondisclosures affect creditors' willingness to negotiate their claims and
> enhance the debtor's bargaining position by making the pot that creditors look to
> for recovery appear smaller than it really is. That is particularly important here
> because, as noted above, [the debtor's] owner negotiated very substantial
> compromises of claims against [the debtor].

337 F.3d at 325. In that case, the Court of Appeals stated that "a rebuttable inference of bad

faith" arises when the evidence demonstrates <u>a failure to disclose</u> a known asset and <u>a motive</u> to

conceal that asset in the face of an affirmative duty to disclose. <u>Id.</u> at 321.

A debtor's duty to disclose is consistent with the legal principle requiring a fiduciary to

make full and complete disclosure to its beneficiaries of all facts that the beneficiaries would

consider to be material. <u>See</u> <u>Zirn v. VLI Corp.</u>, 621 A.2d 773 (Del. 1993)("<u>Zirn I</u>") (holding that

a duty to disclose to beneficiaries of all material facts bearing upon a vote arises under fiduciary

duties of care and loyalty); <u>Zirn v. VLI Corp.</u>, 681 A.2d 1050, 1056 (Del. 1996) ("<u>Zirn II</u>") (after

a party chooses to make partial disclosure, it has an obligation to provide "an accurate, full, and

fair characterization" of relevant events).

### b. Affording SNC the benefit of specific inferences to which it was entitled, SNC clearly proved all of the elements of a fraud claim.

Had the Bankruptcy Court accorded SNC the legal inferences and presumptions to which

it was entitled, there could be no question that SNC proved, and the Estate Representatives failed

to rebut, every element of a claim of fraud in the inducement under applicable law. [28] Under

New York law, a presumption of fraud arises where – as here – the parties to a transaction are in

a fiduciary relationship or one of unequal bargaining power. Under New York law, which

governs the Completion Agreement, the elements of fraud are "a material misrepresentation [or

omission] of fact, made with knowledge of its falsity, with intent to deceive, justifiable reliance

---

[28] Section 4.8 of the Completion Agreement provides that New York law governs. App. at Vol. II A-928.

and damages." Liling v. Segal, 633 N.Y.S.2d 199, 199 (2d Dep't 1995) (internal quotation omitted).[29] Ordinarily, the burden of proof to establish fraud rests on the plaintiff. Pierce v. Richard Ellis & Co., 310 N.Y.S.2d 266, 269 (N.Y. Civ. Ct. 1970) (plaintiff's burden may be met by direct or circumstantial evidence).

The ordinary rule does not apply where – as here – there exists a fiduciary relationship, or the plaintiff is compelled to rely on the disclosures of a defendant who controls all relevant information. Inferences then arise in favor of the plaintiff, including specific inferences as to the elements of reliance and knowledge or intent to defraud. Gordon, 45 N.Y.2d 692; compare Di Maio, 517 N.Y.S.2d 675 (recognizing principle that fiduciary duty creates presumption in favor of plaintiff); see also Small, 679 N.Y.S.2d at 600 (reliance on fraudulent statements or actions readily inferred where "defendants effectively controlled all the information about the transaction").

Furthermore, knowledge or intent to defraud is inferred where a misrepresentation has been put forward as "true of one's own knowledge". Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 186 (1931) (fraud inferred as to corporate accountants who certified that information was accurate to their knowledge); Koo v. Robert Koo Wine & Liquor, Inc., 611 N.Y.S.2d 4 (N.Y. App. Div. 1st Dep't 1994) (same, where defendant has written checks for insufficient funds or has forged the name of another party); Lippman Packing Corp. v. Rose, 120 N.Y.S.2d 461 (N.Y. Mun. Ct. 1953) (same, as to president of corporation active in company's management, who wrote check for insufficient funds, was charged with knowledge of company's

---

[29]  The choice of law rules of Delaware govern proceedings before Delaware bankruptcy courts. In re PHP Healthcare Corp., 128 Fed. Appx. 839 (3d Cir. 2005)(choice of law is that of state in which bankruptcy proceedings is pending).  In Delaware, courts must honor the choice of law provisions negotiated by parties to a contracts, "so long as that law has a material relationship to the transaction." ABRY Partners V., L.P. v. F&W Acquisition LLC, 891 A.2d 1032, 1046 (Del. Ch. 2006).  SNC and the Debtors selected New York law under the Completion Agreement, and therefore it is to New York law that the Court should turn to derive the elements of the causes of action alleged.

bank account).

