**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) | Case No. 06-11045 (BLS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| SNC-LAVALIN POWER ONTARIO, INC. | ) | |
| | ) | |
| Appellant, | ) | Civil No. 1:08-cv-00024 (JFF) |
| | ) | |
| v. | ) | |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) | |
| | ) | |
| Appellees. | ) | |

**APPENDIX TO APPELLANT'S OPENING BRIEF
VOLUME IV
(Compendium of Canadian Cases)**

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

-- and --

SULLIVAN & WORCESTER LLP
Patrick P. Dinardo, Esq.
Paul E. Summit, Esq.
Pamela Smith Holleman, Esq.
One Post Office Square
Boston, MA 02109
Tel: (617) 338-2800
Fax: (617) 338-2888

Dated: May 15, 2008
    Wilmington, Delaware

*Attorneys for Appellant,
SNC-Lavalin Power Ontario, Inc.*

## INDEX OF CANADIAN CASES

Active Customs Brokers Ltd. v. Sack, [1987] 37 B.L.R. 229 .................................................. Tab 1

Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek
Construction Co.), [2003] O.J. No. 2320............................................................................. Tab 2

Harvie v. Gibbons, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.)................................................... Tab 3

Paquette v. Smith, [1989] 70 O.R. (2d) 449 ............................................................................ Tab 4

Pullano v. Yellowhead Timber Ltd., [1994] B.C.J. No. 1317 (QL) ......................................... Tab 5

SPX Canada Inc. v. Watts, [1995] A.C.W.S.J. 630732 ............................................................ Tab 6

Travel Machine Ltd. v. Madore, [1983] 143 D.L.R. (3d) 94..................................................... Tab 7

# EXHIBIT 1

*Indexed as:*
## Active Customs Brokers Ltd. v. Sack

**IN THE MATTER OF an action commenced in the North York
Small Claims Court under the Small Claims Court Act,
R.S.O. 1980, Chapter 476 and under the Provincial Court
(Civil Division) Project Act, R.S.O. 1980, Chapter 397;
Between
Active Customs Brokers Ltd., Plaintiff (Respondent), and
Roy Sack, Defendant (Appellant)**

[1987] O.J. No. 1082

Action No. 535/86

25 O.A.C. 305, 37 B.L.R. 229

Supreme Court of Ontario - High Court of Justice
Divisional Court - Toronto, Ontario

**Campbell J.**

Heard: November 20, 1987
Judgment: November 30, 1987

*Guarantees -- Oral guarantee outside provisions of Statute of Frauds where guarantor has
substantial personal property interest in subject matter of guarantee -- Statute of Frauds, R.S.O.
1980, ss. 2, 5, 6.*

This was an appeal by the defendant president of a company against a judgment against him on
his oral guarantee of the debts of his company on the ground that the trial judge erred in finding
that the defendant had a substantial benefit or interest in the subject matter of the guarantee such
as to take it out of the provisions of the Statute of Frauds.

HELD: The appeal was dismissed. The appellant and one other were the officers of the company.
The debt was substantially his own debt. The defendant had a personal property interest in the
company to protect by making the guarantee.

S.E. Rosenthal, for the Plaintiff (Respondent).
A. O'Brien, for the Defendant (Appellant).

---

**CAMPBELL J.** (orally):-- This is an appeal from a decision of Judge Fitzpatrick holding the
defendant, Roy Sack, liable on his oral guarantee of the debts of his company, Baccarat

Industries.

The ground of appeal is that the learned trial fudge erred in holding that Mr. Sack himself had a sufficiently substantial benefit or interest of his own in the subject matter of the guarantee so as to take it out of the provisions of the Statute of Frauds.

The plaintiff and the defendant had done business for some time together and the plaintiff had experienced difficulties in getting payment from Baccarat Industries. He was reluctant to extend further credit to the company.

The plaintiff, after some discussion with Mr. Sack, agreed to extend credit to the company, so long as Mr. Sack gave his personal guarantee of the company's obligation. The learned trial judge found, as a fact, that Mr. Sack gave his oral guarantee, personally, of the obligations of the company. The company defaulted and the plaintiff sought to enforce Mr. Sack's oral guarantee.

The question before Judge Fitzpatrick was whether or not the defendant Roy Sack had such a substantial benefit or interest of his own to protect in the subject matter of the case, which was the debt of the company and its guarantee by him, as to take the case out of the Statute of Frauds.

The evidence before the learned trial judge was that the company had been incorporated by Mr. Sack in 1979 and that he had continued as its president. Mr. Sack justified that there was one other officer of the company. The company was referred to in the evidence as Mr. Sack's company.

The learned trial judge, in directing himself to the question whether Mr. Sack had a substantial benefit or interest such as would take the guarantee out of the Statute of Frauds, said this:

> The court finds that the defendant is president of Baccarat Industries and had a direct benefit in ensuring that materials kept coming. This would keep the company in business, and the bank happy, and be a direct benefit to the president of Baccarat Industries, who otherwise would lose all interest in his company. The defendant had a substantial interest in making the promise to guarantee the payment, and the plaintiff is therefore entitled to enforce the guarantee, notwithstanding the absence of writing.

This finding, together with the evidence which supported it, made it clear that in this case Mr. Sack had a personal property interest of his own in the company to protect by making the promise. The promise was made to protect or further his own interest in the company. He had, to use the language set out in some of the cases, a real advantage in connection with the property to sustain his promise to pay the debt of the company. his promise was not in substance a promise just to pay the debt of another, but a promise to pay something that was, substantially, his own debt.

I see nothing in the cases of Jack-O Pumpkin Ltd. v. Simon's Delicstessen Products Ltd., et al. 35 O.R. (2d) 539, or in the case of John C. Love Lumber Co. Ltd. v. Moore et al., [1963] 1 O.R. 245, that causes me to resile from the legal conclusion reached on the evidence by Judge Fitzpatrick, based on his findings of fact.

In the result, there is no error in law in the judgment below, and the appeal will be dismissed.

CAMPBELL J.

# EXHIBIT 2

*[2003] O.J. No. 2320; 2003 ON.C. LEXIS 1524, **

Between Ferrell Builders Supply Limited, plaintiffs, and 1234932 Ontario Limited, carrying on business under the name and style of Megatek Construction Company and Filippo Mizzi, defendants

**INDEXED AS:** Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.)

Court File No. 00-2581

Ontario Superior Court of Justice

**JUDGES:** Whitten J.

[2003] O.J. No. 2320; 2003 ON.C. LEXIS 1524

**DATE INFORMATION:** Heard: May 12, 2003. Judgment: June 3, 2003.

**JUDGMENT DATE:** June 3, 2003

**COUNSEL:**
**[*1]** Rocco Grilli, for the plaintiff.
V. William Andreou, for the defendant, Filippo Mizzi.

**JUDGMENT:**
[1] WHITTEN J.:-- Ferrell Building Supplies Ltd. is an Ontario corporation that supplies masonry products (hereinafter referred to as Ferrell). Megatek is the name in which an Ontario numbered corporation; namely 1234932 Ontario Limited carries on business (hereinafter referred to as Megatek). In the fall of 1999 a sales representative of Ferrell contacted Megatek who apparently was in need of masonry supplies for a townhouse project. A credit application was completed by Filippo Mizzi on behalf of Megatek. Three shipments of masonry supplies were made between January and July 2000. The first and third were paid by Megatek, however, the second shipment worth $ 34,882.54 remains outstanding. Megatek did not defend this matter at trial and judgment was entered accordingly. Filippo Mizzi was joined as a defendant as part of the credit application form completed on behalf of Megatek contained a personal guarantee.

[2] The issue for this court to decide is whether in all of the circumstances of this matter is Filippo Mizzi personally liable for the outstanding indebtedness of Megatek.

Trial Testimony **[*2]**

[3] Dominic Galeazza testified that as a sales representative for Ferrell he had received from another sales representative the name of Megatek as a possible consumer of Ferrell materials. Mr. Galeazza made contact with Carmello Mizzi who spoke of a need for a particular kind of brick in the construction of townhouses in Unionville. Carmello Mizzi was apparently one of four brothers. Mr. Galeazza met with Carmello Mizzi and one other brother who apparently ran the Megatek business. Mr. Galeazza received a full set of plans

from Carmello in order to quantify the amount of brick necessary. Carmello inquired as to the availability of the brick in question. Ferrell had the brick in stock. It was Mr. Galeazza who left the credit application with Carmello to fill out and send in.

[4] The Credit Application was received back October 22, 1999 faxed by Megatek. Exhibit #4 is the faxed copy it is in letter size, as that was how the FAX machine was set up, complete with coversheet which refers to Carmello Mizzi as the sender on behalf of Megatek. Exhibit #8 is a copy of the original legal size credit application. If the application had not been received Mr. Galeazza would have contacted **[\*3]** Megatek to inquire as to its whereabouts. If received, the application would cause an account to be opened, otherwise materials are delivered on a C.O.D. basis.

[5] On or about January 22, 2000 the first shipment of brick occurred. Exhibit #5 represents the invoices for that shipment. On the Invoice No. 2049799 Carmello's name is mentioned as it is on Order No. 405047. Other invoices and orders refer to "Joe". Still others refer to "Dom G". In any event this shipment was paid for.

[6] The second shipment took place in March and April of 2000. This as previously mentioned is the outstanding amount. Exhibit #6 represents the invoices and orders pertinent to this shipment.

[7] Exhibit #7 is a collection of invoices pertaining to a shipment in June and July 2000. This account was paid for.

[8] Mr. Galeazza had no contact with Filippo Mizzi. He did have contact with another brother at the job site; namely Joe Mizzi. It was not Mr. Galeazza's responsibility to review the credit application, he was, however, to verify its existence before product was shipped.

[9] Libertore Ferrelli is the Secretary-Treasurer of Ferrell. He explained something of the history and product line **[\*4]** of Ferrell. The credit application was received by fax October 22, 1999. There were three signatures on the application (all apparently from the same person). It was in his opinion complete, notwithstanding various blank spaces. In this instance the credit that was sought was between $ 20,000. and $ 50,000. An account would have to be paid by the 15th of the month following the delivery.

[10] The second shipment amount of $ 34,882.54 was outstanding. Exhibit #9 represents a handwritten note that he faxed to Carmello/Joe Mizzi, September 5, 2000.

[11] In cross-examination Mr. Ferrelli confirms that the application was completed in the top right corner, and as such this would indicate that the application was approved. Even though the bottom of the form which talks of "Accepted for Ferrell Builders Supply Ltd. By ...." was not completed, the fact was that the application was approved. It would be either the accounts receivable person or himself who would approve the application. He himself did not review this application, therefore, it must have been the accounts receivable personnel who approved this application.

[12] Mr. Ferrelli agreed there were incomplete parts to the **[\*5]** application, he doubted that there would be calls to have the blanks filled in. Specifically, there are blanks in the five numbered paragraphs described as "terms and conditions". He agrees that normally the blank in condition #1 would be completed by an individual with respect to a company name that would be inserted in the second blank. No. 3 would call for the insertion of a company name. No. 4 is a personal guarantee for an individual to complete. No. 5 is a confirmation that an individual has read the contents of the application and understands them.

{B0688542; 1}

[13] Mr. Ferrelli had had no personal contact with Mr. Filippo Mizzi. He had never called him. He did have a conversation with Carmello Mizzi when he was considering liening the project, but was persuaded not to, as there were other jobs coming up. The inference being that Ferrell would be the supplier for these other projects and would ultimately be paid.

[14] Filippo Mizzi testified he was the project manager for Megatek, in other words, he would manage the job site from the office. It is his signature on 3 occasions on Exhibit #4 (Exhibit #8). He recalls signing the document. Mr. Mizzi is neither a shareholder and **[*6]** director in Megatek. This fact appears to be borne out by Exhibits #10 and 11, namely; a copy of the articles of incorporation, and the registration under the Business Names Act respectively.

[15] Mr. Mizzi testified that he was authorized to sign such documents on behalf of the company, Megatek. Someone actually filled in the body of the application. He understood that when he was described as a principal of the corporation, that was someone who was in charge. All of the information or detail provided with respect to the corporation was true. He did not recall the description "Personal Guarantor" beside his name. He did not focus on that characterization. He did not intend to personally guarantee the indebtedness of the company.

[16] In cross-examination, Mr. Mizzi testified that his cousin, Mr. Mario Bordonaro, the principal shareholder and director according to Exhibits #10 and #11 asked him to complete the form, Bordonaro made this request as he was out of town.

[17] At that time, Mr. Filippo Mizzi was managing two job sites for the corporation. His brother Joe Mizzi was actually on site running the projects.

[18] Mr. Filippo Mizzi agrees that his cousin Mario told him **[*7]** to read over the credit application. Mario did not tell him where to put his signature. It was the witness' decision as to where he put his signature. He read over the document before signing it.

[19] Mr. Mizzi explained that he had been in the construction business for ten years. He understood principal to be the site manager, he has since come to understand that designation differently.

[20] In any event, he was authorized by Mario to sign on behalf of the corporation. It was his opinion that the company required credit in the range set out on the application. He would benefit in having a job, if the credit was extended.

[21] Mr. Mizzi testified that he did not read the rest of the document as he had had nothing to do with personally guaranteeing the indebtedness. He merely signed at the bottom of the document to verify the truth of the contents.

[22] Mr. Mizzi acknowledged that the words "Personal Guarantor" were there when he signed the document, beside his signature. He agreed that the purpose behind signing the credit application was to get credit i.e.: that the company would receive product and have time to pay for it. The product was consequently shipped to the **[*8]** site. As for whether he read the portion of the agreement below the credit amount sought, he could not recall at the time of his testimony if he read it or not.

[23] In reply, Mr. Mizzi stated that he would have read that portion of the application, if he filled it in. As it was, Ferrell was not the only brick supplier Megatek was dealing with at the

time.

Analysis

Statute of Frauds R.S.O. 1990 S. 19

[24] The applicable section of the statute is section 4 which reads in part;

"No action shall be brought to ... any person upon any special promise to answer for the debt, default ... of any other person ... unless the agreement upon which the action is brought or some memorandum or note thereof is in writing and signed by the party to be charged therewith ..."

