## IN THE UNITED STATES DISTRICT COURT
## FOR THE UNITED STATES

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) | Case No. 06-11045 (BLS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| SNC-LAVALIN POWER ONTARIO, INC. | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civil No. 1:08-cv-00024 (JJF) |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) | |
| | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

### APPELLEES' ANSWERING BRIEF

Jeffrey M. Schlerf (No. 3047)
Scott G. Wilcox (No. 3882)
Eric M. Sutty (No. 4007)
BAYARD, P.A.
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

Attorneys for Appellee Global Power Equipment
Group Inc.

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

-and-

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Meghan M. Breen, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Attorneys for Appellee Deltak Plan Administrator

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

-and-

Howard L. Siegel, Esquire
BROWN RUDNICK LLP
Cityplace I, 185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esquire
John C. Elstad, Esquire
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111

Dated: July 7, 2008
        Wilmington, Delaware

Attorneys for Appellee Official Committee
of Equity Security Holders

**TABLE OF CONTENTS**

Page

I.  STATEMENT OF THE CASE ......................................................................1

    A.  "Buyer's Remorse".........................................................................1

    B.  No Parent Guaranty .....................................................................4

II. COUNTER-STATEMENT OF FACTS ......................................................6

    A.  Events Leading Up to Bankruptcy.............................................6

        1.  Deltak's Financial Challenges.....................................6

        2.  Financing Defaults........................................................6

        3.  Restructuring Efforts ...................................................7

    B.  Bankruptcy Filing and Wind Down of HRSG Business ...........8

        1.  Debtors Filed For Chapter 11 .....................................8

        2.  Wind Down Strategy ....................................................8

    C.  Completion Agreement.................................................................9

        1.  SNC's "Only Practical Option"...................................9

        2.  Knowles Report ...........................................................11

    D.  Schedules of Assets and Liabilities ..........................................12

        1.  Schedules Generally ..................................................12

        2.  Debtors' Cash Management System .........................12

        3.  Uncertainties with "Intercompany Balances" .........13

        4.  Global Note .................................................................15

    E.  No Financial Due Diligence By SNC..........................................15

    F.  SNC's Disputed Claims Against Deltak and GPEG ................16

        1.  SNC's Proofs of Claim...............................................16

        2.  Alleged GPEG Parental Guaranty ...........................17

## TABLE OF CONTENTS
### (Cont'd)

|  |  |  |  |
|---|---|---|---|
|  | 3. | Objections to SNC's Claims | 18 |
|  | 4. | Trial on SNC's Proofs of Claim and the Debtors' Claims Objections | 18 |
| III. |  | STANDARD OF APPELLATE REVIEW | 19 |
| IV. |  | ARGUMENT | 20 |
|  | A. | No Inferences or Burden Shifting | 20 |
|  | B. | No Proof of Fraud | 22 |
|  |  | 1. No Misrepresentation or Omission | 23 |
|  |  | a. Unsettled Characterization of Intercompany Balance | 23 |
|  |  | b. Global Note was Appropriate | 24 |
|  |  | c. Other Alleged Misrepresentations | 27 |
|  |  | 2. No Intent to Deceive | 28 |
|  |  | a. Frank's March 15, 2007 E-Mail | 29 |
|  |  | b. Other E-mails | 30 |
|  |  | 3. No Reliance By SNC | 31 |
|  | C. | No Breach of Any Disclosure Duty | 33 |
|  | D. | No Willful Misconduct | 36 |
|  | E. | Severance Remedy Moot and Improper | 37 |
|  | F. | Alleged Parental Guaranty Barred by Statute of Frauds | 38 |
|  |  | 1. No Promise of Parent Guaranty | 38 |
|  |  | 2. Multiple Document Exception to the Statute of Frauds Inapplicable | 42 |
|  |  | 3. Agency Theory Inapplicable | 45 |

{BAY:01048757v3}

## TABLE OF CONTENTS
### (Cont'd)

4.     "Wider Interest Exception" to Statute of Frauds
       Inapplicable.................................................................................................46

5.     No Basis to Apply Equitable Principles ...................................................49

V.    CONCLUSION...........................................................................................................50

{BAY:01048757v3}

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Acierno v. McCall*, 264 A.2d 513 (Del. 1970)............................................................................47

*American Home Prods. Corp. v. Barr Lab., Inc.*, 834 F.2d 368 (3d Cir. 1987)............................19

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)..............................................................................26

*Bren v. Capital Realty Group Senior Housing, Inc.*, 2004 WL 370214 (Del. Ch., 2004)..............35

*Cohen Dev. Co. v. JMJ Prop., Inc.*, 317 F.3d 729 (7th Cir. 2003)...............................................42

*Constr. Mgmt. Servs., Inc. v. Mfrs. Hanover Trust Co. (In Re Coastal Group Inc.)*, 13 F.3d 81 (3d Cir 1994)..................................................................................................................33

*DiMaio v. State*, 517 N.Y.S.2d 675 (Ct. Cl. 1987) ...............................................................20, 21

*Duke Energy Trading and Marketing, LLC v. Enron Corp. (In re Enron Corp.)*, 2003 WL 1889040 (Bankr. S.D.N.Y. 2003) ..............................................................................................36

*F&M Marquette Nat'l Bank v. Emmer Bros. Co. (In re Emmer Bros. Co.)*, 52 B.R. 385 (D. Minn. 1985) .........................................................................................................................33

*Friedman v. Libin*, 157 N.Y. 2d 474 (N.Y.Sup. 1956) ................................................................38

*Goepp v. American Overseas Airlines, Inc.*, 117 N.Y.2d 276 (N.Y.A.D. 1952)..........................36

*Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692 (N.Y. 1978)..........................20

*Greystone Staffing Inc. v. Vincenzi*, 2005 WL 1183191 (N.Y.Supp.2005) .................................37

*In re Ionosphere Clubs, Inc.*, 103 B.R. 501 (Bankr. S.D.N.Y. 1989)...........................................36

*Jablonski v. Rapalje*, 788 N.Y.S.2d 158 (N.Y.App.Div. 2d Dep't 2005).....................................22

*In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..............................................26

*Kerin Agency, Inc. v. West Haven Painting and Decorating, Inc.*, 660 A.2d 882 (Conn. App. 1995) ..............................................................................................................................46

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)..............................................50

*Koo v. Robert Koo Wine & Liquor, Inc.*, 611 N.Y.S.2d 4 (N.Y.App.Div. 1st Dep't 1994)..........22

{BAY:01048757v3}

**TABLE OF AUTHORITIES**
(Cont'd)

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003)................................................................................................................33, 34

*LaSalle National Bank v. Perelman*, 82 F.Supp.2d 279 (D. Del. 2000).......................26

*Lindsey v. M.A. Zeccola & Sons, Inc.*, 26 F.3d 1236 (3d Cir. 1994) .............................44

*Lippman Packing Corp. v. Rose*, 120 N.Y.S.2d 461 (N.Y. Mun. Ct. 1953)..................22

*Matter of Liquidation of Union Indem. Ins. Co. of New York*, 89 N.Y.2d 94 (N.Y. 1996)...........37

*In re New Valley Corp.*, 181 F.3d 517 (3d Cir. 1999) ..............................................49, 50

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)........................33

*In re Pinnacle Brands, Inc.*, 259 B.R. 46 (Bankr. D. Del 2001)....................................36

*Ram Constr. Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049 (3d Cir. 1984) ...............42

*In re Schipper*, 109 B.R. 832 (Bankr.N.D. Ill. 1989)...................................................26

*Scully v. US Watts, Inc.*, 238 F.3d 497 (3d Cir. 2001)......................................19, 20, 42

*Shire US Inc. v. Barr Lab., Inc.*, 329 F.3d 348 (3d Cir. 2003) .....................19, 20, 31, 40

*Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593 (N.Y. App. Div. 1st Dep't 1998) .................21

*Spencer v. Green*, 842 N.Y.S.2d 445 (N.Y. App. Div. 2007).........................................22

*Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882 (Pa. Super. 1985).....................46

*In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001) .........................26

*Trumbull Corp. v. Boss Construction, Inc.*, 801 A.2d 1289 (Comm. Ct. Pa. 2002)...............46, 47

*Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170 (N.Y. 1931).........................22

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005).............................27

*In re Water's Edge Ltd. P'shp.*, 251 B.R. 1 (Bankr. D. Mass. 2000) ............................36

*Zirn v. VLI Corp.*, 621 A.2d 773 (Del. 1993) ........................................................34, 35

**TABLE OF AUTHORITIES**
**(Cont'd)**

*Zirn v. VLI Corp.*, 681 A.2d 1050 (Del. 1996) ........................................................................34, 35

## BRITISH HOUSE OF LORDS CASE

*Actionstrength Ltd. v. Int'l Glass Eng'g*, [2003] UKHL 17 .....................................................48, 49

## CANADIAN CASES

*Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.)*, [2003] O.J. No. 2320 (Ont. S.Ct. Just.)........................................................................................47

*Harvie v. Gibbons*, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.).......................................................44

*Paquette v. Smith*, [1989] 70 O.R. (2d) 449 (Ont. S. Ct.)............................................................44

*Pullano* v. *Yellowhead Timber Ltd.*, [1994] B.C.J. No. 1317 (QL)..............................................47

*The Neighbourhoods of Cornell Inc. v. Ontario Inc.*, 2003 CarswellOnt 2757 (Ont. Sup. Ct. Just.) ....................................................................................................................................47

*SPX Canada Inc. v. Watts*, [1995] A.C.W.S.J. 630732 (B.C.S. Ct.) ...........................................47

*Travel Machine Ltd. v. Madore*, [1983] 143 D.L.R. (3d) 94 (Ont. H. Ct. Just.) .........................47

## FEDERAL STATUTES

11 U.S.C. § 521...........................................................................................................................12

11 U.S.C. § 1125.........................................................................................................................33

Del. Bankr. L.R. 1007-1..............................................................................................................12

Fed. R. Bankr. P. 1007................................................................................................................12

## CANADIAN STATUTE

Ontario Statute of Frauds, R.S.O. 1980, c. 481 ..........................................................................38

## DELAWARE STATUTE

Delaware Statute of Frauds, DEL. CODE ANN. tit. 6 §2714..........................................................38

{BAY:01048757v3}

**TABLE OF AUTHORITIES**
**(Cont'd)**

**OTHER AUTHORITIES**

R. Franklin Balotti & Jesse A. Finkelstein, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 4-170 (2007 Supp.)........................................................................27

RESTATEMENT (SECOND) OF CONTRACTS § 131 (1981)................................................................44

{BAY:01048757v3}

# I.    STATEMENT OF THE CASE

## A.    "Buyer's Remorse"

SNC-Lavalin Power Ontario, Inc. ("SNC"), one of the world's leading engineering and construction companies, entered into a CAD$757 million contract ("Sithe Contract") with Sithe Global Power Goreway LLC ("Sithe") to construct a power facility in Canada known as the "Goreway Station Project" ("Goreway Project"). In connection with the project, SNC awarded a fixed-priced subcontract ("HRSG Contract") to Deltak, LLC ("Deltak") of approximately CAD$46 million to supply three heat recovery steam generators ("HRSGs").

When it filed for bankruptcy protection, Deltak lacked the financial wherewithal to fulfill its remaining obligations under its contract with SNC and its other customers. As a result, Deltak offered to negotiate so-called "completion agreements" with its customers, including SNC, pursuant to which Deltak would agree to complete construction of the HRSGs if, among other things, the customer agreed to pay all costs of completion and waive any claims for damages (including warranties) against Deltak upon completion of the HRSGs. If accommodations could not be reached, Deltak proposed to reject (*i.e.*, breach) its contracts and customers would be free to assert unsecured claims for damages against Deltak's estate but would have to secure alternative sources for completion of such projects, including the Goreway Project. Most of Deltak's customers, including SNC, chose to enter into completion agreements rather than risk the uncertainty, delay, and potentially massive liquidated damages that they would face to secure an alternative supplier and restart the process of design, engineering and construction of HRSGs. SNC admitted that its "only practical option" was to enter into a completion agreement with Deltak.

Nearly a year after entering into the completion agreement, and after SNC received the benefit of having the HRSGs almost completely constructed and delivered to the project site in

Canada,[1] SNC apparently began to second-guess its business decision to waive its claims against Deltak as part of the negotiation over the completion agreement.

In a classic case of "buyer's remorse," SNC asserts that it was fraudulently induced to enter into the completion agreement and to waive its rejection damage claim. The crux of SNC's theory is that it was duped into believing that its rejection claim against Deltak was worthless because Global Power Equipment Group, Inc. *et al.* (the "Debtors") intentionally concealed an intercompany claim owed to Deltak by Global Power Equipment Group Inc. ("GPEG").