"Misleading partial disclosure" is worse than silence, and may have the effect of a material misrepresentation. "[O]nce defendants travel[ ] down the road of partial disclosure ... they ... [have] an obligation to provide…an accurate, full, and fair characterization of…events.'" Zirn II, 681 A.2d at 1056, citing Arnold v. Soc'y for Sav. Bancorp., 650 A.2d 1270, 1280 (Del. 1994); Bren, 2004 WL 370214, at *9 (defendants' argument that General Partner did not owe a fiduciary duty of full disclosure to creditors who were sent requests to approve action of the partnership, while simultaneously signing waivers of their claims against the partnership, was "weak" and "unconvincing").

The duty of candor requires disclosure by a fiduciary of all material facts bearing upon a beneficiary's decision. Zirn I, 621 A.2d 773 (requirement of disclosure to shareholders of all material facts bearing upon a vote arises under the duties of care and loyalty), citing Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983). A determination as to what information should be disclosed must be controlled not by the fiduciary's subjective views, but by an objective analysis of what information the recipient might consider relevant. Zirn I, 621 A.2d at 779 (focus is on what a reasonable investor would consider important in tendering his stock, not what a director considers important). "'While it need not be shown that an omission or distortion would have made an investor change his overall view of a proposed transaction, it must be shown that the fact in question would have been relevant to him.'" Id. at 779, quoting Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1289 (Del. 1989). Put another way, in a fiduciary context, an omission is material if it is part of the "total mix" of information that a reasonable shareholder would consider relevant to his decision, *even if disclosure of the omitted fact would not have caused the shareholder to change his vote*. Zirn I, 621 A.2d at 778-79, citing TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976); see also Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del.

1985) (same).

Here, where the Debtors were fiduciaries that controlled all relevant information concerning Deltak's financial condition, and the Debtors intentionally withheld this information from their creditors, a presumption of fraud and specific inferences of knowledge, intent and reliance arise in favor of SNC under the applicable case law. Consequently, SNC, as one of Deltak's HRSG creditors, was entitled to an inference –

• that the Debtors knowingly withheld information that creditors would consider relevant to their decision to waive their rights under § 365(g);

• that the Debtors intentionally withheld that information as part of a plan to capture value for GPEG's shareholders; and

• that SNC relied to its detriment on the Debtors' omissions, half-truths, partial and misleading disclosures and misrepresentations.[30]

The record proved that the Debtors – fiduciaries of their Chapter 11 estates – knowingly and intentionally caused SNC to agree to waiver and step-down provisions in the Completion Agreement. SNC's Gilles Laramee testified "convincingly" as found by the Bankruptcy Court (App. at Vol. I A-786): SNC was kept in the dark as to Deltak's largest asset, and undertook negotiation of the Completion Agreement having been repeatedly told that Deltak had little to no going concern value, that its liquidity had recently become significantly constrained, and that GPEG planned to wind down Deltak's entire money-losing HRSG business. As a result, SNC suffered precisely the damages that the Debtors intended. Accordingly, all of the elements of fraud are satisfied. See Liling, 633 N.Y.S. 2d at 199.

---

[30] Even applying the customary presumption – where the plaintiff bears the burden of proof as to all elements of its claim – the record conclusively proves that these Debtors specifically contemplated the enhanced return to equity if the HRSG creditors' rejection damages claims were waived; that they intentionally concealed information regarding the intercompany cash balances; and that, in agreeing to the waiver and "step-down" of its rejection damages, SNC relied on a series of omissions, partial truths and misrepresentations.

The Bankruptcy Court erred not only by disregarding binding precedent, but also in disregarding its own findings of fact. The Court did not dispute (nor could it) that the Debtors, as Delaware corporations and debtors-in-possession, owed statutory and fiduciary duty to disclose to their creditors – and to the Court – all of their assets, including Deltak's receivable from GPEG arising from GPEG's intercompany debt. The Bankruptcy Court disregarded its own finding that the figures withheld were stated plainly in the Debtors' accounting records. App. at Vol. I A-786. The Bankruptcy Court also disregarded its own acknowledgment that the Debtors may have engaged in "strategic behavior" with regard to their HRSG creditors – the beneficiaries of the Debtors' statutory and fiduciary duty to disclose. App. at Vol. I A-789.