The Position of the Defendant Filippo Mizzi

[25] Counsel for this defendant advances that the statute is applicable, and that the credit application Exhibit 4 and 8 fails to satisfy the requirements of the statute in that there are significant omissions. In Imperial Bank of Canada v. Nixon (1926), 59 O.L.R. 538 (Supreme Court of Ontario (Appellate Division), two documents were produced to establish a guarantee: a statement **[*9]** of affairs of the defendant, and the endorsement on the guaranty. The latter document omitted any reference to the name of the bank customer whose account was guaranteed. Justice Middleton stated that "the contract must be found in the writing and (that this) failure ... results in a document which omits the most material factor of the contract and so fails to supply the evidence in writing required by the Statute of Frauds". (underlining mine) (p. 542)

[26] In his analysis in AGS Electronics Ltd. v. Sherman (1980) 19 B.C.L.R. 22, Justice Callaghan of the Supreme Court of British Columbia describes how before the changes in 1958 to the British Columbia Statute of Frauds, the wording was as per the Ontario statutes. That previous wording had been interpreted to require the essential terms of the contract. The basic essential terms being "parties, property and price". If the "parties" were omitted that would prevent the enforcement of the guarantee. One of the authorities for this proposition cited by Justice Callaghan was Imperial Bank v. Nixon.

[27] The British Columbia statute had been changed to read instead of "note or memorandum", "evidenced in writing". Apparently, MacDonald **[*10]** J. of the British Columbia Supreme Court in Transco Mills Ltd. v. Lorrie [1975] W.W.D. 141, 59 D.L.R. (3d) 665 interpreted that "evidence in writing" "prima facie ... means that every term or element of the agreement or transaction is found in a document or documents." (as quoted in AGS Electronics at p. 27) Justice Callaghan agreed with this statement. It is noted that no authority is cited by Justice MacDonald for his "prima facie" observation. This progression from "material or essential terms" to "all terms" is made without there being an expressed rationale.

[28] Given the above authorities, counsel advances that the omissions contained in what is described as "terms and conditions" in this Credit Application is fatal to the enforcement of the guarantee under the statute. These omissions, it is stated, do not establish the identity of the principal debtor or the fact that Mr. Filippo Mizzi is guaranteeing the debt of the debtor.

The Position of the Plaintiff

[29] "(I)n the absence of fraud or misrepresentation, a person is bound by an agreement to which he has put his signature whether he has read its contents or has chosen to leave them unread." **[*11]** Robins J.A. in Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co. et al (1997), 34 O.R. (3d) 1. To hold otherwise, Justice Robins states would lead to the absurdity of a person not having read a document being in a better position than one who had. Although, Mr. Mizzi equivocates there is evidence he read the application in question. Therefore, whether or not he read the application is not really an issue.

[30] Counsel for the plaintiff advances two arguments with respect to the statute. The first argument is that if one takes a holistic approach to the Credit Application, the requirements of the statute are met in that the essential elements are set out. Alternatively, it is advanced that the statute is not applicable as the application is in reality part of a wider on-going relationship.

[31] In SPXC Canada Inc. v. Watts, [1995] B.C.J. No. 83 (British Columbia Supreme Court), Justice Hall speaks of courts since the inception of the Statute of Frauds, chafing against the rigidity of the statute, that at times it was an engine of fraud rather than as the curative device it was originally intended to be (at **[*12]** para. 18).

[32] Obviously, any case is contextual, one must look at the documentation in its entirety. In this matter, there is a single document. Clearly Mr. Filippo Mizzi is holding himself to be a principal of Megatek. On that company's behalf he applies for credit in the range of $ 20,000 to $ 50,000. He provides banking information relating to the company so that Ferrell presumably can verify if it wishes, the financial health of Megatek. Other names in the construction industry are provided so that the reputation of Megatek can be discerned. The terms and conditions establish that any outstanding account is due by the 15th of the following month, and that an interest rate of 2% per month will apply to outstanding accounts. Clearly the principal debtor is Megatek. Whatever ambiguity exists as to the role of Mr. Mizzi as principal of Megatek and as a personal guarantor is minimal, especially so when he signs as a personal guarantor. In other words, the omissions in the terms and conditions are not essential in that the parties and their respective capacities is clearly established on the face of the document. Therefore, the requirements of the statute are met.

[33] **[*13]** Alternatively, the Credit Application is described as being incidental to a wider on-going relationship. This distinction is referred to in paragraph 4819 of Chitty on Contracts 25th edit (1978) referred to by Justice Sutherland in **Travel Machine** Ltd. v. Madore (1983), 143 D.L.R. (3d) 94 (Ont. High Court of Justice). The learned author states that a promise to answer for the debt of another does not come within the ambit of the Statute of Frauds if the promise is incidental to a wider transaction. "The question is whether the main object of the parties is that one should guarantee the liability of another, or whether it is to enter a different sort of transactions altogether. Thus where a person contract to buy goods as agent for a principal, on the terms that he is liable for the price if the principal fails to pay, this does not fall within the section even though the agent is in a sense promising to answer for the debt of the principal, for the object of the parties is to effect a sale of goods, not to enter into a contract of guarantee." (at page 99)

[34] In **Travel Machine** Ltd. v. Madore, Justice Sutherland found that the oral guarantees given **[*14]** by the respondent were part of a wider economic relationship where the person contracted to buy goods as agent for his principal on the terms that he is to be liable if the principal fails to pay, and the statute does not apply because the parties intended to cause a sale of goods. (Ibid) In **Travel Machine,** the defendant wished to ensure the sale

of travel services and the oral guarantee arose in a pre-existing commercial relationship. With such an exception, the jurist also looks to see if the person who makes the promise, but for the liability, is totally unconnected to the transaction or do they have an interest in the transaction, independent of the promise.

[35] In the case at hand, counsel argues that Mr. Mizzi appears to be operating in concert with his brothers, at least Joe and Carmello in the operation of Megatek. Filippo would benefit in that this enterprise i.e.: Megatek with which he is involved, ostensibly as the project manager, would get bricks on credit and therefore, his employment is perpetuated for this project at Unionville. Counsel notes that generally Megatek and the Mizzi brothers have an on-going relationship with Ferrell in which they obtain masonry **[\*15]** materials on credit. Given this relationship and the independent benefit, counsel argues that the Statute of Frauds is not applicable.

Conclusion

[36] The issue at hand, must be approached with a degree of commercial common sense. Mr. Filippo Mizzi indisputably had the authority of Megatek to bind the corporation in its application for credit from Ferrell. He provided financial details with respect to Ferrell, he sought a specific line of credit on behalf of that corporation. There is no dispute with respect to the fact of and the intent of this Credit Application.

[37] Viewing the document in its entirety, the role of the party Megatek is clear, it is the principal debtor or customer seeking credit with respect to the supply of materials. Megatek, leaving aside the issue of the personal guarantee would be bound by the terms and conditions even though there are blanks. The obligation of Megatek is based on the submission (or faxing) of the application. There is no effort to change the terms of the credit. Megatek obtained masonry materials as a consequence of this application. It would be abhorrent to principles of equity and specific performance to hold otherwise. The **[\*16]** omissions or in-completed blanks do not detract from this liability.

[38] Mr. Mizzi completed the application with the intent that he be treated as having the authority to bind Megatek. The evidence at trial supports his authority. His name is printed in accordance with the instructions on the form as "personal guarantor". He signs immediately below that identification of him. In my opinion, the parties and their roles are established. There is both an application for credit, and a guarantor. The essential roles are set out. The omissions do not detract from these roles. The roles of Mr. Mizzi as principal and as guarantor make for an inferential completion of the blank spaces or omissions. The essential elements are there. To hold that the omissions or spaces represent elements which should have been specifically completed in order to satisfy the requirements of the statute would be an exercise of the rigid approach of yesteryear which caused more inequities than fairness. Thus if one were to apply the statute, the personal guarantee would stand.

[39] Alternatively, it is possible to view the credit application in the context of a wider relationship between Megatek and **[\*17]** Ferrell. Megatek by submitting such a Credit Application was able to obtain specific masonry materials. There were three deliveries and the hint of more. It was this latter hint of future consumption at other job sites that that caused Ferrell not to place a lien with respect to the second delivery. No doubt the payment by Megatek of the third delivery, advanced the sense of an on-going relationship. The relationship of Filippo Mizzi to Megatek is somewhat vague, yet he enjoys the trust of the principal shareholder of Megatek to commit the company to provide financial details. He is not a stranger to the affairs of the company. He is one who can be put forth as a principal

on the spur of the moment. He is part of the team that comprises Megatek. He benefits in that he is employed in on-going projects. Accordingly, if I am in error in that the statutory requirements are met, I am of the view that there is an on-going relationship between Megatek and Ferrell, and Mr. Mizzi's, guarantee survives notwithstanding the statute.

[40] Accordingly, there will be a judgment against Mr. Mizzi as there was against the corporation for $ 34,882.54 with interest at the rate of 2% per month, **[*18]** up until the Statement of Claim was issued, and henceforth from that date, interest shall be calculated in accordance with The Courts of Justice Act.

[41] Counsel may exchange and file submissions as to costs within 30 days of the date of this judgment, or within that time frame establish a date to argue same.

WHITTEN J.

# EXHIBIT 3

Westlaw.

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

▷
1980 CarswellAlta 20

### Harvie v. Gibbons

### HARVIE and HAWRYLUK v. GIBBONS

Alberta Court of Appeal

Clement, Moir and Laycraft JJ.A.

Judgment: February 7, 1980
Docket: Edmonton App. No. 12804

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Counsel: H.J.L. Irwin, for appellants.

A. H. Lefever, for respondent.

Subject: Property; Evidence; Contracts

Evidence --- Corroboration -- Corroboration of evidence in actions involving deceased -- Sufficiency of corroboration -- General.

Statute of Frauds --- Compliance with statute -- Proof of memorandum -- Availability of parol evidence -- Connecting written documents.

Specific performance -- Particular contracts -- Sale of land -- Cheque endorsed by testatrix -- Later memoranda by executrices -- Statute of Frauds satisfied -- Sufficient corroborative evidence to satisfy Evidence Act, s. 13 -- Executrices lawful representatives so as to bind estate by actions.

The appellants appealed an order for specific performance of an agreement for sale of land entered into between the respondent and the deceased.

Held:

Appeal dismissed.

The deceased endorsed a cheque for a deposit on the land and also drew a map indicating the land sold and gave it to the respondent. After the deceased's death the respondent held several conversations with the executrices and obtained permission to harvest the land. There were several memoranda signed by the executrices. There was sufficient material to satisfy the Statute of Frauds. No rigid or precise form of memorandum was prescribed by the Statute of Frauds, so long as the essential terms were stated and several documents could be connected to each other by reasonable inference, with parol evidence if necessary, to constitute a sufficient memorandum. The cheque had the signature of the party to be charged, and it was reasonable to connect the other memoranda into an agreement.

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

The executrices, whose signatures appeared on the other memoranda, were the lawful representatives of the testatrix and able to bind the estate. All of the memoranda did not have to be made at the same time or previous to the death of the testatrix. There was no question of fraud or undue influence.

Section 13 of the Evidence Act did not require corroboration of every particular of the agreement. It was only necessary that the testimony produce inferences or probabilities tending to support the truth of the respondent's story. The endorsement of the cheque, conversations with the executrix's son, and harvesting of the field corroborated her story. The price, property and parties were all ascertainable, so an agreement had been reached.

Cases considered:

Black v. George McKean & Co. (1921), 62 S.C.R. 290, 68 D.L.R. 34 -- considered

Caisley v. Stewart (1911), 18 W.L.R. 415 (Man.) -- considered

Doran v. McKinnon (1916), 53 S.C.R. 609, 31 D.L.R. 307 -- considered

Hoyle, Re; Hoyle v. Hoyle, [1893] 1 Ch. 84 (C.A.) -- considered

Long v. Millar (1879), 4 C.P.D. 450 (C.A.) -- considered

McKenzie v. Walsh, 61 S.C.R. 312, [1921] 1 W.W.R. 1017, 57 D.L.R. 24 -- considered

Pearce v. Gardner, [1897] 1 Q.B. 688 (C.A.) -- referred to

Radford v. Macdonald (1891), 18 O.A.R. 167 -- considered

Rattenbury (N.) Ltd. v. Winchester, [1950] 3 D.L.R. 826, affirmed 31 M.P.R. 69 (P.E.I.C.A.) -- referred to

Smallman v. Moore, [1948] S.C.R. 295, [1948] 3 D.L.R. 657 -- applied

Stammers v. O'Donohoe (1884), 11 S.C.R. 358 -- referred to

Standard Realty Co. v. Nicholson (1911), 24 O.L.R. 46 -- considered

Stephenson v. McLean (1977), 4 Alta. L.R. (2d) 197 (T.D.) -- considered

Timmins v. Moreland Street Property Co., [1958] Ch. 110, [1957] 3 All E.R. 265 (C.A.) -- distinguished

Turner v. Hatton, [1952] 1 All E.R. 1286 -- referred to

Ward v. Coffin (1972), 4 N.B.R. (2d) 481, 27 D.L.R. (3d) 58 (C.A.) -- considered

White v. Carson (1975), 13 N.B.R. (2d) 357 (Q.B.) -- referred to

Statutes considered:

Alberta Evidence Act, R.S.A. 1970, c. 127, s. 13.

Administration of Estates Act, R.S.A. 1970, c. 1, ss. 2(g), 33.

Statute of Frauds.

Appeal from decision awarding specific performance of agreement for sale of land.

{B0694714; 1}Copr. © West 2007 No Claim to Orig. Govt. Works

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

**The judgment of the court was delivered by *Lycraft J.A.*:**

1    This action for the specific performance of an agreement for the sale of land establishes, if further proof were needed, that the interpretation of the Statute of Frauds, even after some 300 years, remains a fruitful source of litigation. The issues are whether several documents may be read together to constitute the "note or memorandum" required by the statute, whether there is a sufficient signature of the party to be charged, and whether the land description is sufficiently precise. The appellants also urge that there is no corroboration of the evidence of the plaintiff in a claim against the estate of a deceased person as required by s. 13 of the Alberta Evidence Act, R.S.A. 1970, c. 127.