SNC's theory was rejected by the Bankruptcy Court. The theory was flawed because SNC wrongly assumed, without any analysis, that general ledger intercompany accounting balances represented bona fide "claims" of Deltak against GPEG. To the contrary, the balances only represent the historical movement of cash and certain recorded non-cash transactions between GPEG and Deltak. No determination was ever made by the Debtors' management (or by the Bankruptcy Court) as to whether the transfers giving rise to the balances were loans from Deltak to its parent as opposed to dividends from Deltak to its parent. Additionally, the Creditors' Committee and Equity Committee (together, the "Committees"), after extensive investigation, could not agree on the characterization of the intercompany balances. As the Bankruptcy Court aptly recognized, "intercompany claims in chapter 11 cases are notoriously subject to dispute, and in my experience, the number that appears in the debtors' financial statement at the outset of a case is typically the starting point and not the ending point of the analysis and the dispute over intercompany claims." (A-786, Tr. 168:13-18).[2]

---

[1]      Indeed, as of today, two of the three HRSGs have passed the required tests, evidencing completion, and the remaining HRSG is expected to pass its "test" before July 31, 2008.

[2]      Hereafter, "A-___" refers to the Appendix of Exhibits to Appellant's Opening Brief; "Tr. ___" refers to Transcripts of the December 14 and 17, 2007, Trial; and "SA-___" refers to Supplement Appendix of Exhibits to Appellees' Answering Brief, submitted with Appellees' Answering Brief.

2

In addition to the unsettled characterization of the intercompany balances, the Bankruptcy Court found that the Debtors and their advisors had "reason to doubt" the general ledger intercompany balances because (i) they were out of balance; (ii) certain non-cash intercompany transactions were not adequately documented; (iii) other intercompany transactions were not historically allocated by GPEG to Deltak (*i.e.* payment of federal taxes); and (iv) certain intercompany transactions were not allocated by GPEG to Deltak for 2005 and 2006. In light of the foregoing, the Debtors understandably did not want to disseminate faulty or incorrect information to the public that could mislead creditors or other investors (who continued to trade in Debtors' claims and equity). Instead, the Debtors made, as the Bankruptcy Court found, a "legitimate business and judgment call" to include an explanatory note in their schedules of assets and liabilities stating intercompany balances were not "quantified." The decision to use the explanatory note was reasonable and appropriate considering that the intercompany balances were unreliable, inaccurate, incomplete and the characterization was unresolved.

After a two-day trial, the Bankruptcy Court rejected SNC's assertions and found that "the evidence does not support a conclusion by this Court that the [Debtors] wrongfully delayed disclosure of the intercompany liabilities as part of a strategy to defraud or mislead SNC ..." (A-786, Tr. 168:9-13). The Bankruptcy Court committed no error.

SNC's inaccurate factual assertions are compounded by its manufactured legal theories to then argue (i) that the Debtors, as fiduciaries, owed SNC a duty to disclose the intercompany balances during negotiations of the completion agreement and (ii) that SNC, as a beneficiary, is entitled to a presumption of the elements of fraud, thus shifting the burden of proof to the Debtors to prove the absence of fraud. There is no legal support for SNC's theory that a debtor in possession must disclose all information to a single creditor during negotiations, nor does

SNC cite to any support for this proposition. Cases cited by SNC support the undisputable proposition that a debtor in possession must disclose *known* assets and liabilities in its schedules and adequate information in its disclosure statement (which is relied upon by creditors and other parties in determining their vote for or against a chapter 11 plan). Neither of these propositions is remarkable. Here, the Debtors met both of these duties. The facts in the cases SNC uses to support its burden-shifting theory are completely irrelevant and inapplicable to the current situation. Courts have found burden-shifting to be warranted in very limited circumstances in fraud cases when the plaintiff and defendant did not deal on equal terms and the relationship was extraordinarily one-sided in favor of defendant (*e.g.*, an action to set aside an alleged gift to a nursing home by an 85-year old, semicomatose, partially paralyzed patient less than one month before her death). This is not the case here, where SNC was a sophisticated party represented by experienced counsel. In sum, SNC did not prove that the Debtors fraudulently induced it to waive its rejection damages and the Bankruptcy Court's finding of fact and law are unassailable.

**B.    No Parent Guaranty**

SNC also filed a claim against GPEG for its alleged damages, claiming that GPEG had guaranteed Deltak's obligations under the HRSG Contract. However, it was undisputed that GPEG never executed a written guaranty, and, accordingly, the statute of frauds prevented the enforcement of the purported guaranty. Undaunted, SNC argued that Monte Ness, President of Deltak and a Senior Vice-President of GPEG, had promised SNC a GPEG parent guaranty and that certain exceptions were applicable to take Ness' purported oral guaranty outside the statute of frauds. However, the Bankruptcy Court found, on the record before it, that it could not conclude an oral guaranty had ever been given and it also found that SNC had failed to identify sufficient evidence to establish any of the exception to the statute of frauds.

4

On appeal, SNC has argued that the Bankruptcy Court's finding that it could not conclude that a parental guaranty had ever been promised was clearly erroneous. However, the Bankruptcy Court relied on credible evidence in reaching its determination, including: (i) Ness' testimony that he had never promised a parent guaranty; (ii) the testimony of four other GPEG officers that a parent guaranty was never authorized; (iii) the complete absence of any documentary evidence in the record that a parent guaranty had ever been promised other than a four word note by a SNC official to himself; (iv) the admission by this same SNC official that he had never negotiated any of the terms of a parent guaranty; and (v) the ambiguity of the HRSG Contract itself – a parent guaranty was only one of several financial security options referenced in the HRSG Contract, and a blank form of guaranty attached to it was apparently taken from some other transaction as it named a competitor of Deltak as the contracting party. The findings of the Bankruptcy Court, amply supported by credible evidence, are not clearly erroneous and cannot be reversed.

SNC has also argued that the Bankruptcy Court failed to apply (i) the multiple document exception to the statute of frauds; (ii) the wider interest exception to the statute of frauds; (iii) agency law to bind GPEG to Ness' purported promise of a parent guaranty; and (iv) the equitable maxim that "treats as done that which should be done" for the benefit of SNC. In a misguided attempt to retry its case, SNC has incorrectly presumed that these additional alleged errors of the Bankruptcy Court are matters of law. On the contrary, the conclusions of the Bankruptcy Court with respect to these issues were factual determinations subject to the clearly erroneous standard of review. SNC's additional arguments must also fail because such arguments all depend on the existence of an essential predicate fact – the promise of a parent guaranty. Here, the Bankruptcy

{BAY:01048757v3}

Court resolved disputed facts on the entire record before it and determined that no guarantee was given.

## II.    COUNTER-STATEMENT OF FACTS

### A.    Events Leading Up to Bankruptcy

#### 1.    Deltak's Financial Challenges

Due to the competitive nature of the HRSG industry, Deltak operated under fixed price contracts with customers. (A-28). The actual costs often varied, sometimes substantially, from the original projections due to several factors, including fluctuating commodity prices. (A-53). HRSG projects were also inherently complex, and ranged in duration from 12 to 24 months. *Id*. Deltak's HRSG business was both capital intensive and subject to the risk of substantial volatility in commodity prices and other costs. In this challenging and competitive environment, Deltak posted an overall year-to-date net loss of $1.7 million on revenue of approximately $133.8 million as of July 31, 2006, mostly attributable to Deltak's HRSG business division (the "HRSG Business"). (A-28; A-53). The HRSG Business had a negative gross margin, in the aggregate, for its HRSG projects and projected losses for the HRSG projects during that same period totaling approximately $26.6 million. (A-53). It was expected at that time that the HRSG Business would continue to incur losses and, absent a cash infusion, would incur a negative cash drain of approximately $22 million in completing its outstanding HRSG projects. (A-28).

#### 2.    Financing Defaults

Prior to the bankruptcy filing, the Debtors incurred significant indebtedness with their secured lenders and under subordinated notes. (A-55). In October, 2004, GPEG and certain of its subsidiaries entered into a $100 million credit agreement (as amended, the "Senior Credit Facility") with Bank of America, N.A. ("BoA") and certain other lenders. (A-54). In late November 2004, GPEG issued $69 million of 4.25% Convertible Senior Subordinated Notes (the

6

"Notes") due on November 23, 2011. *Id.* By 2006, the Debtors began experiencing liquidity issues that eventually led to both a liquidity crisis and the Debtors' chapter 11 filings.

In 2006, GPEG discovered unrecognized expenses relating to two projects that had been completed in 2004. (A-56-57). As a result of these expenses, gross profits for these two projects had been inadvertently overstated by approximately $7 million. (A-57). After further investigation, the Debtors determined they needed to restate earnings for 2004, and three quarters of 2005. *Id.* This issue triggered a default under the Senior Credit Facility and the Notes. In March 2006, GPEG negotiated a waiver agreement with the lenders which, among other things, also reduced the availability of credit. (A-57). Shortly after entering into the waiver agreement, GPEG discovered potential cost reporting issues in connection with several of Deltak's HRSG projects, which it believed could further impact the consolidated financial statements. (A-57). Because of these cost reporting errors GPEG failed to file its 2005 10-K with the Securities and Exchange Commission by the required deadline of March 31, 2006. *Id.* This delay in filing triggered other declared defaults under the Senior Credit Facility and the Notes and, as a result, the lenders refused to extend any further credit to GPEG. *Id.*

### 3.    Restructuring Efforts

In February 2006, the Debtors hired Alvarez & Marsal ("A&M"), a well known crisis management, restructuring and financial advisory firm. (A-667, Tr. 49:8-10). A&M immediately assisted the Debtors with its issues with the existing lenders. (A-667, Tr. 49:18-23). GPEG's efforts to refinance at the time were unsuccessful due largely to the overall condition of Deltak. (A-58). As of July 2006, the Debtors were faced with a liquidity crisis, largely attributable to Deltak. (A-54). The HRSG Business had little to no going concern value and it became evident the only viable option was liquidation and cessation of operations. (A-29).

{BAY:01048757v3}

**B.    Bankruptcy Filing and Wind Down of HRSG Business**

**1.    Chapter 11 Filing**

On September 28, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[3]  At that time, the Debtors had no financing and BoA had not consented to the use of cash collateral.  (A-21).  By emergency order dated October 2, 2006, the Bankruptcy Court permitted a limited use of cash collateral through October 20, 2006, which was further extended through December 4.  (A-114; Bankr. D.I. 152, 348, 459).  Significantly, the conditions tied to this limited use of cash collateral were severe – including a prohibition against any funding of the HRSG business.  Id.  It was not until November 21, 2006, when Morgan Stanley stepped in to replace BoA as the Debtors' lender, that there was debtor in possession financing in these cases.  (Bankr. D.I. 337).

**2.    Wind Down Strategy**

On September 29, 2006, the Debtors filed a "first day" motion seeking to wind down the HRSG Business, reject certain related HRSG contracts, and implement procedures for the orderly completion of work in progress (the "Wind Down Motion").  (A-27).  The Debtors could have simply sought to reject each of their contracts with HRSG customers.  Id.  However, they recognized that their inability to deliver the HRSG units then under contract would impact the business objectives of HRSG customers and result in large rejection damage claims.  (A-3).  Therefore, the Debtors believed that the orderly "completion" of work in progress would provide substantial benefits not only to the Debtors and their employees, but also to customers, vendors and other stakeholders.  (A-29).  Specifically as to customers, because the HRSGs were highly

---

[3]    The United States Trustee appointed the Creditors' Committee on October 10, 2006, and appointed the Equity Committee on November 9, 2006.  (A-156).  The Committees were parties in the trial below.  Pursuant to the Plan and the Confirmation Order (defined below), the Creditors' Committee ceased to exist after confirmation and was replaced by the Deltak Plan Administrator.  The Deltak Plan Administrator, together with the Debtors and the Equity Committee, are referred to as the "Estate Representatives."

{BAY:01048757v3}

customized, the wind down could benefit them by giving them the option to complete the construction of the HRSG on mutually beneficial terms. (A-41). As explained in the Wind Down Motion, for the completion of each HRSG project each customer would have to agree to (a) pay all actual costs of completion on a time and materials basis; (b) pay any contractor incentives offered to employees who were retained to perform work on the customer's project; and (c) waive rejection damage claims to the extent the Debtors completed work on the project. (A-41-42). The Bankruptcy Court granted the Wind Down Motion and the Debtors successfully negotiated completion agreements with 10 HRSG customers, including SNC. (A-101-103).

## C.    Completion Agreement

### 1.    SNC's "Only Practical Option"

SNC's senior executives met on October 20, 2006 to evaluate their options in light of Deltak's bankruptcy filing and the impact such filing would have on SNC's ability to timely complete the Goreway Project. (A-521-522, Tr. at 167-168). At the meeting were:

| | |
|---|---|
| Jacques Lamarre | Chief Executive Officer and President |
| Gilles Laramée | Chief Financial Officer and Executive VP |
| Greg Tardanico | Vice President - Procurement/Contracts |
| Mike Ranz | President of SNC division responsible for Goreway Project |

In preparation for the October 20 meeting, SNC prepared a power-point presentation identifying three options for SNC: (A) continuing the relationship with Deltak by entering into a completion agreement; (B) acquiring Deltak's engineering and hiring a third party manufacturer to complete the HRSGs; or (C) replacing Deltak by hiring another vendor to re-start from scratch the engineering, procurement and construction of the three HRSGs for the Goreway Project. (SA-197-222; A-522-523; A-1504). The power point presentation also described the relative benefits and estimated costs of each option, including potential liquidated damages for project delays that could be assessed by Sithe against SNC under the Sithe Contract. (SA-215-222).