Furthermore, the Bankruptcy Court's finding that there was reason to doubt the "validity or accuracy" of the net intercompany receivable was clearly erroneous. On this point, the following undisputed facts plainly establish that, *at least with regard to the intercompany obligation owed by GPEG to Deltak*, the Debtors had no doubt or uncertainty whatsoever:

- Donald Harer of Alvarez & Marsal (charged with reviewing the Debtors' general ledger and accounts) said he did not distrust the data;

- The Debtors' Brian Lavarnway said "we have comfort" in the journal entries;

- the figures in the general ledger were well known and *reconciled a few weeks after Harer was finally assigned the task in December 2006* (and no major discrepancies were found in the reconciliation process). It usually took only 45 days after month end to reconcile the intercompany accounts, so September's numbers should have been final in mid-November 2006, as promised by Lavarnway;

- the intercompany accounts were listed as "payables" and "receivables" in the Debtors' general ledger accounts, with no footnotes reflecting any disputed item; and

- the Debtors' October 2006 Monthly Report, filed on January 8, 2007 (two months late),

37

referred to the Debtors' intercompany "payables and receivables," with no caveat.[31]

By contrast, there is uncontroverted evidence on the record that the Debtors timed the release of information regarding intercompany debt because of its "plan implications". The Debtors deliberately withheld information regarding the massive intercompany receivable owed by GPEG to Deltak, in the face of enormous pressure from the Creditors' Committee to disclose that information. Like the debtor in Krystal Cadillac, the Debtors here plainly advanced their bargaining position with SNC and other Deltak creditors by making it appear that the pot for recovery was smaller than it truthfully was – thereby inducing SNC and the others to waive rejection damages claims against the Debtors in the erroneous belief that those claims were essentially worthless, all to the benefit of the equity-holders in the parent company, GPEG, who held the residual interest in the subsidiary, Deltak.

The Bankruptcy Court's finding that SNC's only "practical option" may have been to complete its project with Deltak's HRSG equipment and surrender its rejection damages claim, was both clearly erroneous on this record and reflected a fundamental error of law. As a factual matter, the Court could not reach this conclusion without disregarding its own finding that Tardanico "testified credibly that there was 'no way' SNC would have entered into the completion agreement if they had known that Deltak held a [net] claim against its parent in excess of $120 million". See App. at Vol. I A-784. At the same time, however, the Court failed to address the unrebutted testimony that Blackstone's analysis, prepared for the Debtors, showed that unsecured creditors (Deltak's "Class Five") would recover up to 86% if intercompany debts were paid at 100% – a fact that was kept from SNC, and which provides the Debtors' "motive" (discussed in Krystal Cadillac), as well as powerful support for SNC's fraud claim.

---

[31] The Debtors' filing of this information only a few weeks after gaining approval of the Completion Agreement belies the Bankruptcy Court's suggestion that the intercompany transactions "typically require more intense analysis." App at Vol. I A-788. The Debtors did nothing but delay the reconciliation to buy time to complete the negotiation of their completion agreements, and otherwise deal with the ramifications of these figures.

Moreover, the Bankruptcy Court drew improper inferences from the difficulties of starting over and the pressure on SNC to allow Deltak to finish the equipment. It was undisputed that SNC could have kept its rejection damages claim and used another contractor to finish Deltak's work, rather than entering into a completion agreement with Deltak. App. at Vol. I A-784 ("no one disputes that SNC could have held onto its rejection claim"). With complete information, SNC might also have chosen to negotiate a completely different Completion Agreement with Deltak. It was improper to deny SNC the inference that, had SNC been told the truth, it would <u>not</u> have agreed to include in the Completion Agreement the step-down provision leading to waiver of its claim in full.

The Bankruptcy Court's acknowledgment: "I am confident that with more information, SNC probably would have negotiated a somewhat different deal," <u>see</u> App. at Vol. I A-784, renders its decision unsustainable under binding Third Circuit authority. According to <u>Krystal Cadillac</u>, SNC is not required to speculate as to what might have been had the Debtors not failed to disclose that asset. 337 F.3d at 324-25. The Debtors' wrongful acts entitled SNC to relief.[32]

> **c.    Having erred as a matter of law in failing to rule in SNC's favor on the issue of liability, the Bankruptcy Court erred again in failing to afford SNC an appropriate remedy under New York law.**

Under New York law, a release – such as the waiver and release of SNC's Rejection Damage Claim – may be voided on grounds of duress, illegality, fraud or mutual mistake. <u>See Thives v. Holmes Ambulance Serv. Corp.</u>, 432 N.Y.S.2d 235, 236 (N.Y. App. Div. 2d Dep't 1980); <u>Aetna Cas. & Sur. Co. v. Jackowe</u>, 468 N.Y.S.2d 153 (N.Y. App. Div. 2d Dep't 1983); <u>Mangini v. McClurg</u>, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513 (1969). Insofar as the waiver