2    Prior to December 1975, the deceased, Alice Marie Bakken, was the owner of an irregularly shaped piece of land which was the portion of a quarter section south and west of highway 36 which had been built through the land. From this portion, which adjoins the hamlet of Dixonville, some lots had been subdivided out. Mrs. Bakken still owned lot 7 and lot 4 as well as all the other land in the parcel which had not been subdivided. A plan of the land not to scale was somewhat as follows:

*[Graphic not reproduced].*

3    During the week of 12th December 1975, Mrs. Bakken telephoned Mrs. Gibbons to state that there was a prospective buyer who wished to buy lot 4. Mrs. Gibbons held a long-term lease on lot 4 which contained an option to purchase the lot for $100. After consideration, Mrs. Gibbons decided she would exercise her option on lot 4 and in addition would offer $1,000 for the remainder of the land in the parcel which Mrs. Bakken still owned, that is, lot 7 and the unsubdivided portion.

4    Mrs. Gibbons gave evidence that she went to see Mrs. Bakken and in her presence made a copy of a map of the land which the latter had in her possession. She made her offer, which was accepted. She gave a down payment by means of a $200 cheque on which she wrote the words "Deposit payment for Lots 4 and No. 7 and balance of land in corner". She stated, however, that the $1,000 was to cover only lot 7 and the balance of the land, and not lot 4 for which she would pay an additional $100 as provided in her option. Mrs. Bakken subsequently endorsed and cashed the cheque. Mrs. Gibbons testified that Mrs. Bakken told her she would tell her daughter Thelma of the agreement and said to Mrs. Gibbons, "You will be safe." Mrs. Gibbons understood that a subdivision of the land had been approved, that a survey would shortly be done, and that she would get title when it was completed.

5    On 27th June 1976 Alice Marie Bakken died. Her daughters Helen Marie Harvie and Thelma Evelyn Hawryluk are executrices of her estate.

6    On 12th July 1976 Mrs. Gibbons and the two executrices attended the funeral of a mutual friend. Mrs. Gibbons says that Helen Harvie approached her after the funeral and said she was pleased that Mrs. Gibbons was buying the land since it would simplify the administration of her mother's estate. Mrs. Gibbons also says that on 15th August 1976 Mrs. Harvie's son, Dennis, approached her to say that there was a rumour she was not interested in the land. Mrs. Gibbons says she then telephoned Mrs. Harvie and said she still wanted the land. She also asked if she could harvest the hay on the land. Mrs. Harvie agreed and Mrs. Gibbons arranged for the harvest which was completed thereafter.

7    During October 1976 Mrs. Gibbons saw an advertisement in the paper giving creditors and claimants against Mrs. Bakken's estate until 22nd October to advise the executrices of their claims. On 21st October she went to visit the two executrices. At this meeting the two executrices each stated that they had no knowledge of the agreement which Mrs. Gibbons alleged she had with Mrs. Bakken. Mrs. Harvie also expressed concern that $1,000 would not even cover the expenses of the survey. The executrices had decided to have more lots surveyed and to sell them for more money. Alternatively they offered to let her have the land which was the subject of the alleged agreement for $1,000 plus all of the surveyor's fees. Mrs. Gibbons testified as follows on this aspect:

> Helen and Thelma told me that the four children, themselves and Donna and Norman, had decided to have more lots surveyed and sell them to make money. They offered to sell me the land that was left in the

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

corner, after the second row of lots was surveyed, for the $1,000.

THE COURT: They offered you what? I didn't understand that.

A. To say that the land that was left in the corner after the second row of lots that they proposed to survey - - it isn't marked on there -- they proposed to survey a second row of lots to sell.

THE COURT: In the triangle?

A. In the triangle, and they offered to sell me what was left for the $1,000. An alternate offer that they made at the same time was that if I paid all of the surveyor's fees, I could have the land. I couldn't agree to an open amount, but I did offer to go up to $1,500; that's $1,000 for the land and $500 on surveyor's fees.

MR. MCINTOSH: Would you say that amount, please, how much for the land?

A. $1,000 for the land and $500 towards the surveyor's fees.

THE COURT: In effect, you offered to pay $500 towards the fees?

A. Yes.

8    At Mrs. Gibbons' request, Mrs. Hawryluk wrote an unsigned memorandum of this portion of the discussion, which was introduced as Ex. 2. It stated:

Emma is willing to go up to $1,500. on triangle if required for surveyor's fee. If no surveyor's fee, Mother's wish is honored. If surveyor's fees are needed over the extra $500. we renegotiate.

9    Neither Mrs. Harvie nor her son Dennis was called as a witness to refute or explain the testimony of Mrs. Gibbons as to the conversations she alleged she had with Mrs. Harvie on 12th July, with Dennis on 15th August, and subsequently again by telephone with Mrs. Harvie. The only one of the executrices called was Mrs. Hawryluk, who stated that she and her sister became aware of the alleged land transaction for the first time at the meeting on 21st October. Referring to the memorandum in her handwriting, she testified:

Q. And I'm showing you Exhibit 2. Do you recognize that?

A. Yes.

Q. And was that some notes of yours on the occasion you met there in October?

A. That's right.

Q. And what did you mean by this: Emma is willing to go $1,500 on triangle if required for surveyor's fees?

A. She told us that she thought that the land was worth $1,000, but if the surveyor's fees were high, she would go up to $500, split the surveying fees or whatever it was.

Q. And what is this? It says: if no surveyor's fees, mother's wish honoured. What did this mean?

A. I really don't know.

10    At the meeting on 21st October, Mrs. Hawryluk also wrote a memorandum of questions which Mrs. Gibbons was to ask during a visit to the land titles office in order to determine whether the land could be conveyed without a

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

survey. Mrs. Hawryluk printed her name at the end of this memorandum. On the same day, the parties attended at a local store where copying equipment was available and made a copy of a map of the land to give to Mrs. Gibbons. At that time there was a conversation to the effect that the estate would not sell because it would cost them money to do it.

11    Two weeks later, the executrices wrote Mrs. Gibbons a letter signed by both of them stating that they had consulted the other beneficiaries of the estate. They stated:

> The decision that was reached was that we would return your two hundred dollar deposit on 'lots #4 and #7 and balance of land in corner', therefore we are enclosing a cheque for the amount of $200.00 (Two hundred dollars)

> When the title to the land is registered in our names we will give you first opportunity to buy the land if you are still interested:

> Sincerely yours.

12    The learned trial judge found that despite the claim by the executrices that they first learned of the alleged agreement on 21st October 1976, "at least Helen had knowledge". The learned trial judge had the advantage of seeing and hearing the witnesses and, in addition, was entitled to draw an inference adverse to the executrices from the fact that neither Mrs. Harvie nor her son Dennis was called to deny the conversations with them about the transaction which Mrs. Gibbons had related. I respectfully agree with the finding.

13    Dealing with Mrs. Gibbons' offer to pay $500 towards the survey fees, the learned trial judge said:

> The plaintiff offered to pay $500 towards survey fees. I find that this is not a negotiation involving a change in the purchase price of the contract that was made, but rather was voluntary on her part so that the deal could be concluded. I find that there was no change in the land price.

14    Although the price of the land is not expressly set forth in any of the documents, the learned trial judge found that it could be ascertained from the document written by Mrs. Hawryluk. He said:

> Deducting the fees that are needed over the extra $500 from the total of $1,500 mentioned in the first paragraph, and one easily arrives at the conclusion of the price being $1,000.

15    The learned trial judge concluded:

> It is clear that the defendants did not want to proceed because of surveyor's cost, and it is interesting to note that they never even got an estimate of what cost would be involved in that. Secondly, and perhaps more importantly, they wanted more money. That is the nub of the problem.

> The deceased did all of her own business. She strikes me as having been a person of experience, seems a very prominent person in her community, and she was well at the time the deal was made between herself and the plaintiff. No issue of undue influence or duress or mental incapacity was raised in this action.

> It is clear that the person to be charged, namely, the deceased and her estate, has signed. All of the documents taken together to which I have referred satisfy me that the three P's of parties, price and property have been ascertained. It is clear that there is a contract in existence, and its basic nature has been made out; and its terms.

> That is not to say, of course, that follow-up things like possession date and so on have not been agreed upon, but I am satisfied from all of the evidence, both verbal and from the documentation filed, that the plaintiff is entitled to specific performance of the agreement.

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

16    It is clear that no rigid or precise form of memorandum is prescribed by the Statute of Frauds, nor need the entire contract be contained in the writing. What is required is a statement of the essential terms of the contract. Moreover, the statute does not deal with the validity of the contract but with the evidence of its existence. In *Re Hoyle; Hoyle v. Hoyle*, [1893] 1 Ch. 84 (C.A.), Bowen L.J. said at p. 99:

> The Court is not in quest of the intention of the parties, but only of evidence under the hand of one of the parties to the contract that he has entered into it. Any document signed by him and containing the terms of the contract is sufficient for that purpose.

17    In *Standard Realty Co. v. Nicholson* (1911), 24 O.L.R. 46 at 53, Riddell J. said:

> ... it must never be forgotten that the Statute of Frauds does not deal with the validity of the transaction, but only with the evidence to prove an agreement.

18    The memorandum must set forth the material terms of the agreement. Though what is material will vary with the circumstances of each case, in land transactions the usual essentials are said to be "parties, property and price". In *McKenzie v. Walsh*, 61 S.C.R. 312, [1921] 1 W.W.R. 1017, 57 D.L.R. 24, Sir Louis Davies C.J. said of a memorandum of an agreement for the sale of land which was in the form of a receipt [p. 313]:

> ... have reached the conclusion that the memorandum or receipt is sufficient. That it must contain all the essential terms of the contract and must show that the parties have agreed to those terms is conceded by both sides. That it does do so, I conclude. The essential terms are the parties, the property and the price.

19    It is also well established that several documents may be connected to each other by reasonable inference, with parol evidence if necesssary, to constitute a sufficient memorandum. This principle has been stated in a series of cases commencing with *Long v. Millar* (1879), 4 C.P.D. 450 (C.A.), and has been adopted in Canada. In *Stammers v. O'Donohoe* (1884), 11 S.C.R. 358, the court looked at 18 letters which had passed between the parties to see if together they made a sufficient memorandum. In *Doran v. McKinnon* (1916), 53 S.C.R. 609 at 613, 31 D.L.R. 307, Davies J. referred to *Long v. Millar*, supra, and said:

> In the latter case the purchaser signed a memorandum to purchase three lots of land, 40 feet frontage on Pickford Street, Hammersmith, for £310, and agreed to pay deposit in part payment of £31 and pay the balance and complete on the 1st October. The vendor (defendant) signed a receipt for the £31.
>
> deposit on the purchase of three plots of land, Hammersmith.
>
> Both documents were signed at the same time, and the Court held that they could be connected by parol evidence, and that, together, they formed a sufficient contract to satisfy the Statute of Frauds. In that case, Bramwell L.J. said (p. 454):
>
> I think that, subject to the point which has been raised as to the omission of the vendor's name from the agreement signed by the plaintiff and the receipt, there is a sufficient memorandum, and it appears to me that *Ridgway v. Wharton* (1854), 3 De G. M. & G. 677, 43 E.R. 266, affirmed 6 H.L. Cas. 238 (H.L.), and *Baumann v. James* (1868), 3 Ch. App. 508 (C.A.), are in point, and are decisive.

Bagallay L.J. says (p. 455):

> The true principle is that there must exist a writing to which the document signed by the party to be charged can refer, but that this writing may be identified by verbal evidence.

And Thesiger L.J., at p. 456, says:

> If, however, it appears from the instrument itself that another document is referred to, that document

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

> may be identified by verbal evidence. A simple illustration of this rule is given in *Ridgway v. Wharton*;
> there "instructions" were referred to; now instructions may be either written or verbal; but it was held
> that parol evidence might be adduced to show that certain instructions in writing were intended. This
> rule of interpretation is merely a particular application of the doctrine as to latent ambiguity. Although
> parol evidence may be given to identify the document intended to be referred to, it must be clear that
> the words of the document signed by the party to be charged will extend to the document sought to be
> identified.

20    Other Canadian cases to the same effect are *N. Rattenbury Ltd. v. Winchester, [1950] 3 D.L.R. 826*, affirmed
31 M.P.R. 69 (P.E.I.C.A.), and *White v. Carson (1975), 13 N.B.R. (2d) 357* (Q.B.). In the latter case, parol evidence
was permitted to connect an agreement written on paper on which was printed the defendant's name, with a cheque
for part payment and with a subdivision plan where the defendant had written the plaintiff's name on a lot. Among
the English cases permitting parol evidence for this purpose are *Pearce v. Gardner*, [1897] 1 Q.B. 688 (C.A.), and
*Turner v. Hatton*, [1952] 1 All E.R. 1286.

21    In my view the documents in this case are connected together on a fair and reasonable view of the evidence.
The map, Ex. 5, was drawn at the time the cheque was signed. That cheque, by the words "deposit -- payment",
establishes that the parties to it were entering into *some* transaction. It also establishes the identity of the parties,
namely, Alice Bakken and Emma Gibbons. The other words on the cheque, "On lots #4 and #7 and balance of land
in corner", show that the transaction was for the sale of land. It has on it the signature of the "party to be charged".
The land description is imprecise, but assistance is to be derived from the map drawn at the time of the agreement
and showing lots 4 and 7 as well as all the land south and west of the road through the quarter section.

22    If the notation on the cheque had said "on lots 4 and 7 and balance of land in corner as shown on the map
drawn by Emma Gibbons December 12, 1975" there would be no question that the documents referred to each other
and could be used to satisfy the statute. Following *Doran v. McKinnon*, supra, it is not essential that a direct
reference be made in one document to another if by a "fair and reasonable inference" they can be seen as referring to
and connected with each other. That may be established by parol evidence. Mrs. Gibbons testified that the map was
drawn by her in Mrs. Bakken's presence at the meeting where she gave the cheque and that the map showed the land
that was being purchased (A.B., pp. 111 and 126). In my opinion it would be a "fair and reasonable inference" that
the two documents are connected.