During the October 20 meeting, SNC's senior executives focused on option A (entering into a completion agreement with Deltak) and option C (replacing Deltak with another vendor) (A-523, Tr. 169:20-23).   SNC estimated that option A (completion agreement with Deltak) would cost CAD$61 million and that SNC would not likely incur liquidated damages under the Sithe Contract. (SA-220; *see also* A-527, Tr. 173:12-18 explaining the presentation had a miscalculation).   Comparatively, SNC estimated that option C (replacing Deltak with new vendor) could result in massive delays of the Goreway Project of up to 300 days, thereby exposing SNC to potential liquidated damages of approximately CAD$119 million, for a total cost of CAD$184 million.  (SA-222; A-530, Tr. 176:7-9).   At the conclusion of the meeting, SNC's senior executives decided to pursue option A (completion agreement with Deltak) because it was the "best" and most "cost effective" option.  (A-532, Tr. 178:10-11, 19-20).

After the October 20 meeting, SNC and Deltak representatives negotiated the terms of a completion agreement.  In fact, SNC and Deltak executed two completion agreements.  The first version, dated as of November 10, 2006 (SA-4-19), was executed without the consent of the Creditors' Committee, which it asserted was required by prior Bankruptcy Court order.  After the Creditors' Committee became involved in the negotiations and provided substantive comments, SNC and Deltak executed an amended and restated completion agreement, dated November 30, 2006 (the "Completion Agreement"), that was approved by order of the Bankruptcy Court dated December 4, 2006.  (A-915-934; Bankr. D.I. 457).

Pursuant to the Completion Agreement, Deltak agreed to complete construction of SNC's three HRSG units as originally contemplated under the HRSG Contract in exchange for which SNC agreed (i) to fund the costs to complete the HRSG units and (ii) to cap its maximum claim against Deltak arising from the rejection of the HRSG Contract based on the extent to which

{BAY:01048757v3}

Deltak achieved completion of certain "milestones" as set forth in a schedule in section 2.2 of the Completion Agreement. (A-916-917, 923-924). When each milestone is achieved, SNC's maximum claim against Deltak "steps-down" by a certain set percentage of the maximum claim, ultimately to zero. (A-923-924). SNC's maximum claim is governed by the step-down schedule except in instances of willful misconduct or intentional fraud by Deltak or its affiliates. (A-923).

## 2.    Knowles Report

SNC's business decision, reached at the October 20 meeting -- that its only practical option was to enter into a completion agreement with Deltak -- was reaffirmed by SNC nearly one year later in a September 2007 report commissioned by SNC for its client. SNC retained an independent expert, Knowles Consultancy Services, Inc. ("Knowles"), to prepare two reports for Sithe with respect to the delays in completion of the so-called "simple cycle" and "combined cycle" facilities to be built by SNC for Sithe. (A-1063). The purpose of the reports (the "Knowles Reports") was to establish that any delays in completion of the Goreway Project attributable to Deltak's bankruptcy should not result in the assessment of liquidated damages against SNC because such delays were excusable under a force majeure provision in the Sithe Contract. (A-1063). The Knowles Reports, both dated September 10, 2007, were delivered by SNC to Sithe. (A-551, Tr. 197:4-6).

To prepare the Knowles Reports, the expert and author, Roger Bridges, along with other Knowles employees, interviewed members of SNC's management team. (A-492, Tr. 138:3-6). The Knowles Reports each state that SNC had determined that contracting with a new supplier (*i.e.*, option C) "would delay the Project by as much as 18 months...[and SNC] concluded that entering into the Completion Agreement with Deltak was the ***only practical option***." (A-1090, 1186) (emphasis added). Bridges affirmed that although it was SNC's management who

11

believed entering into the Completion Agreement was SNC's only practical option, "it was a statement [Bridges] agreed with." (A-494, Tr. 140:11-17).

**D.     Schedules of Assets and Liabilities**

  **1.     Schedules Generally**

Pursuant to § 521(a)(1)(B) of the Bankruptcy Code and Rule 1007(b) and (c) of the Federal Rules of Bankruptcy Procedure, a debtor must file a "Schedule of Assets and Liabilities" (the "Schedules") within 15 days of the petition date. When, as here, the total number of creditors exceeds 200, the deadline is automatically extended to 30 days from the Petition Date under Rule 1007-1 of the Local Rules. The deadline can be further extended "for cause" pursuant to Bankruptcy Rule 1007(c). In large chapter 11 cases, debtors routinely request and courts customarily grant extensions. Here, the Debtors filed their first extension motion on September 29, 2006 seeking a 60-day extension. (A-15-24). The Bankruptcy Court granted a 15-day extension. (A-99-100). The Debtors filed a second extension motion seeking a further extension of 15 days. (A-112-118). The Bankruptcy Court granted the motion and the Schedules were filed on November 27, 2006, 60 days after the Petition Date. (A-150-151).

  **2.     Debtors' Cash Management System**

GPEG, since its inception, has utilized a centralized cash management system whereby cash received by its operating subsidiaries is swept to GPEG's cash accounts. (A-305-306). As these operating subsidiaries require cash to fund operating disbursements, GPEG funds the subsidiaries from its centralized cash management pool. (A-305). To account for the transfers of cash, GPEG established intercompany cash accounts, one for each of its operating subsidiaries, maintained on the GPEG general ledger and correspondingly, each of the operating subsidiaries maintained an intercompany cash account on its general ledgers to account for cash transfers with GPEG. (A-305). As part of the Company's month-end close process, GPEG

12

reconciled the amounts reflected on each of the subsidiaries' books and records to the corresponding balance reflected on GPEG's books and records. (A-306). GPEG also has maintained a corporate overhead function through which it provides a number of shared services to its subsidiaries, the cost and expense of which are allocated and/or passed along to such subsidiaries through intercompany non-cash accounts. (A-306). Corporate overhead services that are provided include: executive management, legal, treasury, accounting, tax, finance, risk management, information technology and human resources. (A-306).

### 3.    Uncertainties with "Intercompany Balances"

The Debtors and their advisors had significant reservations regarding the inclusion of intercompany general ledger balances in their Schedules as "assets" or "liabilities." First, as explained below, there were concerns about the reliability, accuracy and completeness of the data contained in the Debtors' general ledgers. Second, there was uncertainty concerning the legal characterization of the intercompany balances. Did the balances represent (i) liabilities (or assets) owing by (or to) one debtor to another, (ii) dividends made by subsidiaries to the parent, or (iii) a contribution of capital from the parent to its subsidiaries?

In connection with their review of the ledger balances, the Debtors, AlixPartners, LLC ("AlixPartners") (the Debtors' claims agent tasked with preparing the Schedules) and A&M discovered the following red flags, which raised concerns (in addition to the legal characterization) about the accuracy, reliability and completeness of balances:

(i)    Out of Balance. Intercompany cash balances on the general ledgers of GPEG and its respective subsidiaries did not "net to zero" and were both "out of balance." (A-634-635, Tr. 16:23-17:4; A-670, Tr. 52:16-23).

(ii)    Insufficient Records. Non-cash intercompany transactions were not adequately documented because GPEG and Deltak did not maintain adequate records, such as invoices, proof of delivery, or purchase orders. (A-636, Tr. 18:15-19).

13

(iii)  <u>Lack of Allocation</u>.  Certain non-cash intercompany transactions (*i.e.*, federal taxes, management fees and board fees) were not historically allocated by GPEG to its subsidiaries (A-687, Tr. 69:14-21) and the allocation process was not performed at all among GPEG and its subsidiaries for 2005 and 2006.  (SA-181).

(iv)  <u>Other Concerns</u>.  The Debtors' general accounting issues, such as the Debtors' need to restate the gross profit for 2004 and the first three quarters of 2005 and the Debtors' failure to file its 2005 Form 10-K with the SEC, presented additional challenges to collecting data for the Debtors' Schedules, including intercompany data.  (A-57; A-632, Tr. 12-23).

A complete reconciliation to determine an accurate, reliable and complete balance (to address the issues noted above) was merely the starting point of the analysis because there remained the all important determination of characterization of intercompany balances.  As noted above, Schedules require the disclosure of <u>assets</u> and <u>liabilities</u>.  Here, it was unclear whether the general ledger intercompany balances reflected assets or liabilities.  "[H]istorically the Debtors' management did not address the issue of the appropriate accounting characterization of the intercompany balances ... ."  (A-311).  Both the Debtors' former and then current CFOs admitted that the general ledger balances were never characterized in terms of assets and liabilities.[4]  Moreover, after extensive analysis (performed subsequent to the filing of the Schedules), the Committees could not agree on how to characterize the intercompany balances.  (A-311; A-691, Tr. 73:5-7).  The Equity Committee believed that the intercompany balances did not constitute a debt, relying on the fact that none of the indicia of debt (a writing, fixed maturity date, interest, security, etc.) were present.  (A-311).  The Creditors' Committee, on the other hand, argued that a portion of the balances could be classified as debt or otherwise was recoverable by Deltak.  (A-311).

---

[4]    James Wilson, GPEG's CFO from December 2003 through November 2006, noted that the general ledger only reflected intercompany accounts and not a "payable or receivable."  (A-1376).  Wilson also classified the intercompany net activity in the A&M GPEG Inter-company Cash Account Summary dated March 16, 2007 as "a history of cash transactions from one subsidiary to the parent" that was incomplete in terms of valuation of true receivables/payables.  (A-1388).  Moreover, according to Michael Hanson, the Debtors' CFO during bankruptcy, no one at GPEG had ever determined if the intercompany balance was an asset or liability or how it should be treated in the bankruptcy cases.  (SA-159).

14

4.    **Global Note**

At the time that the Debtors were required to file their Schedules, the issues regarding accuracy, reliability, completeness and characterization of the general ledger balances were unresolved. As reflected in the testimony at trial and cited by the Bankruptcy Court in the ruling, the Debtors' concerns were compounded by the fact that (i) the Schedules were to be filed under the penalty of perjury, and (ii) dissemination of misleading information to the marketplace would be problematic because investors rely on the Schedules as a basis for investment decisions, including the trading of claims during the chapter 11 cases. (A-630, Tr. 12:10-21). Instead of disclosing inaccurate or incomplete information and taking a premature position on the legal characterization of intercompany balances, the Debtors made a legitimate business and judgment call to include an explanatory "global note" in their Schedules ("Global Note") which provided:

> Prior to the Petition Date, the Debtors routinely engaged in intercompany transactions resulting in intercompany accounts payable and receivable. The respective intercompany accounts payable and receivable as of the Petition Date have not been quantified. Accordingly intercompany account balances are not listed in the Schedules. (A-172)

Similar notes have been used in other bankruptcy cases. (A-638, Tr. 20:3-20). The decision to include the Global Note was a sound exercise of the Debtors' business judgment.

E.    **No Financial Due Diligence by SNC**

SNC admits that at no time during these chapter 11 cases did it ever seek financial information from the Debtors to evaluate whether Deltak had any assets with which to provide a recovery to general unsecured creditors (including holders of rejection damages claims, which SNC agreed to waive under the November 10 and November 30 versions of the Completion Agreement). Indeed, SNC's CFO conceded that there was no information that SNC requested from the Debtors that was not then divulged to SNC. (A-538, Tr. 9-16). He also admitted that

SNC had never requested that Deltak provide a list of assets or a standalone financial statement. (A-539-540, Tr. 185:10-14, 186:1-3).[5]

SNC did surface early in the chapter 11 cases.  It was represented by experienced bankruptcy counsel who filed a notice of appearance with the Bankruptcy Court within the first month (Bankr. D.I. 215) and even responded to a motion.  Yet, when the Schedules were filed on November 27 -- which was three days before SNC executed the November 30 Completion Agreement -- SNC never inquired about Deltak's financial condition, its assets or liabilities, the Global Note, or anything else related to the Schedules.  In fact, SNC admitted that it never reviewed the Schedules when they were filed.  (A-547, Tr. 193:5-12).

**F.    SNC's Disputed Claims Against Deltak and GPEG**

**1.    SNC's Proofs of Claim**

SNC filed a proof of claim on March 22, 2007 against Deltak in the amount of approximately USD$55,179,000 for alleged damages arising under the rejected HRSG Contract, and an identical claim against GPEG alleging that GPEG guaranteed Deltak's obligations under the HRSG Contract (collectively, the "Proofs of Claim").  (A-1; A-8).  SNC's claim against Deltak was entirely inconsistent with the "capped amount" (CAD$46,662,179) and "step downs" under the Completion Agreement.  SNC alleged damages arising from, among other things, the excess costs to complete Deltak's work, payment of SNC's contingent liabilities owed to its customer, Sithe, for liquidated damages due to Deltak's alleged delays in delivery and/or failures of performance, incidental costs associated with modules to the HRSGs, and losses or damages arising from faulty or defective modules.  *Id.*  SNC also reserved the right to challenge the

---

[5]      SNC sent a letter, dated October 30, 2006, to the Creditors' Committee.  (A-903-906).  The letter did not request balance sheets, income statements, financial statements, cash flow statements or other similar information. The Creditors' Committee's counsel responded, and, among other things, advised SNC that its best option was to seek information directly from the Debtors.  (A-908-909).  SNC failed to do so.