---

[32] It is well settled under New York law that unenforceable provisions of a contract may be severed and the remainder of the covenant enforced. <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 394-95, 690 N.Y.S.2d 854, 860 (1999) (partially enforcing a restrictive covenant even though agreement did not contain a severability provision ); <u>Karpinski v. Ingrasci</u>, 28 N.Y.2d 45, 51-52, 320 N.Y.S.2d 1, 6-7 (1971) (same); <u>Trans-Continental Credit & Collection Corp. v. Foti</u>, 704 N.Y.S.2d 106, 107 (N.Y. App. Div. 2d Dep't 2000) (same). Here, the provisions of the Completion Agreement are expressly made severable by § 4.6. App. at Vol. II A-928.

or release itself was procured by fraudulent concealment, it may be avoided.  See Blue Chip

Emerald LLC v. Allied Partners Inc., 750 N.Y.S.2d 291 (N.Y. App. Div. 1st Dept. 2002) (waiver

and release voidable where fiduciary negotiating a transaction with its beneficiary fails to make

full disclosure of all material facts;); accord Rivera v. Vickers, 421 N.Y.S.2d 918, 919 (N.Y.

App. Div. 2d Dep't 1979) (release held void where plaintiff relied on the defendants and was

misled).

Even where negotiations have been extensive and the parties to an agreement are highly

sophisticated, a claim of fraudulent inducement plainly exists where, as here, one party had no

means to obtain the information being withheld and no means to learn if the party inducing the

waiver has been truthful.  See Blue Chip Emerald, 750 N.Y.S. 291; P.T. Bank Cent. Asia v. ABN

AMRO Bank N.V., 754 N.Y.S.2d 245, 251 (N.Y. App. Div. 1st Dep't 2003) (upholding claim of

fraudulent inducement); H.W. Collections. Inc. v. Kolber, 682 N.Y.S.2d 189, 190 (N.Y. App.

Div. 1st Dep't 1998) ("a general release will not insulate a tortfeasor from allegations of breach

of fiduciary duty, where he has not fully disclosed"); Bloss v. Va'ad Harabonim, 610 N.Y.S.2d

197 (N.Y. App. Div. 1st Dep't 1994) (being represented by counsel does not bar a plaintiff from

avoiding the release on grounds of fraudulent inducement).

**2.    In the alternative, the Bankruptcy Court erred as a matter of law by failing to consider that the Debtors' willful misconduct invokes the exception to the waiver and step-down provisions contained in the Completion Agreement.**

Even had the Bankruptcy Court not been inclined to sever the waiver and step-down

provisions from the Completion Agreement as having been induced by fraud, the Debtors'

willful misconduct was sufficient to invoke the exception contained in the Completion

Agreement by its own terms.

As interpreted by the courts, "willful misconduct" includes intentional acts or omissions

undertaken with knowledge that the act or omission will probably result in damage or injury.

See, e.g., Hoge v. Moore (In re Railworks Corp.), 345 B.R. 529 (Bankr. D. Md. 2006); accord Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988) (discussing the difference between "misconduct" and "fraud").

In this case, as discussed above, the Debtors were guilty of numerous instances of willful misconduct, including a continuing pattern of lies, omissions and misleading partial disclosures in violation of their various statutory and fiduciary duties, all undertaken with the knowledge that such breaches would result in economic injury to SNC.[33]

**B.     The Bankruptcy Court Erred in Failing to Credit SNC's Arguments that It Was Entitled to the Benefit of GPEG's Promised Guaranty.**

Finally, the Bankruptcy Court erred as a matter of law, and its factual findings were clearly erroneous, when the Court failed to conclude that GPEG is jointly and severally liable to SNC for Deltak's wrongful acts and omissions.

**1.     The Bankruptcy Court's finding that GPEG's Senior Vice President, Monte Ness, did not promise SNC a parent guaranty was clearly erroneous in light of all of the evidence and the Court's own findings of Tardanico's credibility.**

The Bankruptcy Court's finding that Monte Ness did not promise SNC a parent guaranty was clearly erroneous in light of all of the evidence and its own rulings. That evidence included each of the following:  (i) the Court's finding that SNC's witness, Gregory Tardanico, "testified credibly regarding his belief that he had been promised a parent guaranty by Mr. Ness"; (ii) undisputed documentary evidence presented by SNC of Ness' promise, including the contemporaneous written record by Tardanico of his conversation with Ness; and (iii) Ness' admissions, in sworn deposition testimony, that the guaranty was a "deliverable" under the contract between SNC and Deltak, and that he had no recollection sufficient to confirm or deny "one way or the other" his conversation with Tardanico.