23    The imprecision of the land description on the cheque is capable of being made certain by parol evidence when
connected to the map and to the memorandum prepared at the meeting on 21st October. The term "the balance of the
land in the corner" is explained in Mrs. Gibbons' evidence. That the parties themselves clearly understood what land
was being discussed is shown by the harvesting of the hay crop and by the absence of any discussion about land
description on 21st October. The land being sold may be readily identified even though its precise legal description
is not set forth.

24    In *Caisley v. Stewart* (1911), 18 W.L.R. 415 (Man.), Robson J. said at p. 422:

> The other objection based on the Statute of Frauds is that the lots in Winnipeg to be taken in part payment
> are not sufficiently described. They are referred to as '6 lots in Winnipeg as listed with J. P. Bucknam &
> Son'. It is clear that parol evidence is admissible to follow up this reference to the lots so as to ascertain
> their exact identity.
>
> In Chitty on Contracts, p. 86, it is stated that parol evidence to identify references has been frequently
> admitted, and several authorities are referred to. Among these is cited *Shardlow v. Cotterell* (1881), 20 Ch.
> D. 90, which was relied on by the plaintiff here. In that case Jessel, M.R., and Baggallay, L.J., considered
> sufficient a writing signed on behalf of the defendant thus: 'Received of Mr. A. Shardlow the sum of £21 as
> deposit on property purchased at £120 at Sun Inn, Pinxton, on the above date; Mr. George Cotterell,
> Pinxton, Owner.' Jessel, M.R., said: 'I consider that any two specific terms are enough to point out
> sufficiently what is sold. For instance, "the estate of A.B. in the county of C.", or "the estate of A.B. which
> he bought of C.D.," or "the estate of A.B. which was devised to him by C.D." '

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

25    In *Ward v. Coffin (1972), 4 N.B.R. (2d) 481, 27 D.L.R. (3d) 58* (C.A.), the description of the land was challenged as being insufficient for the statute. Hughes J.A. said at p. 67:

> The defendant alleges that there are two deficiencies in the letter. The first relates to the identity of the two lots which the defendant undertook to convey to the plaintiff by deed. I think this objection has been adequately met by parol evidence which is admissible to make certain a general description in a memorandum which is capable of being made certain: see *Plant v. Bourne , [1897] 2 Ch. 281*, and *Zhilka v. Turney, [1955] O.R. 213, [1955] 4 D.L.R. 280* (H.C.), where Spence, J., referred to *Plant v. Bourne* at p. 303 saying:
>
>> The test would seem to be whether the description in the document is capable of being made certain, and whether parol evidence will make it certain.
>
> The parol evidence shows what cottages and contents were referred to, and the 'remaining land' combined with the reference to the land involved, in both transactions, (for both cottages)' can only mean both lots in which the deceased held an interest.

26    The price of the land may be taken from the note written at the 21st October meeting; it states:

> Emma is willing to go up to $1,500. on triangle if required for surveyors' fee. If no surveyors' fees, Mother's wishes are honoured. If surveyors' fees are needed over the extra $500. we renegotiate.

27    This note may be connected to the other documents by the references to "Emma", to the "triangle" and to "surveyors' fees" coupled with the parol evidence of both the plaintiff and Mrs. Hawryluk. A reasonable interpretation of "willing to go up to $1,500" and "over the extra $500, we renegotiate" in the context of surveyors' fees, in my opinion, leads unmistakably to the conclusion that the purchase price was $1,000.

28    It was urged on behalf of the executrices that it was necessary that the memorandum, to satisfy the Statute of Frauds, be derived only from documents completed prior to the death of Mrs. Bakken. In my opinion, this argument fails. As I have stated, what the court is seeking is not the agreement itself but evidence of the agreement. It is, of course, true that to be valid an agreement between Mrs. Bakken and plaintiff had to be complete in all respects prior to Mrs. Bakken's death. It does not follow, however, that evidence of that agreement cannot come into existence at a later time. The ordinary rule is that the memorandum or one of the documents making up its parts may come into existence at any time prior to the commencement of action. In Farrand, Contract and Conveyance (1973), at p. 33, it is said:

> This evidence, the memorandum, must have been brought into existence before the particular action on the contract commenced, i.e., by the time the writ was issued (see *Lucas v. Dixon (1889), 22 Q.B.D. 357*; cf. *Farr, Smith & Co. v. Messrs. Ltd.*, [1928] 1 K.B. 397). Apart from this, however, there is no time-limit after the contract within which to make the memorandum (e.g., *Barkworth v. Young (1856), 4 Drew. 1, 62 E.R. 1* -- over fourteen years later).

29    In this case three of the documents bear some signature, though two of them were signed by either or both executrices after Mrs. Bakken's death. The cheque, to which the other documents are related, bears Mrs. Bakken's endorsement. The memorandum of questions for Mrs. Gibbons to use during her visit to the land titles office has printed on it the name "Thelma Hawryluk", and the letter of 6th November 1976 with its references to "the lots and triangle of land you are interested in" and to "your two hundred dollar deposit on lots #4 and #7 and balance of land in corner" is signed by both executrices. The endorsement on the cheque would not, of itself, be sufficient, but when the other documents are connected to it both by statements in the documents themselves and by the evidence of Mrs. Gibbons and Mrs. Hawryluk, the signatures, in my opinion, satisfy the requirements of the statute, even though the signatures of the executrices were put on the document after Mrs. Bakken's death.

30    The appellant has cited *Timmins v. Moreland Street Property Co.*, [1958] Ch. 110, [1957] 3 All E.R. 265

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

(C.A.), as authority for the proposition that the endorsement on a cheque cannot be taken as a signature sufficient to satisfy the Statute of Frauds. In that case, however, the only document signed by or on behalf of the defendant company was the cheque. It contained no reference which permitted it to be connected with any other document or transaction. Standing alone, it could not be taken as a sufficient signature. In this case, however, the documents are connected together.

31     It is also my opinion that the executrices are persons "lawfully authorized", as that term is used in the Statute of Frauds. By s. 2(g) of the Administration of Estates Act, R.S.A. 1970, c. 1, they were "legal representatives" of the estate, and by s. 33 they had full and exclusive power to act for the estate. This term of the statute has been broadly interpreted to cover not only the acts of authorized agents but also to include ratification of an unauthorized agent's acts by the party to be charged as sufficient to satisfy the statute: *Maclean v. Dunn* (1828), 4 Bing 722, 130 E.R. 947.

32     In my view, there is a sufficient memorandum to satisfy the requirements of the Statute of Frauds.

33     The final defence advanced for the executrices was that Mrs. Gibbons' evidence in a claim against the estate of a deceased person is not corroborated as required by s. 13 of the Alberta Evidence Act. It is said that the sole evidence of the purchase price and of the identity of the land came from the uncorroborated evidence given by Mrs. Gibbons and therefore her claim must fail. I do not agree that Mrs. Gibbons gave the only evidence on those points. Nevertheless, even on the basis that the statement is correct, in my view it expresses far too stringent a test for the requirement of s. 13. The section does not require that every material fact be corroborated by independent evidence. Section 13 provides:

> 13. In an action by or against the heirs, next of kin, executors, administrators or assigns of a deceased person, an opposed or interested party shall not obtain a verdict, judgment or decision on his own evidence in respect of any matter occurring before the death of the deceased person, unless the evidence is corroborated by other material evidence.

34     The nature of the corroboration required under an Ontario provision identical with s. 13 in every material respect was considered by the Supreme Court of Canada in *Smallman v. Moore*, [1948] S.C.R. 295, [1948] 3 D.L.R. 657. The main consideration of corroboration was in the dissenting judgment of Kellock J., but the majority expressly concurred with him on this point. At p. 301 he said:

> ... the section here does not say that every fact necessary to be proved to establish a cause of action must be corroborated by evidence other than that of the interested party but that the evidence of the interested party itself is to be corroborated by *some other material evidence*. I do not think that the word 'matter' in the section is to be taken as synonymous with every fact required to be proved in establishing a cause of action and it has never, as far as I am aware, been so construed.

> In the leading case in this court, *Thompson v. Coulter* (1903), 34 S.C.R. 261, 3 O.W.R. 82, Killam, J., said at page 263:

> > In my opinion this enactment demands corroborative evidence of a material character supporting the *case* to be proved by such "opposite or interested party" ... Unless it supports that case, it cannot properly be said to "corroborate" ... At the same time the corroborating evidence need not be sufficient in itself to establish the case. ...

> It is clear of course that the corroborating evidence need not be that of a second witness but may be afforded by circumstances; *McDonald v. McDonald* (1903), 33 S.C.R. 145.

35     Kellock J. then cited with approval statements in *Black v. George McKean & Co.* (1921), 62 S.C.R. 290 at 308, 68 D.L.R. 34, and *Radford v. Macdonald* (1891), 18 O.A.R. 167. In the *McKean* case, Anglin J. said:

> ... all that the statute requires is that the evidence to be corroborated shall be

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

> strengthened by some evidence which appreciably helps the judicial mind to believe one or more of the material statements or facts deposed to,

and, as was said in *Green v. McLeod*, 23 A.R. 676,

> the "material evidence" in corroboration may consist of inferences or probabilities arising from other facts and circumstances.

36    In the *Radford* case, Osler J.A. said [p. 171]:

> Then the question arises in what degree, or to what extent? It has long been conceded that it need not be corroborated in every particular. Had that been the intention of the Act [the Evidence Act, R.S.O. 1887, c. 61], it would have been simpler to enact that the party in such case should not be a competent witness, since the evidence required in corroboration would alone be sufficient. Nor is corroboration required to be directed to any particular fact, or part of the evidence. It is the *evidence* of the party which is to be corroborated by some *other material evidence*. If then the evidence in corroboration is not required either to prove the contract itself or any particular fact deposed to by the party, the only test or formula which can be applied to it is that it must be relevant and material and calculated to lead to the belief that the evidence of the party is credible.

37    In the same case, Maclennan J.A. said at p. 173:

> I think, in such cases, the first question is, is the evidence admissible? and the further question, does it strengthen the evidence given by the party adducing it? If these two questions are answered in the affirmative, I think the evidence answers the requirement of the statute, provided the judge, or the jury, as the case may be, believe it.

> 'Corroborate' means to strengthen, to give additional strength to, to make more certain, and if the evidence helps the judicial mind appreciably to believe one or more of the material statements or facts deposed to by the party, then, I think, it is what is required by the statute.

38    This quotation was also cited with approval by Kellock J. in *Smallman v. Moore*, supra, though, in error, it is attributed to Osler J.A.

39    In *Stephenson v. McLean* (1977), 4 Alta. L.R. (2d) 197 (T.D.), Greschuk J. reviewed the extensive case law on this subject and derived the following principles as a guide to assessing whether there is sufficient corroboration under s. 13 [pp. 209-10]:

> (1) The statute does not require independent proof of the plaintiff's evidence and so the evidence relied on as corroboration need not completely prove an agreement or go so far as the plaintiff's evidence.

> (2) The statutory prohibition differs from the common law and should not be extended any further than its precise words require.

> (3) The test for corroboration is whether the evidence in question makes the plaintiff's evidence more probable or 'strengthened by some evidence which appreciably helps the judicial mind to believe one or more of the material statements'.

> (4) It is enough that the testimony produces inferences or probabilities tending to support the truth of the plaintiff's statement.

> (5) Corroboration may be circumstantial evidence and fair inference.

40    In this case, in my opinion, a number of factors strengthen the plaintiff's evidence and "appreciably help the judicial mind to believe one or more of the material statements". Mrs. Bakken's endorsement on the cheque is a

12 Alta. L.R. (2d) 72, 16 R.P.R. 174, 109 D.L.R. (3d) 559

factor; the conversation with Mrs. Harvie's son and the harvesting of the hay by Mrs. Gibbons are other such factors. The documents produced at the meeting of 21st October with the significant expression that "if no surveyors' fee, Mother's wish is honored", and the indirect reference to the price of the land support Mrs. Gibbons' evidence as well. The failure to call Mrs. Harvie or her son produces a fair inference that Mrs. Gibbons' evidence of her conversations with each of them is true and that Mrs. Harvie had been told of the transaction by her mother, Mrs. Bakken. In my view, the defence under s. 13 of the Alberta Evidence Act fails.

41    I would dismiss the appeal with costs to the respondent.

*Appeal dismissed.*

END OF DOCUMENT

# EXHIBIT 4



70 O.R. (2d) 449

**C**
1989 CarswellOnt 902

Paquette v. Smith

Roger Paquette, Appellant (Plaintiff); v. Walter Dennis Smith also known as
Denis Smith, Respondent (Defendant)

Ontario Supreme Court

Maloney J.

Judgment: November 16, 1989
Docket: Doc. 286/89

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors.  All rights reserved.

Counsel: Theo Wolder, for the appellant (plaintiff).

Donald A. Taylor, for the respondent (defendant).

Subject: Contracts

Statute of Frauds --- Compliance with statute -- Proof of memorandum -- What constitutes writing.

Courts of Justice Act, 1984, S.O. 1984, c. 11, s. 116(6)  -- Statute of Frauds, R.S.O. 1980, c. 481, s. 4.

Plaintiff made a written offer to vendor for the full asking price. Real estate broker telephoned vendor and informed
him of plaintiff's offer. Vendor advised real estate broker he would accept the offer. Real estate broker told plaintiff
his offer was accepted and noted in his records the details of the transaction, indicating the property had been sold.
Vendor refused to close the transaction. Plaintiff tendered the balance of the purchase price and brought an action
for specific performance and asked for a certificate of pending litigation. The issuance of the certificate was granted,
but defendant had the order vacated. Plaintiff appealed. Held, the certificate of pending litigation was granted.
Plaintiff had to show that there was a triable issue as to whether or not the documents and records constituted a
memorandum or note within s. 4 of the Statute of Frauds. All that was required was a statement of the essential
terms of the contract. Broker's written evidence indicated plaintiff had a reasonable claim to an interest on the land.