{BAY:01048757v3}

applicability of the step-down schedule in the Completion Agreement based upon a showing that

Deltak committed fraud or willful misconduct.  *Id.*

### 2.     Alleged GPEG Parental Guaranty

As to its claim against GPEG, SNC alleged, without any supporting documentation, that

GPEG guaranteed Deltak's obligations under the HRSG Contract.   In it proof of claim, in

pertinent part, SNC alleged:

> Pursuant to the Executory Contract and "Exhibit T" attached thereto,
> presumably with GPEG's knowledge and consent, Deltak undertook to
> provide SNC with a parent company guaranty of all of Deltak's
> obligations in connection with the Project in order to induce SNC to enter
> into the Executory Contract.  GPEG failed to disclose Deltak's financial
> condition to SNC at the time SNC entered into the Executory Contract,
> and then failed to provide the parent guaranty as agreed.

(A-13).   However, what the HRSG Contract (which was referenced in the proof of claim)

provides regarding a parental guaranty is unclear.  The HRSG Contract, in the applicable section,

required Deltak to provide "financial securities as contained in the referenced article within

Exhibit A 'General Terms and Conditions of Purchase' as follows: . . . Article 21.3 Parent

Company Guarantee (in accordance with Exhibit T 'Sellers Form of Parent Company Guarantee

Agreement')."  (A-822).  However, the Exhibit A general terms and conditions has no Article

21.3, does not mention a parental guarantee and in the only applicable section, Article 21, states

only that "Seller shall be capable of providing payment and/or performance bonds, letters of

credit, or the like satisfactory to Buyer."  (A-833).

Moreover, far from signifying an affirmative undertaking by GPEG to answer for

the debts of its subsidiary, the Exhibit T form of parent company guaranty attached to the HRSG

Contract was (i) undated and unsigned; (ii) silent as to the guarantor party; (iii) purported to

guaranty the obligations arising under a contract between SNC and ALSTOM (not Deltak, but

instead a competitor of Deltak (A-1299-1300)); (iv) chose the law of France as its governing law; and (v) adopted Paris, France as the venue for any arbitration of disputes. (A-1527-28).

Despite the "presumably with GPEG's knowledge and consent" language in its proof of claim, SNC later alleged that Monte Ness, the President of Deltak and a Senior Vice-President of GPEG, promised a parental guaranty on behalf of GPEG. Op. Br. at 7-10.[6] However, Ness flatly denied ever making such a promise. (A-1617). Candice Cheeseman, GPEG's general counsel, denied that GPEG ever approved a parental guaranty. (A-726-27, Tr. 108:7-109:21).

### 3.    Objections to SNC's Claims

The Debtors objected to the Proofs of Claim, seeking to disallow the claim against GPEG in its entirety and reduce the amount of the claim against Deltak in accordance with the "step down" schedule in the Completion Agreement (the "Claims Objections"). (SA-20-41; SA-42-54). The Committees filed joinders to the Claims Objections. (SA-55-58; SA-59-62). On November 5, 2007, the Estate Representatives filed a motion to temporarily allow, for voting purposes only in connection with the Debtors' pending chapter 11 plan, SNC's claim against Deltak in a reduced, stepped down amount based upon anticipated milestones to be reached under the Completion Agreement ("Temporary Allowance Motion"). (SA-109-123).

### 4.    Trial on SNC's Proofs of Claim and the Debtors' Claims Objections

At the conclusion of a two-day trial following extensive discovery, the Bankruptcy Court sustained the Debtors' Claims Objections and granted the Temporary Allowance Motion. (A-789). Regarding the claim against GPEG, the Bankruptcy Court determined that the record did not support SNC's allegations of a parent guaranty by GPEG. (A-782). The Bankruptcy Court also ruled in the Debtors' favor with respect to SNC's claims of intentional fraud and willful

---

[6]    References to Appellant's Opening Brief are noted herein as "Op. Br. at" followed by the page number.

misconduct, finding that the evidence did not support a conclusion that the Debtors' wrongfully delayed disclosure of the intercompany balances as part of a strategy to mislead or defraud SNC or other customers into executing completion agreements. (A-786).

After the trial, on December 20, 2007, the Bankruptcy Court held a confirmation hearing at which it confirmed the Debtors' First Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). The Bankruptcy Court had previously approved the Debtors' Disclosure Statement Relating to the Plan (the "Disclosure Statement") by order dated October 31, 2007. (Bankr. D.I. 1913). The Debtors' Disclosure Statement described the complex issues relating to the intercompany balances, as well as the resulting settlement, in great detail. (A-309-313). The Bankruptcy Court entered an order confirming the Plan on December 21, 2007 (the "Confirmation Order"). (Bankr. D.I. 2233).

### III.    STANDARD OF APPELLATE REVIEW

A "finding of fact may be reversed on appeal only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Shire US Inc. v. Barr Lab., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003). This "clearly erroneous standard applies to the [trial court's] factual findings 'whether based on oral or documentary evidence.'" *Id.* (citing *American Home Prods. Corp. v. Barr Lab., Inc.*, 834 F.2d 368, 370 (3d Cir. 1987)). Moreover,

> the clearly erroneous standard 'does not permit an appellate court to substitute its findings for those of the trial court. . . . That a different set of inferences could be drawn from the record is not determinative. It is sufficient that the [trial court's] findings of fact could be reasonably inferred from the entire record. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Scully v. US Watts, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001) (citations omitted). Moreover, the "credibility of witnesses is quintessentially the province of the trial court, not the appellate court... Accordingly, we may only reject a [trial court's] finding concerning a witness's (sic)

19

credibility in rare circumstances." *Id*. On the other hand, an appellate court exercises plenary review of the trial court's legal conclusions. *See Shire US Inc.*, 329 F.3d at 352.

## IV.    ARGUMENT

### A.    No Inferences Or Burden Shifting

SNC asserts that the Bankruptcy Court erred as matter of law in failing to credit SNC with certain inferences on its fraud claim which would shift the burden of proof to the Estate Representatives. Op Br. at 31-39. SNC asserts that by virtue of its fiduciary relationship with the Debtors, it is entitled to the inferences of reliance, knowledge and intent in connection with its fraud in the inducement claim. Op. Br. at 32. SNC is wrong as a matter of law.

The cases relied upon by SNC are utterly inapposite. In *Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.* the court permitted burden shifting in an action by a decedent's estate to recover a gift made by the decedent on the grounds that the gift was made by the decedent under fraud, duress or coercion. 45 N.Y.2d 692, 698 (N.Y. 1978). The facts in *Gordon* are compelling: the alleged gift was made by an 85 year-old woman, less than a month before her death, while in the "infirmary of the nursing home," while "unable to speak," with "with no spontaneous movement," "paralyzed in both hands" and who was characterized by her physician as "confused, drowsy and at times semicomatose, partially paralyzed, unresponsive and uncooperative, sometimes required to be restrained for her own safety and of impaired hearing." *Id.* at 696. In this context, the New York Court of Appeals found burden shifting was appropriate because there was a "fiduciary relationship" and the parties "did not deal on terms of equality." *Id.* at 699.

SNC also relies on *DiMaio v. State*, in which a Vietnam war veteran filed suit against a state agency alleging that his assigned counselor misplaced his application for disability benefits and misadvised him regarding the status of the application. 517 N.Y.S.2d 675, 676 (Ct. Cl.

{BAY:01048757v3}

1987). The facts were extreme and yet even then the court did not permit the burden to be shifted -- the plaintiff had a "tenth grade education," was "withdrawn, suffered flashbacks and nightmares, started drinking heavily (becoming an alcoholic) and attempted suicide," he was sent for "psychiatric treatment" and found to be "seventy percent disabled." *Id.* at 676, 678. Under these extreme circumstances, the court held that the veteran/counselor relationship was not so one-sided or overmastering as to warrant the shifting of the burden of proof. *Id.* at 678.

Here, SNC (unlike the semicomatose 85 year-old donor in *Gordon*) is a large Canadian engineering-construction firm formed by an alliance of two major Canadian engineering firms. (A-800). SNC was a sophisticated party, represented by experienced counsel, negotiating a modification to an existing commercial business relationship involving a multi-million dollar project. The relationship between the Debtors and SNC is not remotely similar to the relationship between an infirm elderly patient and a nursing home or a disabled veteran to his counselor. SNC had the means and opportunity to assess its potential recovery from Deltak. It never inquired of the Debtors or the Creditors' Committee about Deltak's financial condition, assets or liabilities. *See supra* Sect. II.E. SNC never even bothered to review the Schedules filed three days before the Completion Agreement was executed. (A-547, Tr. 193:5-12).

In fact, even a case cited by SNC, *Small v. Lorillard Tobacco Co.*, supports the Estate Representatives' position that inferences are not appropriate in this situation. 679 N.Y.S.2d 593, 600 (N.Y. App. Div. 1st Dep't 1998). In *Small* the court notes that "[r]eliance on defendants' misrepresentations will not be presumed where plaintiffs had a reasonable opportunity to discover the facts about the transaction beforehand by using ordinary intelligence." *Id.* Here, the record shows that SNC had a "reasonable opportunity." Consequently, there is no legal basis to

shift the burden of proof. Moreover, as shown below, SNC's claims are untenable regardless of the burden of proof.[7]

**B.    No Proof of Fraud**

To sustain a fraud in the inducement claim under New York law,[8] the record must show: (1) the Debtors knowingly misrepresented a material fact or omitted a material fact that it was duty-bound to disclose; (2) such misrepresentation or omission was made to induce SNC to rely upon it, or with the intent to deceive; (3) SNC justifiably relied on the misrepresentation or omission; and (4) injury. *See Jablonski v. Rapalje*, 788 N.Y.S.2d 158, 162 (N.Y.App.Div. 2d Dep't 2005); *see also Spencer v. Green*, 842 N.Y.S.2d 445, 446 (N.Y. App. Div. 2007) ("Although a cause of action alleging fraud may be predicated on acts of concealment, the plaintiffs must allege, inter alia, that the defendant had a duty to disclose the disputed information").

At trial, SNC argued that it was duped into entering into the Completion Agreement and thereby waived a rejection claim against Deltak as a result of (i) an alleged failure to disclose a $182 million "claim" against GPEG, allegedly a Deltak "asset" and (ii) the inclusion of the allegedly materially false Global Note in the Schedules. After hearing two days of testimony and reviewing multiple volumes of trial exhibits, the Bankruptcy Court rejected SNC's allegations. As shown below, the factual findings that support the decision are not clearly erroneous.

---

[7]    The other cases cited by SNC to support inferences/burden shifting are similarly inapposite. In *Lippman Packing Corp. v. Rose*, 120 N.Y.S.2d 461, 463 (N.Y. Mun. Ct. 1953), the court inferred the defendant had knowledge that a check would not be honored because he was the president of the bank. In *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 179 (N.Y. 1931) the court determined that a claim of fraud should have been submitted to the jury for decision because the defendant, an accountant, certified facts as true when they really had no knowledge of these facts. In *Koo v. Robert Koo Wine & Liquor, Inc.*, 611 N.Y.S.2d 4, 5 (N.Y.App.Div. 1st Dep't 1994), the court inferred fraud when the defendant admittedly signed plaintiff's name to a deed arguably without plaintiff's authority. None of these cases involved a debtor in possession or facts analogous to those presented here.
[8]    The Completion Agreement is governed by New York law. (A-928).

22

1.    **No Misrepresentation or Omission**

a.    **Unsettled Characterization of Intercompany Balance**

SNC's fraud in the inducement claim is based on the Debtors' alleged failure to disclose "an asset of some $182,000,000 owed by GPEG to Deltak," which SNC maintains should have been disclosed in the Schedules. Op. Br. at 13. And, as a result of the alleged non-disclosure, "SNC was kept in the dark as to Deltak's largest asset." Op. Br. at 36. SNC's theory is flawed because it wrongly assumes, without any support in the record or any analysis, that the intercompany cash general ledger balance in favor of Deltak against GPEG was recoverable as a claim of Deltak against GPEG. As described above, the characterization of the Debtors' unreconciled general ledger balances was an unresolved issue at the time the Schedules were being prepared. *See supra* Sect. II.D.3. Although the unreconciled general ledgers, and subsequently filed monthly operating reports, may have reported intercompany balances in terms of "payables" and "receivables," the balances reflected only a report of the history of cash transactions among GPEG and its subsidiaries. Moreover, the Debtors' management never made a determination of the appropriate legal characterization (*e.g.*, intercompany loans representing true debt versus dividends to GPEG by subsidiaries or equity contributions by GPEG to subsidiaries). (A-311; A-1388; SA-159). As the cases unfolded, the Committees (after their own independent investigations of the facts and law) could not agree on the characterization of the intercompany balances. (A-311). The lack of clarity on characterization is not surprising because, as the Bankruptcy Court aptly recognized, "intercompany claims in chapter 11 cases are notoriously subject to dispute, and in my experience, the number that appears in the debtors' financial statement at the outset of a case is typically the starting point and not the ending point

23

of the analysis and the dispute over intercompany claims." (A-786, Tr. 168:13-18). Only after extensive negotiations, a compromise was reached eleven months into the cases. (A-309-313).