---

[33] Of a piece with the Debtors' other actions taken in bad faith was their omission of key language from quotes of the contract's terms relating to DPEC's warranties (App. at Vol. I A-396), in filings with the Bankruptcy Court, and their "overreaching" on other contract terms. App. at Vol. I A-401.

The Bankruptcy Court found that despite Tardanico's credible testimony, other witnesses offered by the Debtors disputed that the promise was given. App. at Vol. I A-780. This was clear error. In fact, only Ness spoke with Tardanico, and Ness did not dispute Tardanico's recollection of the conversation reflected in Tardanico's notes. No other witness could claim to have the slightest personal involvement in that conversation. It is also important to recall that Ness acknowledged that the guaranty was a "deliverable" under the Purchase Order; that he had "no idea" why the guaranty was not delivered; and that GPEG's own Annual Report notes that guarantees and letters of credit are typically required in large HRSG transactions such as the one with SNC. Other than Ness and Tardanico, no witness claimed to have any personal knowledge whatsoever of the conversation that took place between the two men. The others' thoughts have no bearing on Ness' promise.

### 2.    The Bankruptcy Court also erred in failing to consider the multiple documents that evidenced the GPEG guaranty.

Failing even to consider the multiple documents that evidenced the GPEG guaranty, the Bankruptcy Court committed clear error as a matter of law.[34] Even in the absence of a signed guaranty, Canadian courts (like U.S. courts) permit the joining together of two or more documents to form a memorandum, with parol evidence if necessary, to satisfy the Statute of Frauds. See, e.g., Harvie v. Gibbons, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.), at ¶¶ 16, 19, 22 (check and map together, connected by parol evidence, satisfied Statute of Frauds); cited in Paquette v. Smith, [1989] 70 O.R. (2d) 449 (broker's written evidence, Trade Record Sheet and telephone records sufficient to satisfy Statute of Frauds notwithstanding that seller orally accepted but did not sign offer to purchase).

---

[34] Whether a contract comes within the statute of frauds is a question of law. See, e.g., Tope v. Beal, 98 F.2d 548 (3d Cir. 1938) (affirming trial court); Pruitt v. Levi Strauss & Co., 932 F.2d 458, 463 (5th Cir. 1991), abrogated on other grounds, Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc., 55 F.3d 181 (5th Cir. 1995) (contract for an indefinite duration, terminable only for cause, falls outside the statute of frauds under Texas law).

Here, as discussed earlier, the Bankruptcy Court erred in stating that the HRSG Purchase Order "does not include a parent guaranty." See App. Vol. I A-782. In fact, in addition to the language of the HRSG Purchase Order, which specifically provided for the parent guaranty, the following documents gave evidence of the promised guaranty:

(a)    Tardanico's contemporaneous – *and uncontroverted* – written record of his telephone conversations with Ness, a Senior Vice President of GPEG, during which Ness orally promised that a guaranty would be delivered if the Project were awarded to Deltak (App. at Vol. II A-946);

(b)    Exhibit T to the HRSG Purchase Order issued to Deltak (a form of guaranty that the Debtors admit was a common form), coupled with parol evidence in the form of Ness's acknowledgment that the guaranty was a "deliverable" (App. at Vol. II A-889-90);

(c)    the e-mail correspondence concerning the tradeoff between a letter of credit and the guaranty, evincing GPEG's willingness to offer a guaranty (and stating that the parent guaranty is "still an option" in place of the letter of credit) (App. at Vol. II A-1490);

(d)    the notation by Deltak's Neumeister of "no comment" concerning the form of the guaranty (Exhibit T to the Purchase Order) (App. at Vol. III A-1551, A-1663); and

(e)    the internal memo from Candace Cheeseman's paralegal noting that she could not find a signed form of the guaranty for SNC (indicating that she obviously had some information that there should be one) (App. at Vol. II A-1493).

On this record, it defies credulity to state, as the Bankruptcy Court did, that the "no comment" notation "standing alone" was "insufficient," or that the "only evidence" was

43

Tardanico's four word note of his conversation with Ness. Neumeister's notation, as the Bankruptcy Court noted, was "not insignificant"; however, it absolutely did not stand alone. As the record demonstrates, GPEG was fully aware of Deltak's promise to provide SNC with a parent guaranty, assented to and reaffirmed that promise with its own, and thereafter failed to perform its freely undertaken obligation. In failing to credit SNC's argument that multiple documents exist that, taken together and connected with parol evidence, constitute a memorandum satisfying the Statute of Frauds, the Bankruptcy Court committed an error of law.