Maloney J.:

1    This is an appeal from an order made by Trembley D.C.J. on September 28th, 1989, by which he discharged a
Certificate of Pending Litigation which had been registered against certain land.

2    The respondent (defendant) Smith has owned the land, an island in the Rainy River, since 1975. In 1984 he
listed the property for sale with a real estate brokerage firm, a predecessor company to Landry's for Real Estate Inc.
(both to be referred to as "Landry's"), at a price of $15,400.00. There were no prospective buyers. In April, 1986,
Smith again listed the property for sale with Landry's at $15,400.00. Again, no one appeared interested in buying it.

70 O.R. (2d) 449

In July, 1988, Smith  listed the property, still with Landry's, for $9,800.00. The listing agreement was to expire at 11:59 p.m. on June 30th, 1989.

3    In mid-June, 1989, a prospective purchaser made an oral offer of  $5,000.00 on the property. Smith rejected this offer when it was relayed to him by Landry's.

4    On June 21st, 1989, the appellant (plaintiff), Roger Paquette, approached Landry's expressing an interest in buying the island. Landry's, drawing on its experience with the previous prospective purchaser, informed Paquette that the owner would insist on receiving the full purchase price. Paquette therefore made a written offer to purchase the property for $9,800.00.

5    Gus Landry, the president of Landry's, deposes that he telephoned Smith to advise him of Paquette's offer, and that Smith said he would accept the offer. Landry told Paquette that his offer had been accepted. This evidence is corroborated by that of Terrance Ashby, a friend of Paquette, who was present at Landry's when the offer was made. Further, Landry's telephone bill reveals a four minute call, starting at 4:40 p.m. on June 21st, to Smith's telephone number.

6    On the same day, Landry accepted a $1,000.00 cash deposit from Paquette, forwarded Paquette's written offer to Smith for signature, and filled in a document entitled Trade Record Sheet, saying, "I, Gus Landry, have today sold ... the property ... owned by Denis [sic]  Smith ... to Roger Paquette ... at a price ... of $9,800.00."

7    Smith refused to close the deal; on the closing date set forth in the offer to purchase (engrossed in a standard Ontario Real Estate Association form entitled "Agreement of Purchase and Sale"), Paquette tendered the balance of the purchase price to Smith's solicitor, and then brought an action for specific performance. The plaintiff's claim included a request for a Certificate of Pending Litigation. On September 22nd, 1989, Wright D.C.J. ordered the issuing of a Certificate of Pending Litigation, on an ex parte application brought by the plaintiff. On September 28th, 1989, the defendant made a motion for an order vacating the Certificate of Pending Litigation. This relief was granted by Trembley, D.C.J.

8    This appeal of the order of Trembley D.C.J. was argued before me on October 6th, 1989. Since Judge Trembley's order was made without written reasons, I may treat the appeal as a hearing *de novo*: see *Marleen Investments Ltd. v. McBride et al. (1979), 23 O.R. (2d) 125* (H.C.J.).

9    The *Courts of Justice Act*, S.O. 1984, c. 11, s. 116(6) sets out the circumstances under which a Certificate of Pending Litigation may be discharged. One of the circumstances enumerated is where the person at whose instance the Certificate was issued has no reasonable claim to an interest in the land. It is the respondent's position that because he did not sign the offer to purchase (which he had orally  accepted) he is protected by the *Statute of Frauds* and that, accordingly, the appellant has no interest in the land.

10    Carthy, Millar and Cowan, the editors of the *Ontario Annual Practice, 1989-1990*, in an editorial note re s. 116, have drawn an appropriate analogy when they liken the test for vacating a Certificate to that for obtaining an injunction. Thus, the hurdle which the appellant must clear in this interlocutory appeal in order to have the Certificate of Pending Litigation reinstated is to show that there is a substantial triable issue as to whether or not the documents and records in this case constitute a "memorandum or note" within s. 4 of the *Statute of Frauds*.

11    The *Statute of Frauds*, R.S.O. 1980, c. 481, s. 4, provides:

> No action shall be brought ... to charge any person upon any contract or sale of lands ... or any interest in or concerning them ... unless the agreement upon which the action is brought, or some memorandum or note thereof is in writing and signed by the party to be charged therewith or some person thereunto by him lawfully authorized.

12    The appellant has cited several decisions interpreting this provision  (or its equivalent in other jurisdictions). In *Harvie et al. v. Gibbons  (1980), 109 D.L.R. (3d) 559* (Alta. C.A.), the documents which were held to constitute a sufficient "note or memorandum" to satisfy the *Statute of Frauds* consisted of a copy of a map which the prospective

70 O.R. (2d) 449

purchaser made in the vendor's presence, a $200.00 cheque on which was written "Deposit payment for Lots 4 and No. 7 and balance of land in corner", and an unsigned memorandum, written by the vendor's executrice, of a meeting she and her co-executrice had with the purchaser. On pp. 564-5 of the decision, Laycroft J.A. states:

> It is clear that no rigid or precise form of memorandum is prescribed by the *Statute of Frauds*, nor need the entire contract be contained in the writing. What is required is a statement of the essential terms of the contract. Moreover, the statute does not deal with the validity of the contract but with the evidence of its existence.

13    Another point relevant to this appeal is made later at p. 565:

> It is also well established that several documents may be connected to each other by reasonable inference, with parol evidence if necessary, to constitute a sufficient memorandum. This principle has been stated in a series of cases commencing with *Long v. Millar* (1879), 4 C.P.D. 450, and has been adopted in Canada.

14    In *N. Rattenbury Ltd. v. Winchester et al.*, [1950] 3 D.L.R. 826 (P.E.I.S.C.) entries handwritten by the secretary of a company into the vendor's company's ledger, reflecting a sale of property, were held sufficient to satisfy the *Statute of Frauds*.

15    Finally, in *Notarfonzo v. Goodman et al.* (1981), 24 C.P.C. 127 (Ont.H.C.) Van Camp J. dismissed a motion to vacate a lis pendens, now called a Certificate of Pending Litigation, even though she believed in that case that the plaintiff purchaser would "have an uphill battle to establish that there was a concluded agreement of purchase and sale", and that "the case which the plaintiff will put forward is weak". Nevertheless she concluded: "However weak the evidence may appear, there is a triable issue", and she left the lis pendens in place, so as to preserve the land available to the plaintiff should he succeed at trial.

16    The appellant (plaintiff) asserts that he has a reasonable claim to an interest in the subject land by virtue of the written offer made by him, by virtue of the defendant's oral acceptance, his agent's acceptance of the $1,000.00 deposit, and more particularly that by virtue of the written note or memorandum of the sale (the Trade Record Sheet) made by Landry, who was clearly the defendant's agent, there is compliance with s. 4 of the Statute in that "the agreement upon which the action is brought, or some memorandum or note thereof is in writing and signed by the party to be charged therewith *or some person thereunto by him lawfully authorized*." (Emphasis added).

17    Accordingly, in the present case, taking all of the evidence together, there is clearly a triable issue as to whether or not there is a sufficient "memorandum or note" to satisfy the *Statute of Frauds* and allow the appellant to argue that he has an interest in the land.

18    In the result, therefore, I would allow the appeal, reverse the order of the Honourable Judge Trembley discharging the Certificate of Pending Litigation, and confirm the order of the Honourable Judge Wright permitting the issuance of a Certificate of Pending Litigation on the land in question.

19    I have endorsed the record as follows:

> Appeal allowed. Order to go as asked. Costs to the appellant (plaintiff) in the cause.

END OF DOCUMENT

# EXHIBIT 5

*Indexed as:*
## Pullano v. Yellowhead Timber Ltd. (B.C.C.A.)

**Between**
**Sam Pullano and the said Sam Pullano, carrying on business as**
**Sam Pullano Contracting, Plaintiff (Appellant), and**
**Yellowhead Timber Ltd. and Richard Anthony Sandover-Sly,**
**Defendants (Respondents)**

[1994] B.C.J. No. 1317

Vancouver Registry No. CA017249

British Columbia Court of Appeal
Vancouver, British Columbia

**Cumming, Donald and Hutcheon JJ.A.**

Heard: April 25, 1994.
Judgment: filed June 16, 1994.

(9 pp.)

*Guarantee and indemnity -- The contract -- Memorandum required -- Statute of frauds -- Writing requirement -- Exceptions -- Wider interest exception.*

Appeal from a judgment concerning the enforceability of oral guarantees. At trial the judge had found that the respondent's oral promise to pay a debt did not fall within any exception to the rule that guarantees must be in writing. At trial the appellant argued that the respondent's endorsement of a letter constituted an act within the meaning of section 54(6)(b) of the Law and Equity Act, and that the "wider interest" exception applied.

HELD: Appeal allowed on the basis of the "wider interest" exception. The trial judge erred in his finding as to its continued existence and application to the facts of the case. Proof of a separate agreement or transaction between guarantor and creditor was not essential. At the heart of the exception was the pursuit by the promisor of an objective beyond that of simply guaranteeing the debt.

**Statutes, Regulations and Rules Cited:**

Statute of Frauds.
Law and Equity Act, R.S.B.C. 1979, c. 324, s. 54(6).

Counsel for the Appellant: G.E. Greene.
Counsel for the Respondents: D.A. Warner.

1    **DONALD J.A.** (orally, for the Court, allowing the appeal):-- This appeal explores the
enforceability of oral guarantees.

2    At trial the appellant failed in his suit against Richard Anthony Sandover-Sly (the
respondent) because the learned trial judge held that the respondent's oral promise to pay a debt
owed by Yellowhead Timber Ltd. (Yellowhead) to the appellant was a guarantee which did not
fall within an exception to the rule that guarantees must be in writing.

3    The respondent operates a logging contracting business. His company Yellowhead had an
agreement with Westar Timber Ltd. for the removal of timber "stump to dump" on lands licenced
to Westar. The appellant worked for Yellowhead as a subcontractor. His wife June Pullano
provided bookkeeping services to Yellowhead.

4    In early 1991 Yellowhead ran into financial difficulties. The respondent decided to shift his
undertaking from Yellowhead to a new corporate entity in order to evade some of his debts. He
informed the appellant about his plan when they met one day on a haul road in the forest. He told
the appellant he was going to change the name of his company so he would not have to pay his
debts. At that point Yellowhead owed the appellant $14,183.56. When the appellant asked the
respondent about that debt, the respondent told him he would pay it.

5    The respondent carried through with his plan and resumed logging operations under a new
company, Project 162,000 Investments Ltd. (Project). The appellant continued to work as a sub-
contractor for Project. On several occasions the respondent reassured the appellant that he would
pay Yellowhead's debt.

6    Westar made it a condition of Project replacing Yellowhead that the respondent look after
Yellowhead's trade debts. In a letter dated 16th May 1991 addressed to the respondent personally
(not to either of his companies), Westar's Woodland Manager in the local area wrote in part as
follows:

> This letter is to confirm our discussions of the last few weeks, regarding
> the potential of you operating a Logging Contract Business for Wester Timber
> Ltd., on F.L. A16831.
>
> As you are aware, and as was explicitly mentioned at our General
> Contractor meetings in May of 1990 and 1991, there is currently an over
> supply of logging contractors on our Forest License.
>
> We have agreed to allow you to reconstruct your logging contract
> business, and conduct logging operations on selected blocks on F.L. A16831,
> under the following conditions:
>
> 1.    You will supply Westar Timber Ltd. with a written commitment to
>       liquidate your outstanding debts to the people and business of the local
>       communities. This commitment must be received by us before any
>       operations commence in the Spring and/or Summer of 1991.

7    The respondent put his signature on a copy of the letter and returned it to Westar thereby
signifying his agreement with its terms. However, he did not issue a separate written

commitment as stipulated above.

8    Mrs. Pullano was in the respondent's office on the day the changeover from Yellowhead to Project took place. She testified as follows:

> He came in one day, in the beginning of March, and he said, "Our name today is Project 162,000." And I said, "Oh?" He said, "Yes. I've changed my name. I went to Vancouver. That's why I wasn't here for, whatever, two days, or whatever." I had to divide up the wages and start a new set of books under the new name. At that time he said, "I'm going to pay Sam his money." I said, "Yeah?" I was still kind of sitting there.

She testified that she continued to do the bookkeeping work after the company began operating as Project.

9    The trial judge upheld the respondent's counsel's objection to the introduction of any further evidence of this kind on the grounds of relevancy.

10    Yellowhead did not pay the appellant and the respondent defaulted on his promise to look after the debt. Judgment was taken against Yellowhead in default of appearance.

11    The trial was concerned with the respondent's promise.

12    The writing requirement for an enforceable guarantee goes back to the 1677 enactment of the Statute of Frauds 1677, (29 Cha.Z) c.3 and is now incorporated into the Law and Equity Act, R.S.B.C. 1979, c.324 in s.54(6) which came into force on 1 April 1985 by B.C. Reg. 392/85 and which reads:

> (6)    A guarantee or indemnity is not enforceable unless
>
> (a)    it is evidenced by writing signed by, or by the agent of, the guarantor or indemnitor, or
> (b)    the alleged guarantor or indemnitor has done an act indicating that a guarantee or indemnity consistent with that alleged has been made.

13    At trial the appellant sought to avoid the writing requirement firstly, by establishing that the respondents endorsement of the Westar letter amounted to an act within the meaning of s.54 (6)(b), and secondly, in the alternative, by relying on the "wider interest" exception to the rule. By the latter concept a promisor will be held to his full promise to pay the debt of another if it can be shown that in giving the promise he was mainly pursuing his own object within the overall transaction. It must be seen that he has a wider interest in the matter than simply guaranteeing the debt.

14    The trial judge held against the appellant on the first ground upon finding that the endorsement on the Westar letter only provided evidence of a motive for the guarantee and fell short of constituting an act indicating that a guarantee had been made.