SNC conveniently ignored characterization issues during the trial. It retained an expert (Stephen Darr) to review the Debtors' general ledger balances, but the expert conceded under cross-examination that he was not providing an opinion as to whether the intercompany balances constituted valid claims. (A-467, Tr. 113:7-10). In its ruling, the Bankruptcy Court specifically noted that "Mr. Darr was not asked to analyze the intercompany claims and thus could not speak definitively as to whether the disclosure was properly or improperly withheld." (A-786-787, Tr. 168:25-169:3). The significance of the unresolved legal character of the ledger balances is fatal to SNC's case and was completely ignored by SNC during trial and in its brief.

**b.    Global Note was Appropriate**

SNC's fraud in the inducement claim is also premised on the language in the Global Note in the Debtors' Schedules filed on November 27, 2007. At trial, SNC argued that the Global Note, which states that the general ledger intercompany balances were not "quantified," was a misrepresentation because "intercompany *cash* balances (reconciled as of July 31, 2006) were available in the Debtors' general ledger accounts at least as early as November 15, 2006 and the [intercompany] cash balances as of September 28, 3006, were known or should have been known on or before November 27, 2007." Op. Br. at 22 (emphasis in original). The Bankruptcy Court rejected SNC's position. It found that the use of the Global Note was appropriate and reflected a "legitimate business and judgment" decision (A-789, Tr. 171:4-5) because the Debtors and their advisors had "reason to doubt" the general ledger balances. (A-787, Tr. 169:8-12). On appeal, SNC asserts that the Bankruptcy Court's factual finding was clearly erroneous because it was

inconsistent with the Bankruptcy Court's finding that the "[D]ebtors clearly knew or should have known of the line item for intercompany claims." Op. Br. at 16 (*see* A-786, Tr. 168:20-22).

The Bankruptcy Court's findings are not inconsistent. The issue was <u>not</u> whether the Debtors knew about the line items for intercompany cash balances recorded in their respective general ledgers. Of course they did. Instead, as the Bankruptcy Court correctly recognized, the "issue is the accuracy or validity of that line item, and whether the debtors wrongfully withheld the information from their schedules." (A-786, Tr. 168:23-25).

In terms of accuracy and validity, the Debtors and their advisors faced significant uncertainties and challenges in connection with the intercompany balances on the general ledgers at the time they were preparing the Schedules. As previously noted, the issues included: (i) the unresolved legal character of the intercompany balances; (ii) intercompany cash balances were out of balance; (iii) non-cash intercompany transactions were not adequately documented; (iv) certain intercompany transactions were not allocated by GPEG to Deltak (*i.e.*, federal taxes); (v) intercompany non-cash transactions were not allocated for 2005 and 2006; and (vi) the Debtors' other accounting issues (failure to file 10-Ks and need to restate financials) made obtaining accurate financial information difficult. *See supra* Sect. II.D.3.

The Bankruptcy Court specifically found:

> Mr. Franks testified credibly that as a representative of AlixPartners responsible for preparing the schedules and statements, he was not comfortable putting in a $128 million figure without more analysis for several reasons. First he testified that the debtors had not made required [SEC] financial filings for several years and the 2004 and 2005 statements were being audited and subject to likely restatement. So there was a void of information, and he was hesitant to fill that void with a large figure that he did not have confidence in. He and Mr. Caruso further testified that intercompany claims and especially noncash transactions typically require more intensive analysis. As related party transactions they don't have the invoices, backup, or other documents for audit purposes that one would see with typical third-party vendor/creditor transactions.

(A-787-788, Tr. 169:19 - 170:8).

{BAY:01048757v3}

As a result of the foregoing, the record fully supports the Bankruptcy Court's finding that the Debtors and their advisors had "reason to doubt" the general ledger balances (A-787, Tr. 169:8-12) and the Bankruptcy Court's finding that the Debtors' use of the Global Note was based on "legitimate business and judgment calls." (A-789, Tr. 171:4-5).[9]

The fiduciary duties that a debtor owes the creditors in a chapter 11 case are comparable to the duties owed by directors under Delaware corporate law. *See LaSalle National Bank v. Perelman*, 82 F.Supp.2d 279, 292 (D. Del. 2000) (citing *In re Schipper*, 109 B. R. 832 (Bankr.N.D.Ill. 1989. A debtor in possession is charged with a duty of care to make informed decisions relating to the operation of its business and a duty of loyalty not to engage in self-dealing. *See In re Schipper*, 109 B.R. 832, 836 (Bankr.N.D.Ill. 1989). A presumption of reasonableness attaches to a debtor's decisions once they are made and the decisions are protected by the business judgment rule. *See LaSalle National Bank*, 82 F.Supp.2d at 292 (citing *In re Schipper*, 109 B.R. at 835); cf. *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (the business judgment standard is "widely accepted" in judging the actions of a debtor). Under the business judgment rule, there is a "presumption that in making a business decision the directors of the corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), the courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). To rebut the presumptions of the business judgment rule, a party challenging a decision must show either a breach of the duty of loyalty, or that the directors

---

[9]    SNC takes issue with the phrasing of the Global Note -- stating the intercompany balances were "not quantified." The Bankruptcy Court wisely found the Debtors would have accomplished the same result by stating there was a "contingent or disputed" claim or a debt in an unliquidated amount. (A-788, Tr. 170:9-12).

failed to exercise due care. The analysis of whether a party has acted with due care focuses primarily on whether they "have informed themselves prior to making a business decision, of all material information reasonably available to them." R. Franklin Balotti & Jesse A. Finkelstein, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 4-170 (2007 Supp.). Gross negligence is the legal standard applied in determining whether a business judgment by the board was sufficiently informed to satisfy the directors' duty of care. *Id.* at 4-171. Gross negligence has been defined as a "reckless indifference to or a deliberate disregard" for the shareholders which are "without the bounds of reason." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005). Accordingly, only when the directors are found to have acted with reckless indifference or a deliberate disregard have they violated the duty of care.

Accordingly, as noted above, the Debtors and their representatives made a legitimate business decision to withhold their intercompany balances from the Schedules out of concern for the reliability, accuracy and completeness of the data and a recognition that the characterization of that information was far from clear. (A-789). In its place, the Debtors provided the Global Note, which is not an unusual practice in bankruptcy. This decision was determined by the Bankruptcy Court to be a "legitimate business and judgment" decision. (A-789). SNC has failed to present any credible evidence demonstrating that the Debtors acted with reckless indifference or deliberate disregard for the creditors that justifies disturbing this decision.

### c.    Other Alleged Misrepresentations

SNC alleges that "[*a*]*ll* the Debtors public statements," including the Affidavit of John M. Matheson in Support of First Day Motions and Applications (the "First Day Affidavit") and press releases, regarding Deltak contained misrepresentations. SNC points specifically to statements "that Deltak had little to no going concern value, that its liquidity had recently

27

become significantly constrained, and that GPEG planned to wind-down Deltak's entire money-losing HRSG business" and asserts these statements were "either misrepresentations, or at best, misleading half truths." Op. Br. at 11-12, 36 (*see* A-53, A-894-895). There is no evidence in the record to contradict the First Day Affidavit or any press releases. As explained above, the record is undisputed that Deltak was having liquidity concerns at the time of and before the Petition Date. Indeed, Robert Caruso testified that A&M was hired to address the "liquidity issues the company was facing" focusing on "Deltak... [and] the HRSG contracts in particular,... [as] there was a substantial cash need to fund the completion of those agreements that [Deltak], quite frankly, just didn't have the wherewithal to do." (A-667, Tr. 49:20-21; A-693, Tr. 75:15-20).[10]

### 2.    No Intent to Deceive

At trial, SNC asserted that "the Debtors and their advisors acted with conscious intent to conceal the intercompany balances." Op. Br. at 22. After reviewing the evidence, the Bankruptcy Court rejected this allegation and found that "the evidence does not support a conclusion by this Court that the debtor wrongfully delayed disclosure of the intercompany liabilities as part of a strategy to defraud or mislead SNC and similarly situated completion agreement counterparties." (A-786, Tr. 168:9-13). The Bankruptcy Court held that it was "satisfied from the record that there was no such strategy and that the debtors' failure or delay in disclosing the information was based upon legitimate business and judgment calls." (A-788-789, Tr. 170:24 - 171:5).

---

[10]    Remarkably, in the face of the Wind Down Motion and subsequent completion agreement program, SNC also accuses the Debtors of not being truthful in the First Day Affidavit about Deltak's intention to wind down the HRSG business. Op. Br. at 25. SNC's allegation, however, wholly misconstrues Larry Edwards' deposition testimony about the wind down. SNC contends that Deltak did not really wind down the whole HRSG business. The record plainly proves otherwise. The Debtors wound down the entire HRSG business, and indeed, almost all the HRSG customers executed completion agreements. As Ness testified, "[w]e laid off all of the HRSG group." (A-1579-1580).

Notwithstanding the Bankruptcy Court's well reasoned, amply supported ruling, on appeal SNC argues that the Bankruptcy Court's finding was clearly erroneous because the Bankruptcy Court failed to afford sufficient weight to certain facts, including three e-mails. Despite the overwhelming evidence to the contrary, SNC argues these emails demonstrate that the Debtors and their advisors trusted the general ledger balances and thus intercompany balances should have been included in the Schedules. Op. Br. at 37. As show below, these e-mails do not support SNC's supposition.

    a.    **Frank's March 15, 2007 E-Mail**

SNC relies heavily on a March 15, 2007 e-mail from John Franks (of AlixPartners) to Elayna Conner (a GPEG Corporate Legal Assistant) stating "[i]ntercompany liabilities were intentionally not included in the schedules because of the potential plan implications." Op. Br. at 24 (A-938). SNC leaps to the conclusion from this e-mail that (i) the Debtors delayed reconciliation of intercompany accounts to buy time to complete negotiation of their completion agreements and (ii) the Debtors timed the release of information regarding intercompany balances as a plan strategy. Op. Br. at 38. The Bankruptcy Court wisely disagreed.

The Bankruptcy Court specifically commented on the March 15 e-mail and put it in its proper context: "SNC places substantial weight on Mr. Franks' March 15 e-mail... but to read that e-mail in full context, Mr. Franks goes on to say that he is not confident in the information and that to frame creditor expectations early in the case based on faulty or defective financial information would be unwise, and I do not disagree with that conclusion." (A-788, Tr. 170:12-23). Franks' further testimony is consistent with that finding. At the time the Schedules were filed, "the intercompany numbers were still a work in progress" and to disseminate inaccurate information to the public would be haphazard and potentially misleading -- and that would have plan implications. (A-657, Tr. 39:3-7; A-938). If the Debtors and their advisors had reliable

information prior to filing their Schedules they would have included it in the Schedules. (A-637, Tr. 19:19-21). However, they had legitimate concerns about the reliability, accuracy and completeness of the information, including that the general ledgers did not balance, the non-cash intercompany transactions were not sufficiently documented, some non-cash transactions had not been allocated back to GPEG's subsidiaries, and their characterization could not be determined.

### b.    Other E-mails

SNC also misconstrues the following two e-mails to support its theory that the Debtors and their advisors actually did have confidence in data captured in the intercompany general ledger balances in November 2007 (when the Schedules were filed) but such balances were concealed as part of a scheme:

- Brian Lavarnway (Controller at GPEG) to Jay Bradford (A&M) dated December 3, 2006 stating, among other things, "we have comfort in our daily cash procedures." Op. Br. at 23, 37 (A-1057).
- Donald Harer (A&M) to Robert Caruso (A&M), dated December 21, 2006, stating that he did "not distrust the data." Op. Br. at 6 (A-1058).

These e-mails do not contradict the sworn testimony of Franks and Caruso, both of whom testified during the trial about concerns over intercompany general ledger balances. There are obvious distinctions between the reliability of (out of balance) intercompany cash and non-cash trial balances versus "daily cash procedures" and accounting "data." Moreover, these e-mails must be placed into proper context. First, they are authored by individuals who did not testify at trial and who were not deposed. Second, the e-mails were sent in December 2006, after the Schedules had already been filed with the Bankruptcy Court and thus do not reflect the view of the Debtors' representatives at the time the Schedules were filed. Third, the e-mails do not address the characterization issues regarding the intercompany claims. In fact, Caruso (Harer's supervisor) was asked about Harer's e-mail during the trial and stated: "I would say that we were

comfortable with how the company captured the data at that time with respect to cash movements by entity." (A-701, Tr. 83:6-8). In other words, the Debtors by late December, 2006, were comfortable with the capturing of that particular data. However, there is no evidence that confidence extended to characterization and allocation of intercompany balances. Finally, the purpose of Harer's e-mail was to respond to an inquiry from Caruso about whether Harer was comfortable at that time with including intercompany balances in the Debtors' first monthly operating report (ultimately filed on January 8, 2007) -- not inclusion in the Schedules already filed on November 27, 2006.