   3.   **The Bankruptcy Court also erred as a matter of law in failing to consider SNC's legal argument that GPEG is liable to SNC on its guaranty on an agency theory, based upon the promise given to SNC by Monte Ness, a Senior Vice President of GPEG, who had apparent (if not actual) authority to grant SNC such a guaranty.**

The Bankruptcy Court also erred in failing even to consider SNC's contention that GPEG is liable to SNC under well-established principles of agency law.[35]  See Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988) (remand required to determine whether parent companies could be held liable for actions of foreign subsidiaries under customary agency principles; reasoning that, while parents did not completely dominate subsidiaries, parent and subsidiaries appeared to have entered into agency relationship for specific transaction).

> [W]hile one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation – completely independent of a second corporation – may assume the role of the second corporation's agent in the course of one or more specific transactions....total domination or general alter ego criteria need not be proven."

Albert v. Alex Brown Mgmt. Servs., Inc., No. Civ. A. 762-N, 763-N, 2005 WL 2130607, at *9 (Del. Ch. Aug. 26, 2005), citing Phoenix, 842 F.2d at 1477, citing Restatement (Second) of

---

[35] Notably, in ¶ 14 of each of its proofs of claim, SNC specifically reserved against Deltak and GPEG "all rights it may have, in law and equity, including but not limited to … [the right] to challenge the applicability of the step-down schedule set forth in § 2.2 of the Completion Agreement, based upon a showing that Deltak committed willful misconduct, including, e.g. by its statements or omissions at the time of entering into the Executory Contract, the Completion Agreement or thereafter and/or by conducting itself as an alter ego or mere instrumentality of GPEG, or otherwise …".  App. at Vol. 1 A-6 and A-13.

Agency § 14M, cmt. (a) (1958). "Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the proponent must demonstrate a relationship between the corporations and the cause of action." Phoenix, 842 F.2d at 1477. "[A]n arrangement exist[s] between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing." Id. "The focus of this test is on 'the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim.'" Ethypharm S.A. France v. Bentley Pharms., Inc., 388 F. Supp. 2d 426, 432 (D. Del. 2005), citing C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 560 (D. Del. 1998). "In order for the parent corporation to be liable under this test, there must be 'a close connection between the relationship of the corporations and the cause of action.'" Id., citing C.R. Bard, Inc., 997 F. Supp. at 560.[36]

Here, GPEG was bound by the promise made by Ness, its Senior Vice President, who had apparent authority to grant SNC a guaranty. "Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing." Albert, 2005 WL 2130607, at *10, citing Henderson v. Chantry, No. Civ. A. 1486-K, 2002 Del. Ch. LEXIS 14, at *14, 2002 WL 244692 (Del. Ch. Feb. 5, 2002)). "In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable." Id., citing Billops v. Magness Constr. Co., 391 A.2d 196, 198 (Del. 1978). "The concept of apparent agency or authority focuses not upon the actual relation of a principal and agent, but the apparent relationship." Billops, 391 A.2d at 198. "Manifestations by the alleged

---

[36] Where Deltak and GPEG are Delaware corporations, and SNC's claims concern the conduct of officers of the parent company GPEG, SNC's claims relate to internal corporate affairs and, as such, are governed by Delaware law. LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 289 (D. Del. 2000) (Delaware law applied, notwithstanding choice of law provision selecting New York law).

principal which create a reasonable belief in a third party that the alleged agent is authorized to bind the principal create an apparent agency from which spring the same legal consequences as those which result from an actual agency." Id., citing Finnegan Constr. Co. v. Robino-Ladd Co., 354 A.2d 142 (Del. Super. Ct. 1976).

"The manifestations may be made directly to the third party, or may be made to the community in general, for example, by way of advertising." Billops, 391 A.2d at 198, citing Gizzi v. Texaco, Inc., 437 F.2d 308 (3d Cir. 1971); Restatement 2d Agency §§ 8, 8B, 27(1957). "In order to establish a chain of liability to the principal based upon apparent agency, a litigant must show reliance on the indicia of authority originated by the principal, Bowman v. Home Life Ins. Co. of Am., 3 Cir., 260 F.2d 521 (1958); Restatement 2d, Agency § 267, and such reliance must have been reasonable." Billops, 391 A.2d at 198, citing Finnegan Constr. Co., 354 A.3d at 142.