15    On the second point, the wider interest exception, the trial judge followed his earlier decision in Talisman Projects Inc. v. Sunnymede Agrico Ltd. and Udy (1984), 55 B.C.L.R. 393 (S.C.) where he found that the exception had been wiped out by the revision of the Statute of Frauds in 1958 (S.B.C. 1958, c.18). But he went on to deal with the point in the event that it may

be found that the exception survived the 1958 revision, and perhaps also in deference to the later view contrary to his expressed by Perry J. in Lindstrom Construction Ltd. v. Capozzi Enterprises Ltd., [1992] B.C.J. No. 261 (6 February 1992), Prince George No. 1412/84 (B.C.S.C.). At p. 7 of his reasons for judgment in this case the trial judge said:

> But if I am wrong in that view I do not think the wider interest exception could apply on the facts here. When the guarantee was first given on the Balsam Main, nothing was said about Mr. Pullano continuing to work for any new company to be acquired by Mr. Sandover-Sly. There was no wider interest that was made the subject matter of any agreement between Mr. Pullano and Mr. Sandover-Sly as there was for example in Conrad v. Kaplan (1914), 6 W.W.R. 1061, 18 D.L.R. 36 (Man. C.A.). When it was repeated after Mr. Pullano went to work for Project, it was not attached to any agreement, express or implied, that he would continue to work for Project.

16    In my opinion the appeal should succeed on the second ground. I find myself in respectful disagreement with the trial judge's decision as to the continuing existence of the wider interest exception and his application of the exemption to the facts of this case.

17    When the legislature amended the Statute of Frauds in 1958 it changed the words "special promise" to read "guarantee or indemnity". The trial judge attached the following significance to that change in his reasons for judgment in Talisman, supra, p. 397:

> The point to notice is that any reference to a "special promise" to answer for another's debts has gone. The old exceptions to the statute were based upon a finding that because the defendant had a wider interest in the whole transaction, his undertaking was not merely a "special promise". The statute as presently worded is not limited to special promises but refers to guarantees or indemnities generally. In Morin v. Hammond Lbr. Co., [1923] S.C.R. 140, 1 D.L.R. 519, this point was recognized in the Supreme Court of Canada. Idington J., at p. 521, said this about the English authorities for the exception to the statute:

>> In these cases, [as] the authorities on which they respectively rest, or were sought to be rested, there are cited the leading cases which turned on the distinction between the words of the statute being a special promise to answer for the "debt, default or miscarriage of another" and the manifold ways in or by which a contract of indemnity may be called into existence, and yet not be that kind of special promise, within the Statute of Frauds.

> The change in the wording of our statute appears to have made the old exceptions to the rule inapplicable in British Columbia.

18    Perry J. in Lindstrom, supra, dealt with Talisman firstly on the ground that the above passage was obiter and therefore need not be followed, and secondly on the basis that the reasoning in Talisman puts far too much on the change in language. He referred to a major study of the B.C. Law Reform Commission on the subject of the Statute of Frauds published in 1977 which discussed the wider exception rule as a subsisting and operative concept, nine years after the amendment. I am in respectful agreement with the approach taken by Perry J. and would hold that the wider interest exception is alive and well.

**19**    In the instant case the trial judge discarded the exception because he found that there was no understanding reached between the appellant and the respondent that as a consequence of respondent's guarantee the appellant would continue to provide sub-contracting services. The trial judge dismissed Mrs. Pullano's role in the matter as irrelevant.

**20**    While many of the cases dealing with the wider interest exception discuss the existence of a separate agreement or transaction between the guarantor and creditor, I do not believe that proof of such an agreement is an essential element of the exception. At the heart of the exception lies the pursuit of an objective beyond that of simply guaranteeing the debt; in other words the guarantee is incidental to a larger purpose sought to be accomplished by the promisor. With the greatest of deference to the trial judge I think that the appellant made out a case for the wider interest exception even though he did not prove the existence of an agreement to continue services.

**21**    The evidence establishes a plan by the respondent to shift his logging undertaking from one corporate entity to another in order to evade certain creditors. The success of the plan depended in part on his maintaining the continuity of his business. His Westar contract, his relationship with the appellant as sub-contractor and Mrs. Pullano as bookkeeper were important elements in that regard. The promises he made to the appellant and Mrs. Pullano were obviously in pursuance of his plan to keep the undertaking together as he shifted the business from one company to another. The trial judge said this went only to motive and did not prove an agreement. With respect, the distinction is unimportant in a case like this. The respondent's motivation for giving the assurances of payment went well beyond a bare guarantee: they were advanced as an integral part of a corporate manoeuver and thereby served a broader objective.

**22**    I would allow the appeal and grant judgment in the amount claimed by the appellant.

DONALD J.A.
CUMMING J.A.:-- I agree.
HUTCHEON J.A.:-- I agree.

# EXHIBIT 6

⊓

*1995 A.C.W.S.J. LEXIS 45547, \*; 1995 A.C.W.S.J. 630732, \*\*;*
*52 A.C.W.S. (3d) 1095*

(C) The Cartwright Group Ltd., 2007

BETWEEN: SPX CANADA INC. PLAINTIFF AND: PATRICIA ANN WATTS, JOHN GRAHAM
PROUST and DARCY RONALD BROWN DEFENDANTS

SPX Canada Inc. v. Watts

File No. C941916 Vancouver

British Columbia Supreme Court

1995 A.C.W.S.J. LEXIS 45547; 1995 A.C.W.S.J. 630732; 52 A.C.W.S. (3d) 1095

January 19, 1995, Decided

**KEYWORDS:**

### [\*1]

GUARANTEE AND SURETYSHIP -- Formalities -- Defendant sought summary judgment that
amount claimed by plaintiff as owing to plaintiff under equipment lease was not owed by
him as guarantor -- Guarantee was part of parcel of documents executed in connection with
equipment lease -- Guarantee was brief and made no reference to subject matter of lease --
Defendant contended that guarantee was unenforceable for uncertainty -- Court found that
contextual evidence left no uncertainty as to what guarantee referred to -- Guarantee was
not unenforceable for uncertainty -- Motion was dismissed (15 pp.).

**SUMMARY:** A.C.W.S.

**COUNSEL:** Counsel for the Plaintiff: Mark Levitz
Counsel for the Defendant Proust: Bryan Gibbons

**JUDGES:** Hall J. in Chambers

JUSTICE HALL

**[\*\*1]** 1 This is an application by the defendant, John Graham Proust, pursuant to Rule 18A of the Rules of Court for a declaration that a guarantee made by him of sums owing under a lease of equipment to a company is unenforceable as against him. Counsel are in general agreement that the issue to be decided here can be appropriately dealt with under this Rule. The document of guarantee which is annexed to the affidavit of Kathy Poettcker reads as follows:

GUARANTY **[\*2]**   The undersigned guarantees the full and prompt performance of each and every obligation to be performed by Lessee and in the event of Lessee's default, Lessor shall not be required to pursue any remedies it may have against Lessee as a condition to the enforcement of this Guaranty.

| Signature "J. G. Proust" | Date |
|---|---|
| **8631 Point Grey Road,** | **Vancouver, B.C.** |
| **Home Address** | **City** |
| **737-7247** | **V6R 1B1** |
| **Home Phone Number** | **Postal Code** |

**[\*\*2]** 2 As appears from the affidavit of Richard V. Pawlewicz, an officer of the plaintiff, this guarantee document was part and parcel of a group of documents relating to a lease of air testing equipment. The relevant documents were executed at the beginning of December of 1992.

**[\*\*3]** 3 It is clear from a perusal of the material annexed to the Pawlewicz affidavit that in the fall of 1992, a group of people in Vancouver were negotiating with a Canadian subsidiary of the predecessor corporation of the plaintiff with a view to leasing automotive diagnostic equipment from that subsidiary. The lessor corporation is hereafter designated "Allen Canada". The corporate vehicle that the Vancouver entrepreneurs proposed to use as the operating lessee was AirPro **[\*3]** Automotive Services Ltd. ("Airpro") and the person who seems to have been the leading agent in negotiations with a Mr. Kinsey of Allen Canada was Patricia Watts, an accountant, who was located in Vancouver. It appears that the concept was that the diagnostic equipment would be leased by Airpro and would be used in the new AirCare program that was being introduced by government in British Columbia.

**[\*\*4]** 4 Mr. Pawlewicz deposes that in October of 1992 he spoke with Ms. Watts and that he advised her that in order for Allen Canada to proceed with the leasing of the needed equipment to Airpro, Allen Canada would require personal credit information on the principals of Airpro and if the credit information was acceptable, Allen Canada would require personal guarantees from these principals. There were further ongoing discussions between the parties and on November 3, 1992 Ms. Watts wrote the following letter on the letterhead of Airpro to the **parent** corporation, The Allen Group located at Livonia, Michigan, to the attention of Lisa Klein.

Dear Lisa:

I spoke to Herb Kinsey this morning and he indicated that you would be able to lease us the equipment [sic] with a 15% downpayment (\$ **[\*4]** 9,800 in addition to that already received), 1 payment in advance, and personal guarantees. This would be acceptable to our directors so long as we had a 45 day escape clause to allow us to pay out the lease in full

with no penalty. Please let me know if this is acceptable as I require this equipment immediately.
Yours truly,
Patricia A. Watts, C.A.
President

**[\*\*5]** 5 In the result, the equipment was leased through Allen Canada to Airpro but commercial misfortunes overwhelmed the Airpro company in short order and by the late spring of 1993, a receiver of Airpro was in place. The company being a financial derelict, the lessor plaintiff on March 31, 1994 commenced an action against the guarantors in the Vancouver Registry of this court seeking payment of the sum of approximately a quarter of a million dollars. Among other pleas, in the amended statement of defence of the defendant Mr. Proust filed on November 10, 1994, this defendant pleads in pars. 5 of the defence: In the alternative, all material terms of the Guarantee are not evidence in writing and therefore the Guarantee is void for uncertainty or, alternatively, is unenforceable pursuant to Section 54 of the Law an [sic] **[\*5]** Equity Act, R.S.B.C., 1979, Ch. 224, and amendments thereto.

**[\*\*6]** 6 The allegations in that paragraph succinctly categorize the arguments advanced here by the defendant on this application. It is submitted that for the reasons stated the guarantee of the defendant should be declared to be unenforceable.

**[\*\*7]** 7 The relevant legislation, being a. 54(6) & (7) of the Law and Equity Act, R.S.B.C. 1979 c. 224 as amended, reads as follows:

(6)A guarantee or indemnity is not enforceable unless

(a)it is evidenced by writing **signed** by, or by the agent of, the **guarantor** or indemnitor, or

(b)the alleged **guarantor** in indemnitor has done an act indicating that a guarantee or indemnity consistent with that alleged has been made.

(7)A writing can be sufficient for the purpose of this section even though a term is left out or is wrongly stated.

**[\*\*8]** It appears that sub-section (7) came into the legislation by amendment in 1985.

**[\*\*9]** 8 These sections are successor legislation to s. 5(1) of the **Statute of Frauds,** c. 369, R.S.B.C. 1960, which was as follows: 5. (1) No **guarantee** or indemnity is enforceable by action unless evidenced in writing, **signed** by the party to be charged **[\*6]** or by his agent, but any consideration given for the **guarantee** or indemnity need not appear in the writing.

**[\*\*10]** 9 As noted by Donald J.A. in the case of Pullano v. Yellowhead Timber Ltd., [1994] B.C.J. No. 1317, the ancient predecessor to all this legislation was the **Statute of Frauds** enacted in 1677 in the latter days of the Stuart kings. The language of that earlier legislation spoke of a **guarantee** as "a special **promise**".

**[\*\*11]** 10 It is fair to say that in general terms the courts have historically adopted a quite rigorous approach to the requirements for an enforceable guarantee. Some examples in this court are the earlier cases of AGS Electronics Ltd. v. Sherman (1979), 19 B.C.L.R. 22 (B.C.S.C.) and Transco Mills Ltd. v. Louie et al (1975), 59 D.L.R. (3d) 665 (B.C.S.C.). In AGS, the headnote reads as follows: The defendant executed a form of guarantee of a company's indebtedness to the plaintiff. The names of the principal debtor and creditor were omitted from the form. In an action on the guarantee, the defendant denied liability on the basis of the Statute of Frauds, which provides that a guarantee is not enforceable unless

"evidenced **[\*7]** in writing".

 Held - Judgment for defendant. The requirement that a guarantee be "evidenced in writing"  prima facia  means that every term or element of the agreement must be found in a document or documents. The failure to include the names of the principal debtor and creditor was, accordingly, fatal to the guarantee here.

 **[\*\*12]** 11 In  Transco Mills, the headnote reads:  Section 5(1) of the  Statute of Frauds, R.S.B.C. 1960, c. 369, providing that no guarantee or indemnity is enforceable unless evidenced in writing, continues the requirement of the former Act that all the terms of the contract must be contained in the writing. Consequently, a writing that omits the name of the principal debtor is insufficient.

 **[\*\*13]** 12 An earlier case in our Court of Appeal,  A. MacDonald Company v. Fletcher, [1915] 22 B.C.R. 298, illustrates a very rigorous approach being adopted to find that a guarantee was unenforceable. In that case, it appeared that the plaintiff wholesaler had been providing goods to W.G. Fletcher, a retail grocer. During the currency of these arrangements, the mother of the retail grocer wrote on a leaf of a ledger in the plaintiff's office: "I hereby guarantee **[\*8]**  the account of W.G. Fletcher, successor to Fletcher & Jackson, covering past and future purchases to the value of $ 750.00," and she signed her name to the notation. Apparently, there was no writing on the ledger to identify it as belonging to the plaintiff. The trial judge had given judgment against both defendants. The guarantor, Mrs. Fletcher, appealed on the ground that the provisions of the  Statute of Frauds  had not been complied with and that oral evidence was wrongly admitted at the trial supplementing the memorandum to identify the document. The Court of Appeal allowed the appeal. At p. 300, MacDonald C.J.A. said:  I think the appeal should be allowed. In my opinion there is nothing in the document to indicate that the account which was guaranteed was the account of A. Macdonald & Company. In the absence of something of that kind, parol evidence cannot be given, no matter how clearly the facts might be provable by parol evidence.