Accordingly, the e-mails originating after the Schedules were filed do not refute the ample record supporting the Bankruptcy Court's Ruling. The Bankruptcy Court's findings -- that the Debtors did not wrongfully delay disclosure of the intercompany liabilities as part of a strategy to defraud or mislead SNC and that the Debtors' failure or delay in disclosing the information was based upon legitimate business and judgment calls -- have a more than credible evidentiary basis and are rationally related to this evidentiary basis. *See Shire US*, 329 F.3d at 352. The findings are not reversible under the clearly erroneous standard.

### 3.    No Reliance By SNC

At trial, SNC argued that it would not have entered into the Completion Agreement and waived its rejection claim had it known that "Deltak held a [net] claim against its parent in excess of $120 million." Op. Br. at 38 (A-784, Tr. 166:8-13). The Bankruptcy Court disagreed, holding: "I'm not satisfied that the record supports a conclusion that SNC was indifferent as to who finished the job such that the rejection claim would have been a deciding factor. The record is clear that SNC needed to get the project done. Mr. [Laramée] and Mr. Tardanico both testified that SNC's assessment early on was that having Deltak finish the job was quote, 'the only practical option,' close quote, and I frankly agree with that assessment." (A-785, Tr. 167:3-11).

{BAY:01048757v3}

Nevertheless, in this appeal, SNC asserts that the Bankruptcy Court's finding was clearly erroneous, in part because the Bankruptcy Court referred to Tardanico as having "testified credibly." Op. Br. at 38. SNC would lead this Court to believe there was nothing else in the record in support of the Bankruptcy Court's ruling in favor of the Debtors. To the contrary, the Bankruptcy Court's ultimate findings are fully supported by the record. SNC's own witnesses, including Laramée and Bridges, testified "to the dire consequences of delaying the project" and "that bringing in another contractor would have given rise to a delay of either 18 months, 14 months, or 10 months in the completion of the project." (A-785, Tr. 167:11-16). The testimony from SNC's witnesses was that "the only way to reduce [the delay] time at all was to bring in another contractor on a quote, 'crash course,' close quote, to finish the HRSG... SNC quite logically concluded that going with Deltak was preferable to all of the unknowns that would go with a crash course and a new vendor." (A-785, Tr. 167:16-24). This record led the Bankruptcy Court to the inescapable conclusion that a completion agreement with Deltak was the "only practical option." (A-785, Tr. 167:7-11).

Finally, SNC points to Tardanico's assertion that there is "no way" that SNC would have entered into the Completion Agreement had it known about an "asset" of Deltak of this magnitude. However, this testimony is based on the faulty assumption that Deltak had a "claim" against GPEG and in excess of $120 million. As shown above, the evidence does not support a conclusion that Deltak had such a "claim" against GPEG, once again contradicting SNC's reliance argument.[11]

---

[11]   SNC also challenges the Bankruptcy Court's finding that SNC's "only practical option" was to enter into the Completion Agreement as clearly erroneous by arguing the "Court failed to address the unrebutted testimony that Blackstone's analysis, prepared for the Debtors, showed that unsecured creditors... would recover up to 86% if intercompany debts were paid at 100% - a fact that was kept from SNC." Op. Br. at 38. This argument is nonsensical. Blackstone's analysis is not relevant to the evidence the Bankruptcy Court had to consider before making the ultimate finding. Moreover, this was but one scenario in a multiple scenario analysis, and based on two presumptions (i) if the general ledger intercompany balance were recognized as a debt owed by GPEG to Deltak and

As a result of the foregoing, the Bankruptcy Court's finding regarding the only practical options available to SNC was consistent with the weight of the evidence.

## C.    No Breach of Any Disclosure Duty

SNC argues that the Debtors, by virtue of their capacity as debtors in possession and the fiduciary obligations that arise from such capacity, had to make a full disclosure to SNC of the general ledger intercompany balances in negotiating the Completion Agreement. Op. Br. at 29. There are no cases to support SNC's novel legal theory.

SNC relies on four cases to support the unremarkable proposition that a debtor in possession has a duty to honestly and accurately disclose (i) adequate information in its disclosure statement pursuant to 11 U.S.C. § 1125(a) and (ii) known assets and liabilities in the schedule of assets and liabilities required under 11 U.S.C. § 521(a)(1)(B).[12] These statutory duties are not disputed. SNC goes astray by pointing to the statutory duty regarding the filing of Schedules to support its argument that the Debtors breached their disclosure obligations as debtors in possession. SNC is wrong.

At the time the Debtors filed their Schedules, there was significant uncertainty regarding the accuracy, validity and characterization of the ledger balance of Deltak against GPEG. (A-787, Tr. 169:8-12). The Debtors' advisors believed, based on their prior experience, that it would be unwise "to frame creditor expectations early in the case based on faulty or defective financial information." (A-788, Tr. at 170:21-22). As a result, the Bankruptcy Court concluded

---

(ii) if such balance would be recognized at 100%. Of course, neither of these presumptions was realistic. Again, this was just one of many different scenarios under the Blackstone analysis, each showing different assumptions regarding the intercompany balance and differing valuations of the Debtors' businesses. (A-714, Tr. 96: 11-18; A-717, Tr. 99:9-16).

[12]    Op. Br. at 30-33 *citing Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003); *Constr. Mgmt. Servs., Inc. v. Mfrs. Hanover Trust Co.* (*In Re Coastal Group Inc.*), 13 F.3d 81 (3d Cir 1994); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988); *F&M Marquette Nat'l Bank v. Emmer Bros. Co.* (*In re Emmer Bros. Co.*), 52 B.R. 385 (D. Minn. 1985).

{BAY:01048757v3}

that "the [D]ebtors' failure or delay in disclosing the information [regarding intercompany balances] was based upon legitimate business and judgment calls." (A-789, Tr. 171:4-5).

In contrast, in *Krystal Cadillac* the debtor failed to disclose a lawsuit as an asset in its disclosure statement, despite the "debtor's obvious knowledge of the existence of the asset." The debtor later commenced the lawsuit after soliciting votes in favor of its chapter 11 plan. *Id*. at 318, 320, 325. Here, unlike in *Krystal Cadillac*, creditors were not "duped." The Bankruptcy Court expressly found based upon the evidence that the Debtors "were not simply sitting on information to dupe Deltak creditors." (A-787, Tr. 169:17-18).[13]

Unable to demonstrate a breach by the Debtors of their statutory duties to disclose known assets, SNC seeks to extend its legal theory. SNC asserts that a debtor in possession also has a duty to disclose all material facts to an individual creditor before entering into a contract with it. There is no support for this novel theory and none is cited by SNC. Instead, SNC relies on cases outside the bankruptcy context.

SNC's reliance on *Zirn v. VLI Corp.*, 621 A.2d 773 (Del. 1993) ("*Zirn I*") and *Zirn v. VLI Corp.*, 681 A.2d 1050 (Del. 1996) ("*Zirn II*") is misplaced. Op. Br. at 33, 35. Both cases involve a shareholder vote on a challenged tender offer/merger. 621 A.2d at 776 (Del. 1993); 681 A.2d at 1053 (Del. 1996). Directors soliciting a favorable response to a tender offer from shareholders omitted potentially relevant information in *Zirn I* and made a misleading partial disclosure in *Zirn II*. *Zirn I*, 621 A.2d at 778-79; *Zirn II*, 681 A.2d at 1055. In *Zirn I* the court

---

[13]    SNC also relies upon three cases cited above to support a different theory. In two of these cases, the Court addressed the inference of bad faith by a debtor for purposes of applying judicial estoppel. The court inferred bad faith on the part of the debtor for purposes of applying judicial estoppel to bar the debtor's prosecution of a cause of action when the debtor knowingly failed to disclose the asset (*i.e.*, cause of action) in its disclosure statement. The other decision involved a debtor's attempt to dismiss a suit alleging concealment of an asset in connection with plan confirmation on the grounds that the debtor was shielded by the confirmation order and its chapter 11 plan. These decisions are each inapplicable here because (i) this matter does not involve judicial estoppel or issues relating to the effect of the confirmation order and chapter 11 plan; and (ii) the Debtors did not deliberately conceal a known asset from their Schedules or Disclosure Statement.

34

held that the role a market crash played in the directors' decision to accept a reduced per share price in the tender offer may have been relevant to shareholders, and remanded to the lower court for determination. 621 A.2d at 779-80. In *Zirn II*, the plaintiffs discovered that the directors had stated in their solicitation statement that the corporation had been advised by patent counsel of the "significant possibility" that the corporation might not be able to obtain reinstatement of a patent covering its most important product, without further informing them that patent counsel had gone on to state there was an "excellent chance" reinstatement would be achieved. 681 A.2d at 1056-57. The full extent of counsel's opinion regarding reinstatement of the patent was material to the shareholders' decisions whether to tender at the offered price. *Id.* at 1057. The directors misrepresented material facts to the shareholders (unlikely to reinstate patent) and failed to disclose a material fact (counsel's view that reinstatement was likely).

We are in an entirely different context in this matter. Here, the Debtors disclosed the full truth as they knew it at the time the Schedules were being prepared -- the general ledger intercompany balances were not quantified, the information they had at the time was not accurate, complete or reliable enough to include in the Schedules and characterization was unresolved. Hence, these two Delaware Chancery Court decisions involving shareholder voting are of no importance to this dispute.

SNC also relies upon *Bren v. Capital Realty Group Senior Housing, Inc.*, 2004 WL 370214 (Del. Ch. 2004) (Op. Br. at 31), another decision addressing disclosure obligations in a corporate context. Yet again, such reliance is misplaced given this distinctly different scenario. Quite simply, there is no authority cited by SNC (and none found by the Estate Representatives) equating the disclosure obligations of a board of directors seeking shareholder action under Delaware law with the disclosure obligations of a debtor in possession.

{BAY:01048757v3}

In the end, SNC seeks to convince the Court that the Debtors assumed heightened fiduciary duties vis-à-vis SNC when negotiating the Completion Agreement. However, there is no authority cited by SNC (and none found by the Estate Representatives) holding that a debtor in possession owes fiduciary duties to a single creditor. In fact, courts have held just the opposite -- duties of a debtor in possession run in favor of the <u>class</u> of creditors and not to any one specific creditor. *Duke Energy Trading and Marketing, LLC v. Enron Corp.* (*In re Enron Corp.*), 2003 WL 1889040, at *8 (Bankr. S.D.N.Y. 2003); *see also In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del 2001) (holding that a debtor's fiduciary duty is to maximize the value of the estate for distribution to creditors, not to minimize the exposure of an individual creditor while increasing the liability of the estate). Moreover, the case law shows that a debtor retains its freedom of action when negotiating or contracting with parties in interest even though it may owe fiduciary duties to the class to which such parties in interest belong. *See In re Water's Edge Ltd. P'shp.*, 251 B.R. 1, 7-8 (Bankr. D. Mass. 2000) (in the context of plan negotiations, debtor's fiduciary duties did not require it to disclose to secured creditor what dividend it was able to provide on such creditor's unsecured deficiency claim); *In re Ionosphere Clubs, Inc.*, 103 B.R. 501, 504 (Bankr. S.D.N.Y. 1989) ("The sole fact that an entity becomes a debtor-in-possession subject to court control and statutory obligations and duties under Title 11 of the United States Code does not remove the entity's "freedom of contract rights."). Indeed, if a debtor were required to abide by the standard urged by SNC when doing business with individual creditors or other parties, it would risk breaching its actual duty to all creditors.

**D.    No Willful Misconduct**

SNC contends that the Bankruptcy Court erred by not finding the Debtors had engaged in willful misconduct. SNC is wrong. Under New York law, a party engages in willful misconduct

when it consciously acts or fails to act and harm results to another. *Goepp v. American Overseas Airlines, Inc.*, 117 N.Y.S.2d 276, 281 (N.Y.A.D. 1952). "There must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct." Id. Here again, SNC failed to meet its burden of proof. The Debtors' actions, as recognized by the Bankruptcy Court, were not a deliberate or wrongful attempt to withhold information in order to prejudice any parties, let alone SNC, as it negotiated the completion agreements. (A-788-789, Tr. 170:24-171:2). In fact, as explained above, the Debtors viewed their actions in fulfilling their statutory duty of preparing and filing their Schedules as completely divorced from the exercise of negotiating completion agreements with the HRSG customers. Again, SNC failed to point to any evidence to the contrary. The actions of the Debtors vis-à-vis their Schedules were based upon concerns about the accuracy, completeness and reliability of intercompany information. (A-787-788). They were driven by a desire to not mislead creditors reviewing their Schedules, rather than to mislead them as SNC alleges.

E.    **Severance Remedy Moot and Improper**

A critical component of the Completion Agreement was SNC's waiver of all damage claims against the Debtors in connection with the contract unless it could prove willful misconduct and/or intentional fraud. (A-923). Because there was no showing of willful misconduct or intentional fraud, the Completion Agreement remains in full effect and SNC is without a remedy. Even if SNC were entitled to relief by proving fraud in the inducement, the appropriate remedy would be to void the entire contract. *See Greystone Staffing Inc. v. Vincenzi*, 2005 WL 1183191, at \*3 (N.Y.Supp.2005). Under New York law, a contract induced by fraud is void *ab initio*. *Id.*; *Matter of Liquidation of Union Indem. Ins. Co. of New York*, 89 N.Y.2d 94, 108 (N.Y. 1996). Thus, the Bankruptcy Court could not sever some provisions of the Completion Agreement while preserving others which SNC prefers. A party injured by a

fraudulently induced contract has only two choices: it can either elect to affirm the contract and sue for damages or rescind the contract and seek to re-establish the status quo. *See Friedman v. Libin*, 157 N.Y. 2d 474, 481 (N.Y.Sup. 1956). A party like SNC cannot keep the good parts and rid themselves of the bad.