GPEG widely advertised Ness' authority and his importance as a senior officer of the company. He was described in GPEG's 2004 annual report as Senior Vice President of GPEG and President of Deltak, as a "senior executive" and key "executive officer" of GPEG. He was known by Tardanico to have held those positions at all relevant times, and Tardanico acted in reliance on that knowledge. Consequently, under the governing precedents Ness clearly had apparent authority to bind GPEG to deliver the guaranty. In failing even to consider SNC's legal argument on this issue, the Bankruptcy Court committed reversible legal error.

4.    **The Bankruptcy Court erred as a matter of law in failing to apply the "wider interest" exception or an estoppel theory to take the GPEG guaranty out of the Ontario Statute of Frauds.**

The Bankruptcy Court also erred in refusing to apply the "wider interest exception" or principles of estoppel take the GPEG guaranty out of the Ontario Statute of Frauds.[37]  The

---

[37] The HRSG Purchase Order is governed by the laws of Toronto, Ontario. App. at Vol. II A-823.

seminal case regarding the wider interest rule is Travel Machine Ltd. v. Madore, [1983] 143 D.L.R. (3d) 94. Where the person who makes the promise has an interest in the transaction independently of the promise, the promise is not within the statute of frauds. Id.; see also S.M. Waddams, The Law of Contracts, 5th ed. (Toronto: Canada Law Book, 2005) (noting that guaranty may not be within the statute where the guarantor has an interest in property or some business interest, which the guarantor seeks to advance by the guaranty) (at p. 162); J.D. McCamus, The Law of Contracts (Toronto: Irwin Law, 2005) (guarantees may be excluded from the statute where they are mere incidents of a larger contractual relationship, including where the guaranty is given in the context of a larger transaction to protect the proprietary interest of the guarantor in an asset) (at p. 166).

The rule is part of a reaction by the courts against the stringency with which the Statute of Frauds had traditionally been applied. "In succeeding centuries the courts in individual cases chafed at times against the rigidity of the Statute of Frauds and not infrequently one sees expressions by the courts regretting that the Statute was being used as an engine of fraud rather than as the curative device that the legislature envisioned." SPX Canada Inc. v. Watts, [1995] A.C.W.S.J. 630732, cited in Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.), [2003] O.J. No. 2320, at 11-12.

The vitality of the wider interest exception was recognized by the British Columbia Court of Appeal in Pullano v. Yellowhead Timber Ltd., [1994] B.C.J. No. 1317 at ¶¶ 16-18 (QL), where the court rejected the argument that a change to the wording of the relevant B.C. statute had rendered this exception inapplicable in B.C. The court commented that at the heart of the exception lies the pursuit of an objective beyond that of simply guaranteeing the debt, that is, the

guaranty is incidental to a larger purpose sought to be accomplished by the promisor (at ¶ 20).[38]

As an evidentiary matter, the Bankruptcy Court ignored GPEG's interest in seeing Deltak make this particular sale, and disregarded SNC's legal argument that GPEG was estopped from asserting the Statute of Frauds as a bar to SNC's claim, given GPEG's promise to deliver the parent guaranty and its subsequent failure to do so. The Court failed to consider that Deltak is wholly-owned by GPEG, and that GPEG sold its products worldwide under certain "brand names", including the Deltak name. See App. at Vol. III A-1955. GPEG plainly had an interest in ensuring that SNC awarded a substantial contract to its subsidiary, and that interest was sufficient to take the promised guaranty out of the operation of the Statute. Given Edwards' statement that the effort to recapitalize started nine months prior to the bankruptcy, and the fact that GPEG took $30 million out of Deltak in the course of those nine months, its interest in Deltak's sale to SNC in January 2006 was not the product of the usual parent-subsidiary relation.

By adopting an archaic construction of the Statute of Frauds that permits it to be used as "an engine of fraud," the Bankruptcy Court ignored controlling authority as well as the evidentiary record, and thereby committed reversible error.

**5.    The Bankruptcy Court erred as a matter of law in failing to apply, on behalf of SNC, the equitable maxim that treats "as done that which should be done" in order to relieve a victim of the consequences of a wrongdoer's failure to act.**

With respect to the promised parent guaranty, the Bankruptcy Court erred in failing to accord SNC the benefit of the equitable maximum that treats "as done that which should be done" in order to relieve a victim of the consequences of a wrongdoer's failure to act. Bankruptcy courts are courts of equity, and courts of equity historically have applied the well-

---

[38] At least one Ontario court has further held that the wider interest exception applies to an oral guaranty given by the sole shareholder who was one of two officers of the debtor company on the basis that the guarantor had a personal property interest in the company to protect by making the promise. See Active Customs Brokers Ltd. v. Sack, [1987] 37 B.L.R. 229 at 2.

established equitable maxim which treats "as done that which should be done" in order to relieve a victim of the consequences of a wrongdoer's failure to act.[39] See, e.g., In re Cumberland Farms, Inc., 249 B.R. 341, 355 (Bankr. D. Mass. 2000), aff'd, 284 F.3d 216 (1st Cir 2002) (enforcing an unsigned tolling agreement). See also Indep. Wireless Tel. Co. v. RCA, 269 U.S. 459, 472-73 (1926); Camp v. Boyd, 229 U.S. 530, 559-60 (1913); Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.), 186 F.3d 1356, 1386 (Fed. Cir. 1999).