 **[\*\*14]** 13 The other members of the court agreed and referred to the earlier case of  Williams v. Lake  (1859), 29 L.J., Q.B. 1. I have read that case. Whether or not it is on its facts an authority for the proposition enunciated by the Court **[\*9]**  of Appeal could I suppose be arguable, but in any event, the  Fletcher  case affords dramatic illustration of the often quite technical approach adopted by courts concerning questions of guarantee.

 **[\*\*15]** 14 Relying on the legal principles enunciated in these cases and many other like authorities, counsel for the defendant, Mr. Proust, submits that the guarantee in the case at bar is defective and cannot now be enforced by the plaintiff.

 **[\*\*16]** 15 While it is regrettable that the defendant finds himself in this sad financial predicament caused by the demise of the AirPro company, I am of the view that the defence set forth in para. 5 of the statement of defence does not avail this defendant as an answer to the claim of the plaintiff. My conclusion is founded on a number of grounds. First, I do not think that the document of guarantee herein stands alone in that it is part and parcel of several documents relating to this lease transaction. This may, to some extent, serve to distinguish this case from the earlier cases of  AGS  and  Transco Mills  referred to  supra, although if the legislation had remained unamended, that might be a rather less firm ground of distinction. Nonetheless,  **[\*10]**  it appears from previous authority that where a document of guarantee is, in effect, a part of a group of documents, in may be permissible to look to those other documents to construe it and by that methodology to escape from some of the rigours of the former  **Statute of Frauds** . This passage from the judgment of Disbery J. in  Ontario Marble Company Limited v. Creative Memorials Ltd. et al  (1963), 42

W.W.R. (N.S.) 315 at 317, affid (1964) 48 W.W.R. (N.S.) 239, adverts to the relevant principles: A memorandum of a **promise** to pay the **debt** of another must show who is the **promise** as well as the **promisor.** Huron (County) v. Kerr (1868) 15 Gr 265; White v. Tomalin (1890) 19 O.R. 513; A. MacDonald & Co. v. Fletcher (1915) 22 BCR 298; and 18 Halsbury, 3rd ed., p. 424. However, I cannot find in the authorities any requirement that such should appear either in the body or in any other particular part of the writing. The requirements of the statute are satisfied if the names of the parties appear upon the face of the memorandum, either expressed or by reasonable construction or by reference to other documents physically or referentially **[*11]** attached thereto. Richard v. Stillwell (1885) 8 OR 511; Freeman v. Freeman (1891) 7 TLR 431; and McEwan v. Dynon (1877) 3 Vict LR 271 (26 English & Empire Digest, p. 46).

**[**11]** 16 As I noted, our legislation changed in 1985 with the addition of ss. (7) to s. 54 of the Law and Equity Act, cited supra . That now reads as follows:
(7) A writing can be sufficient for the purpose of this section even though a term is left out or is wrongly stated.

**[**18]** 17 I believe that this particular legislative change was intended to change and did work a significant change in this area of the law. While it would be difficult to assert that fraud has been stamped out in the latter days of the twentieth century, it is undoubtedly true that the business landscape today is dramatically different from that of the late 17th century. I think we now live in a much more settled commercial landscape. It must be remembered that from just before the middle of the 16th century up to the time of William and Mary at the end of the 17th century, there were a great many upheavals and commotions in the ecclesiastical **[*12]** and civil affairs of England. Changes in ownership of the monastic lands, the different competing **religious** parties at different times, the turbulence of the civil wars before the era of the Lord Protector Cromwell soon to be succeeded by the temporary restoration of the Stuart kings undoubtedly created a society where there were many opportunities afforded for sharp practices and sharp operators and I should think that the Statute of Frauds was a legislative device adopted to attempt to dispel uncertainties that could exist with respect to title to land and commercial dealings.

**[**19]** 18 In succeeding centuries the courts in individual cases chafed at times against the rigidity of the Statute of Frauds and not infrequently one sees expressions by the courts regretting that the Statute was being used as an engine of fraud rather than as the curative device that the legislature envisioned. I believe that by 1985, the British Columbia Legislature had recognized that significant change was required to better accord with modern commercial reality. In my judgment, s.s. 7 of s. 54 has effected a fundamental shift away from the preexisting law. Therefore, in my judgment, many of the **[*13]** earlier cases on this branch of the law are no longer applicable authorities. I should add, however, that I see little evidence from the case law that there is any disposition, legislatively or judicially, to attenuate the requirement that there should be no dealing between creditor and debtor that would tend to prejudice the position of a guarantor. It should also be noted that by reason of s. 54(6), it is still required that a guarantee must be evidenced by writing. I am of the view that the evidence in this case leaves no uncertainty as to what obligation this guarantee related to and that it is therefore, not unenforceable for the defects alleged in argument.

**[**20]** 19 Counsel for the plaintiff submitted that, in any event, on the alternate ground that this guarantee was part of a commercial transaction, it was therefore enforceable as against this defendant under what is termed the wider interest exception. I entirely agree with this submission. As noted by Donald J.A. in Pullano, cited supra, this doctrine or principle of law remains in full vigour in British Columbia. At pp. 6 & 7, His Lordship said

this: In the instant case the trial judge discarded the exception **[\*14]** because he found that there was no understanding reached between the appellant and the respondent that as a consequence of respondent's guarantee the appellant would continue to provide sub-contracting services. The trial judge dismissed Mrs. Pullano's role in the matter as irrelevant. While many of the cases dealing with the wider interest exception discuss the existence of a separate agreement or transaction between the guarantor and creditor, I do not believe that proof of such an agreement is an essential element of the exception. [Emphasis start] At the heart of the exception lies the pursuit of an objective beyond that of simply guaranteeing the debt; in other words the guarantee is incidental to a larger purpose sought to be accomplished by the promisor.[Emphasis end] With the greatest of deference to the trial judge I think that the appellant made out a case for the wider interest exception even though he did not prove the existence of an agreement to continue services. The evidence establishes a plan by the respondent to shift his logging undertaking from one corporate entity to another in order to evade certain creditors. The success of the plan depended in part on his **[\*15]** maintaining the continuity of his business. His Westar contract, his relationship with the appellant as sub-contractor and Mrs. Pullano as bookkeeper were important elements in that regard. The promises he made to the appellant and Mrs. Pullano were obviously in pursuance of his plan to keep the undertaking together as he shifted the business from one company to another. The trial judge said this went only to motive and did not prove an agreement. With respect, the distinction is unimportant in a case like this. The respondent's motivation for giving the assurances of payment went well beyond a bare guarantee: they were advanced as an integral part of a corporate manoeuver and thereby served a broader objective. I would allow the appeal and grant judgment in the amount claimed by the appellant. (my emphasis)

**[\*\*21]** 20 The wider interest rule or doctrine extant in Canada finds its counterpart in U.S. law concerning the Statute of Frauds under the heading of the "Leading Object" rule. A useful discussion of this can be found in Volume II of Corbin on Contracts, 1950 ed., c. 16. At p. 274 of that work is to be found a quotation from that great Massachusetts jurist, Chief Justice **[\*16]** Shaw, in the case of Nelson v. Boynton, 3 Metc. 396, where he says that in such a case, the party promising has for his object a benefit which he did not before enjoy, accruing immediately to himself; but where the object of the promise is to obtain the release of the person or property of the debtor, or other forbearance or benefit to him, it is within the statute.

**[\*\*22]** 21 Also found at the same location in Corbin is a quote from the Supreme Court case of Emerson v. Slater, (1859) 16 L.Ed. 360:
But whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability.

**[\*\*23]** 22 As I see it, both the leading object rule and the wider interest rule or doctrine were fashioned by the courts to avoid some of the, at times, absurd rigour surrounding this area of **[\*17]** the law and to provide for the situation where a guarantor has as part of a wider business arrangement pledged his personal credit in order to achieve the accomplishment of that business end. In the circumstances disclosed in the case at bar, one can see how clearly applicable such a principle is. Here the various co-venturers interested in AirPro sought to set up a profit making venture. The lessor required from them their personal guarantees in order for it to agree to grant to them a lease of this valuable equipment. The individuals were willing to provide those personal guarantees to assist in going forward with the business venture and it is difficult to see any good reason why they

should now be excused from honouring obligations freely entered into for commercial reasons that they then perceived as beneficial to themselves. I say nothing, of course, concerning any other potential defences that may accrue to this defendant or others arising from the facts of the case but I simply say that the wider interest exception is clearly available here to the plaintiff on the facts of this case and is a full answer to any alleged lack of detail in the executed document of guarantee.

 **[\*\*24]   [\*18]**  23 Mr. Levitz for the plaintiff additionally argued that there was here a part performance as he termed it by the delivering by the defendant of the guarantee concurrently with the other lease documents. If the matter were  res integra, I would be inclined to doubt the validity of this proposition because it seems to me that it is stretching the concept or doctrine of part performance a fair distance in the factual circumstances here demonstrated. Nonetheless, two cases decided in this court in the recent past being  Ronalds Printing v. Odyssey Publishing Inc., [1991] B.C.J. No. 2204, Shaw J. and  Richardson Greenshields of Canada Ltd. v. Naguschewekski, [1994] B.C.J. No. 1470, Owen-Flood J., appear to lend considerable support to this argument of counsel for the plaintiff. Accordingly, on the basis of these cases, I am inclined to think this argument of the plaintiff to be well-founded, although I would be perhaps less inclined to find for the plaintiff on the basis of this argument than for the reasons I expressed earlier in the judgment. I simply feel more confident of my conclusions on the other grounds than I do on this latter ground.

 **[\*\*25]**  24 The result of all the foregoing **[\*19]**  is that I find that this application by the defendant should not succeed and accordingly, it is dismissed with costs payable to the plaintiff in any event of the cause.

**CLB-NO:** 095026041

**LOAD-DATE:** November 01, 2001

# EXHIBIT 7

*143 D.L.R. (3d) 94, \*; 1983 D.L.R. LEXIS 3405, \*\**

(C) The Cartwright Group Ltd., 2006

### **TRAVEL MACHINE** LTD. v. MADORE

143 D.L.R. (3d) 94; 1983 D.L.R. LEXIS 3405

Ontario High Court of Justice

**JUDGES:** Sutherland J.

February 3, 1983

**KEYWORDS-1:  [\*\*1]**  Contracts -- Formalities -- Guarantee -- Oral guarantee by employee of travel agent inducing extension of credit to customer -- Whether within Statute of Frauds -- Statute of Frauds, R.S.O. 1980, c. 481, s. 4.

**KEYWORDS-2:** Courts -- Small claims court -- Powers -- Court empowered to make orders agreeable to equity and good conscience -- Whether bound by statutes -- Small Claims Courts Act, R.S.O. 1980, c. 476, s. 57.

**KEYWORDS-3:** Appeal -- Procedure -- Raising defence not pleaded, argued or referred to at trial -- Considerations.

**SUMMARY-3:** The defendant, an employee of the plaintiff travel agency, orally guaranteed payment of the debts of one of the plaintiff's customers, and the plaintiff, contrary to its usual policy, accordingly extended credit to the customer. The customer failed to pay and the plaintiff sued the defendant on the guarantee. The small claims court judge gave judgment for the plaintiff. The Statute of Frauds, R.S.O. 1980, c. 481, was not pleaded or argued.

On appeal to the Ontario High Court of Justice, held, a small claims court judge, though empowered by s. 57 of the Small Claims Courts Act, R.S.O. 1980, c. 476, to make such order as appears just and agreeable to equity and good conscience, was  **[\*\*2]**  bound to give effect to statutes. In the circumstances the defendant was not precluded from raising the Statute of Frauds on appeal. However, the guarantees, being incidental to a wider transaction in which the defendant had an interest (namely, sale of travel services), were not within the Statute of Frauds. Accordingly, the appeal should be dismissed.

Sutton & Co. v. Grey, [1894] 1 Q.B. 285, apld

Other cases referred to

Sereda v. Consolidated Fire & Casualty Ins. Co., [1934] O.R. 502, [1934] 3 D.L.R. 504; Shaver Hospital for Chest Diseases v. Slesar et al. (1979), 27 O.R. (2d) 383, 106 D.L.R. (3d) 377, 15 C.P.C. 97; leave to appeal to S.C.C. refused 38 N.R. 353n; Connecticut Fire Ins. Co. v. Kavanagh, [1892] A.C. 473; Canadiana Towers Ltd. v. Fawcett et al. (1978), 21 O.R. (2d) 545, 90 D.L.R. (3d) 758; Owners of the Ship "Tasmania" et al. v. Smith et al. (1890), 15 App. Cas. 223; Harburg India Rubber Comb Co. v. Martin, [1902] 1 K.B. 778; Marin v. Hammond Lumber Co., [1923] S.C.R. 140, [1923] 1 D.L.R. 519; Steadman v. Steadman, [1974] 3 W.L.R. 56  **[\*95]**   Statutes referred to

Small Claims Courts Act, R.S.O. 1980, c. 476, s. 57

Statute of Frauds, R.S.O. 1980, c. 481, s. **[\*\*3]** 4

APPEAL from a judgment of Tierney Sm. Cl. Co. J. in favour of the plaintiff in an action on a guarantee.

C. B. Sproule, Q.C., for appellant, defendant, Shelley Madore.

George Brightman, vice-president, for respondent, plaintiff, The **Travel Machine** Ltd.

**JUDGMENT-BY:** SUTHERLAND J.

**JUDGMENT:** SUTHERLAND J.:--This is an appeal by the defendant, Mrs. Shelley Madore, from a decision of His Honour Judge T.C. Tierney in the Seventh Small Claims Court of the Judicial District of Ottawa-Carleton issued on July 7, 1982, in which judgment was given against the defendant in the amount of $ 726 without costs. At the trial Mrs. Madore acted for herself and plaintiff, The **Travel Machine** Ltd., was represented by Mr. George Brightman, its secretary-treasurer and vice-president of marketing.