### F.    Alleged Parental Guaranty Barred by Statute of Frauds

The Bankruptcy Court sustained the Debtors' objection to SNC's Proof of Claim No. 1100, which was based on an alleged guaranty by GPEG of the obligations of Deltak, and disallowed SNC's claim in its entirety. (A-779, Tr. 161:6-10). Pursuant to the statute of frauds, whether under Canadian or United States law, a promise to be responsible for the debt of another must be in writing, contain all the necessary terms and be signed by the party against whom it is to be enforced. (A-779, Tr. 161:9-11; Ontario Statute of Frauds, R.S.O. 1980, c. 481; Delaware Statute of Frauds, DEL. CODE ANN. tit. 6 §2714). Here, the record was undisputed that GPEG did not sign a guaranty in favor of SNC. (A-779, Tr. 161:13-14). Therefore, unless an established exception to the statute of frauds applied, SNC's claim was unenforceable. (A-779-80, Tr. 161:18–162:8). The Bankruptcy Court found that no exception applied and therefore disallowed SNC's claim. (A-795, Tr. 177:18-20). SNC has appealed the Bankruptcy Court's decision to disallow SNC's guaranty claim, asserting a number of points of error – all without merit.

### 1.    No Promise of Parent Guaranty

As a preliminary matter, the Bankruptcy Court found that GPEG (and hence anyone who might be deemed to represent GPEG, including Monte Ness) did not promise SNC a parental guaranty. "SNC has not carried its burden to establish that a parent guaranty had actually been promised." (A-783, Tr. 165:1-3).

In making this finding, the Bankruptcy Court credited the trial and deposition testimony of (i) Larry Edwards, Chief Executive Officer for GPEG (A-1296-1305); (ii) Candice

{BAY:01048757v3}

Cheeseman, General Counsel for GPEG (A-719-22, Tr. 101:5–104:10); (iii) James Wilson, Chief Financial Officer for GPEG (A-1403-04); (iv) Michael Hanson, Chief Financial Officer for GPEG and successor to Wilson (A-1843-49); and (v) Monte Ness (A-1560; A-1617), that a GPEG parent guaranty had never been promised. (A-779, Tr. 161:22-24). It was also important to the Bankruptcy Court that the governing purchase order, the HRSG Contract, was ambiguous. (A-781-82, Tr. 163:21–164:1) Although a blank standard form of parent guaranty was attached to it, "Section 21 of the terms and conditions of the contract titled Financial Security list (sic) several options or in Mr. Ness' terms deliverables, but does not include a parent guaranty." (A-781, Tr. 163:23-164:1; A-833). In addition to a parent guaranty, a letter of credit and a reserve were "on the table" as deal points as to financial security when the purchase order was negotiated. (A-780, Tr. 162:9-13).

In addition, the Bankruptcy Court credited the testimony of Cheeseman (A-726-27, Tr. 108:7-109:21), Wilson (A-1403-15) and Hanson (A-1843-49) with regard to the process for approving and granting a GPEG guaranty. (A-781, Tr. 163:2-5). There was no evidence of that process occurring. (A-781, Tr. 163:5-6). "[T]he record does not show any correspondence or other documentation to support the allegation that a request for a parent guaranty was made to GPEG." (A-780-81, Tr. 162:25–163:2). The Bankruptcy Court found that "if indeed the parent guaranty has been such a central piece of the transaction, there would be more evidence of that demand and the purported agreement, either emails or correspondence memorializing the demand and requesting approval post-contract execution, requests for documentation, and the like." (A-781, Tr. 163:12-17). The Bankruptcy Court found it significant that "the only documentary evidence presented today to directly support the proposition that either GPEG or Deltak promised SNC a GPEG guaranty is a handwritten four-word line from Tardanico's notes

of a teleconference with a Deltak representative [Ness] stating, quote, "Parent guaranty, no problem." (A-780, Tr. 162:14-19).

If the Bankruptcy Court had so chosen it could have cited to additional aspects of the record to support its findings.[14]  For example, the blank standard form of parent guaranty attached to the Purchase Order (A-1526-28) was silent as to the guarantor party, purported to guaranty the obligations arising under a contract between SNC and ALSTOM (not Deltak, but instead a competitor of Deltak (A-1299-1300)), chose the law of France as its governing law and adopted Paris, France as the venue for any arbitration of disputes.  (A-1527-28).  The reference in the blank standard form of guarantee to guaranteeing the obligations of a competitor of Deltak, rather than Deltak, coupled with such an unlikely choice of law and venue for arbitration would further support an inference that the form was included as an option, but that no effort was made to negotiate the specifics of a parent guaranty.  Furthermore, the record also supports an inference that the parties, after initially considering a parent guaranty, reached a decision to go with a letter of credit instead.  (A-1490, "Deltak agrees to provide a letter of credit for 10% of the contract price . . . . The option to provide a parent company guarantee in lieu of the LC remains.").  Regardless, the Bankruptcy Court's findings have a more than credible evidentiary basis and are rationally related to this evidentiary basis.  *See Shire US*, 329 F.3d at 352.  Such findings are not clearly erroneous.

SNC attempts to find error with the Bankruptcy Court's findings by pointing to (i) the Bankruptcy Court's observation that Tardanico "testified credibly regarding *his belief* that he had been promised a parent guaranty by Mr. Ness" (emphasis added); (ii) Tardanico's

---

[14]    The Bankruptcy Court gave its ruling from the Bench so as not to delay a pending hearing on the confirmation of the Debtors' Plan.  "[G]iven the significance of the issue and the presentation by the parties, it would have been vastly preferable for the Court to address this matter through a formal written opinion.  Under the circumstances, as an accommodation not only to the debtor but also to SNC, I believe it was appropriate to address this in a less formal environment of a bench ruling."  (A-796, Tr. 178:9-14).

contemporaneous four word note "Parent guaranty, no problem;" and (iii) Ness' statements in his deposition that a parent guaranty was a deliverable under the purchase order and that he had no recollection of his conversation with Tardanico. Op. Br. at 41. In SNC's view, the Bankruptcy Court should have found that Ness promised a parent guaranty.

However, Ness flatly denied promising Tardanico a parent guaranty in Ness' deposition testimony that was admitted at trial. (A-1617; A-758, Tr. 140:14-15 (Bankruptcy Court observes to SNC counsel that Ness testified under oath that he never made such a promise)). SNC has tried to set up a false contradiction by arguing that the other witnesses relied on by the Bankruptcy Court, Edwards, Cheeseman, Wilson and Hanson, were not parties to the Ness-Tardanico conversation and could neither confirm nor deny the substance of such conversation. However, the issue before the Bankruptcy Court was whether GPEG had promised to be answerable to SNC for Deltak's obligations. The testimonies of Edwards, Cheeseman, Wilson, Hanson and Ness were relevant to that issue.

On the limited issue of whether Ness had promised to Tardanico, on behalf of GPEG, a GPEG parent guaranty, the Bankruptcy Court appropriately considered, in arriving at its finding, Tardanico's testimony, Ness' testimony, including an express denial of having made such a promise, and the entire remaining record. In addition to the record discussed above, Tardanico had admitted "that he never discussed or negotiated with Mr. Ness the terms of a parent guaranty, the amount, the duration, the conditions, trigger events, et cetera." (A-781, Tr. 163:17-20; A-615-16, Tr. 261:15–262:2). Moreover, whatever weight should be attributed to Tardanico's four word note, "Parent guaranty, no problem," this point was counter balanced by the complete absence in the record of any other documentary evidence of an undertaking to

41

provide a parent guaranty. In addition, although a parent guaranty was a purchase order deliverable, it was just one of many financial security options.

Accordingly, the Bankruptcy Court's observation that Tardanico "testified credibly regarding his *belief* that he had been promised a parent guaranty" (A-780, Tr. 162:20–22 (emphasis added)) signifies nothing more than that Tardanico was genuine in his misunderstanding. SNC wishes to draw a different set of inferences from the record and substitute its findings for those of the Bankruptcy Court. SNC urges this appellate court to do the same. But this is not the law. When, as here, the Bankruptcy Court's findings represent reasonable inferences based on the entire record, its findings are not clearly erroneous even though a different set of inferences are theoretically possible. *See Scully*, 238 F.3d at 506.

### 2.    Multiple Document Exception to the Statute of Frauds Inapplicable

SNC next attempts to find error by arguing that the Bankruptcy Court failed to consider multiple documents offered by SNC to satisfy the statute of frauds. Op. Br. at 42–44. However, SNC has misrepresented the standard of review, arguing that the Bankruptcy Court erred as a matter of law, perhaps improperly hoping to retry its case before an appellate court. However, in the instant matter, the issue is whether a guaranty contract was formed. Such an issue turns on its facts and is reviewed by an appellate court only for clear error. *See Scully*, 238 F.3d at 505-06 (applying clearly erroneous standard to review of district court's determination that parties had entered into two year employment contract); *Ram Constr. Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984) ("When the interpretation of oral contracts or partly oral, partly written, contracts is before an appellate court, special deference is due the factfinder's ability to make credibility assessments."); *see also Cohen Dev. Co. v. JMJ Prop., Inc.*, 317 F.3d 729, 736-38 (7th Cir. 2003) (applying clearly erroneous standard of review to trial court's determination

that multiple document and partial performance exceptions did not take contract outside the statute of frauds). On this standard of review, SNC's argument must fail.

The Bankruptcy Court did consider the multiple document exception. "There is a further exception, which I will refer to as the multiple document rule, which provides an out from the statute of frauds if a party can establish the commitment or transaction from a collection of materials even in the absence in a single signed contract. SNC contends that these exceptions apply here, I disagree." (A-780, Tr. 162:4-9).

Attempting to substitute its interpretation of the evidence for that of the Bankruptcy Court, SNC asserts that (i) Tardanico's four word "parent guaranty, no problem" note to himself; (ii) the blank standard form of guaranty; (iii) email correspondence between a Deltak employee and an SNC employee demonstrating that a parent guaranty or a letter of credit were under discussion as financial security for the project and supporting the inference that a letter of credit was the favored option; (iv) a Deltak employee's "no comment" notation on the blank standard form of guaranty; and (v) a subsequent memo from Cheeseman's assistant stating that no signed form of parent guaranty for the SNC project existed in GPEG's records, taken together, satisfy the statute of frauds. Op. Br. at 43.

However, the Bankruptcy Court considered all the evidence before it, including the documents relied on by SNC, in addition to, as discussed above: (i) the absence of any documentary evidence of a parent guaranty promise except for the "Parent guaranty, no problem" notation; (ii) the complete absence of any correspondence demonstrating a request for a parent guaranty by SNC or any follow up; (iii) testimony regarding the process for granting a parent guaranty and that such process was never triggered; (iv) testimony denying that a parent guaranty was ever promised or authorized; and (v) Tardanico's admission that he never

43

negotiated the terms of a parent guaranty with Ness and found that "based on the record before me I cannot conclude that SNC has identified sufficient evidence or documentation to escape application of the statute of frauds." (A-782, Tr.164:13-16). This finding was rationally related to the evidence before the Bankruptcy court and was not clearly erroneous.

Moreover, SNC has misapplied the multiple document exception. This exception allows a court to combine several documents to satisfy the requirement of the statute of frauds that the guaranty be in writing and signed by the party against whom it is to be enforced. *See Lindsey v. M.A. Zeccola & Sons, Inc.*, 26 F.3d 1236, 1239 (3d Cir. 1994). Significantly, one or more of the documents subject to such combination must be signed by the alleged guarantor.

In determining whether any particular writing or writings satisfy the statute, Delaware relies on section 131 of the RESTATEMENT (SECOND) OF CONTRACTS, which requires that at least one of the writings be signed by the party to be charged and that all the writings taken together: (a) reasonably identif[y] the subject matter of the contract, (b) [are] sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and (c) state . . . with reasonable certainty the essential terms of the unperformed promises in the contract. *Id.* (citation omitted). In the two cases relied on by SNC, at least one of the documents was signed by the party to be charged with the obligation.[15] Here, none of the documents offered by SNC in support of its argument were signed by a representative of GPEG. Accordingly, as a matter of law, the multiple documents cited by SNC do not fit the multiple document exception, and its argument must fail.

---

[15]     *See Paquette v. Smith*, [1989] 70 O.R. (2d) 449 (Ont. S. Ct.) (Trade Record Sheet signed by defendant's (real estate) agent presented triable issue whether there was a signed memorandum or note sufficient to satisfy the statute of frauds); *Harvie v. Gibbons*, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.) (three documents, an endorsed check, a memorandum of questions relevant to the disputed land sale, and a letter referencing the land, were signed by the party to be charged or by her executrices).