The Estate Representatives placed much emphasis on the fact that GPEG failed to deliver the written guaranty which its own Senior Vice President (and its wholly-owned subsidiary Deltak) *expressly undertook* to provide, but the Debtors' failure to deliver the signed GPEG guaranty utterly fails as a basis for relieving them of their obligations here.

The Bankruptcy Court's failure to allow SNC the benefit of the equities of the case was particularly egregious given the Bankruptcy Court's own finding that the Debtors may have engaged in "strategic behavior", carefully timing the disclosure of intercompany debt so as to induce their HRSG creditors to waive claims against a subsidiary drained of cash by its parent for several years. The Bankruptcy Court's failure to apply the equitable maxim and treat the promised guaranty as having been delivered – as GPEG should have done – was reversible error on this record.

## IX.    CONCLUSION

It is neither fair nor equitable, nor in keeping with the express terms of the Bankruptcy Code or applicable Third Circuit Court precedent, to allow the Debtors to obtain a waiver or release of claims through false, incomplete and misleading statements. For all of the foregoing reasons, the Claims Order issued by the Bankruptcy Court on December 21, 2007 should be reversed and the matter remanded to the Bankruptcy Court with instructions (i) to excise the

---

[39] Sitting as a court of equity, the Bankruptcy Court unquestionably had the power and authority to implement such equitable maxims. See 11 U.S.C. § 105(a).

waiver and step-down provisions of §§ 2.1 and 2.2 from the Completion Agreement as

unenforceable, (ii) to make findings as to SNC's money damages against Deltak and GPEG

arising from the Debtors' breach of the HRSG Purchase Order and their failure to deliver the

promised parent guaranty, without regard to any alleged waiver or step-down, and (iii) grant such

other and further relief as is just and proper.

Dated: May 15, 2008
Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC

William D. Sullivan (No. 2820)
Elihu E. Allinson, III (No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191

and

SULLIVAN & WORCESTER LLP

Patrick P. Dinardo
Paul E. Summit
Pamela Smith Holleman
One Post Office Square
Boston, MA 02109
Tel: (617) 338-2800

*Attorneys for SNC-Lavalin Power Ontario, Inc.*

50

## CERTIFICATE OF SERVICE

     I, William D. Sullivan, do hereby certify I am not less than 18 years of age and that on this 15th day of May 2008, I caused a copy of the foregoing *Appellant's Opening Brief* to be served upon the parties listed below in the manner indicated.

| HAND DELIVERY: | FIRST CLASS MAIL: |
|---|---|
| Jeffrey M. Schlerf, Esq.<br>Eric M. Sutty, Esq.<br>Mary E. Augustine, Esq.<br>THE BAYARD FIRM<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE 19801 | Steven D. Pohl, Esq.<br>BROWN RUDNICK BERLACK ISRAELS LLP<br>One Financial Center<br>Boston, MA 02111 |
| Adam G. Landis, Esq.<br>John H. Strock, Esq.<br>LANDIS RATH & COBB LLP<br>919 Market Street, Suite 600<br>Wilmington, DE 19801 | Howard L. Siegel, Esq.<br>BROWN RUDNICK BERLACK ISRAELS LLP<br>City Place I<br>185 Asylum Street<br>Hartford, CT 06103 |
| Mark Minuti, Esq.<br>Jeremy Ryan, Esq.<br>SAUL EWING LLP<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, DE 19899 | Jeffrey S. Sabin, Esq.<br>David M. Hillman, Esq.<br>SCHULTE ROTH & ZABEL LLP<br>919 Third Avenue<br>New York, NY 10022 |
| David M. Klauder, Esq.<br>UNITED STATES TRUSTEE<br>844 King Street, Suite 2207<br>Wilmington, DE 19801 | |

     Under penalty of perjury, I declare that the foregoing is true and correct.

| *May 15, 2008* | */s/ William D. Sullivan* |
|---|---|
| Date | William D. Sullivan |