On the appeal before me there was no material dispute as to the facts, and the argument related principally to three issues, namely:

(i) the extent to which a judge acting under s. 57 of the Small Claims Courts Act, R.S.O. 1980, c. 476, to make such order or judgment "as appears to him just and agreeable to equity and good conscience" is bound to apply the statutes and ordinary rules of law applicable to tribunals not operating **[\*\*4]** under that Act;

(ii) whether and in what circumstances a defendant should be allowed to raise on appeal a defence that was not pleaded and was not argued or referred to at trial, and

(iii) the effect of s. 4 of the Statute of Frauds, R.S.O. 1980, c. 481, on actions to enforce oral guarantees.

With respect to the issue under the Statute of Frauds the plaintiff (respondent) also argues that there is part performance on the part of the plaintiff to take the case out of the prohibition of s. 4.

The facts are relatively simple. At the material times Mrs. Madore was employed by The **Travel Machine** Ltd. as a travel consultant. As found by Judge Tierney, the travel agency had a policy of requiring payment by cash, cheque or credit card at the time the travel arrangements and the instructions to order tickets became final, except in the case of commercial accounts, where a limited period of credit was allowed. The Grenada High Commission in Ottawa was one of the customers of the travel **[\*96]**

agency, and the troubles giving rise to this case arose in respect of sales made on behalf of the agency by Mrs. Madore to a Miss Brenda Butler who was then employed at the Grenada High Commission. **[\*\*5]** Summarizing the findings of fact in this regard by Judge Tierney, it may be said that Mrs. Madore, contrary to the policy of the agency, issued some travel tickets to Miss Butler, in her personal capacity, on credit, and subsequently, while the first order had not yet been paid for, issued tickets to the Grenada High Commission on credit, and on terms that deviated from the arrangements usually followed by that commission

with respect to payment, such tickets being for the personal use of Miss Butler.

When these matters came to the attention of management Mrs. Madore stated that she knew Miss Butler and was certain that the tickets would be paid for and she told her employer that she guaranteed their payment. There was a subsequent transaction in which further tickets were issued for the account to Miss Butler, again on the strength of statements by Mrs. Madore that she guaranteed payments of the amounts in question. Miss Butler has since left the employ of the Grenada High Commission and has left the country, having made only a part payment on her account with the agency. It appears that no part of the indebtedness was properly indebtedness of the Grenada High Commission. Judge **[\*\*6]** Tierney found that in issuing the first tickets Mrs. Madore had violated her employer's policy, and he further found that Mrs. Madore gave a personal guarantee of payment for the subsequent tickets.

I have read the transcript of the evidence at the hearing and it appears clear to me that the oral guarantees given by Mrs. Madore applied not only to the tickets subsequently sold, but also to the first tickets sold to Miss Butler. Finding that Mrs. Madore had breached the company policy, and that she had given guarantees, Judge Tierney gave judgment for the plaintiff.

As to all but the first of the purchases here in issue, it is expressly stated by Judge Tierney that the liability of Mrs. Madore is based upon her oral guarantees. It is the reasonable interpretation of Judge Tierney's reasons to say that, although there was reference to breaches by Mrs. Madore of her employer's rules as to credit sales, the liability of Mrs. Madore as to the first of the transactions was mainly based upon her oral guarantees.

Mrs. Madore presented her own case at the trial, and the issue of the unenforceability of an oral guarantee was not raised in her simple pleadings, nor argued before Judge Tierney. **[\*\*7]** There is nothing in the record to suggest that the question of s. 4 of the **[\*97]** Statute of Frauds was brought, or came, to the attention of the court.

With respect to the first point of the argument, I accept the contention of the appellant, based on the Court of Appeal decision in Sereda v. Consolidated Fire & Casualty Ins. Co., [1934] O.R. 502, [1934] 3 D.L.R. 504, that the provisions of s. 57 of the Small Claims Courts Act empowering a judge to "make such order or judgment as appears to him just and agreeable to equity and good conscience" does not mean that a judge acting under that Act is not required to apply the rules of law or that he can decide an issue contrary to law. Accordingly, if on the law s. 4 of the Statute of Frauds Act is applicable to the oral guarantee here in question, neither trial judge, nor I sitting on appeal, can properly, on the basis of "equity and good conscience" ignore the fact that s. 4 of the Statute of Frauds Act, generally speaking, has the effect of prohibiting actions based on oral guarantees.

The second issue raised on the appeal is whether or not a defence based on the said s. 4 can be raised on appeal when it was neither pleaded nor **[\*\*8]** argued at trial, and when there has not previously been any motion to amend the pleadings. While scrupulous care must be taken not to permit a new argument to be made on appeal if to do so would prejudice the position of the opposite party, the test on the authorities is a pragmatic one. The concern is with the question of whether or not the allowing of the new plea would prejudice the opposite party in the sense that, had such party been aware at trial of the new plea, different evidence might have been led or a different emphasis would or might have been sought to be given on cross-examination. In Shaver Hospital for Chest Diseases v. Slesar et al. (1979), 27 O.R. (2d) 383, 106 D.L.R. (3d) 377, 15 C.P.C. 97, Lacourciere J.A. speaking for the Court of Appeal quoted with approval [at pp. 387-8 O.R., p. 381 D.L.R.]

the following statement of Lord Watson in the Privy Council judgment in Connecticut Fire Ins. Co. v. Kavanagh, [1892] A.C. 473 at p. 480:

When a question of law is raised for the first time in a court of last resort, upon the construction of a document, or upon facts either admitted or proved beyond controversy, it is not only competent but expedient, in the interests of **[\*\*9]** justice, to entertain the plea. The expediency of adopting that course may be doubted, when the plea cannot be disposed of without deciding nice questions of fact, in considering which the Court of ultimate review is placed in a much less advantageous position than the Courts below. But their Lordships have no hesitation in holding that the course ought not, in any case, to be followed, unless the Court is satisfied that the evidence upon which they are asked to decide establishes beyond doubt that the facts, if fully investigated, would have supported the new plea.
**[\*98]**

In the Shaver Hospital decision Lacourciere J.A. referred to the earlier Court of Appeal decision in Canadiana Towers Ltd. v. Fawcett et al. (1978), 21 O.R. (2d) 545, 90 D.L.R. (3d) 758, citing it for the proposition that an appellant could raise on appeal points not pleaded at trial only if the appellate court is satisfied beyond all doubt that it has before it all the facts bearing upon the new contention. Also quoted [at pp. 389-90 O.R., p. 383 D.L.R.] was the following statement of Lord Herschell in Owners of the Ship "Tasmania" et al. v. Smith et al. (1890), 15 App. Cas. 223 at p. 225, as follows:

My **[\*\*10]** Lords, I think that a point such as this, not taken at the trial, and presented for the first time in the Court of Appeal, ought to be most jealously scrutinised. The conduct of a cause at the trial is governed by, and the questions asked of the witnesses are directed to, the points then suggested. And it is obvious that no care is exercised in the elucidation of facts not material to them.

It appears to me that under these circumstances a Court of Appeal ought only to decide in favour of an appellant on a ground there put forward for the first time, if it be satisfied beyond doubt, first, that it has before it all the facts bearing upon the new contention, as completely as would have been the case if the controversy had arisen at the trial; and next, that no satisfactory explanation could have been offered by those whose conduct is impugned if an opportunity for explanation had been afforded them when in the witness box.

Having regard to the nature of the new plea here sought to be introduced, the plea that no action can be brought on an oral guarantee, because of the provisions of s. 4 of the Statute of Frauds, I am of the opinion that the above-mentioned tests have been met **[\*\*11]** and that the new plea should be allowed, and that the pleadings of the appellant should be deemed to be amended accordingly. Any issue as to whether a separate motion to amend should have been brought prior to the hearing of the appeal should be resolved in favour of the appellant, as to do otherwise would be to apply a degree of technical formalism not appropriate to matters arising under the Small Claims Courts Act.

We come now to the third, and main, issue, which is whether s. 4 of the Statute of Frauds is a defence to the claims founded on the oral guarantees in question. In my opinion, if these were ordinary oral guarantees that had not been given as incident to a wider series of transactions in the course of a relationship of employer and employee, s. 4 would have been a complete defence. But in my opinion the guarantees in question are not within s. 4, because they were given as incident to a wider, and ongoing relationship. The authorities for this distinction are the cases of Sutton & Co. v. Grey, [1894] 1 Q.B. 285, and Harburg India **[\*99]** Rubber Comb Co. v. Martin, [1902] 1 K.B. 778 at p. 786, which are discussed

in para. 4819 on p. 1026 of Chitty on Contracts, 25th **[\*\*12]** ed. (1978), as follows:

4819. Guarantee as incident to wider transaction. Even where a person clearly does promise to answer for the debt, default or miscarriage of another, the promise will not be within the section where it is merely an incident to a wider transaction. The question is whether the main object of the parties is that one should guarantee the liability of another, or whether it is to enter into a different sort of transaction altogether. Thus where a person contracts to buy goods as agent for a principal on the terms that he is to be liable for the price if the principal fails to pay, this does not fall within the section even though the agent is in a sense promising to answer for the debt of the principal, for the object of the parties is to effect a sale of goods, not to enter into a contract of guarantee. Similarly, where a person promises to pay off an encumbrance on property in which he has an interest in order to secure its release, the mere fact that the encumbrance arose out of another's debt does not bring the case within the section.

In my opinion, the oral guarantees given by the respondent were given as part of a wider economic relationship with the appellant, **[\*\*13]** in circumstances similar to those referred to in the immediately preceding quotation, where the person contracted to buy goods as agent for his principal on the terms that he is to be liable if the principal fails to pay, and s. 4 was held not to apply because the object of the parties was to effect a sale of goods. Here the object was to effect the sale of travel services and the oral guarantees arose in a pre-existing commercial relationship.

In Sutton & Co. v. Grey, supra, Esher M.R., in stating that a particular guarantee was not one to which s. 4 of the Statute of Frauds applied, stated:

The contract is not a guarantee with regard to a matter in which the defendant has no interest except by virtue of the guarantee:

In the same case Lopes L. J. declared:

The true test, as derived from the cases, is, as the Master of the Rolls has already said, to see whether the person who makes the promise is, but for the liability which attaches to him by reason of the promise, totally unconnected with the transaction, or whether he has an interest in it independently of the promise. In the former case, the agreement is within the statute; in the latter, it is not.

Sutton & Co. v. Grey **[\*\*14]** was considered by the Supreme Court of Canada in Morin v. Hammond Lumber Co., [1923] S.C.R. 140, [1923] 1 D.L.R. 519, where, although the main ground of the decision was that the promise there in question gave rise to a new contract, or to a contract of indemnity and not of guarantee, the decision in Sutton and related English decisions were referred to with approval by three of the five judges who gave judgments. **[\*100]**

The oral guarantees given by Mrs. Madore were related to her regular work and to the regular business of her employer. Mrs. Madore had an interest in having the business in question transacted. It therefore cannot be said that any of her guarantees was "a guarantee with regard to a matter in which [she] had no interest except by virtue of the guarantee". Under the rule in Sutton & Co. v. Grey, supra, the employment and commercial nexus is sufficient to take the case out of the statute.

Although it is not really necessary to the decision in this case, I should respond briefly to the arguments addressed to me by the respondent to the effect that if the oral guarantees

were found to be within the Statute of Frauds the respondent should none the less succeed because **[\*\*15]** of the application of the doctrine of part performance. With respect, I cannot agree, for three reasons, the first being that the respondent's acts of part performance (even if the doctrine of part performance were to be found to be applicable to this class of case) while consistent with the existence of the contract of guarantee, do not point to its existence with sufficient clarity. The respondent's conduct does not depart sufficiently from the way it would have been without the guarantees. The second reason is that if the doctrine of part performance were applied to oral contracts of guarantee then any time the recipient of the guarantee had acted on the guarantee, the case would be taken out of the statute; it would not then be possible to envisage a cause of action where the statute would be a bar to an action on an oral guarantee, and that would constitute, in effect, an improper judicial repeal of the provisions of the statute relating to guarantees. The third reason is that, historically, the doctrine of part performance has been employed to take cases out of the statute only, or, principally, in the case of contracts relating to land, being contracts where the remedy of specific **[\*\*16]** performance is available. It is said that the House of Lords' decision in Steadman v. Steadman, [1974] 3 W.L.R. 56, extends the doctrine of part performance beyond land transactions but even in that case there was, as part of an omnibus oral agreement between separating spouses, an agreement to convey land. The case decided that part performance of one of the other elements of the omnibus agreement was sufficient to take the case out of the statute although there had been no part performance of the element of the omnibus agreement involving a transfer of land. In my view Steadman, supra, is not an authority for the proposition that part performance by the beneficiary of an oral guarantee will take such guarantees out of s. 4 of the Statute of Frauds. **[\*101]**

The appeal is dismissed. In the circumstances, where the respondent was represented by its vice-president, and where the preliminary issues were carried by the appellant and the crucial issue was not argued by the respondent, and where the respondent's contention as to part performance was rejected, it seems appropriate that there be no order as to costs and so there will **[\*\*17]** be none.

Appeal dismissed.

## CERTIFICATE OF SERVICE

I, William D. Sullivan, do hereby certify I am not less than 18 years of age and that on this 15th day of May 2008, I caused a copy of the foregoing *Appendix to Appellant's Opening Brief (Volume IV)* to be served upon the parties listed below in the manner indicated.

**HAND DELIVERY:**

Jeffrey M. Schlerf, Esq.
Eric M. Sutty, Esq.
Mary E. Augustine, Esq.
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Adam G. Landis, Esq.
John H. Strock, Esq.
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Mark Minuti, Esq.
Jeremy Ryan, Esq.
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899

David M. Klauder, Esq.
UNITED STATES TRUSTEE
844 King Street, Suite 2207
Wilmington, DE 19801

**FIRST CLASS MAIL:**

Steven D. Pohl, Esq.
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111

Howard L. Siegel, Esq.
BROWN RUDNICK BERLACK ISRAELS LLP
City Place I
185 Asylum Street
Hartford, CT 06103

Jeffrey S. Sabin, Esq.
David M. Hillman, Esq.
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Under penalty of perjury, I declare that the foregoing is true and correct.

*May 15, 2008*
Date

*/s/ William D. Sullivan*
William D. Sullivan