44

### 3.    Agency Theory Inapplicable

SNC next attempts to find error by asserting that the Bankruptcy Court failed to consider that GPEG was liable to SNC under principles of agency law. SNC asserts that "GPEG was bound by the promise made by Ness, its Senior Vice President, who had apparent authority to grant SNC a guaranty." Op. Br. at 45. Such an argument is fundamentally flawed, however, because it requires as an essential predicate element, a factual finding that Ness *made a promise* to guarantee the obligations of Deltak. Without this predicate factual finding that Ness promised a guaranty, the issue of Ness' authority, apparent or actual, to bind GPEG under agency law has no significance. Here, the Bankruptcy Court did *not* find that Ness made such a promise. Therefore, there can be no error in failing to consider the precepts of agency law.

As discussed above, the Bankruptcy Court found that SNC had not carried its burden to establish that a parent guaranty had actually been promised. Ness denied promising a parent guaranty. The Bankruptcy Court viewed Tardanico as credible only in his *belief* that he had been promised a parent guaranty. Meanwhile, the evidence showed that Tardanico had never negotiated the terms of such guaranty, the process for issuing a parent guaranty had not been triggered and the record was devoid of any correspondence demonstrating a promise of a guaranty or any follow up on SNC's part with respect to such guaranty except for four words, "Parent guaranty, no problem." On the evidence before it, the Bankruptcy Court could not conclude that a parent guaranty had ever been promised. Such finding was rationally related to the evidence before it and was not clearly erroneous. No error can be ascribed to the Bankruptcy Court for failing to apply agency law to a promise that was never made.[16]

---

[16]    Even assuming for the sake of argument that Ness had promised a parent guaranty and the Bankruptcy Court found it necessary to reach this issue, whether Ness acted as an agent of Deltak or as an agent of GPEG is open to dispute. Cheeseman, GPEG's General Counsel, testified that Ness never held himself out as an officer of GPEG and never acted for GPEG in relation to third parties. (A-729, Tr. 111:14-19). In fact, Ness only became an

### 4.    "Wider Interest Exception" to Statute of Frauds Inapplicable

SNC alleges, by way of further error, that the Bankruptcy Court refused to apply the "wider interest exception" or principles of estoppel to take the guaranty issue outside the statute of frauds.  Op. Br. at 46.  However, the Bankruptcy Court did consider the wider interest exception, but found that it did not apply.  "SNC argues also for application of the wider interest rule which carves out from the statute cases where the guaranty is incident to a larger transaction and where the party to be held liable has an interest in the overall transaction ... SNC contends that these exceptions apply here, I disagree."  (A-779-80, Tr. 161:25-162:9).  Like SNC's argument on the multiple document exception, this issue must be reviewed under the clearly erroneous standard and not as a matter of law.  *See e.g. Kerin Agency, Inc. v. West Haven Painting and Decorating, Inc.*, 660 A.2d 882, 883 (Conn. App. 1995) (holding that the findings of the trial court with respect to the U.S. counterpart to the wider interest exception "is subject only to limited appellate review to determine whether it was clearly erroneous in light of the evidence in the whole record."); *Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 884 (Pa. Super. 1985) ("It is for us to determine if the lower court abused its discretion in holding that Barron's main purpose for making the guaranty was to serve his own pecuniary or business interests...").

SNC's argument must fail because it lacks an essential predicate fact – there must be a finding that a guarantee, oral or otherwise, was provided, before the issue whether such an exception should apply can be reached.  *See Trumbull Corp. v. Boss Construction, Inc.*, 801 A.2d

---

officer of GPEG so that he would be entitled to participate in GPEG's executive incentive compensation program.  (A-728-29; Tr. 110:19 – 111:13).  Moreover, in a pre-trial affidavit Tardanico averred that he dealt with Ness in Ness' capacity as President of Deltak.  (A-270).  Tardanico's change of position in later testimony after discovery is therefore suspect.  Furthermore, SNC has demonstrated some confusion on this point itself.  According to its own proof of claim, SNC alleged that it was Deltak that promised to obtain a guaranty from GPEG and not GPEG itself that promised the guaranty.  An alleged promise by a subsidiary to obtain a parent guaranty for a project is not itself a *guaranty* of anything.

1289, 1291-93 (Comm. Ct. Pa. 2002) (using an explicit 3 step approach in analyzing whether or not the leading object rule applied to the statute of frauds defense - first whether there was clear and precise evidence of an oral agreement, second whether the defendant failed to comply with the terms of the oral agreement and third whether the primary purpose of defendant's promise to pay the debt was to advance defendant's business or pecuniary interest).[17]

Furthermore, in each case cited by SNC, it was undisputed that either an oral guarantee had been provided or there was a written guarantee that was challenged because it lacked certain terms. *See Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.)*, [2003] O.J. No. 2320 (Ont. S.Ct. Just.) (wider interest exception could apply where defendant admitted to signing document with the words "Personal Guarantor" beside his name, but asserted that terms were missing); *SPX Canada Inc. v. Watts*, [1995] A.C.W.S.J. 630732 (B.C.S. Ct.) (where defendant signed written guaranty, but resisted enforcement alleging that some material terms were missing, court applied wider interest exception); *Pullano* v. *Yellowhead Timber Ltd.*, [1994] B.C.J. No. 1317 (QL) (court applied the wider interest exception where it was undisputed that party gave oral guarantee to pay the debt of his company); *Travel Machine Ltd. v. Madore*, [1983] 143 D.L.R. (3d) 94 (Ont. H. Ct. Just.) (court applied wider interest exception where no material dispute as to facts that included travel agent giving oral guarantee to company that she would answer for the debt of the customer). In contrast, the Bankruptcy Court here resolved disputed facts to find that no oral guarantee was given.

As discussed above, the Bankruptcy Court considered (i) the absence of any documentary evidence of a parent guaranty promise except for the "Parent guaranty, no problem" notation; (ii)

---

[17]    *Compare The Neighbourhoods of Cornell Inc. v. Ontario Inc.*, 2003 CarswellOnt 2757 (Ont. Sup. Ct. Just.) (partial performance exception to application of statute of frauds to a contract for the sale of land requires separate evidentiary determinations on partial performance and on the existence of an oral agreement); *Acierno v. McCall*, 264 A.2d 513, 514 (Del. 1970) ("[T]he immediate weakness in plaintiff's argument is that there is no oral agreement between the parties to be subject to the doctrine of part performance.").

{BAY:01048757v3}

the complete absence of any correspondence demonstrating a request for a parent guaranty by SNC or any follow up; (iii) testimony regarding the process for granting a parent guaranty and that such process was never triggered; (iv) testimony denying that a parent guaranty was ever promised or authorized; and (v) Tardanico's admission that he never negotiated the terms of a parent guaranty with Ness, and determined, on the record before it, that it could not conclude that a parent guaranty had ever been promised. Such a conclusion, rationally related to credible evidence, cannot be clearly erroneous. Without an oral agreement by GPEG to answer for the obligations of Deltak, the wider interest exception to the statute of frauds simply does not come in. SNC has improperly attempted to use the wider interest exception to prove the existence of an oral guarantee rather than to take such oral guarantee outside the statute.

The Bankruptcy Court found SNC's wider interest exception argument unsupportable in another regard. "SNC testified that the parent guaranty or similar security was critical to the deal, and at a baseline level, GPEG as the parent, did have an economic interest in seeing Deltak get the business. But SNC's invocation of the exception here would swallow the rule and basically provide that parent guaranties of subsidiary contracts need not be in writing. Every parent has an interest in the success of it (sic) subsidiary and parent guaranties, while important, are typically incident to the real purpose or objective of the contract between the subsidiary and its customer." (A-782, Tr. 164:3-13).

This well reasoned observation finds support in the opinions of other courts, notably an opinion of the British House of Lords cited by SNC itself in a pre-trial pleading. In *Actionstrength Ltd. v. Int'l Glass Eng'g*, a subcontractor continued work on a construction project, even though it was no longer being paid on account of the main contractor's insolvency, on the strength of an oral guarantee to pay the debt made by the project customer. [2003] UKHL

48

17. Lord Hoffman observed, in finding that the statute of frauds barred the subcontractor's suit against the project customer on the oral guarantee, that

> It will always be the case that the creditor will have acted to his prejudice on the faith of the guarantor's promise. To admit an estoppel on these grounds would be to repeal the statute of frauds. . . . If a creditor asks for a guarantee, it is always a reasonable inference that without the guarantee he would not have extended or continued to extend credit. The guarantor may be reasonably expected to know this. It is frequently in the interest of the guarantor to give the guarantee; for example, when it secures indebtedness of a company he controls, a business associate or even a spouse. And it must be obvious that the creditor may suffer loss if the guarantee is not honoured. No doubt in each case there will be differences in degree, but no distinctions that could be drawn without throwing the law into disarray.

*Id.*; (SA-103).

### 5.    No Basis to Apply Equitable Principles

Finally, SNC argues that the Bankruptcy Court erred as a matter of law by not applying the equitable maxim that treats "as done that which should be done" for the benefit of SNC. Op. Br. 48–49. The Bankruptcy Court did consider equity. "I do not find that enforcement of the statute of frauds in this case would work a manifest injustice or yield an unconscionable result. To the contrary, the trial that we just had with conflicting testimony and competing circumstantial evidence is precisely the exercise that the statute of frauds was designed to prevent. This is a court of equity, and if sufficient evidence supported the allegations that the debtors were behaving badly or had engaged in a bait and switch, I would not hesitate to impose liability . . . but on this record, SNC has not carried its burden to establish that a parent guaranty had been actually promised and then wrongfully withheld." (A-782, Tr. 164:22 – 165:3). Moreover, SNC is again wrong about the standard of review. A bankruptcy court's exercise of its equitable powers is subject to review for clear error. *See In re New Valley Corp.*, 181 F.3d 517, 525-26 (3d Cir. 1999) (bankruptcy court's application of unclean hands doctrine rests

within its sound discretion and may not be overturned unless its findings are clearly erroneous); *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933) ("when assessing whether to invoke the doctrine of unclean hands, courts of equity must not be bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion").

Here, as discussed above, after considering all the evidence before it, the Bankruptcy Court could not conclude that a parental guaranty had been promised and wrongfully withheld. Its finding was rationally related to credible evidence. Such finding was not clearly erroneous and should be upheld.

## V.    CONCLUSION

For the foregoing reasons, the Bankruptcy Court's decision should be affirmed.

BAYARD, P.A.

By:  /s/ Jeffrey M. Schlerf
    Jeffrey M. Schlerf (No. 3047)
    Scott G. Wilcox (No. 3882)
    Eric M. Sutty (No. 4007)
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware 19801
    Attorneys for Appellee Global Power
    Equipment Group Inc.

    LANDIS RATH & COBB LLP

By:  /s/ Kerri K. Mumford
    Adam G. Landis (No. 3407)
    Kerri K. Mumford (No. 4186)
    919 Market Street, Suite 600
    Wilmington, DE 19801

        -and-

    SCHULTE ROTH & ZABEL LLP
    Jeffrey S. Sabin, Esquire
    David M. Hillman, Esquire
    Meghan M. Breen, Esquire
    919 Third Avenue
    New York, NY 10022
    Attorneys for Appellee Deltak Plan
    Administrator

SAUL EWING LLP

By:  /s/ Jeremy W. Ryan
    Mark Minuti, Esquire
    Jeremy W. Ryan, Esquire
    222 Delaware Avenue, Suite 1200
    Wilmington, DE 19801

        -and-

    BROWN RUDNICK LLP
    Howard L. Siegel, Esquire
    John C. Elstad, Esquire
    Cityplace I, 185 Asylum Street
    Hartford, CT 06103

    Steven D. Pohl, Esquire
    One Financial Center
    Boston, MA 02111

    Attorneys for Appellee Official
    Committee of Equity Security Holders

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, hereby certify that on the 7th day of July, 2008, I caused a copy of the

**Appellees' Answering Brief** to be served upon the parties listed below in the manner indicated.

*VIA* **ELECTRONIC MAIL AND**
**U.S. FIRST CLASS MAIL**

Howard Siegel, Esquire
*Brown Rudnick LLP*
City Place I
185 Asylum Street
Hartford, CT 06103-3402

Jeffrey Sabin, Esquire
David Hillman, Esquire
Meghan M. Breen, Esquire
*Schulte Roth & Zabel, LLP*
919 Third Avenue
New York, NY 10022

Steven Pohl, Esquire
John C. Elstad, Esquire
*Brown Rudnick LLP*
One Financial Center
Boston, MA 02111

Patrick P. DiNardo, Esquire
Paul E. Summit, Esquire
Pamela Smith Holleman, Esquire
*Sullivan & Worcester LLP*
One Post Office Square
Boston, MA 02109

*VIA* **ELECTRONIC MAIL AND**
**HAND DELIVERY**

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
*Landis Rath & Cobb LLP*
919 Market Street, Suite 600
Wilmington, DE 19801

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
*Saul Ewing LLP*
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

William D. Sullivan, Esquire
*Sullivan Hazeltine Allinson LLC*
4 East 8th St., Suite 400
Wilmington, DE 19801

David M. Klauder
*Office of the United States Trustee*
844 King North King Street, Suite 2207
Wilmington, DE 19801

Eric M. Sutty (No. 4007)

{BAY:01053303v1}