## IN THE UNITED STATES DISTRICT COURT
## FOR THE UNITED STATES

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) Case No. 06-11045 (BLS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| SNC-LAVALIN POWER ONTARIO, INC. | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) Civil No. 1:08-cv-00024 (JJF) |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) |
| | ) |
| Appellees. | ) |
| | ) |

## SUPPLEMENTAL APPENDIX OF EXHIBITS TO APPELLEES' ANSWERING BRIEF

Jeffrey M. Schlerf (No. 3047)
Scott G. Wilcox (No. 3882)
Eric M. Sutty (No. 4007)
BAYARD, P.A.
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

Attorneys for Appellee Global Power Equipment Group Inc.

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

-and-

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Meghan M. Breen, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Attorneys for Appellee Deltak Plan Administrator

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801

-and-

Howard L. Siegel, Esquire
BROWN RUDNICK LLP
Cityplace I, 185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esquire
John C. Elstad, Esquire
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111

Dated:  July 7, 2008          Attorneys for Appellee Official Committee
        Wilmington, Delaware   of Equity Security Holders

# INDEX OF EXHIBITS[1]

**Tab    Document (filing date) (D.I.#)**

1.   Amended Order Granting in Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress (10/26/06) (D.I. 195)

2.   Completion Agreement, dated as of November 10, 2006.

3.   Debtors' Objection to Proof of Claim No. 1099 Filed by SNC-Lavalin Power Ontario Inc. (8/29/07) (D.I. 1579)

4.   Debtors' Objection to Proof of Claim No. 1100 Filed by SNC-Lavalin Power Ontario Inc. (8/29/07) (D.I. 1581)

5.   Joinder of the Official Committee of Unsecured Creditors in the Debtors' Objections to SNC Claims (9/27/07) (D.I. 1732)

6.   Joinder of the Official Committee of Equity Security Holders in the Debtors' Objections to SNC Claims (10/3/07) (D.I. 1774)

7.   Surreply of SNC-Lavalin Power Ontario, Inc to the Estate Representatives' Reply to SNC's Opposition to Objections to Claim Nos. 1099 and 1100 (10/16/07) (D.I. 1825)

8.   Supplemental Memorandum of Law of SNC-Lavalin Power Ontario, Inc. as to Objections to its Claim Nos. 1099 and 1100 (10/29/07) (D.I. 1905)

9.   Joint Motion of Estate Parties Pursuant to Bankruptcy Rule 3018 to Determine the Temporarily Allowed Amount of SNC-Lavalin Power Ontario, Inc. Claim No. 1099 for Plan Voting Purposes (11/5/07) (D.I. 1943)

10.  Estate Representatives' Supplemental Objection to Claim Nos. 1099 and 1100 (11/5/07) (D.I. 1944)

11.  Order Setting: (1) Administrative Claim Bar Date for SNC-Lavalin Power Ontario, Inc. ("SNC"); (2) Schedule Discovery in Connection With Pending Objections to Claim Nos. 1099 and 1100 of SNC, Pending Bankruptcy Rule 3018 Motion Concerning SNC Claim No. 1099, Potential Administrative Claims of SNC, and Potential Future SNC Plan Confirmation Objections; and (3) Consolidated Hearing Date (11/15/07) (D.I. 2000)

---

[1] This Supplemental Appendix supplements the exhibits contained in the Appendix of Exhibits to Appellant's Opening Brief.

12.   Designation by the Estate Representatives of the Deposition Testimony of Michael Edward Hanson

13.   GPEG Inter-Company Non-Cash Account Summary

14.   Goreway Station – Deltak Bankruptcy Recovery Plan

# TAB 1 – EXHIBIT A

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
|  | Jointly Administered |
| Debtors. | Re: Docket No. 12 |

### AMENDED ORDER GRANTING IN PART DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 FOR AN ORDER AUTHORIZING DEBTORS TO (I) WIND DOWN OPERATIONS OF THE HEAT RECOVERY STEAM GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK DEBTORS, (II) REJECT CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (III) IMPLEMENT PROCEDURES FOR THE ORDERLY COMPLETION OF WORK IN PROGRESS

Upon the motion, dated September 29, 2006 (the "Motion"),[1] of Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing the Debtors to (i) wind down the HRSG Business operations of the Deltak Debtors[2] and (ii) reject certain executory contracts and unexpired leases in connection therewith (as identified on Exhibit "A" hereto, collectively, the "HRSG Contracts"), and (iii) implement procedures for the orderly completion of work in progress, as more fully set out in the Motion; and upon consideration of the Affidavit of John M. Matheson in Support of First Day Motions and Applications sworn to on the 29th day of September, 2006; and a hearing on the Motion having been held on October 2, 2006 (the "October 2 Hearing"); and the Court having entered an order dated October 5, 2006 (the "Original Order"); and a further hearing on the Motion having been held on October 26, 2006 (the "October 26 Hearing" and collectively with the October 2

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2]    The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

Hearing, the "Hearings") and based upon the record of the Hearings; and the Court having been

advised that the Debtors, the Official Committee of Unsecured Creditors (the "Creditors'

Committee") and the Senior Lenders have agreed to entry of this Order on the terms set forth

herein; and it appearing that the Court has jurisdiction over this matter; and it appearing that due

notice of the Motion as set forth therein is sufficient under the circumstances, and that no other

or further notice need be provided; and it further appearing that the relief requested in the Motion

is in the best interests of the Debtors and their estates and creditors; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is hereby

     ORDERED that the Motion is granted to the extent set forth herein; and it is

further

     ORDERED that pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy

Code, the Debtors are hereby authorized and empowered to wind down the HRSG Business

operations and affairs; and it is further

     ORDERED that the hearing on the Debtors' proposed rejection of the HRSG

Contracts, and any objections thereto, shall be held on November 6, 2006 at 1:00 p.m. Prevailing

Eastern Time. before the undersigned United States Bankruptcy Judge; and it is further

     ORDERED that if the Debtors have deposited monies with any HRSG

Counterparty as a security deposit or other arrangement, such counterparty shall not setoff or

otherwise use such deposit without prior authority of this Court; and it is further

     ORDERED that the Debtors are authorized, but not directed, to negotiate with

customers to reach accommodations for the completion of certain HRSG Contracts (the

"Accommodations") in exchange for such customer's agreement, at a minimum, to (i) fund all

actual costs of completion on time and materials terms, including, without limit, all outstanding

costs owed to vendors and Contract Employees relating to the completion of such contracts, plus

the customer's share of any excess costs that would be incurred in the ordinary course outside of

the wind down plan, (ii) fund any contractor incentives offered to Contract Employees who are

retained to perform on such customer's HRSG project, and (iii) waive all rejection damages

claims to the extent the Deltak Debtors complete such customer's HRSG project; provided

however, that the Debtors shall provide written notice to the Creditors' Committee and the

Senior Lenders of any proposed Accommodations and, unless otherwise agreed to by the

Creditors' Committee and the Senior Lenders, the Debtors shall not implement such proposed

Accommodations until at least forty-eight (48) hours after delivery of such written notice to the

Creditors' Committee and the Senior Lenders (the "48-Hour Period"), provided further however,

that, in the event the Creditors' Committee or the Senior Lenders deliver to the Debtors a written

objection to such proposed Accommodations within such 48-Hour Period, the Debtors shall

obtain approval of such Accommodations from this Court prior to implementation thereof, and

provided further, the Creditors' Committee and the Senior Lenders agree not to oppose a request

by the Debtors for an expedited hearing to consider approval of such proposed Accommodations

by the Court to the extent required herein.

      ORDERED that this Court shall, and hereby does, retain jurisdiction with respect

to all matters arising from or in relation to the implementation of this Order.

Dated:  Wilmington, Delaware
        October 26, 2006

                                         UNITED STATES BANKRUPTCY JUDGE

NP3N2006 7-2v PM (2R)
MIAMI 682052 v3 [682052_3 DOC]

3

**TAB 2 – EXHIBIT B**

EXECUTION COPY

## COMPLETION AGREEMENT

This COMPLETION AGREEMENT (this "Agreement"), dated as of November 10, 2006 (the "Effective Date"), is between SNC-Lavalin Power Ontario Inc., a Canadian corporation (the "Customer"), and DELTAK, L.L.C., a Delaware limited liability company ("Deltak" and together with the Customer, the "Parties").

### RECITALS

A.     The Parties entered into the an agreement identified as SNC-Lavalin Power Ontario Purchase Order number 5900010, dated as of January 26, 2006, as amended through Change Order 7, dated August 13, 2006 (the "Contract"; initial capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Contract), under which Deltak agreed to (i) sell to the Customer, and the Customer agreed to purchase from Deltak, Heat Recovery Steam Generators ("HRSGs"), accessories and other equipment (as more particularly defined in the Contract, the "Equipment"), and (ii) provide certain technical and other services (as more particularly defined in the Contract, the "Services"), in each such case subject to and on the terms and conditions of the Contract.

B.     On September 28, 2006, Deltak, its ultimate parent company, Global Power Equipment Group Inc., and its applicable affiliates (collectively and as more particularly defined in the petition, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, which case is now pending as Case No. 06-11045 (the "Bankruptcy Case").

C.     On September 29, 2006, the Debtors filed a motion (the "Wind Down Motion") with the Bankruptcy Court requesting authority, among other things, to reject the Contract and to provide to Deltak's HRSG customers the opportunity to complete the current HRSG projects in progress, as more particularly described in such Wind Down Motion.

D.     On October 2, 2006, the Bankruptcy Court issued an order (the "October 2, 2006 Order") as amended, granting in part the Debtors' Wind Down Motion, which among other things, authorized Deltak to negotiate with its customers to reach accommodations for the completion of certain HRSG contracts in exchange for such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms, including all outstanding costs owed to vendors and contract employees relating to the completion of such contracts, plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any contractor incentives offered to contract employees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent Deltak completes such customer's HRSG project (the "HRSG Project Completion Plan Order").



D007325

E.    Consistent with the HRSG Project Completion Plan Order, the Parties enter into this Agreement to provide for the completion of the Customer's HRSG project, on and subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises set forth above, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## 1.    COMPLETION OF THE CUSTOMER'S HRSG PROJECT

1.1 Obligations under the Contract.  Except as specifically provided in this Agreement, and except with respect to Rejection Damages (defined below) which are expressly reserved subject to waiver under Section 2.1 hereof, neither Party will have any further obligation to pay any amounts or otherwise perform any other obligations under, in connection with or relating to the Contract.

1.2 Deltak Assistance; Reimbursement for Expenses.  Deltak agrees to perform those remaining performance obligations under the Contract to be identified by the Parties in the Completion Plan pursuant to Section 1.4(c) of this Agreement (all references in this Agreement to the unperformed obligations of Deltak under the Contract mean all such obligations of Deltak under the Contract prior to Deltak's rejection thereof, unless such obligations have been or are actually performed by Deltak, including the "stamping" of the HRSGs but excluding for all purposes any warranty obligation or obligations that the Equipment meet any performance guarantees or any indemnity obligation), as and to the extent requested by the Customer (the completion of the performance of such unperformed obligations and the other obligations of Deltak under this Section 1, the "Completion of Customer's HRSG Project"), subject only to the reimbursement by the Customer to Deltak in accordance with Section 1.3 herein, of all actual documented costs of any personnel, materials and facilities and all Deltak's out-of-pocket costs and expenses actually incurred by Deltak and in connection with the Customer's request to incur such costs and expense on its behalf, in the Completion of Customer's HRSG Project on time and material terms, including (a) all outstanding costs and expenses owed under vendors' purchase orders that the Customer elects to assume by assignment, (b) all outstanding costs and expenses owed to employees and contract employees of Deltak relating to the Completion of Customer's HRSG Project from the date of the October 2, 2006 Order and as approved by the Customer, (c) the Customer's *pro rata* share of any excess costs and expenses that are incurred in the ordinary course of administering the Contract, outside of the wind down plan approved by the Bankruptcy Court from the date of the October 2, 2006 Order, and (d) fund any employee or contract employee incentives offered to employees or contract employees of Deltak who are retained to perform in connection with this Agreement from the date of the October 2, 2006 Order as approved by the Customer (all of the foregoing costs and expenses, collectively, the "Reimbursable Expenses").    Deltak agrees to provide copies to the Customer of all

2



D007326

documentation and materials as the Customer may reasonably require to substantiate Deltak's right to payment of an invoice in accordance with this Agreement; and if an invoice has already been paid from the Escrow Account in accordance with Section 1.3.2, then Customer shall have the continuing right to request and have Deltak provide to it all documentation and materials for purposes of an audit to verify that such payment was made in accordance with this Section 1.2. In the event a payment was made in error, the amount of such error plus reasonable interest shall be credited to any subsequent payment or reimbursed to Customer. Notwithstanding any provision of this Agreement or the Contract to the contrary, the Customer will not have any obligation to pay any amount to Deltak, except for duly incurred Reimbursable Expenses. Schedule 1 hereto (as jointly updated by the Parties from time to time) lists the items conforming the Reimbursable Expenses. The only compensation that Deltak is entitled to receive for the Completion of Customer's HRSG Project is the Reimbursable Expenses and the consideration of the waiver of claim pursuant to <u>Section 2.1</u> hereof.

1.3 <u>Invoices</u>.

    1.3.1 *Pre-funding*. Immediately prior to the execution of this Agreement, Deltak shall provide to the Customer (a) a projection (a "<u>Four-week Projection</u>") reflecting Deltak's good faith estimate of the Reimbursable Expenses estimated for the four weeks following the Effective Date, (b) a pro forma invoice for the aggregate Reimbursable Expenses estimated to be incurred during the four weeks following the Effective Date, including the aggregate amount of the applicable retention bonus for Deltak's employees and contract employees as set forth in the Four-week Projection (the "<u>Initial Pro Forma Invoice</u>"), and (c) an invoice for the Reimbursable Expenses incurred but not paid from the date of the October 2, 2006 Order and prior to the Effective Date relating to the Completion of the Customer's HRSG Project (the "<u>Initial Invoice</u>").

    1.3.2 *Escrow account*. To insure that the funds paid by the Customer will be applied to Reimbursable Expenses incurred in the performance of this Agreement, the Parties will establish an escrow account (the "<u>Escrow Account</u>") pursuant to an escrow agreement, substantially in the form set forth in Exhibit A hereto, to be entered by and among Deltak, the Customer and a financial institution reasonably acceptable to the Parties. The Escrow Agent shall disburse amounts held in the Escrow Account upon receipt of a written instruction notice executed by Deltak and approved by the Customer (the "<u>Written Instruction</u>"), provided, however, that to the extent such Written Instruction refers to undisputed amounts, the Customer will not withhold the execution of such Written Instruction. The Written Instruction may be executed on separate counterparts under the same terms set forth in <u>Section 4.15</u> of this Agreement.

    1.3.3 *Initial Payments*. On the Effective Date, the Customer will pay the amount of the (a) Initial Pro Forma Invoice to the Escrow Agent by wire transfer to the

3

CONFIDENTIAL

D007327

Escrow Account, and (b) Initial Invoice directly to Deltak by wire transfer to the following account ("Deltak's Account" and together with the Escrow Account, the "Accounts"):

Account Name: Deltak, LLC
Account Number: 1-602-3371-5913
Bank: U.S. Bank National Association
Bank's Address: 601 Second Avenue South Minneapolis, MN 55402-4302
ABA Number: 091000022
Bank Contact: James Cecil
Contact's Phone Number: 612-303-4505

Upon such funds becoming available in the Accounts, Deltak will commence the work and services relating to the Completion of the Customer's HRSG Project.

1.3.4  **Subsequent payments.**  By the end of business of Tuesday of the second calendar week following the Effective Date, and by the end of business of each Tuesday every two weeks thereafter (and where such Tuesday is not a business day, the business day thereafter), Deltak shall provide an invoice for the aggregate actual Reimbursable Expenses incurred through the end of the immediately preceding two-week period ending at 11:59 P.M., prevailing Central time on the immediately preceding Saturday (the "Invoice Period") (the "Subsequent Invoices" and, collectively with the Initial Pro Forma Invoice and the Initial Invoice, the "Invoices").

1.3.5  The Customer shall pay each of the Subsequent Invoices and the funds shall be available on Deltak's account no later than the end of business of Friday of the week in which the Subsequent Invoice is received.

1.3.6  Deltak shall include with each of the Invoices a reasonably detailed description of the services performed and the rates charged, together with, as applicable, copies of all subcontractor or third party receipts, invoices, delivery tickets, bills of lading, account statements, releases of claim and lien waiver affidavits, progress reports and the updated Completion Plan and other similar documentation necessary for Customer to verify that the invoice amount reflects the actual amount of work performed to the end of the Invoice Period for the Completion of the Customer's HRSG Project (the "Invoice Documentation").

1.3.7  If the Customer fails to timely pay any Invoice, Deltak shall immediately cease all the work and services relating to the Completion of the Customer's HRSG Project, except in the event Deltak fails to invoice the Customer on the schedule set forth in Section 1.3.4. If such default continues and is not remedied for a period of five (5)

4



days, Deltak may terminate the Completion Agreement by giving written notice to the Customer.

1.3.8   In the event that the Customer has a good faith dispute with regard to any item of an Invoice, included any challenge with respect to the Invoice Documentation (the "Disputed Item"), the Customer will provide Deltak with written notice of the reasons supporting the dispute (the "Dispute Notice") within three (3) business days following the receipt of such Invoice.  In the event Deltak disagrees with any such objections, appropriate senior representatives of Deltak and the Customer will promptly attempt to resolve the disagreement within seven (7) business days of the receipt of the Customer's objection notice.  If Deltak and the Customer are unable to resolve the dispute within seven (7) business days from the receipt of the Customer's objection notice, the Customer may submit the dispute to the Bankruptcy Court.  The Parties agree that they shall continue to perform their respective obligations pursuant to the terms of the Completion Agreement during the course of a dispute resolution pursuant to this Section 1.3.8.  If the Customer submits the dispute to the Bankruptcy Court, the Customer will bear all of the reasonable fees, costs and expenses of the dispute resolution incurred by Deltak and Customer, except to the extent that the Customer prevails in the dispute and as determined by the Bankruptcy Court.  If the dispute is resolved in favor of the Customer, the disputed item shall be deducted from the Subsequent Invoice submitted following the resolution of the dispute along with any such fees, costs and expenses allowed to Customer by the Bankruptcy Court.

1.4 Completion Plan.   Subject to Section 3.4 of this Agreement, Deltak agrees to diligently work with the Customer to prepare a completion plan, to be jointly updated by the Parties from time to time (the "Completion Plan") for the Completion of Customer's HRSG Project in accordance with the SNC –Lavalin specifications SP-B110 Revision B, as amended by the Parties, and for the performance of unperformed obligations of Deltak under the Contract. The Completion Plan will, among other things, to the best of the Parties' knowledge, (a) identify the location and describe the status of all Equipment, documentation (as specified in the Contract, the "Documentation") and other items not already delivered to the Customer as required under the Contract, (b) identify all subcontractors and other Persons manufacturing or possessing any such Equipment, Documentation or other items, or to provide Services required to be performed by Deltak under the Contract, together with any amounts already paid by Deltak for such items and Services and amounts outstanding and to become outstanding with respect to such items and Services, (c) describe any and all other unperformed obligations of Deltak under the Contract and identify those unperformed obligations, including any Services to be provided (including, among others,  the engineering, purchase order requisitions, delivery of all material, Equipment, supplies and Documentation from subcontractors and suppliers, including Deltak Power Equipment (China) Co. Ltd, assignment of purchase orders subject to Section 3.6 herein, and timely delivery of supporting documentation for the "stamping" of the HRSGs when

5



complete, all in accordance with and necessary to support the Customer's HRSG project schedule to be agreed by the parties), (d) establish an action plan and critical milestone schedule for the performance of those unperformed obligations under the Contract by Deltak selected by the Customer to be performed by Deltak (to be integrated, to the extent possible, with the Customer's project schedule), including (i) the completion of manufacturing, as applicable, and the delivery of all such Equipment, Documentation and other items to the Customer, (ii) payment of all subcontractors and other applicable third parties required in connection with the Completion of Customer's HRSG Project unless such subcontracts are assigned to the Customer pursuant to Section 3.6 herein, and (iii) the providing of any Services selected by the Customer to be performed by Deltak; provided, however, that the Customer must not select obligations that Deltak will not be permitted to perform by operation of law, contract or otherwise, (e) contain Deltak's best estimate as to the remaining payments, costs and expenses required to be made for the Completion of Customer's HRSG Project, including an estimate of the Reimbursable Expenses to be incurred excluding from such estimate any increases or changes in the scope initiated by Customer after the Effective Date (the "Initial Budget") reasonably acceptable to Customer, and (f) contain such other items as may be reasonably requested by the Customer. The Parties acknowledge and agree that to the extent any revision of the agreed-upon schedule is required to meet certain Customer's defined milestone activities, Deltak will use its reasonable efforts to cooperate with the Customer under the terms of this Agreement on a time and material basis without cost to Deltak.

1.5 <u>Right to Contract with Subcontractors; Equipment and Documentation</u>. Notwithstanding any provision of the Contract or this Agreement to the contrary and so long as the Customer is not in breach of its obligations under this Agreement, the Customer will have the right to (a) the assignment of an existing purchase order with a sub-contractor, <u>provided, however</u>, that such assignment shall be subject to the approval of the Bankruptcy Court, (b) subject to Sections 3.3 and 3.4 of this Agreement, contact, negotiate with and enter into agreements directly with any subcontractors of Deltak or other Persons (including Deltak affiliates) supplying or to supply Services, Equipment, Documentation or other items in connection with the Contract and purchase those Services, Equipment, Documentation or other items directly from such subcontractors or other Persons (including Deltak affiliates), and to select, hire and use other Persons (including Deltak affiliates) to independently provide similar items or services, (c) take care, custody and control of, subject to any payments required to be made to any applicable third party subcontractors or other Persons, of all Equipment and Documentation, at which time title and risk of loss thereto will pass for all purposes to the Customer free and clear of all liens of Deltak and Debtors' Senior Lenders, and (d) perform or hire a third party to perform, in each such case, at the Customer's cost and expense, any of the obligations of Deltak under the Contract and in the place of Deltak. In the case of <u>clauses (b)</u> and <u>(d)</u> above, should the Customer contract directly with any subcontractor or other Person (other than Deltak) for the supplying or purchase of any Services, Equipment, Documentation or other items not previously supplied by Deltak, or otherwise hire a third party to perform any of

6

the obligations of Deltak, under the Contract or this Agreement, in the place of Deltak, Deltak will be relieved of such obligations then to be performed by said subcontractor, other Person or third party, without requirement of any notice. The Customer will be responsible for all insurance and transportation of any such Equipment or Documentation. Notwithstanding, Customer reserves all its rights to damages subject to the waiver under Section 2.1 with respect to Services, Equipment, Documentation or other items supplied by or through Deltak prior to the Effective Date hereof. For purposes of this Agreement, "Senior Lenders" shall mean the following parties to the $100,000,000 Credit Agreement entered into with Global Power and certain of its subsidiaries on or about October 1, 2004 (as amended from time to time, the "Senior Credit Facility"): (i) Bank of America, N.A., as administrative agent, swing line lender and letter of credit issuer, (ii) certain lenders from time to time party to the Senior Credit Facility, (iii) U.S. Bank National Association, as syndication agent, and (iv) Bank of Oklahoma, N.A., as managing agent.

1.6 **Meetings and Report; Subcontracts; Cooperation.** Subject to Section 3.4 of this Agreement, Deltak agrees to make available at its offices in Plymouth, Minnesota, its personnel for meetings and other purposes as reasonably requested by the Customer to perform the requirements of this Agreement. Further, Deltak agrees to provide to the Customer, as and to the extent reasonably requested by the Customer from time to time, an estimate of Reimbursable Costs incurred and to be incurred, and a progress report of the activities being undertaken under this Agreement, and compare such information with the estimates and critical milestone schedule set forth in the Completion Plan, together with such other information as reasonably requested by the Customer. Deltak agrees to provide copies of all subcontracts Deltak or Deltak's affiliates have entered into in connection with the Contract and assign those rights under such subcontracts to the Customer to the extent requested by the Customer. Deltak also agrees to reasonably cooperate with the Customer and its designees to promptly, safely and efficiently achieve the Completion of the Customer's HRSG Project. For the avoidance of doubt, any expenses incurred in carrying out the cooperative actions set forth above, including any similar actions, shall be deemed Reimbursable Expenses.

1.7 **Right to Terminate.** Subject to a Force Majeure Event (as defined below), if Deltak fails to perform its obligations under this Agreement and fails to cure such failure upon the receipt of a five (5) business days written notice, and so long as the Customer is not in material breach of its obligations under this Agreement, the Customer may (only in good faith) terminate this Agreement by written notice to Deltak. In the event this Agreement is terminated pursuant to this Section 1.7 or Section 3.7 hereof and notwithstanding any pending challenge Deltak may raise to termination in the Bankruptcy Court or otherwise, the Customer shall have the right to ownership and immediate delivery of any raw materials, work in process and finished goods acquired by Deltak with funds provided under the Contract or this Agreement in connection with Deltak's performance of its obligations hereunder and thereunder (the "WIP"), and the Customer shall have immediate access to, and use of, all intellectual property necessary to complete the

7

Customer's HRSG Project. Upon taking possession of, and title to, said WIP materials at Project Site (if already delivered), or EXW place of manufacture (if not), the Customer shall waive a percentage of Rejection Damages (as defined below), which percentage shall be equal to the percentage of completion of Deltak's scope of work for the fabrication of the HRSGs, performed from the date of the execution of the Contract, and under this Agreement in accordance with the Completion Plan, through the date of the termination pursuant to this Section 1.7. or Section 3.7 hereof. In such event, and in order to obtain title to said WIP materials free and clear of all liens of Deltak and Debtors' Senior Lenders, the Customer shall pay Deltak scrap value for all WIP materials then in existence as of September 29, 2006, which the Parties agree shall be calculated as not to exceed 1,500 gross tons at US$202 per gross ton. In the event Deltak challenges Customer's termination, and Deltak prevails in any such challenge by obtaining a finding from the Bankruptcy Court that Deltak was materially performing its obligations under this Agreement prior to termination, the Customer shall waive all Rejection Damages (as defined below). Except as set forth in this Section 1.7, under no circumstances shall Deltak be liable for any damages under this Agreement, it being understood that the right to terminate pursuant to this Section 1.7 and Section 3.7 hereof shall be the Customer's sole and exclusive remedy under this Agreement; provided, however, such limitation of liability for damages shall not apply to any action that the Customer may have, on account of Deltak actively taking actions (other than actions taken by Deltak to protect its own rights) for the purpose of hindering or otherwise impeding the Customer's efforts to complete the Customer's HRSG Project after termination pursuant to this Section 1.7.

2.    **WAIVER**

2.1 Completion and Waiver. Notwithstanding any other provision under this Agreement providing for reservation of rights to damage claims under the Contract, upon the delivery of all of the Equipment, Documentation and other items required for the Completion of Customer's HRSG Project and the passage of title thereto to the Customer, free and clear of any liens of Deltak and Debtors' Senior Lenders, and the performance of all Services and other obligations required for the Completion of Customer's HRSG Project (or the written waiver of any such obligation by the applicable Party to whom such obligation runs), the Customer waives all damages claims against the Debtors in connection with the Contract, including all rights to damages under the Contract reserved pursuant to this Agreement (the "Rejection Damages"). Failure to satisfy the Completion of the Customer's HRSG Project shall result in the Customer's rights with respect to Rejection Damages being preserved without prejudice. The foregoing waiver excludes any insurance that was required by the Contract or otherwise that may still be available.

8

## 3.   REPRESENTATIONS AND WARRANTIES AND OTHER AGREEMENTS

3.1 <u>Reciprocal</u>. Each Party represents and warrants to the other Party that: (a) such Party is a corporation or limited liability company, as applicable, duly formed and validly existing and in good standing under the laws of the state of its formation, (b) such Party has the full power and authority to execute, deliver and perform this Agreement and to carry out the transactions contemplated by this Agreement; (c) the execution and delivery of this Agreement by such Party and the carrying out by such Party of the transactions contemplated by this Agreement have been duly authorized by all requisite partnership or limited liability company, as applicable, action, and this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable against the Party in accordance with the terms of this Agreement, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws generally affecting creditors' rights and by equitable principles regardless of whether enforcement is sought in equity or at law; (d) no authorization, consent, notice to or registration or filing with any governmental authority is required for the execution, delivery and performance by such Party of this Agreement; (e) none of the execution, delivery and performance by such Party of this Agreement conflicts with or will result in a breach or violation of any law, contract or instrument to which such Party is a party or is bound; and (f) other than the Bankruptcy Case, there are no proceedings by or before any governmental authority, now pending or (to the knowledge of such Party) threatened, that if adversely determined could have a material adverse effect on such Party's ability to perform the Party's obligations under this Agreement.

3.2 <u>Implied Warranties</u>.  The Equipment and Services provided by Deltak under this Agreement for the Completion of the Customer's HRSG Project are provided on an "as is, where is" basis.  Neither Deltak nor its Debtor affiliates (as of September 29, 2006) (the "<u>Debtor Affiliates</u>"), employees, officers, directors or agents warrants that the Equipment and Services provided by Deltak under this Agreement will be uninterrupted or error free.  Deltak and its Debtor Affiliates, employees, officers, directors or agents make no warranty, guarantee or representation, either express or implied, regarding the merchantability, title or fitness for a particular purpose of any Equipment and Services provided by Deltak after the Effective Date under this Agreement.

3.3 <u>No Solicitation</u>.  The Customer shall not, and it shall cause all of its subsidiaries and affiliates not to, directly or indirectly, (i) solicit, encourage, entice or induce any person who is a current employee of Deltak or party to another accommodation agreement between Deltak and a third party to terminate his or her employment with Deltak, or (ii) hire, employ or enter into any independent contractor relationship with any person who is a current Deltak employee.

3.4 <u>No Impairment</u>.  The Customer shall not, and it shall cause all of its subsidiaries and affiliates not to, directly or indirectly, impair Deltak's ability to perform the completion of other

9



customers' HRSG projects, including without limitation the exclusive use of an employee or contract employee whose expertise is also required for another HRSG project. The Customer acknowledges that as a result of the HRSG Project Completion Plan Order, Deltak is entering into similar "completion agreements" with other HRSG customers, and it further acknowledges that Deltak's obligations under this Agreement shall not be deemed exclusive.

3.5 Guaranties. The Parties acknowledge and agree that as of September 28, 2006, there were no outstanding letters of credit or bank guarantees securing any obligations under the Contract. Customer reserves all rights to claim a parent guarantee, the existence of which Deltak disputes, provided, however, that the Customer's claim to such parent guarantee shall be waived when the conditions to waiver under Section 2.1 hereof are met.

3.6 Assumption and Assignment. The Parties acknowledge and agree that they will work together to determine the vendors' purchase orders or other subcontracts that will be ultimately assigned to the Customer, upon the Customer's request and in the event that certain vendor purchase orders or other subcontracts will not be assigned or not utilized at all, then as the Parties may jointly agree, Deltak will move promptly to reject such orders and subcontracts. The Parties agree to use their commercially reasonable efforts to obtain the necessary approvals and relief from the Bankruptcy Court in order to give full effect to the assignment of such vendors' purchase orders and Deltak will cooperate with Customer in connection with such third party vendors or subcontractors including in any action Customer may bring against any such third parties vendors or subcontractors, on a time and material basis.

3.7 Projections. Both Parties acknowledge and agree that Deltak has prepared, or will prepare, under this Agreement, its good faith estimate of Reimbursable Expenses, including the Four-week Projection, which shall remain subject to changes as a result of, among other things, Deltak's vendors and employees willingness to perform in a manner consistent with the estimate of Reimbursable Expenses, all of which are beyond Deltak's control. Subject to the rights and limitations under Section 1.7 of this Agreement, in the event the costs for the Completion of the Customer's HRSG Project deviate, in any respect or for any reason, from what Deltak has estimated, Deltak will, without cost to itself, use reasonable efforts to minimize any excess cost. In the event that the projections (as amended) or the actual costs for Completion of Customer's HRSG Project exceed the Initial Budget, excluding the costs associated with any increase in the scope initiated by the Customer, by more than 15%, Customer shall have the right to terminate this Agreement pursuant to Section 1.7 hereof.

3.8 Pre-funding. Notwithstanding anything in this Agreement to the contrary, the Parties agree and acknowledge that Deltak shall not be responsible for any cost of the Completion of the Customer's HRSG Project unless such cost is funded in advance by the Customer.

3.9 Further Bankruptcy Court Approval. The Parties acknowledge and agree that the terms of this Agreement, including Deltak's obligations hereunder, will be submitted to, and

.10

shall remain subject to the approval of, the creditors' committee and the Debtors' Senior Lenders in the Bankruptcy Case, or the relief of the Bankruptcy Court, as the case may be, pursuant to the HRSG Project Completion Plan Order as amended on October 26, 2006.

## 4.    MISCELLANEOUS

4.1 <u>References in this Agreement</u>.  In this Agreement, unless a clear, contrary intention appears: (a) the singular includes the plural and vice versa; (b) reference to any Person includes such Person's successors and assigns but, in the case of a Party, only if such assigns are permitted by this Agreement; (c) reference to any gender includes each other gender; (d) reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of this Agreement; (e) reference to any law means such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, including, if applicable, rules and regulations promulgated thereunder; (f) reference to any Section means such Section of this Agreement, and references in any Section to any clause means such clause of such Section; (g) "hereunder," "hereof," "hereto" and words of similar import will be deemed references to this Agreement as a whole and not to any particular Section or other provision of this Agreement; (h) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and (i) relative to the determination of any period of time, "from" means "from and including", "to" means "to but excluding" and "through" means "through and including".

4.2 <u>Entire Agreement; Amendments</u>.  This Agreement represents the entire agreement of the Parties with respect to the matters contained in this Agreement.  This Agreement may be amended or modified only in a writing signed by both Parties.

4.3 <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of the Parties to this Agreement and their respective successors and permitted assigns. Neither Party may assign this Agreement, or any part of this Agreement, without the prior written consent of the other Party.  Any assignment in violation of this <u>Section 4.3</u> will be void.

4.4 <u>Waivers</u>.  No failure, course of dealing or delay on the part of a Party in exercising any right under this Agreement will operate as a waiver, nor will any single or partial exercise of any such right preclude any other or further exercise of that right or the exercise of any other right under this Agreement.  No waiver of any provision or the waiver of any breach of any provision of this Agreement will be effective unless the waiver is contained in a written instrument duly executed on behalf of the Party giving the waiver and then such waiver will be effective only in the specific instance and for the specific purpose for which the waiver is given and will not operate as a waiver of any future application of such provision.

11

4.5 <u>No Third Party Beneficiaries</u>. The provisions of this Agreement are intended for the sole benefit of the Parties, and there are no third party beneficiaries.

4.6 <u>Severability</u>. If all or any part the provisions of this Agreement is or becomes invalid, illegal or unenforceable in any jurisdiction, the remaining parts or provisions of this Agreement will be, as to such jurisdiction, severable and: (a) the validity, legality or enforceability of such remaining parts or provisions will not in any way be affected or impaired by the severance of the parts or provisions severed; and (b) the invalidity, illegality or unenforceability of all or any part of any provisions of this Agreement in any jurisdiction will not affect or impair such part or provision or any other provisions of this Agreement in any other jurisdiction. The Parties agree to use reasonable efforts to replace any such invalid, illegal or enforceable provision with a valid, legal and enforceable provision that preserves, to the extent possible, the original agreement of the Parties.

4.7 <u>Further Assurances</u>. The Parties agree to provide such information, execute and deliver any instruments and documents, and to take such other actions (including seeking further relief from the Bankruptcy Court) as may be necessary or reasonably requested by the other Party, which are not inconsistent with the provisions of this Agreement and which do not involve assumptions of obligations other than those provided for in this Agreement, in order to give full effect to this Agreement and to carry out the intent of this Agreement. The Parties further agree not to take any actions that would interfere or conflict with the full implementation of this Agreement.

4.8 <u>Governing Law</u>. THIS AGREEMENT IS MADE IN THE STATE OF NEW YORK AND WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT-OF-LAW OR CHOICE-OF-LAW RULES WHICH MIGHT LEAD TO THE APPLICATION OF THE INTERNAL LAWS OF ANOTHER JURISDICTION). EACH OF THE CUSTOMER AND DELTAK CONSENT TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND ANY APPELLATE COURT THEREFROM WITH RESPECT TO ANY AND ALL MATTERS RELATING TO THIS AGREEMENT.

4.9 <u>Cumulative Remedies</u>. All rights and remedies of either Party are cumulative of each other and of every other right or remedy such Party may otherwise have at law or in equity, and the exercise of one or more rights or remedies will not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

4.10 <u>Notices</u>. All notices and other communications given in connection with this Agreement will be in writing and will be deemed to have been duly given (a) when received by the applicable Party to this Agreement, if (i) personally delivered, (ii) sent by a recognized overnight delivery service, postage prepaid, or (iii) sent by certified or registered mail, return receipt requested and postage prepaid, or (b) when transmitted by the applicable Party to this

12

CONFIDENTIAL

D007336

Agreement, if transmitted by (i) facsimile, subject to the sender's facsimile machine receiving the correct answerback of the addressee and confirmation of uninterrupted transmission by a transmission report, or (ii) email, subject to the sender sending a written copy of such email, within two (2) days of the e-mail's original transmission, using one of the other delivery methods specified above or otherwise receiving written confirmation by the recipient of receipt of the email. Notices will be given to the address specified for notices on the applicable signature page to this Agreement or to such other address as will be designated by such Party in a written notice to the other Party in accordance with this Section 4.10.

4.11    Liability Limitation.    Notwithstanding anything to the contrary in this Agreement or at law or in equity, in no event shall either Party be liable for punitive, special, indirect, incidental or consequential damages to the other Party or any other person (including without limitation, damages for loss of business profits, business interruption or any other loss) arising from or relating to any claim made under this Agreement or the provision of the failure to provide the Services.

4.12    Confidentiality.    Any and all information that is not generally known to the public, including information about the terms and conditions hereof or information exchanged between the Parties in connection with this Agreement or the Contract, whether of a technical, business or legal nature, shall be considered to be confidential ("Confidential Information"). Each Party agrees that Confidential Information shall not be disclosed to any third party or parties, other than such Party's directors, officers, employees, attorneys, accountants and similarly situated agents ("Disclosure Parties"), without the express written consent of the other Party; provided, however, that Deltak may disclose Confidential Information to the creditors' committee, Debtors' Senior Lenders, and other parties in interest who are subject to confidentiality in connection with the Bankruptcy Case; provided, further, however, that in no event shall a competitor of Customer or of Deltak (in the manufacture of HRSGs) be a Disclosure Party, except in the event of termination of this Agreement, in which case such Confidential Information may be used by Customer to complete Customer's HRSG Project. Each Party shall take reasonable measures to protect against nondisclosure of Confidential Information by its directors, officers, employees, attorneys, accountants and other agents. Confidential Information shall not include any information (i) that is or becomes part of the public domain through no fault of the Party disclosing such information, (ii) that is obtained from third parties who are not bound by confidentiality obligations, (iii) that is required to be disclosed by law or the rules or decisions of any governmental authority, or (iv) that is independently developed by the Party disclosing such information as evidenced by written records. The provisions of this Section 4.12 shall survive the termination of this Agreement for a period of five years. Each Party shall immediately inform the other Party of any unauthorized used of such Party's information, programs or any other property and immediately take all the steps to prevent the unauthorized use of such property.

13

CONFIDENTIAL

D007337

4.13  Force Majeure.  In the event either Party's performance under this Agreement is interrupted or interfered with by reason of any cause beyond its reasonable control including, but not limited to, fire, storm, flood, earthquake, explosion, war, strike or labor disruption, rebellion, insurrection, terrorist act, quarantine, act of God, boycott, embargo, riot, or governmental law, regulation or edict (each a "Force Majeure Event"), such Party shall not be deemed to be in default of this Agreement by reason of its nonperformance due to such Force Majeure Event, but shall give notice to the other Party hereto of the Force Majeure Event.  The Party whose performance is interrupted by such Force Majeure Event will be excused from performance of its obligations only to the extent and for such time as the cause that prevents performance continues.  Any Party asserting its inability to perform any obligation hereunder for any such contingency shall promptly notify the other Party of the existence of such contingency, and shall use its reasonably diligent efforts to re-commence its performance of such obligation as soon as commercially practicable.  Force Majeure Event shall not include (i) the occurrence of any manpower or materials shortages, except if such shortage results from an act, event or condition which constitutes a Force Majeure Event, (ii) any failure by Deltak to obtain and/or maintain any permit, license, registration or other similar authorization as necessary for the Completion of Customer's HRSG Project, or (iii) any delay, default or failure by Deltak (direct or indirect) in obtaining materials, Equipment, Documentation or other items or retaining any subcontractor or any other delay, default or failure (financial or otherwise) of a subcontractor, except if such delay, default or failure results from an act, event or condition which constitutes a Force Majeure Event.

4.14  Headings Descriptive.  The headings of the Sections of this Agreement are inserted for convenience only and will not in any way affect the meaning or construction of any provision of this Agreement.

4.15  Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties to this Agreement on separate counterparts, each of which when so executed and delivered will be an original, but all of which will together constitute one and the same instrument.  An executed fax or .pdf signature page by a Party will be binding on the Party as if it were an original executed signature page by the Party.

[Signature page follows]

14

CONFIDENTIAL

SA 17

IN WITNESS WHEREOF, the Parties to this Agreement have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

SNC – LAVALIN POWER ONTARIO INC.

By: _____
Name: Gregory J. Pardanico
Title: VP Procurement / Contracts

Addresses for Notices:

SNC-Lavalin Power Ontario Inc
2655 North Sheridan Way, Suite 180
Mississauga, Ontario, Canada L5K 2P8

Attention:    Michael Ranz
Phone/Fax:    (425) 489-8110 / (425) 489-8030
E-Mail :      mike.ranz@slthermal.com

and

Attention:    David Lund
Phone/Fax:    (425) 489-3330 / (425) 489-8032
Email:        david.lund@slthermal.com

**DELTAK, L.L.C.**

By: _____
Name: _____
Title: _____

Address for Notices:

2905 Northwest Blvd., Suite 150
Plymouth, MN 55441

Attention:    Monte Ness
Phone/Fax:    (763) 557-4711 / (763) 557-4700
E-mail:       mness@deltak.com

## SCHEDULE 1

### REIMBURSABLE EXPENSES

**Updated as of November 10, 2006**

- Management staff including Project Manager      $ 84.32 per hour
- Engineering staff including Project Engineer     $ 60.35 per hour
- Design and Detailing staff                                   $ 55.33 per hour
- Other professional staff including purchasing staff,
  fabrication advisors and inspectors                      $ 57.40 per hour
- Secretarial and support staff                                $ 40.82 per hour
- Manufacturing staff                                              $ 52.78 per hour
- Field Services and support                     Per Field Service rate sheet
- Travel, material, facilities and other expenses    Actual Expense + 10%
- Retention Bonus —                                        - To be Discussed -



CONFIDENTIAL

D007340_

**TAB 3 – EXHIBIT C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| Debtors. | Jointly Administered |
| | Objection Deadline: September 21, 2007 at 4:00 p.m.<br>Hearing Date: September 28, 2007 at 10:00 a.m. |

## NOTICE OF OBJECTION

**TO:** Counsel to SNC-Lavalin Power Ontario Inc., The Office of the United States Trustee, counsel to the DIP Lender, counsel to the Official Committee of Unsecured Creditors, counsel to the Official Committee of Equity Security Holders, and all parties who filed a notice of appearance pursuant to Bankruptcy Rule 2002

Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession have filed the attached **Debtors' Objection to Proof of Claim No. 1099 Filed by SNC-Lavalin Power Ontario Inc.** (the "Objection").

Responses or objections to the Objection, if any, are to be filed on or before **September 21, 2007 at 4:00 p.m.** At the same time, you must serve a copy of the objection or response on the undersigned attorneys.

If any responses are timely filed in accordance with this Notice, a hearing on the Objection will be held on **September 28, 2007 at 10:00 a.m.**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: August 29, 2007

THE BAYARD FIRM

By: _____

Jeffrey M. Schlerf (No. 3047)
Mary E. Augustine (No. 4477)
Kathryn D. Sallie (No. 4600)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

Attorneys to the Debtors and
Debtors in Possession

DATE 8·29·07

SA 20

DOCKET # 1581

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| | Jointly Administered |
| Debtors. | |
| | Objection deadline: September 21, 2007 at 4:00 p.m. |
| | Hearing date: September 28, 2007 at 10:00 a.m. |

### DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 1099
### FILED BY SNC-LAVALIN POWER ONTARIO INC.

Global Power Equipment Group Inc. ("Global Power") and its affiliated debtors and debtors in possession (collectively, the "Debtors"),[1] pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bar Date Order (as defined below), file this objection (the "Objection") to proof of claim number 1099 filed by SNC-Lavalin Power Ontario Inc. ("SNC"), and in support of this Objection, respectfully represent as follows:

### Background

1.     On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors'

---

[1]     In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP.

668237-3

chapter 11 cases (the "Cases") have been consolidated for procedural purposes only and are being jointly administered.

2.    On October 10, 2006, the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in these Cases.    On November 9, 2006, the U.S. Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee," and together with the Creditors' Committee, the "Committees").    No trustee or examiner has been requested or appointed in any of the Debtors' Cases.

3.    On January 10, 2007, the Court entered an Order Pursuant to Bankruptcy Rule 3003(c) (i) Establishing a Bar Date for Filing Certain Proofs of Claim; (ii) Establishing Ramifications for Failure to Comply Therewith; (iii) Approving Proof of Claim Form and Notice of Bar Date; and (iv) Approving Notice and Publication Procedures (the "Bar Date Order") [Docket No. 636].    The Bar Date Order fixed March 26, 2007 (the "Bar Date") as the last date for all persons or entities (each, a "Claimant"), with certain limited exceptions, holding a Claim (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors to file proofs of claim in these Cases.[2]

4.    On or before January 14, 2007, the Debtors' noticing, claims and balloting agent, AlixPartners, LLP (the "Claims Agent"), who maintains the register of proofs of claim filed in these Cases (the "Claims Registry"), gave notice of the Bar Date by mailing to all entities known or reasonably ascertainable as potential holders of a Claim (a) a notice of the Bar Date approved by the Court (the "Bar Date Notice") and (b) a proof of

---

[2]    The Bar Date Order was amended on January 19, 2007 [Docket No. 665] to fix the deadline for mailing the notice of Bar Date and attach as an exhibit the notice of Bar Date for publication purposes.

claim form substantially similar to Official Form No. 10 customized for these Cases. On March 9, 2007, the Debtors filed an Affidavit of Mailing [Docket No. 893] executed by the Claims Agent with respect to its mailing of the Bar Date materials described above.

5.    On or before February 16, 2007, the Debtors published notice of the Bar Date in the following newspapers and trade journals: <u>The Wall Street Journal</u> (National Edition), <u>The New York Times</u> (National Edition), <u>Tulsa World</u>, <u>Power</u>, <u>Power Engineering</u>, <u>Oil & Gas Journal</u>, and <u>Journal of Protective Coatings and Linings</u>. On March 2, 2007 the Debtors filed an Affidavit of Publication [Docket No. 875] executed by Poorman-Douglas with respect to the publication of the notice of Bar Date as described above.

6.    The Debtors and their professionals are in the process of conducting a review of the proofs of claim submitted in these Cases, including any supporting documentation, to determine the validity of such claims.

<u>Wind Down of the HRSG Business Segment</u>

7.    On September 29, 2006, the Debtors filed their Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress (the "Wind Down Motion") [Docket No. 12].

8.    Pursuant to orders entered on October 2, 2006[3] and October 26, 2006 (collectively, the "Wind Down Order") [Docket Nos. 64 and 195], the Court granted the

---

[3]    An order correcting the October 2, 2006 order was entered on October 5, 2006 [Docket No. 85].

Wind Down Motion in part, authorizing the Debtors to wind down operations of their heat recovery steam generation ("HRSG") business segment operated by Deltak, L.L.C. ("Deltak") and Deltak Construction Services, Inc. (collectively, the "Deltak Debtors"). Additionally, the Wind Down Order authorized the Debtors to negotiate with their HRSG customers (each, a "Customer" and, together, the "Customers") to reach accommodations (each, a "Completion Agreement" and, together, the "Completion Agreements") for the completion of certain executory contracts for the Deltak Debtors' delivery of HRSG units to their Customers (the "HRSG Contracts") in exchange for each such Customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms, including all outstanding costs owed to vendors and contract employees relating to the completion of such contracts, plus the Customer's share of any excess costs that would be incurred in the ordinary course outside of the wind-down plan, (ii) fund any contractor incentives offered to contract employees who are retained to perform on such Customer's HRSG project, and (iii) waive rejection damage claims to the extent the Debtors complete such Customer's HRSG project.

9.      To date, the Debtors have successfully negotiated ten Completion Agreements with certain of their Customers, including SNC. Since the Petition Date, the Court has entered several orders rejecting HRSG Contracts, including those covered by Completion Agreements.

### SNC HRSG Contract and Related Completion Agreement

10.     On January 26, 2006, SNC and Deltak entered into an agreement identified as SNC Purchase Order number 59000010 (the "SNC HRSG Contract")

66E237-3

pursuant to which Deltak agreed to (i) sell HRSGs, accessories and other equipment to SNC and (ii) provide certain technical and other services in connection therewith.

11.    On November 30, 2006, Deltak entered into a Completion Agreement with SNC (the "SNC Completion Agreement") for the completion of the SNC HRSG Contract. Section 2.2 of the SNC Completion Agreement provides that the maximum claim SNC may assert against any of the Debtors arising from the rejection of the SNC HRSG Contract (the "Capped Claim Amount") is capped based upon the extent to which the Debtors have achieved various performance milestones. A schedule setting forth the various performance milestones under the SNC Completion Agreement and the corresponding reductions in the Capped Claim Amount is set forth in Exhibit A, which has been separately filed under seal.[4]

12.    On December 4, 2006, the Court entered an order approving the rejection of the SNC HRSG Contract *nunc pro tunc* to September 29, 2006.

13.    Subsequently, during February-March 2007, Deltak, Deltak's non-debtor affiliate ("DPEC") and SNC were engaged in a dispute regarding the conformity of tubes in modules to be delivered to SNC.[5] In late March 2007, the parties reached a resolution of this dispute.

14.    By Order dated April 18, 2007, this Court approved a confidential interim settlement between Deltak, DPEC and SNC (the "Confidential Settlement") with respect to the dispute.

---

[4]    Pursuant to SNC Completion Agreement, the Debtors continue to be required to keep confidential all non-public information contained therein.

[5]    Additional detail regarding the Deltak-SNC dispute can be found in the Debtors' Expedited Motion to Compel SNC-Lavalin Power Ontario Inc.'s Compliance with Completion Agreement or Alternatively for Adjudication of Disputes Thereunder [Docket No. 910].

668237-3

## SNC Claim

15.    On March 26, 2007, as the parties were on the verge of resolving the dispute, SNC filed a proof of claim against Deltak in an amount in excess of $55,179,700.00 (the "SNC Claim") on account of alleged damages from alleged performance failures by Deltak. The SNC Claim has been assigned claim number 1099 in the Claims Registry for these Cases.

## Jurisdiction

16.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

17.    By this Objection, the Debtors seek (i) reduction of the amount of the SNC Claim to the applicable Capped Claim Amount in accordance with the SNC Completion Agreement and (ii) approval of procedures to further reduce the SNC Claim based upon future decreases in the Capped Claim Amount.

## Basis for Relief

18.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that the Court shall allow a claim,

> except to the extent that —
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

**C.    The SNC Claim Should be Reduced in Accordance with the Completion Agreement**

19.    The Debtors have determined that the amount of the SNC Claim exceeds the current Capped Claim Amount set forth in the SNC Completion Agreement based on the Debtors' achievement of performance milestones to date.  Section 12(i) of the SNC Claim asserts claims for the "Excess Cost to Complete" in the amount of $17,308,158.00.  Additionally, Sections 12(ii)-(v) of the SNC Claim assert various contingent claims against Deltak for liquidated damages, incidental costs, attorneys' fees and costs and "other loss or damages relating to faulty or defective goods."

20.    The terms of the SNC Completion Agreement, which are confidential, preclude SNC from asserting these additional claims.  SNC agreed to waivers of claims in excess of the Capped Claim Amount as well as other limitations on liability.[6]

21.    SNC makes a general reference to possible circumstances such as willful misconduct or intentional fraud on the part of Deltak or its affiliates which may under the Completion Agreement provide relief from its capped claim.  However, the SNC Claim lacks any specific allegation of such conduct.  Further, the Debtors believe that SNC's recent decision to forgo an opportunity under the terms of the Confidential Settlement further precludes any alleged basis for a claim besides the capped claim.

22.    Accordingly, the Debtors request that the aggregate amount of the SNC Claim be reduced to the current Capped Claim Amount and that any remaining claims outside of such claim be disallowed and expunged in their entirety.

---

[6]    The Debtors are prepared to discuss such terms in more detail before this Court under a sealed record.

658237-3

23.    Moreover, the Capped Claim Amount is likely to decrease as the Debtors achieve additional performance milestones in the future in connection with the SNC Completion Agreement.    As such, the Debtors request that the Court approve the following procedures (the "Reduction Procedures") to allow the Debtors to reduce the SNC Claim accordingly:

(i)    To the extent the Debtors determine that the current amount of the SNC Claim exceeds the Capped Claim Amount pursuant to the SNC Completion Agreement, the Debtors shall provide written notice (the "Reduction Notice") by facsimile, electronic mail or overnight mail to (a) SNC's counsel and (b) counsel to each of the Committees (collectively, the "Notice Parties") stating that the Debtors intend to reduce the amount of the SNC Claim to the Capped Claim Amount.    The Reduction Notice shall set forth the then current dollar value of the SNC Claim and the Capped Claim Amount.

(ii)    If none of the Notice Parties serves the Debtors with a written objection to the proposed payment in a manner so that it is actually received by the Debtors within seven (7) days after the date the Debtors send the Reduction Notice (the "Notice Period"), or if any such objection is received and resolved, the Debtors will be authorized to reduce the amount of the SNC Claim to the then current Capped Claim Amount without further notice or Court order.

(iii)    If the Debtors receive a written objection from any Notice Party prior to the expiration of the Notice Period, and the Debtors are unable to resolve such objection, the Debtors will not reduce the amount of the SNC Claim to the then current Capped Claim Amount without first obtaining this Court's approval.    The Debtors may schedule a hearing on such objection at the next regularly scheduled omnibus hearing upon 10 days prior notice to the Notice Parties.

662237.3

24.    The proposed resolution of the SNC Claim promotes efficiency and eliminates unnecessary administrative expenses attendant to drafting, serving, and filing additional objections, as well as time incurred by attorneys for appearing in Court hearings, all of which will only serve to impede the Debtors' reorganization efforts. The expedited nature of the Reduction Procedures set forth herein will permit the Debtors to efficiently reduce the SNC Claim in accordance with the SNC Completion Agreement, while still providing for a review of the proposed reduction by the Notice Parties.

<u>**Reservation of Rights**</u>

25.    The Debtors expressly reserve the right to amend, modify, or supplement this Objection and to file additional objections to any claims (filed or not) which may be asserted against the Debtors. Should the grounds for objection stated in this Objection be dismissed or overruled, the Debtors reserve the right to object on any other grounds that the Debtors discover during the pendency of these Cases. Further, the Debtors reserve the right to seek an estimation of the SNC Claim for any and all purposes.

26.    Notwithstanding anything contained in this Objection or the attached exhibit, nothing herein shall be construed as a waiver of any rights that the Debtors may have to (a) bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, section 547 of the Bankruptcy Code, (b) assert counterclaims, including, but not limited to, those arising under the SNC Completion Agreement, or (c) enforce the Debtors' rights of setoff or recoupment relating to such avoidance actions or counterclaims.

## Notice

27.     This Objection will be served on (i) counsel to SNC; (ii) counsel to the Committees; (iii) counsel to the DIP Lenders; (iv) the Office of the U.S. Trustee; and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

28.     Except as otherwise provided herein, no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
        August 29, 2007

                                THE BAYARD FIRM

                        By: _____
                                Jeffrey M. Schlerf (No. 3047)
                                Kathryn D. Sallie (No. 4600)
                                222 Delaware Avenue, Suite 900
                                Wilmington, Delaware 19801
                                (302) 655-5000

                                Attorneys to the Debtors and
                                Debtors in Possession

668227-3

# EXHIBIT A

# FILED UNDER SEAL

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>GLOBAL POWER EQUIPMENT GROUP<br>INC., et al.,<br><br>　　　　　　　　　　Debtors. | ) Chapter 11<br>)<br>) Case No. 06-11045 (BLS)<br>)<br>) Jointly Administered<br>)<br>) Re: Docket No. __ |

## ORDER SUSTAINING DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 1099 FILED BY SNC-LAVALIN POWER ONTARIO INC.

Upon consideration of the objection (the "Objection")[1], filed by Global Power Equipment

Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to

proof of claim number 1099 (the "SNC Claim") filed by SNC-Lavalin Power Ontario Inc.

("SNC"); and it appearing that the Court has jurisdiction over this matter; and it appearing that

notice of the Objection as set forth therein is sufficient, and that no other or further notice need

be provided; and it further appearing that the relief requested in the Objection is in the best

interests of the Debtors, their estates and their creditors; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Objection be, and hereby is, SUSTAINED; and it is further

ORDERED that the aggregate amount of the SNC Claim is hereby reduced to the

applicable Capped Claim Amount and that any remaining claims asserted pursuant to the SNC

Claim be disallowed and expunged in their entirety; and it is further

ORDERED that the following Reduction Procedures are hereby approved:

　　　　(i)　　To the extent the Debtors determine that the current amount
　　　　　　　of the SNC Claim exceeds the Capped Claim Amount
　　　　　　　pursuant to the SNC Completion Agreement, the Debtors

---

[1]　　Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Objection.

shall provide written notice (the "Reduction Notice") by facsimile, electronic mail or overnight mail to (a) SNC's counsel and (b) counsel to each of the Committees (collectively, the "Notice Parties") stating that the Debtors intend to reduce the amount of the SNC Claim to the Capped Claim Amount. The Reduction Notice shall set forth the then current dollar value of the SNC Claim and the Capped Claim Amount.

(ii)    If none of the Notice Parties serves the Debtors with a written objection to the proposed payment in a manner so that it is _actually received_ by the Debtors within seven (7) days after the date the Debtors send the Reduction Notice (the "Notice Period"), or if any such objection is received and resolved, the Debtors shall be authorized to reduce the amount of the SNC Claim to the then current Capped Claim Amount without further notice or Court order.

(iii)    If the Debtors receive a written objection from any Notice Party prior to the expiration of the Notice Period, and the Debtors are unable to resolve such objection, the Debtors will not reduce the amount of the SNC Claim to the then current Capped Claim Amount without first obtaining this Court's approval. The Debtors may schedule a hearing on such objection at the next regularly scheduled omnibus hearing upon 10 days prior notice to the Notice Parties;

and it is further

ORDERED that the Debtors' rights to raise other objections to the SNC Claim on any and all grounds permitted by law and/or equity are hereby preserved; and it is further

ORDERED that the Debtors' right to estimate the SNC Claim for any and all purposes is hereby preserved; and it is further

ORDERED that the Debtors' rights to (a) bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, section 547 of the Bankruptcy Code, (b) assert counterclaims, including, but not limited to, those arising under the SNC Completion Agreement, or (c) enforce their rights of setoff or recoupment relating to such avoidance actions or counterclaims, are hereby preserved; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: Wilmington, Delaware
           September __, 2007.

_____
UNITED STATES BANKRUPTCY JUDGE

GLOBAL POWER EQUIPMENT GROUP, INC. et al.
Case No. 06-11045 BLS Jointly Administered with Case Nos. 06-11045 through 06-11055
United States Bankruptcy Court for the District of Delaware
Claim Number:

1099

# United States Bankruptcy Court
## for the District of Delaware

# PROOF OF CLAIM

| | |
|---|---|
| Name of Debtor: **Deltak, L.L.C.** | Case Number **06-11050** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor:**
**SNC-Lavalin Power Ontario, Inc.**
*(The person or other entity to whom the debtor owes money or property)*

**Name and Address Where Notices Should be Sent:**
Patrick P. Dinardo, Esq.
Pamela Smith Holleman, Esq.
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109

Telephone number:  T 617-338-2800
　　　　　　　　　　F 617-338-2880

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if this address differs from the address on the envelope sent to you by the court.

8398

THIS SPACE IS FOR
COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:
**See attached Addendum**

Check here if this claim ☐ replaces
　　　　　　　　　　☐ amends  a previously filed claim, dated:_____

**1. BASIS FOR CLAIM**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other    **See attached Addendum**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
　　Your social security number _____
　　Unpaid compensation for services performed
　　from _____ to _____
　　　　　(date)　　　　　　(date)

**2.** DATE DEBT WAS INCURRED: **See attached Addendum**

**3. IF COURT JUDGMENT, DATE OBTAINED:**

**4. TOTAL AMOUNT OF CLAIM**
AT TIME CASE FILED:  **Up to CAD $46,662,179 including contingent, unliquidated amounts (equivalent to USD $40,313,323 based upon an exchange rate, as of March 22, 2007, of Canadian Dollars $1=U.S. Dollars .863940), less applicable Step-Down Amount (if any); see attached Addendum.**
If all or part of your claim is secured or entitled to priority, also complete Items 5 or 6 below.
☐ Check this box if claim includes pre-petition charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. SECURED CLAIM**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate　　☐ Motor Vehicle
☐ Other:_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any $_____

**6.** Unsecured Priority Claim
☐ Check this box if you have an unsecured priority claim. Amount entitled to priority $_____
Specify the priority of the claim:
☐ Domestic support obligations owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries, or commissions (up to $10,000), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4)
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5)
☐ Up to $2,225 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - specify applicable paragraph of 11 U.S.C. § 507(a  )

**7.** CREDITS: The amount of all payments on this claim has been credited and deducted for the purpose of making this claim.
**8.** SUPPORTING DOCUMENTS: Attach copies of supporting documents such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**9.** DATE-STAMPED COPY: To receive an acknowledgment of the filing of your claim, enclose a stamped self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR
COURT USE ONLY

**RECEIVED**

MAR 2 6 2007

ALIXPARTNERS, LLC

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|
| March 22, 2007 | By: _____ <br> Name: PATRICK LAMARRE <br> Title: PRESIDENT |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both, 18 U.S.C. §§ 152 and 3571.

{B0617073; 1}

## Addendum to Proof of Claim

SNC-Lavalin Power Ontario, Inc., for itself and its affiliated companies (collectively "SNC"), hereby submits proofs of claim (each individually a "Proof of Claim" and together, the "Proofs of Claim") in the Chapter 11 cases of Deltak, L.L.C. ("Deltak") and its affiliated debtor and debtor-in-possession, Global Power Equipment Group Inc. ("GPEG", and together with Deltak, the "Debtors"). In support hereof, SNC states as follows:

1.    Prior to the filing of the Debtors' voluntary Chapter 11 petitions, SNC and Deltak were parties to SNC's Purchase Order No. 59000010 dated January 26, 2006 (the "Executory Contract"), pursuant to which Deltak undertook to supply to SNC, on a fixed price basis, certain goods and services that were to form a portion of SNC's scope of supply in connection with a "turnkey" construction project for the Sithe Global Power Goreway ULC Project (Combined-Cycle Facility in the City of Brampton, Ontario, Canada) (the "Project").

2.    The Debtors rejected the HRSG Contract on or about December 4, 2006 [D.I. 458]. Contemporaneously, SNC and Deltak entered into that certain Completion Agreement amended and restated as of November 30, 2006 (the "Completion Agreement"), pursuant to which Deltak agreed to perform certain remaining performance obligations under the HRSG Contract "as and to the extent requested by [SNC]," provided that SNC financed the cost of such performance on a time and materials basis (all as more fully set forth in the Completion Agreement). Completion Agreement at § 1.2. The Completion Agreement was approved by order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered on or about December 4, 2006 [D.I. 457]. SNC understands that the Debtors have filed a copy of the Completion Agreement with the Court under seal.

3.    The Completion Agreement, § 2.1, contemplates that SNC's rejection damages claim against the Debtors in respect of the Executory Contract shall be capped (the "Capped Rejection Damage Claim") in an amount equal to the Executory Contract Price, based in Canadian Dollars ("CAD"), or CAD $46,662,179 (the "Maximum Rejection Damage Claim"), less a "Step Down Amount", determined in accordance with a table of values (set forth in § 2.2 thereof). The table provides that after Bankruptcy Court approval of the Completion Agreement (i.e., the only such milestone passed to date), the Step Down Amount shall be 25% of the Maximum Rejection Damages Claim, for a Capped Rejection Damages Claim of CAD $34,996,634, though SNC is relieved of the cap in the event of certain circumstances, including willful misconduct and/or intentional fraud on the part of Deltak or its affiliates.

4.    Deltak and its affiliate, Deltak Power Equipment (China) Co. Ltd. ("DPEC"), are parties to Deltak's Purchase Order No. 24-E1641 dated March 6, 2006 through Revision C, pursuant to which DPEC agreed to supply to Deltak, and Deltak agreed to purchase from DPEC, for the benefit of Deltak's customer, SNC, certain HRSG modules as described in such Purchase Order (the "Modules"). The Modules are to be provided by DPEC to Deltak's customer, SNC, for ultimate installation and use in the Project.

5.     Pursuant to Deltak's Purchase Order for the Modules, DPEC's warranty on the Modules, which runs both to Deltak and to SNC as beneficiary and successor-in-interest, is as follows:

> Seller warrants that the goods shall be free from defects in design, material, workmanship, and title, and shall be of the best quality, if no quality is specified. All warranties survive delivery to and reception by the Buyer. Seller's liability hereunder shall extend to all damages proximately caused by the breach of any of the foregoing warranties or guaranties.

6.     DPEC and Jiangxi Hongdu Steel Tube Co., Ltd. ("Hongdu") are parties to a certain Purchase Contract No. G06003-C-001, dated March 27, 2006, pursuant to which Hongdu agreed to supply to DPEC, and DPEC agreed to purchase from Hongdu, certain carbon steel tubes, more fully described in such Purchase Contract (the "Tubes"). The Tubes have been incorporated by DPEC into the assembled Modules.

7.     After SNC and Deltak entered into the Completion Agreement and the Court approved it in December 2006, DPEC apparently discovered leaks in two Tubes in the Modules that were to be delivered for use in the Project, and apparently learned of two others in January 2007, though neither DPEC nor Deltak disclosed any Tube leaks to SNC until on or about January 22, 2007. Investigations concerning the leaks are ongoing.

8.     SNC has made payments to Deltak, DPEC and other suppliers, for all goods and services for the Project in amounts totaling CAD $20,835,118 prepetition, and an additional CAD $8,400,000 in postpetition payments as of February 23, 2007. Pursuant to the Completion Agreement, SNC remitted into escrow an additional payment for the Modules in the amount of USD $5,598,940, which represented the sum of amounts billed by DPEC on two invoices for disputed progress billings in amounts of USD $2,600,000 and $2,489,945 plus a disputed ten percent (10%) mark-up claimed by Deltak. The Completion Agreement, § 1.3.2, contemplates that all payments made by SNC thereunder are to be remitted to an escrow account maintained by Wells Fargo Bank, N.A., a third party escrow agent (the "Escrow Account").

9.     SNC disputed these Module invoices, inasmuch as SNC denied that it had an obligation to pay for the Modules before final inspection at the Project site to assure that the Modules are of satisfactory quality, and further denied that it had an obligation to pay a ten percent mark-up to Deltak thereon. Nonetheless, in compliance with § 1.3.5 of the Completion Agreement, SNC funded the Escrow Account in full, reserving all rights under §§ 1.3.2 and 1.3.8 of the Completion Agreement, including its right to withhold its approval of any written instruction by Deltak to Wells Fargo Bank, N.A., as escrow agent, to disburse any disputed amounts to Deltak and/or DPEC for the Modules.

10.     The parties have tentatively agreed to a resolution of the disputed Module invoices whereby an additional USD $2.6 million was released to DPEC from the Escrow Account on March 22, 2007, and another USD $2,682,811 is planned to be released upon shipment of the Modules. Deltak has waived its claim to the disputed ten percent mark-up.

11.     SNC's Project has been delayed by reason of Deltak's bankruptcy and the negotiation of the Completion Agreement, and subsequent events. Moreover, in the event that SNC must reject the Modules, such that SNC is required to procure substitute goods for the Project, SNC may suffer additional delays in delivery of the Project, for which SNC may incur further liability to its customer for liquidated damages for failure to satisfy performance guarantees, for warranty charges, or other damages or liabilities.

12.     Accordingly, SNC asserts a claim under the Executory Contract and/or the Completion Agreement, as applicable, for: (i) all excess costs to complete Deltak's scope of supply in connection with the Project, including amounts paid to the Debtors or their suppliers on account of the Modules and other goods or services; (ii) contingent liability of SNC to the Project owner for liquidated damages for delays in delivery and/or failure of performance attributable to goods and services provided by the Debtors or their suppliers; (iii) contingent liability for incidental costs associated with Modules (*e.g.*, scheduling, mobilization/remobilization, and double handling); (iv) contingent liability for attorneys' fees and costs pursuant to "Exhibit A (Terms and Conditions of Purchase)" attached to the Executory Contract; and (v) contingent liability to SNC for other loss or damages arising from or related to faulty or defective goods or services provided by the Debtors or their suppliers. In summary, SNC asserts claims against the Debtors, subject to reduction in accordance with §§ 2.1 and 2.2 of the Completion Agreement (as applicable), as follows:

**Amounts Paid to Deltak:**

| | | |
|---|---|---:|
| *Prepetition:* | | CAD $20,835,118 |
| *Postpetition payments and Committed Costs:* | | 34,411,042 |

**Forecast Cost to Complete:**
(approximate figures in Canadian Dollars)

| | | |
|---|---|---:|
| | Freight (excluding shipping costs for Modules): | 5,000,000 |
| | Purchase orders to be issued by SNC to complete Deltak's scope of supply: | 500,000 |
| | Deltak overhead/indirect costs (including shop fabrications): | 2,000,000 |
| | SNC overhead/indirect costs: | 1,000,000 |
| | Start-up costs: | 250,000 |
| | Warranty accrual: | 600,000 |
| | Rework accrual: | 600,000 |
| | Settlement of prepetition claims: | <u>1,500,000</u> |

Projected actual cost to
complete without contingencies:                                        CAD $66,696,160

*Less Executory Contract Price:*                                       ($46,662,179)

(i) **Excess Cost to Complete:**                                       CAD $20,033,981

          *@ exchange rate as of March 22,*  USD $17,308,158
          *2007 (CAD $1=USD 0.863940):*

*Plus contingent claims:*

          (ii) Liquidated damages for delays
          in delivery/failure of performance:

          *CAD $13,998,653 (estimated,*
          *based on projected 120 day delay)*

          (iii) Incidental costs associated
          with DPEC Modules (scheduling,
          mobilization/remobilization,
          double handling) (estimated):

          *CAD 400,000 (estimated)*

          (iv) Attorneys' fees and costs
          (estimated):

          *CAD 500,000 (estimated)*

          **Subtotal,** estimated contingent
          claims calculated in CAD:

          *CAD $14,898,653 (estimated)*

          *@ exchange rate as of March 22,*  USD $12,871,542
          *2007 (CAD $1=USD 0.863940):*   *(estimated)*

          (v) Plus contingent liability to
          SNC for other loss or damages
          relating to faulty or defective
          goods supplied by Deltak or its
          suppliers (including amounts to   USD $25,000,000
          remanufacture and re-tube     *(estimated)*
          Modules, if necessary):

| **Grand total** | **(subject to Step-Down Amount, as applicable)** | **USD $55,179,700** *(including estimated contingent and unliquidated claims) (at least)* |
|---|---|---|
| | (As compared with Maximum Rejection Damages Claim of CAD $46,662,179 (equivalent to USD $40,313,323 @ exchange rate, as of March 22, 2007, of CAD $1 = USD $ .863940) | |

13.     Pursuant to the Executory Contract and "Exhibit T" attached thereto, presumably with GPEG's knowledge and consent, Deltak undertook to provide SNC with a parent company guaranty of all of Deltak's obligations in connection with the Project in order to induce SNC to enter into the Executory Contract. GPEG failed to disclose Deltak's financial condition to SNC at the time SNC entered into the Executory Contract, and then failed to provide the parent guaranty as agreed. Accordingly, SNC asserts the within claim against GPEG, as well as Deltak, with the proviso that, in so doing, SNC seeks but a single recovery from the combined Debtors.

14.     SNC reserves all rights it may have, in law and equity, including but not limited to –

- to amend its Proofs of Claim as necessary with the passage of time to reflect exchange rate gains in converting claims calculated in CAD to USD, additional sums to be owed or any applicable credits or duplicated information;
- to assert additional claims against the Debtors, including, but not limited to, administrative expense claims, rights of set-off, and other claims or rights;
- to challenge the applicability of the step-down schedule set forth in § 2.2 of the Completion Agreement, based upon a showing that Deltak committed willful misconduct, including, e.g. by its statements or omissions at the time of entering into the Executory Contract, the Completion Agreement or thereafter and/or by conducting itself as an alter ego or mere instrumentality of GPEG, or otherwise; and
- against DPEC, Hongdu or other third parties concerning the transactions and occurrences that gave rise to the instant claim.



Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T 617 338 2800
F 617 338 2880
www.sandw.com

March 24, 2007

*By overnight delivery*

Global Power Equipment Group Inc.
c/o AlixPartners, LLP
2100 McKinney Avenue
Suite 800
Dallas, TX 75201

RE:   Deltak, L.L.C., Chapter 11 Case No. 06-11050

Dear Sir or Madam:

Enclosed please find an original and one copy of a Proof of Claim submitted on behalf of SNC-Lavalin Power Ontario, Inc. for filing in the Chapter 11 case of Deltak, L.L.C.[2] Please date-stamp the copy and return it to the undersigned in the envelope provided.

Thank you for your cooperation and assistance in this matter.

Very truly yours,

Patrick P. Dinardo, Esq.
Tel. 617-338-2817
Fax 617-338-2880
pdinardo@sandw.com

enclosures

cc:   Pamela Smith Holleman, Esq.

---

[2] Please note that SNC-Lavalin Power Ontario, Inc. is filing a proof of claim in each of the jointly administered Chapter 11 cases of Global Power Equipment Group Inc., Case No. 06-11045, and Deltak, L.L.C., Case No. 06-11050.

**TAB 4 – EXHIBIT D**

ORIGINAL

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GLOBAL POWER EQUIPMENT GROUP | ) | Case No. 06-11045 (BLS) |
| INC., et al., | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Objection Deadline: September 21, 2007 at 4:00 p.m. |
|  | ) | Hearing Date: September 28, 2007 at 10:00 a.m. |
|  | ) |  |

## NOTICE OF OBJECTION

**TO:**  SNC-Lavalin Power Ontario Inc., the Office of the United States Trustee, counsel to the DIP Lender, counsel to the Official Committee of Unsecured Creditors, counsel to the Official Committee of Equity Security Holders, and all parties who filed a notice of appearance pursuant to Bankruptcy Rule 2002

Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession have filed the attached **Debtors' Objection to Proof of Claim No. 1100 Filed by SNC-Lavalin Power Ontario Inc.** (the "Objection").

Responses or objections to the Objection, if any, are to be filed on or before **September 21, 2007 at 4:00 p.m.** At the same time, you must serve a copy of the objection or response on the undersigned attorneys.

If any responses are timely filed in accordance with this Notice, a hearing on the Objection will be held on **September 28, 2007 at 10:00 a.m.**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: August 29, 2007

THE BAYARD FIRM

By: _____

Jeffrey M. Schlerf (No. 3047)
Mary E. Augustine (No. 4477)
Kathryn D. Sallie (No. 4600)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

Attorneys to the Debtors and
Debtors in Possession    DATE  8/29/07

DOCKET #  1579

668759-1

SA 42

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | )    Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP | )    Case No. 06-11045 (BLS) |
| INC., et al., | ) |
| | )    Jointly Administered |
| Debtors. | ) |
| | )    Objection deadline: September 21, 2007 at 4:00 p.m. |
| | )    Hearing date: September 28, 2007 at 10:00 a.m. |

### DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 1100
### FILED BY SNC-LAVALIN POWER ONTARIO INC.

Global Power Equipment Group Inc. ("Global Power") and its affiliated debtors and debtors in possession (collectively, the "Debtors"),[1] pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bar Date Order (as defined below), file this objection (the "Objection") to proof of claim number 1100 filed by SNC-Lavalin Power Ontario Inc. ("SNC"), and in support of this Objection, respectfully represent as follows:

### Background

1.      On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Debtors'

---

[1]      In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP.

668398-3

chapter 11 cases (the "Cases") have been consolidated for procedural purposes only and are being jointly administered.

2.    On October 10, 2006, the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in these Cases.    On November 9, 2006, the U.S. Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee," and together with the Creditors' Committee, the "Committees").    No trustee or examiner has been requested or appointed in any of the Debtors' Cases.

3.    On January 10, 2007, the Court entered an Order Pursuant to Bankruptcy Rule 3003(c) (i) Establishing a Bar Date for Filing Certain Proofs of Claim; (ii) Establishing Ramifications for Failure to Comply Therewith; (iii) Approving Proof of Claim Form and Notice of Bar Date; and (iv) Approving Notice and Publication Procedures (the "Bar Date Order") [Docket No. 636].    The Bar Date Order fixed March 26, 2007 (the "Bar Date") as the last date for all persons or entities (each, a "Claimant"), with certain limited exceptions, holding a Claim (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors to file proofs of claim in these Cases.[2]

4.    On or before January 14, 2007, the Debtors' noticing, claims and balloting agent, AlixPartners, LLP (the "Claims Agent"), who maintains the register of proofs of claim filed in these Cases (the "Claims Registry"), gave notice of the Bar Date by mailing to all entities known or reasonably ascertainable as potential holders of a Claim (a) a notice of the Bar Date approved by the Court (the "Bar Date Notice") and (b) a proof of

---

[2]    The Bar Date Order was amended on January 19, 2007 [Docket No. 665] to fix the deadline for mailing the notice of Bar Date and attach as an exhibit the notice of Bar Date for publication purposes.

claim form substantially similar to Official Form No. 10 customized for these Cases. On March 9, 2007, the Debtors filed an Affidavit of Mailing [Docket No. 893] executed by the Claims Agent with respect to its mailing of the Bar Date materials described above.

5.     On or before February 16, 2007, the Debtors published notice of the Bar Date in the following newspapers and trade journals: The Wall Street Journal (National Edition), The New York Times (National Edition), Tulsa World, Power, Power Engineering, Oil & Gas Journal, and Journal of Protective Coatings and Linings. On March 2, 2007 the Debtors filed an Affidavit of Publication [Docket No. 875] executed by Poorman-Douglas with respect to the publication of the notice of Bar Date as described above.

6.     The Debtors and their professionals are in the process of conducting a review of the proofs of claim submitted in these Cases, including any supporting documentation, to determine the validity of such claims.

### Deltak - SNC Relationship

7.     On January 26, 2006, SNC and the debtor Deltak, L.L.C. ("Deltak") entered into an agreement identified as SNC Purchase Order number 59000010 (the "SNC HRSG Contract") pursuant to which Deltak agreed to (i) sell HRSGs, accessories and other equipment to SNC and (ii) provide certain technical and other services in connection therewith. Global Power, which is Deltak's corporate parent, was not a party to the SNC HRSG Contract.

8.     On November 30, 2006, Deltak entered into a Completion Agreement with SNC (the "SNC Completion Agreement") for the completion of the SNC HRSG Contract. As described below, while the SNC Completion Agreement is between SNC

and Deltak, the capped claim therein has implications for both Deltak and its affiliated Debtors.[3]

### SNC Claims

9.      On March 26, 2007, SNC filed a proof of claim against Global Power Equipment Group, Inc. ("Global Power") in an amount in excess of $55,179,700.00 (the "SNC – GPEG Claim"). On the same date, SNC filed an identical claim against Deltak in the same amount. SNC does note in its claims that it seeks only a single recovery.

10.     In the SNC – GPEG Claim, SNC contends that (i) Deltak undertook to provide SNC with a parent company guaranty claim in connection with the SNC HRSG Contract "presumably with GPEG's knowledge and consent," but such guaranty was not provided, and (ii) Global Power "failed to disclose Deltak's financial condition to SNC."

11.     The SNC Claim has been assigned claim number 1100 in the Debtors' Claims Registry for these Cases.

### Jurisdiction

12.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

13.     By this Objection, the Debtors seek to disallow and expunge the SNC - GPEG Claim in its entirety.

---

[3]      Additional details regarding the Court-approved winddown of Detlak's business can be found in the Debtors' Objection to Proof of Claim No. 1099 Filed by SNC-Lavalin Power Ontario Inc.

## Basis for Relief

14.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that the Court shall allow a claim,

except to the extent that —

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

### A.    No Substantiation

15.    The SNC – GPEG Claim does not provide any facts in support of a claim against Global Power.  SNC asserts that Deltak "undertook" to provide SNC with a parent company guaranty in connection with the SNC HRSG Contract "presumably with GPEG's knowledge and consent."  SNC does not attach any documentation to support its bare allegation.  The Debtors dispute that Global Power in any way guaranteed the SNC HRSG Contract, or even promised that it would.  Moreover, SNC provides no factual or legal support for the proposition that Global Power had a duty to SNC to disclose Deltak's financial condition, let alone support for what disclosures Global Power did or did not make.  For these reasons, the SNC – GPEG Claim is unenforceable and should be disallowed and expunged pursuant to section 502(b)(1) of the Bankruptcy Code and Bankruptcy Rule 3001(c).

16.    The lack of substantiation means the SNC - GPEG Claim is not entitled to the status of a prima facie claim.  Bankruptcy Rule 3001(c) provides, in pertinent part, that "[w]hen a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim."  Fed. R.

Bankr. P. 3001(c).   The purpose of this rule "is to allow a creditor who attaches documents to his proof of claim to then refrain from presenting any other evidence because the documents establish sufficient evidence to sustain the claim." In re Consol. Pioneer Mortgage, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995) (citing In re Stoecker, 143 B.R. 879, 883 (N.D. Ill. 1992)).   If the claimant does so, the claim is deemed prima facie valid under Bankruptcy Rule 3001(f) as a claim "executed and filed in accordance with [the Bankruptcy] rules." In re All-Am. Auxiliary Assn., 95 B.R. 540, 545 (Bankr. S.D. Ohio 1989) ("a claimant must attach all necessary supporting documents to obtain prima facie validity under Rule 3001(f)"); see also Consol. Pioneer, 178 B.R. at 227 (where claim was based on rejection of purported sales contract, failure to attach contract to proof of claim constituted failure to comply with Rule 3001(c)).   Notwithstanding this presumption of validity, proofs of claim are "to be scrutinized with an eye to credibility . . . ." In re Summa T Corp., Int'l, 73 B.R. 388, 394 (Bankr. E.D. Ark. 1987).

17.   To satisfy a claimant's initial burden of going forward, the claim must allege facts sufficient to establish a legal liability and to factually support the claim in order to attain the status of prima facie validity. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992); In re Planet Hollywood Int'l, 274 B.R. 391, 394 (Bankr. D. Del. 2001) ("claimant must allege facts sufficient to support a legal basis for the claim"). However, courts have denied prima facie validity to proofs of claim in many instances where a claimant failed to attach the documents upon which the claim was based. See, e.g., In re Tran, 351 B.R. 440 (Bankr. S.D. Tex. 2006) (claimant's failure to attach the relevant written contract precluded the proofs claims from having prima facie evidentiary effect under Rule 3001(f)); In re Express One Int'l, Inc., 229 B.R. 129, 138 (Bankr. E.D.

Tex. 1999) (where claim for wrongful termination and attorneys fees did not itemize amounts sought, and only attached a copy of the complaint which failed to establish each element required for wrongful termination, such claim failed for lack of proof and was disallowed in its entirety); <u>In re Lindell Drop Forge Co.</u>, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990) (claim filed on behalf of multiple employees for vacation pay, employee insurance, unpaid medical bills, and other payments, failed to establish calculation of various amounts, and failed to attach writings, such as collective bargaining agreement, list of employees, documentation of relevant time periods or other documentation, did not comply with Rule 3001(c), and, thus, was not entitled to be considered as prima facie evidence); <u>All-Am. Auxiliary</u>, 95 B.R. at 545 (where claimant filed proof of claim for salary, expenses and accounts receivable, and claim was supported only by lists prepared by claimant, without receipts or other evidence, such as employment contracts or corporate actions, such a claim did not comply with Rule 3001(c) or (f) and, thus, was not entitled to prima facie validity); <u>In re Marino</u>, 90 B.R. 25, 28 (Bankr. D. Conn. 1988) (where damages from default of a lease were to be determined based on schedules attached to lease, claimant's failure to provide those schedules constituted failure to set forth necessary facts, and thus claim was not entitled to presumption of prima facie validity); <u>In re Bagson Corp.</u>, 58 B.R. 395, 396 (Bankr. E.D. Pa. 1986) (where claim was based on loan made to debtor, but no documentation supported claimant's assertion, evidence supporting the claim was "substantially deficient").

661398-3

18.    Since the SNC has failed to establish any facts to support the SNC –
GPEG Claim, or provide any legal theory with supporting facts, the SNC – GPEG Claim
is not valid.  Therefore, the claim must be disallowed in its entirety.

**B.**    <u>No Liability</u>

19.    In examining SNC's bare allegations, there is no basis for any liability.
SNC asserts that <u>Deltak</u> "undertook" to provide SNC with a parent company guaranty in
connection with the SNC HRSG Contract, but then <u>Global Power</u> failed to do so.  By
SNC's own admission, Global Power did not in fact guaranty the SNC HRSG Contract.
Therefore, there is no legal basis for making Global Power obligated for a "guaranty."

20.    SNC's only other sketchy allegation is Global Power's failure to make a
disclosure.  Since by SNC's own admission there is not a parent guaranty, Global Power
is at a loss to comprehend how it owed any duties to SNC, including disclosure.

21.    Finally, a fundamental barrier to SNC asserting a claim against Global
Power is the Completion Agreement.  The terms of that agreement specifically release all
claims against the "Debtors" in excess of the capped claim against Deltak arising from
rejection of the SNC HRSG Contract.  This serves as a contractual bar to this alternative
attempt by SNC at recovery.

<u>Reservation of Rights</u>

22.    The Debtors expressly reserve the right to amend, modify, or supplement
this Objection and to file additional objections to any Claims (filed or not) which may be
asserted against the Debtors.  Should the grounds for objection stated in this Objection be
dismissed or overruled, the Debtors reserve the right to object on any other grounds that

the Debtors discover during the pendency of these Cases. Further, the Debtors reserve the right to seek an estimation of the SNC – GPEG Claim for any and all purposes.

23.    Notwithstanding anything contained in this Objection or the attached exhibit, nothing herein shall be construed as a waiver of any rights that the Debtors may have to (a) bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, section 547 of the Bankruptcy Code, (b) assert counterclaims, or (c) enforce the Debtors' rights of setoff or recoupment relating to such avoidance actions or counterclaims.

**Notice**

24.    This Objection will be served on (i) counsel to SNC; (ii) counsel to the Committees; (iii) counsel to the DIP Lenders; (iv) the Office of the U.S. Trustee; and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

25.    Except as otherwise provided herein, no previous request for the relief sought herein has been made to this or any other Court.

66839L-3

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the

relief requested herein and (ii) granting the Debtors such other and further relief as the

Court deems just and proper.

Dated: Wilmington, Delaware
      August 29, 2007

THE BAYARD FIRM

By: _____
    Jeffrey M. Schlerf (No. 3047)
    Kathryn D. Sallie (No. 4600)
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware 19801
    (302) 655-5000

    Attorneys to the Debtors and
    Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) Case No. 06-11045 (BLS) |
|  | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) Re: Docket No. __ |

ORDER SUSTAINING DEBTORS' OBJECTION TO PROOF OF
CLAIM NO. 1100 FILED BY SNC-LAVALIN POWER ONTARIO INC.

Upon consideration of the objection (the "Objection")[1], filed by Global Power Equipment

Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to

proof of claim number 1100 (the "SNC - GPEG Claim") filed by SNC-Lavalin Power Ontario

Inc. ("SNC"); and it appearing that the Court has jurisdiction over this matter; and it appearing

that notice of the Objection as set forth therein is sufficient, and that no other or further notice

need be provided; and it further appearing that the relief requested in the Objection is in the best

interests of the Debtors, their estates and their creditors; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Objection be, and hereby is, SUSTAINED; and it is further

ORDERED that the SNC – GPEG Claim be disallowd and expunged in its entirety; and it

is further

ORDERED that the Debtors' rights to raise other objections to or estimate any claims of

SNC on any and all grounds permitted by law and/or equity are hereby preserved; and it is

further

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Objection.

668398-3

SA 53

ORDERED that the Debtors' rights to (a) bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, section 547 of the Bankruptcy Code, (b) assert counterclaims, or (c) enforce their rights of setoff or recoupment relating to such avoidance actions or counterclaims, are hereby preserved; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: Wilmington, Delaware
       September __, 2007

_____
UNITED STATES BANKRUPTCY JUDGE

# TAB 5 – EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| | Jointly Administered |
| Debtors. | Ref Nos. 1579, 1581, 1703 |

### JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE DEBTORS' OBJECTIONS TO SNC CLAIMS

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Global Power Equipment Group Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submits this Joinder of the Official Committee of Unsecured Creditors in the Debtors' Objections to SNC Claims (the "Joinder"). In support of the Joinder, the Creditors' Committee states as follows:

### BACKGROUND

1. On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.* (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

3. On October 10, 2006, the office of the United States Trustee appointed the Creditors' Committee. On November 9, 2006, the office of the United States Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee").

4. On January 26, 2006, SNC and Deltak L.L.C. ("Deltak") entered into an agreement entitled SNC Purchase Order number 59000010 (the "SNC HRSG Contract")

DATE 9·27·07

DOCKET # 1732

pursuant to which Deltak agreed to sell HRSG and related equipment to SNC-Lavin Power Ontario, Inc. ("SNC") and provide related technical and other services.

5.    On November 30, 2006, Deltak entered into a completion agreement with SNC (the "SNC Completion Agreement") related to the completion of the SNC HRSG Contract. The SNC Completion Agreement provides the maximum claim SNC can assert for the rejection of the SNC HRSG Contract, which is reduced upon the completion of certain milestones by the Debtors.

6.    On December 4, 2006, the Court approved the rejection of the SNC HRSG Contract *nunc pro tunc* to September 29, 2006.

7.    On April 18, 2007, the Court entered an order approving a confidential interim settlement agreement between Deltak, SNC and Deltak Power Equipment (China) Co. Limited ("DPEC"), regarding disputes related to disputes between DPEC and SNC.

8.    On March 26, 2007, SNC filed proof of claim number 1099 against Deltak in an amount in excess of $55,179,700.00 (the "SNC Deltak Claim") on account of alleged damages from the breach of the SNC HRSG Contract.

9.    On March 26, 2007, SNC filed proof of claim number 1100 against Global Power Equipment Group, Inc. ("Global Power") in an amount in excess of $55,179,700.00 (the "SNC GPEG Claim," together with the SNC Deltak Claim, the "SNC Claims"), which based on an alleged guaranty.

10.    On August 29, 2007, the Debtors filed the Debtors' Objection to Proof of Claim No. 1100 by SNC-Lavin Power Ontario, Inc. (the "SNC GPEG Objection"). Pursuant to the SNC GPEG Objection, the Debtors seek to expunge the SNC GPEG Claim on the grounds that there was no guaranty by GPEG on the SNC HRSG Contract.

11.    On August 29, 2007, the Debtors also filed the Debtors' Objection to Proof of Claim No. 1099 filed by SNC-Lavalin Power Ontario Inc. (the "SNC Objection," together with the SNC GPEC Objection, the "SNC Objections"). Pursuant to the SNC Objection, the Debtors seek to reduce the SNC Claim pursuant to the SNC Completion Agreement and establish procedures for further reduction.

12.    On September 21, 2007, SNC filed the Reply to Debtors' Objections to Proof of Claim Nos. 1099 and 1100 Filed by SNC-Lavalin Power Ontario, Inc. (the "SNC Response," together with the SNC Objections, the "SNC Litigation"). In the SNC Response, SNC alleges that it is not bound by the terms of the SNC Completion Agreement.

13.    On September 21, 2007, SNC served discovery related to the SNC Litigation.

**JOINDER**

14.    The Creditors' Committee hereby joins in and states it support for the SNC Objections. The Creditors' Committee incorporates by reference as if fully set forth herein the SNC Objections and fully supports the arguments made by the Debtors therein.

15.    The Creditors' Committee reserves the right to supplement the SNC Objections with any further or additional arguments it may have with respect to the SNC Claims.

WHEREFORE, the Creditors' Committee requests that the Court enter an order (i) sustaining the SNC Objections; and (ii) granting such other and further relief that is just and proper.

Dated:  September 27, 2007

LANDIS RATH & COBB LLP

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4500

- and -

Jeffrey S. Sabin
David M. Hillman
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

Attorneys for the Official Committee
of Unsecured Creditors

**TAB 6 – EXHIBIT F**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GLOBAL POWER EQUIPMENT GROUP, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 06-11045 (BLS)<br><br>Jointly Administered<br><br>Related to Docket Nos. 1579, 1581 and 1703 |

### JOINDER OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN THE DEBTORS' OBJECTIONS TO SNC CLAIMS

The Official Committee of Equity Security Holders (the "Equity Committee") of Global Power Equipment Group Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submits this Joinder of the Official Committee of Equity Security Holders in the Debtors' Objections to SNC Claims (the "Joinder"). In support of the Joinder, the Equity Committee states as follows:

### BACKGROUND

1.    On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.* (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.    The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

3.    On October 10, 2006, the office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). On November 9, 2006, the office of the United States Trustee appointed the Equity Committee.

552329.1 10/3/07

DATE 10-3-07
DOCKET # 1774

4.    On January 26, 2006, SNC and Deltak L.L.C. ("Deltak") entered into an agreement entitled SNC Purchase Order number 59000010 (the "SNC HRSG Contract") pursuant to which Deltak agreed to sell HRSG and related equipment to SNC-Lavalin Power Ontario, Inc. ("SNC") and provide related technical and other services.

5.    On November 30, 2006, Deltak entered into a completion agreement with SNC (the "SNC Completion Agreement") related to the completion of the SNC HRSG Contract. The SNC Completion Agreement provides the maximum claim SNC can assert for the rejection of the SNC HRSG Contract, which claim is reduced upon the completion of certain milestones by the Debtors.

6.    On December 4, 2006, the Court approved the rejection of the SNC HRSG Contract *nunc pro tunc* to September 29, 2006.

7.    On April 18, 2007, the Court entered an order approving a confidential interim settlement agreement between Deltak, SNC and Deltak Power Equipment (China) Co. Limited ("DPEC"), related to disputes between DPEC and SNC.

8.    On March 26, 2007, SNC filed proof of claim number 1099 against Deltak in an amount in excess of $55,179,700.00 (the "SNC Deltak Claim") on account of alleged damages from the breach of the SNC HRSG Contract.

9.    On March 26, 2007, SNC filed proof of claim number 1100 against Global Power Equipment Group, Inc. ("Global Power") in an amount in excess of $55,179,700.00 (the "SNC GPEG Claim," together with the SNC Deltak Claim, the "SNC Claims"), which claim is based on the existence of an alleged guaranty.

10.    On August 29, 2007, the Debtors filed the Debtors' Objection to Proof of Claim No. 1100 by SNC-Lavalin Power Ontario, Inc. (the "SNC GPEG Objection"). Pursuant to

the SNC GPEG Objection, the Debtors seek to expunge the SNC GPEG Claim on the grounds that there was no guaranty by GPEG on the SNC HRSG Contract.

11.    On August 29, 2007, the Debtors also filed the Debtors' Objection to Proof of Claim No. 1099 filed by SNC-Lavalin Power Ontario Inc. (the "SNC Objection," together with the SNC GPEG Objection, the "SNC Objections").    Pursuant to the SNC Objection, the Debtors seek to reduce the SNC Claim pursuant to the SNC Completion Agreement and establish procedures for further reduction.

12.    On September 21, 2007, SNC filed the Reply to Debtors' Objections to Proof of Claim Nos. 1099 and 1100 Filed by SNC-Lavalin Power Ontario, Inc. (the "SNC Response," together with the SNC Objections, the "SNC Litigation").    In the SNC Response, SNC alleges that it is not bound by the terms of the SNC Completion Agreement.

13.    On September 21, 2007, SNC served discovery related to the SNC Litigation.

## JOINDER

14.    The Equity Committee hereby joins in and states it support for the SNC Objections.  The Equity Committee incorporates by reference as if fully set forth herein the SNC Objections and fully supports the arguments made by the Debtors therein.

15.    The Equity Committee reserves the right to supplement the SNC Objections with any further or additional arguments it may have with respect to the SNC Claims.

WHEREFORE, the Equity Committee requests that the Court enter an order (i) sustaining the SNC Objections; and (ii) granting such other and further relief that is just and proper.

Dated:  October 3, 2007

SAUL EWING LLP

By: _____

Mark Minuti (No. 2659)
Jeremy W. Ryan (No. 4057)
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801
(302) 421-6840 (telephone)
(302) 421-6813 (fax)

-and-

BROWN RUDNICK BERLACK ISRAELS LLP
Howard L. Siegel
City Place I
185 Asylum Street
Hartford, CT  06103
(860) 509-6500 (telephone)
(860) 509-6501 (fax)

-and-

BROWN RUDNICK BERLACK ISRAELS LLP
Steven D. Pohl
John C. Elstad
One Financial Center
Boston, MA  02111
(617) 856-8200 (telephone)
(617) 856-8201 (fax)

*CO-COUNSEL FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS*

-4-

SA 62

**TAB 7 – EXHIBIT G**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| GLOBAL POWER EQUIPMENT GROUP | ) Case No. 06-11045 (BLS) |
| INC., *et al.*, | ) Jointly Administered |
|  | ) |
| Debtors. | ) Related Docket Items: 1579, 1581, 1703, and 1822 |

## SURREPLY OF SNC-LAVALIN POWER ONTARIO, INC. TO THE ESTATE REPRESENTATIVES' REPLY TO SNC'S OPPOSITION TO OBJECTIONS TO CLAIM NOS. 1099 AND 1100

SNC-Lavalin Power Ontario, Inc., for itself, its subsidiaries and affiliates (collectively, "SNC"), by its undersigned attorneys, hereby files its surreply to the Estate Representatives' Reply to SNC's Opposition to Objections to Claim Nos. 1099 and 1100 as filed by Deltak, L.L.C. ("Deltak") and its affiliated debtor and debtor-in-possession, Global Power Equipment Group Inc. ("GPEG", and collectively with Deltak and their affiliated debtors and debtors-in-possession, the "Debtors"), and the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders (the "Committees", and together with the Debtors, the "Estate Representatives").

### PRELIMINARY STATEMENT

On September 21, 2007 SNC filed its Reply to Debtors' Objections to Proof of Claim Nos. 1099 and 1100 Filed by SNC-Lavalin Power Ontario, Inc. (the "SNC Opposition" to the "Debtors' Objections"), stating that the Debtors' requests to disallow and expunge Claim No. 1100 (filed against GPEG), to reduce Claim No. 1099 (filed against Deltak) immediately from the as-filed amount of at least USD $55,179,700 to CAD $34,996,635 (together the "Proofs of Claim"), and to approve procedures to implement further reductions of that claim, are

- 1 -

DATE 10-16-07

DOCKET # 1825

completely ill-founded and presumptive.[1]  SNC hereby restates and incorporates by reference the substance and content of the SNC Opposition as if fully set forth herein.

In their Reply to SNC's Opposition to the Debtors' claims objections, the Estate Representatives suggest that SNC's claims constitute a "last ditch" effort to invoke what they call an "escape clause" – the exception to the cap and step down of SNC's claims based on Debtors' "willful misconduct and/or intentional fraud."  They actually assert that "SNC's pleadings are completely devoid of any facts specifying the details of such claims."  See Estate Representatives' Reply at 13-14.  Desperate to evade SNC's claims and stifle *any* inquiry into the serious charges of willful misconduct already raised by SNC, the Estate Representatives "meet" SNC's charges with the ritual incantation that the charges are "vague" and "unsubstantiated"; and that SNC has "failed to allege claims with any particularity."  See Reply at 14-17.  The Estate Representatives' suggestions that these allegations are not sufficiently "particularized", or that SNC seeks "extraneous" discovery are, quite simply, frivolous.

Can the Estate Representatives seriously contend that further "particularization" is needed to warrant discovery in light of the following facts, now clearly set forth in the record?

1.    During October and November 2006, SNC, Deltak and Creditors' Committee counsel were in the midst of intense, non-stop negotiations in connection with a possible Completion Agreement.  In that negotiation, SNC had to balance its need for the custom-made HRSG equipment Deltak and its affiliates had contracted to supply, against the quite onerous form of Completion Agreement tendered by the Debtors.

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in the SNC Opposition.

- 2 -

2.   . On November 27, 2006, the Debtors filed their "Global Notes and Statement of Limitation, Methodology and Disclaimer Regarding Debtors' Statements and Schedules." They said there:

> Prior to the Petition Date, the Debtors routinely engaged in inter-company transactions resulting in inter-company accounts payable and receivable. *The respective inter-company accounts payable and receivable as of the Petition Date have not been quantified.* Accordingly, inter-company account balances are not listed in the Schedules.

See Affidavit of Patrick P. Dinardo submitted herewith (the "Dinardo Affidavit"), at Exhibit A (excerpt from Deltak's Schedules of Assets and Liabilities and Statement of Financial Affairs, D.I. #393), Global Notes at 2 (emphasis added).

3.    Three days later, on November 30th, SNC signed the amended and restated Completion Agreement. There, SNC agreed to a Rejection Damage cap that declined to zero based on Deltak's performance of its obligations, and the passage of certain identified milestones.

4.    On January 8, 2007, by which time the Debtors had executed 9 out of 10 of their completion agreements, the Debtors finally chose to reveal that GPEG owed Deltak a net intercompany debt of approximately *$128 million*. That amount exceeds the *total liabilities* of $125,196,101 stated in Deltak's Summary of Schedules. The Debtors chose to conceal this important fact from SNC (and from every other party concluding a Completion Agreement up to that point) with the seemingly innocuous statement that the intercompany accounts payable and receivable "have not been quantified." Naturally, had SNC known of the enormous intercompany debt due Deltak from its parent, GPEG, the negotiations on the Completion Agreement would have been transformed. See Gregory Tardanico's Affidavit submitted herewith (the "Tardanico Affidavit"), at ¶ 6.

- 3 -

5.     Even if the intercompany accounts had not been precisely calculated, it was incumbent upon the Debtors, of course, to provide whatever disclosure they could of this enormously important fact (for example: "intercompany debt in excess of $120 million"). But we *now* learn from Debtors' own recent admissions that their statement on November 27, 2006 that the intercompany accounts had not then been calculated was in and of itself fundamentally untrue. As we set forth in detail *infra*, in the Debtors' proposed Disclosure Statement, filed on September 10, 2007, the Debtors describe a detailed cash management system of accounting for intercompany transactions and a basic month-by-month reconciliation process. With that cash management system in place, the Debtors could easily have provided a highly accurate statement of the intercompany accounts (and GPEG's massive debt to Deltak) on November 27, 2006 *had they chosen to do so.*

Thus, Debtors have now deprived themselves even of the fig leaf that was supposed to hide this outrageous failure of disclosure.

This is one of SNC's allegations that the Estate Representatives now contend is not "sufficiently particularized."[2] Moreover, and most notably, having been put on notice of this allegation by SNC in multiple documents,[3] the Debtors do not even attempt any defense of this shocking failure to disclose in their twenty-page Reply. Instead, they devote their twenty pages to the absurd notion that this and SNC's other allegations are "unparticularized", and to a fevered

---

[2] Debtors' "lack of particularization" complaint is particularly ironic coming as it does from the same representatives who complained just two days earlier, in a response to SNC's motion to lift the seal applicable to signed completion agreements in this matter, that SNC was "airing their dirty laundry" before the Court. See Debtors' Response to SNC's Motion to Lift Seal (D.I. #1813), at 2. The Debtors' suggestion was made in the context of an astonishing assertion that all the other parties in the case are working consensually with the Debtors, except for SNC, as if Debtors had already made some sensible proposal to resolve SNC's issues here, which they most decidedly have not.

[3] SNC previously alluded to the Debtors' substantial inter-company debts in its Opposition at 3 (¶4), and then in more detail, in its Motion to Lift Seal (D.I. #1769), and again in its Objection to the Debtors' proposed Disclosure Statement, filed October 5, 2007 (D.I. #1791).

{B0688902; 1}

effort to squelch any discovery. Debtors are truly desperate to "move on" and leave this record

behind them. The facts set forth above even standing alone give rise to a powerful inference of

fraud or willful misconduct that is more than sufficient to warrant discovery.[4] Indeed, discovery

is not only in SNC's interest but in the interest of all creditors of the estates, and absolutely

essential to vindicate the fundamental policies of transparency and disclosure that are the

hallmark of the bankruptcy laws. As one court in this District put it recently: "Disclosure goes

to the heart of the integrity of the bankruptcy system." In re eToys, Inc., 331 B.R. 176, 187

(Bankr. D. Del. 2005) (internal quotation omitted).

**I.     Even without discovery, SNC has uncovered numerous instances of the Debtors' willful misconduct and/or intentional fraud to date.**

SNC respectfully submits that actions and omissions of the Debtors (uncovered to date)

evidencing the Debtors' "willful misconduct and/or intentional fraud" and warranting relief to

SNC, include:

**A.     Most significant (and perhaps most notable for the Estate Representatives' failure to address it in their Reply), is the fact that the Debtors' Statements and Schedules, filed on November 27, 2006 (just three days before SNC signed its amended and restated Completion Agreement with Deltak), failed to disclose the fact that GPEG owed Deltak a net intercompany debt of approximately $128 million.** The Debtors tried to cover this non-

disclosure in their so-called Global Notes and Statement of Limitations, Methodology and

Disclaimer Regarding Debtors' Statements and Schedules, at 2, where they said: "The

respective intercompany accounts payable and receivable as of the Petition Date have not been

---

[4] See Section III, infra.

- 5 -

quantified." See Dinardo Affidavit, Exhibit A (excerpt from Deltak's Schedules of Assets and Liabilities and Statement of Financial Affairs, D.I. #393).

First, as we now know, the statement was (at best) grossly misleading, in light of the massive intercompany debt. Beyond that, however, the statement was apparently untrue even on its face. The suggestion that such intercompany balances had "not been quantified" cannot be true, based on the Debtors' own description of their cash management system. As described in their proposed Disclosure Statement filed on September 10, 2007 (D.I. #1638), at 33-34, the Debtors said:

> As part of the business of the Debtors, GPEG and its subsidiaries have entered into a variety of intercompany relationships and transactions. Specifically, since its formation, GPEG has utilized a centralized cash management system whereby cash received by its operating subsidiaries, Williams Industrial Services Group, L.L.C. ("Williams"), Braden Manufacturing, L.L.C. ("Braden") and Deltak, L.L.C. ("Deltak"), is transferred to GPEG's cash accounts and subsequently transferred from GPEG to its subsidiaries to meet operating needs....

> 1. Centralized Cash Management

> *Since its inception*, in the ordinary course of business, *GPEG utilized a centralized cash management system* whereby cash received by its operating subsidiaries is swept to GPEG's cash accounts either through an automated sweep process or periodic manual sweeps. Similarly, as these operating subsidiaries required cash to cover presentments of operating disbursements, GPEG would fund the subsidiaries from its centralized cash management pool. To account for the transfers of cash, GPEG established intercompany cash accounts, one for each of its operating subsidiaries, maintained on the GPEG general ledger and correspondingly, each of the operating subsidiaries maintained an intercompany cash account on its general ledgers to account for cash transfers with GPEG. Intercompany cash and non-cash activity between GPEG's subsidiaries is accounted for through its intercompany cash and non-cash accounts, respectively....

> The cash transfer activity between GPEG and Deltak is generally processed manually. The corporate cash manager monitors Deltak cash balances and disbursement activity *on a daily basis*. As excess balances and deficits are identified, the corporate cash manager initiates wire transfers to maintain Deltak's operating cash at appropriate levels.

- 6 -

The tracking and posting of intercompany cash activity by GPEG is performed by the corporate cash manager and the subsidiaries' controllers *as part of the month-end cash reconciliation process*. The corporate cash manager posts manual journal entries each month to the applicable intercompany cash account to credit (reduce) the intercompany cash account for the cumulative gross receipts received during the month and debit (increase) the intercompany cash account for the cumulative gross disbursements made during the month. Journal entries are posted from daily cash activity logs *and reconciled monthly to bank statements*. As part of the Company's month-end close process, *GPEG reconciles the amounts reflected on each of the subsidiaries' books and records to the corresponding balance reflected on GPEG's books and records*, and differences, if any, are investigated and adjusted as needed over time.

See Dinardo Affidavit, Exhibit B (excerpt from the Debtors' proposed Disclosure Statement filed on September 10, 2007) (emphasis added). The Debtors went on to say that:

The cumulative general ledger activity occurring between October 1, 1998 and the Petition Date reflects an intercompany cash balance at GPEG of approximately negative $329 million. This amount is made up of a cumulative cash balance between GPEG and (i) Williams of approximately negative $22 million, (ii) Braden of approximately negative $126 million, and *(iii) Deltak of approximately negative $182 million*.

Id. at 34 (emphasis added).

Against that $182 million cash obligation that GPEG had to Deltak on the Petition Date is (apparently) a non-cash (corporate overhead) obligation from Deltak to GPEG of approximately $54 million, leaving a net amount due Deltak from GPEG as of the Petition Date of approximately $128 million. See Dinardo Affidavit, Exhibit C (page 20 of the Debtors' October 2006 Monthly Operating Report filed January 8, 2007, D.I. #625).

In light of Debtors' detailed cash management system (utilized by GPEG "since its inception"), to suggest that this substantial intercompany claim was not "quantified" some two months after the Debtors' filing appears to be a brazen falsehood. Offered every opportunity to respond to these serious allegations of misconduct, the Estate Representatives say *nothing* in their own defense, except to argue that "Conduct that occurred before the execution of the

- 7 -

Completion Agreement is of no moment," Reply at 7, as if Debtors' fraud in the inducement (as a direct result of their own fraudulent omission *while under bankruptcy supervision*) is of no consequence.

The Debtors' failure and non-disclosure is compounded by the fact that the figures reflected in the Debtors' October 2006 Monthly Operating Report were not filed with the Court until January 8, 2007, *after* the Debtors had succeeded in executing 9 of the 10 completion agreements concluded in this case. Even in filing various amendments to their Statements and Schedules on or about March 23, 2007, the Debtors did nothing to identify on the record the substantial intercompany balance due to Deltak.

It is ironic that the Estate Representatives (including the Creditors' Committee) strive so mightily to cut off SNC's discovery in this matter now. A year ago, SNC requested information from the Creditors' Committee as to the Debtors' justification for its decision to wind-down Deltak. Back then, counsel for the Creditors' Committee suggested that SNC should request such discovery *in the context of a contested matter*. See Dinardo Affidavit, Exhibit D (letter from counsel to the Creditors' Committee dated November 4, 2006, at 2.) To date, and despite repeated requests, SNC has not received any documents at all, let alone those documents which reflect the reasons for Deltak's wind-down.[5]

This egregious failure to disclose cries out for a full airing of the facts.[6] As if all this were not enough, however, Deltak's then President, Monte Ness, stated in substance in early

---

[5] The reasoning presumably included an effort by GPEG to sidestep its huge intercompany liability to Deltak which it now proposes to resolve in its proposed Plan for $30-34 million. See Debtors' proposed Disclosure Statement at 76. SNC has every right to explore the Debtors' reasoning, particularly in light of the fact that Debtors have repeatedly said that their HRSG contracts were unprofitable, while SNC now believes, based on Ness statements, that in fact *its* contract with Deltak was indeed profitable for Deltak. See Tardanico Affidavit at ¶8.

[6] As Justice Louis D. Brandeis famously wrote, "Sunshine is said to be the best of disinfectants."

- 8 -

2007 to an SNC executive, in the context of his termination from Deltak: "With what I know, I am stunned that they are treating me this way".[7] In context, the SNC executive concluded that Ness was aware of "skeletons in the closet" that Debtors would rather not have widely known.[8]

Discovery here is not "optional"; it is absolutely vital to the integrity of the process.

**B.      The Debtors' actions and omissions concerning the so-called DPEC Modules evidence further willful misconduct, if not outright fraud.**  As already noted in SNC's Opposition, the Debtors initially proposed a form of completion agreement that would have relieved Debtors and all their affiliates of warranty liability (including *non-debtor DPEC* as to the goods it was to provide).  SNC objected and negotiated for language limiting this provision to Deltak and its *Debtor* affiliates in the executed form.  In purporting to quote this language of the Completion Agreement (§ 3.2) in their Expedited Motion to Compel [SNC]'s Compliance with Completion Agreement, etc., filed on March 16, 2007 (originally set for hearing the following Monday, March 19, 2007) (D.I. #910), the Debtors omitted the highlighted word above (i.e. the word limiting the warranty relief to *Debtor* affiliates) from the quote, changing its meaning entirely, and thereby misrepresenting this key provision.  Even assuming the omission was unintentional, the argument that Debtors advanced in their expedited motion was patently misleading and could, depending on the circumstances, lead to a finding of "misconduct."[9]  In

---

[7] See Tardanico Affidavit at ¶ 2.

[8] Debtors *characterize* the discovery sought by SNC as "far-reaching, oppressive and expensive" (Reply at p. 14); notably, they do not bother to substantiate that characterization in any way.   In reality, the discovery proposed by SNC is focused, and could be accomplished in a good faith effort among the parties within 30 days.

[9] "Willful misconduct" includes intentional acts or omissions undertaken with knowledge that the act or omission will probably result in damage or injury.  See, e.g., Hoge v. Moore (In re Railworks), 345 B.R. 529 (Bankr. D. Md. 2006) (claims for willful misconduct survive motion to dismiss where claims are based, *inter alia*, upon alleged prepetition misrepresentations and concealment stemming from statements made as to debtor's financial stability); accord Anderson v. Cryovac, 862 F.2d 910, 923 (1ˢᵗ Cir 1988) (discussing the difference between "misconduct" and "fraud").

- 9 -

context, *inter alia*, if Debtors provided their counsel with an incorrect version of the final agreement, their conduct may even have been "willful", and SNC is entitled to explore that.

Misrepresenting the operative agreement, and using the bankruptcy process in this way to further the needs of the non-Debtor affiliate DPEC (all in an unabashed effort to absolve it of its warranty liability) is wrongful in and of itself. Unfortunately for the Estate Representatives, however, the Debtors' wrongful conduct was not limited to that effort. In the fall of 2006, DPEC's need for cash was such that it asked SNC to enter into a "three way" Direct Payment Agreement with it and Deltak, so that if the Completion Agreement fell through for whatever reason, DPEC would be paid for its efforts and SNC could take delivery of the Modules. See Dinardo Affidavit, Exhibit E (Direct Payment Agreement). The Direct Payment Agreement was negotiated and signed on or about November 22, 2006.[10] Shortly after that, DPEC and Deltak learned of four leaks in the carbon steel tubes incorporated into the Modules (during shop testing) but *withheld that information from SNC until the end of January 2007, after SNC had committed to pay the balance of the price for such Modules* under the Direct Payment Agreement.

Moreover, despite the fact that there was no "markup" remotely authorized by the Direct Payment Agreement, Debtors nevertheless sought to charge SNC a 10% markup, *totaling over $500,000*, for their supposed efforts in coordinating DPEC's manufacture of the Modules.

Citing nothing from the Interim Settlement Agreement (signed in March, 2007) in actual support, the Estate Representatives now claim (Reply at 8) that that Agreement somehow "effectively waiv[ed]" SNC's claims against the Debtors for their actions. But the Agreement

---

[10] The Debtors were well aware of the terms of this Agreement and Deltak signed on. Counsel for the Debtors from White & Case (Edgardo Cavalie) was copied on email correspondence discussing the terms of the Direct Payment Agreement.

- 10 -

contains no such release or waiver by SNC.  SNC did indeed require the Debtors to waive *their*

claims for the 10% markup (and certain other expenses), and that waiver is clearly expressed in ¶

5 of the Interim Settlement Agreement.[11]

      C.      Nothing in the text of §2.1 of the Completion Agreement confines the "willful

misconduct and/or intentional fraud" exception to postpetition actions or omissions, despite

the Estate Representatives' arguments to the contrary.  See Section II, infra; Reply at 7.

There are in fact prepetition instances of misconduct, and their efforts to circumvent discovery

into wrongful prepetition acts are unavailing.  To date SNC has alleged that the Debtors engaged

in particular instances of prepetition misconduct, including the following:

-     failing to deliver the promised GPEG parent guaranty, despite having the form attached to the Purchase Order at Exhibit T, and Deltak having won the bidding at the last minute by undercutting its competition at a time when it may not have had the financial wherewithal to perform;[12] and

-     just days prior to filing for bankruptcy, inducing SNC to pre-pay an additional CAD $3.5 million on the Purchase Order, despite the fact that Deltak had not paid over to its subcontractors amounts SNC had remitted to Deltak in the form of progress payments, (which amounts were then presumably swept up to GPEG).

    Furthermore, nothing limits the instances of "willful misconduct and/or intentional fraud"

to actions of the Debtors directed solely at SNC.  Indeed, just how GPEG came to accrue an

intercompany debt to Deltak of $182 million is hard to fathom, and thus SNC is entitled to

explore the cause (and effect) of such an accrual upon Deltak.

---

[11] This document was previously filed with the Court under seal.  The Estate Representatives' argument based on the Interim Settlement Agreement is a red herring, evidenced by the fact that they do not cite to the text of any waiver language therein that is effective against SNC.

[12] Deltak came up with a last and final bid undercutting its competition, thereby winning the bid in January 2006, at a time when it and its affiliates were already apparently suffering from financial difficulties (according to statements made by GPEG in September 2006).  See Dinardo Affidavit, Exhibit F (news report dated September 28, 2006, quoting GPEG's then President and CEO as saying that unsuccessful efforts to recapitalize had then been ongoing "for the last nine months," and ended with the bankruptcy filing).  The circumstances under which Deltak won the bidding are curious indeed, and must be scrutinized.

- 11 -

{B0688902; 1}

II.    The Estate Representatives' strained reading of the Completion Agreement fails to give effect to all of its provisions, including those portions of §§ 2.1 and 2.2 that preserve SNC's Rejection Damage Claim in "instances of willful misconduct and/or intentional fraud" by the Debtors.

By a strained argument resting precariously on a semicolon, and further "sustained" by a truncated quote of the contractual language, the Estate Representatives interpret the "drafter's intent" as to the Completion Agreement to strip SNC of its Rejection Damage Claim – and even the right to take discovery – in an effort to immunize the Debtors from allegations of intentional fraud and willful misconduct. See Reply at 6-8. As set forth below, however, the supposed "clear and unambiguous language of Section 2.1" (p. 5) squarely supports SNC's interpretation, not that of the Estate Representatives. Moreover, the law governing the parties' agreement does not recognize a waiver that is not clearly manifested, and the Estate Representatives' "semicolon theory" does not even approach that exacting test. Indeed, the Estate Representatives simply a) cut off a quote when it "suits" them, b) ignore those provisions of the Completion Agreement that give the lie to their own argument, and c) posit a theory that defies common sense.

For the Court's ease of reference, we set forth below the complete text of Section 2.1 of the Completion Agreement, as follows:

2.1    Completion and Waiver.  Notwithstanding any other provision under this Agreement providing for reservation of rights to damage claims under the Contract, upon the delivery of all of the Equipment, Documentation and other items required for the Completion of Customer's HRSG Project and the passage of title thereto to the Customer, free and clear of any liens of Deltak and Debtors' Senior Lenders, and the performance of all Services and other obligations required for the Completion of Customer's HRSG Project (or the written waiver of any such obligation by the applicable Party to whom such obligation runs), the Customer waives all damages claims against the Debtors in connection with the Contract, including all rights to damages under the Contract reserved pursuant to this Agreement (the "Rejection Damages"). Failure to satisfy the Completion of the Customer's HRSG Project shall result in the Customer's rights with respect to Rejection Damages being preserved without prejudice; in no event, however, except for instances of willful misconduct and/or intentional fraud by Deltak or its affiliates, shall Customer retain a claim for Rejection Damages in excess of the

- 12 -

Capped Rejection Damages Claim (as defined in Section 2.2 below). The foregoing waiver excludes any insurance that was required by the Contract or otherwise that may still be available.

In their vain attempt to somehow escape the words "except for instances of willful misconduct and/or intentional fraud", the Estate Representatives struggle mightily to look *only* at Section 2.1. Once again, we see attempted "sleight of hand" with a quotation. According to the Estate Representatives, the second sentence of Section 2.1 reads as follows:

> Failure to satisfy the Completion of the Customer's HRSG Project shall result in the Customer's rights with respect to Rejection Damages being preserved without prejudice; in no event, however, except for instances of willful misconduct and/or intentional fraud by Deltak or its affiliates, shall Customer retain a claim for Rejection Damages in excess of the Capped Rejection Damages Claim.

Reply at 5.

But it doesn't read that way. Here is how it *actually* reads, with the omitted words in bold.

> Failure to satisfy the Completion of the Customer's HRSG Project shall result in the Customer's rights with respect to Rejection Damages being preserved without prejudice; in no event, however, except for instances of willful misconduct and/or intentional fraud by Deltak or its affiliates, shall Customer retain a claim for Rejection Damages in excess of the Capped Rejection Damages Claim **(as defined in Section 2.2 below)**.

The Estate Representatives' "edit" – one *not* disclosed to the reader by a proper ellipsis – is convenient indeed. The Estate Representatives are desperate to somehow confine "willful misconduct and/or intentional fraud" to Section 2.1. But even by its own terms, Section 2.1 refers the reader directly to Section 2.2. Moreover, as a matter of contract construction, the Estate Representatives' "semicolon theory" deliberately ignores the interplay between § 2.1 and § 2.2, and ultimately leads to paradoxical results.

Section 2.2 defines SNC's "Capped Rejection Damage Claim" as follows:

- 13 -

{B0688902; 1}

As used herein, the term "Capped Rejection Damage Claim" means the amount equal to C$46,662,179 (the "Maximum Rejection Damage Claim") less the "Step-Down Amount" determined according to the following events:

| | |
|---|---|
| . . . If [the Completion Agreement were to be terminated] after Bankruptcy Court approval of this Agreement; . . . | [Step-Down of] 25% of the Maximum Rejection Damage Claim |
| . . . Upon expiry of one (1) year subsequent to the satisfaction of thermal performance, pursuant to the Specifications of all three (3) HRSG Units. | [Step-Down of] 100% of the Maximum Rejection Damage Claim |

Thus, the "Step-Down" schedule included in § 2.2 reduces the Capped Rejection Damage Claim by progressively increasing percentages as the Project is completed, ultimately culminating in a 100% reduction of the Maximum Rejection Damage Claim "[u]pon expiry of one (1) year subsequent to the satisfaction of thermal performance, pursuant to the Specifications of all three (3) HRSG Units." The second sentence of § 2.1 makes clear that SNC may not retain a claim for Rejection Damages in excess of the Capped Rejection Damage Claim "except in instances of willful misconduct and/or intentional fraud". Thus, SNC *may* retain a claim for Rejection Damages in excess of the Capped Rejection Damage Claim in instances of willful misconduct and/or intentional fraud.

Taking §§ 2.1 and 2.2 of the Completion Agreement together, the paradox in the Estate Representatives' "semicolon theory" becomes evident. The Estate Representatives ask the Court to accept that the "willful misconduct and intentional fraud" exception *does not* apply to preserve SNC's Rejection Damage Claim upon completion of delivery. They fail to address the fact that the exception *does* apply to preserve SNC's Capped Rejection Damage Claim where the Step-Down schedule reduces the capped claim to zero upon completion of the final milestone, one year subsequent to the satisfaction of thermal performance. Compare §§ 2.1 and 2.2. The only way to reconcile Sections 2.1 and 2.2 is to conclude that the "willful misconduct and intentional

- 14 -

fraud" exception is *not* narrowly confined to Section 2.1; but rather, as its plain language suggests, pertains to any willful fraud or misconduct by Deltak.[13]

The Estate Representatives' argument also defies common sense. They contend that the parties' intent was to preserve an exception for intentional fraud or willful misconduct only with respect to the *performance* of the Completion Agreement, while barring the exception with regard to any possible claim of intentional fraud or willful misconduct in connection with the *formation* of the agreement. In particular, it defies reason to suggest that SNC sought to preserve a fraud exception with respect to the Debtors' performance of the Completion Agreement, while waiving the exception where there has been fraud in the inducement – the precise scenario in which fraud might be expected to occur. Indeed, that is why SNC's proof of claim (at ¶ 14) specifically reserved all rights with respect to Deltak's "statements and omissions at the time of entering into the Executory Contract, the Completion Agreement or thereafter...".

The Estate Representatives make much of the second sentence of § 2.1, which provides (in part) that "in no event ... except for instances of willful misconduct and/or intentional fraud by Deltak or its affiliates, shall Customer retain a claim for Rejection Damages in excess of the Capped Rejection Damage Claim (as defined in Section 2.2 below)." By an attempted sleight of

---

[13] The Estate Representatives fail to construe the Completion Agreement so as to give effect to each of its provisions. Under New York law it is a fundamental tenet of contract interpretation that a contract must "be read as a whole and every part will be interpreted with reference to the whole". 3 Williston on Contracts, § 618. The intention of the parties must be ascertained, not from one phrase or provision, but from the entire instrument. Paige v. Faure, 229 N.Y. 114, 118 (1920). New York Courts of Appeal strongly disfavor the interpretation of contract terms in isolation. Such interpretation runs the risk of failing to harmonize the terms, leading to a distortion of the parties' actual agreement. See Williams Press., Inc. v. State, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 77 (1975) ("[t]he meaning of a writing may be distorted where undue force is given to single words or phrases"); Rentways v. O'Neill Milk & Cream Co., 308 N.Y. 342, 347 (1955) (conflicting contractual provisions should not be "read out of the contract"); see also Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (1956) ("[t]he rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect"). Accordingly, "[t]hat interpretation is favored which will make every part of a contract effective." Rentways, 308 N.Y. at 347.

- 15 -

hand, the Estate Representatives attempt to turn the expansive "in no event" contained in the second sentence into a modifier referring only to the immediately preceding clause, which addresses the Debtors' failure to complete the Project. Had the parties intended the second sentence of § 2.1 to have the meaning the Estate Representatives would ascribe to it, however, the natural articulation would have been to state that "Failure to satisfy the Completion of the Customer's HRSG Project shall result in the Customer's rights with respect to Rejection Damages being preserved without prejudice; *but in the event of such failure*, Customer shall retain a claim for Rejection Damages in excess of the Capped Rejection Damage Claim ... only in instances of willful misconduct and/or intentional fraud." That is not the bargain the parties agreed to.

Indeed, when the parties wished to limit SNC's rights *regardless* of whether the Project was completed, they did so explicitly. Thus, § 4.11 of the Completion Agreement excludes "punitive, special, indirect, incidental or consequential damages ... arising from or relating to *any claim made under this Agreement* or the provision [or] the failure to provide the Services." (emph. added)

The evident intent of the Estate Representatives' argument is to deprive SNC of its rights under the Completion Agreement and § 365(g) of the Bankruptcy Code so as to work a forfeiture, which is highly disfavored.[14] It is patently obvious that the Debtors wish to disallow and expunge SNC's claims to leave the estates solvent, thereby allowing the residual value to flow to the holders of equity interests in the Debtors. They show their hand when they refer

---

[14] "The Second Circuit has noted that 'bankruptcy courts, as courts of equity, should look with disfavor on contract forfeitures.'" In re Ames Dep't Stores, Inc., 288 B.R. 339, 355 (Bankr. S.D.N.Y. 2003) (Gerber, J.) (but equitable principle cannot be regarded as a license to disregard material breaches of contract), aff'd on alternative grounds, 302 B.R. 791 (S.D.N.Y. 2003), quoting In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997).

{B0688902; 1}

disparagingly to SNC's "scorched earth strategy in *connection with the approaching plan confirmation process*". See Reply at 2 (emphasis added).[15]

Two final points. First, Under New York law, which governs the parties' rights under the Completion Agreement,[16] intent to waive an existing right "must be *unmistakably manifested, and is not to be inferred from a doubtful or equivocal act*" and "should not be lightly presumed". Navillus Tile, Inc. v. Turner Constr. Co., 770 N.Y.S.2d 3, at *4 (N.Y. App. Div. 1 Dep't 2003) (emph. added), citing Orange Steel Erectors v. Newburgh Steel Prods., 640 N.Y.S.2d 283, 285 (N.Y. App. Div. 3d Dep't 1996) and Gilbert Frank Corp. v. Fed. Ins. Co., 525 N.Y.S.2d 793 (1988); see also, e.g., In re Ocean Power Corp., No. 02-15989 (REG), 2007 WL 949598 (Bankr. S.D.N.Y. Mar. 26, 2007) (creditor did not waive right to payment on superpriority basis of principal, accrued 15% annual interest and attorneys' fees due under debtor-in-possession financing agreement) (copy attached hereto as Exhibit 1).

Second: if indeed there is some ambiguity , and Debtors' strained interpretation is at least colorable, then discovery, and the introduction of parol evidence, is essential to clarify.[17]

---

[15] The Estate Representatives even go so far as to construe SNC's general reservation of rights, at ¶ 14, as a *waiver* of any rights not expressly enumerated. They ignore the plain text of the sentence, which states that "SNC reserves all rights it may have, in law and equity, *including but not limited* to", among other things, the right "to challenge the applicability of the step-down schedule set forth in § 2.2 of the Completion Agreement, based upon a showing that Deltak committed willful misconduct" (emphasis added).

[16] Section 4.8 of the Completion Agreement provides, in pertinent part, that: "This Agreement is made in the State of New York and will be governed by, and construed and interpreted in accordance with, the laws of the State of New York (excluding any conflict-of-law or choice-of-law rules which might lead to the application of the internal laws of another jurisdiction)."

[17] And it bears noting that the Estate Representatives' own argument – that upon completion of delivery, SNC waives its Rejection Damage Claim – makes clear that no such waiver has occurred. *Deltak has not completed delivery.* The operative provision in this context is the first sentence of § 2.1 of the Completion Agreement, which the Estate Representatives allude to in a footnote but choose not to quote. That sentence expressly predicates *any* waiver of SNC's rights "upon the delivery of all of the Equipment, Documentation and other items required for the Completion of Customer's HRSG Project and the passage of title thereto to the Customer, free and clear of any liens of Deltak and Debtors' Senior Lenders, and the performance of all Services and other obligations required for the Completion of Customer's HRSG Project (or the written waiver of any such obligation by the applicable Party to whom such obligation runs)". Even by the Debtors' own strained reading, if a waiver is conditioned upon

- 17 -

III.    In the alternative, the Court should strike from the Completion Agreement the provision purporting to waive SNC's Rejection Damage Claim, insofar as SNC will prove that the Debtors fraudulently induced SNC to include such a provision in the Completion Agreement.

    A.    As a matter of New York law, the release of SNC's Rejection Damage Claim may be voided on the grounds of duress, illegality, fraud or mutual mistake.

Under New York law, a waiver or release of claims, like any other contract provision, may be voided on the grounds of duress, illegality, fraud or mutual mistake. Thives v. Holmes Ambulance Serv. Corp., 78 A.D.2d 651, 652, 432 N.Y.S.2d 235 (2d Dep't 1980); Aetna Cas. Sur. Co., 96 A.D.2d 37, 41, 468 N.Y.S.2d 153 (2d Dep't 1983); Mangini v. McClurg, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508 (1969). The Debtors' assertion that no fraud or willful misconduct occurred *since* the execution of the agreement is inapposite. Insofar as the waiver or release itself was procured by fraudulent concealment, it may be avoided on that basis. See Global Minerals & Metals v. Holme, 35 A.D. 3d 93, 98, 824 N.Y.S.2d 210, 214 (1st Dep't 2006) ( "[A] release may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress.").

The elements of fraud are "a material misrepresentation [or omission] of fact, made with knowledge of its falsity, with intent to deceive, justifiable reliance, and damages." Liling v. Segal, 220 A.D.2d 724, 725-26, 633 N.Y.S. 2d 199 (2d Dep't 1995) (internal quotation omitted). These elements are readily established by the facts that SNC has pleaded. The Debtors knowingly withheld from SNC material information about the net $128 million inter-company debt owed to Deltak by GPEG. The fraudulent concealment of this information from SNC was

---

completion of the Project, and the Project has not been completed, and completion is contingent upon future events, SNC cannot be charged with a waiver.

- 18 -

intended to induce SNC to release its claims and suffer injury thereby, under the mistaken belief that its claims against Deltak were worthless. A release procured under such circumstances is not fairly or knowingly given as required by New York law. Mangini, 24 N.Y.2d at 567.

Moreover, where the releasor has had little opportunity for investigation or deliberation, or where overreaching or unfair circumstances exist, New York courts, at equity, will not allow a waiver or release to serve as a bar to claims. Id. SNC had no means or opportunity of discovering this material information concerning the intercompany liabilities and the Debtors blatantly violated their duty to disclose it. Waivers or releases obtained under such circumstances, which reflect "unfairness, overreaching and unconscionability", may be set aside. Rivera v. Vickers, 72 A.D.2d 807, 808, 421 N.Y.S.2d 918, 919 (2d Dep't 1979) (release held void where plaintiff relied on the defendants and was mislead).

Even where negotiations have been extensive and the parties to an agreement are highly sophisticated, a claim of fraudulent inducement plainly exists where, as here, one party had no means to obtain the information being withheld and no means to learn if the party inducing the waiver has been truthful. See P.T. Bank Cent. Asia v. ABN AMRO, 301 A.D.2d 373, 377, 754 N.Y.S.2d 245, 251 (1st Dep't 2003) (upholding claim of fraudulent inducement in connection with a heavily negotiated $35 million bridge loan made between two sophisticated commercial banks); H.W. Collections. Inc. v. Kolber, 256 A.D.2d 240, 241, 682 N.Y.S.2d 189, 190 (1st Dep't 1998) ("a general release will not insulate a tortfeasor from allegations of breach of fiduciary duty, where he has not fully disclosed alleged wrongdoing"); Bloss v. Va'ad Harabonim of Riverdale, 203 A.D.2d 36, 40, 610 N.Y.S.2d 197 (1st Dep't 1994) (fact that plaintiff was represented by counsel does not bar a plaintiff from avoiding the release on grounds of fraudulent inducement).

- 19 -

It is well settled under New York law that unenforceable provisions of a contract may be severed and the remainder of the covenant partially enforced. BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 394-95, 690 N.Y.S.2d 854 (1999) (partially enforcing a restrictive covenant even though agreement did not contain a severability provision ); Karpinski v. Ingrasci, 28 N.Y.2d 45, 51-52, 320 N.Y.S.2d 1, 6-7 (1971) (same); Trans-Continental Credit & Collection Corp. v. Foti, 270 A.D.2d 250, 251, 704 N.Y.S.2d 106, 107 (2d Dep't 2000) (same). Here, the provisions of the Completion Agreement are expressly made severable by § 4.6.[18] Consequently, the Court should strike the waiver for the reasons set forth herein.

**B.    SNC is entitled to discovery to develop further evidence in support of its claims.**

Contrary to the Estate Representatives' argument, in Bell Atlantic Corp. v. Twombly the United States Supreme Court expressly denied that it was crafting a heightened Rule 8(a)(2) pleading standard, or broadening the scope of Rule 9. The Bell Atlantic court instead concluded that the plaintiffs had not "nudged their claims across the line from conceivable to plausible," to satisfy the existing Rule 8(a)(2) requirement that plaintiffs allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (U.S. 2007). In Bell Atlantic the Court created a "flexible 'plausibility standard' that requires plaintiffs to amplify a claim with some factual allegations

---

[18] Section 4.6 of the Completion Agreement states that –

> Severability. If all or any part the provisions of this Agreement is or becomes invalid, illegal or unenforceable in any jurisdiction, the remaining parts or provisions of this Agreement will be, as to such jurisdiction, severable and: (a) the validity, legality or enforceability of such remaining parts or provisions will not in any way be affected or impaired by the severance of the parts or provisions severed; and (b) the invalidity, illegality or unenforceability of all or any part of any provisions of this Agreement in any jurisdiction will not affect or impair such part or provision or any other provisions of this Agreement in any other jurisdiction. The Parties agree to use reasonable efforts to replace any such invalid, illegal or enforceable provision with a valid, legal and enforceable provision that preserves, to the extent possible, the original agreement of the Parties.

- 20 -

where such is needed to render the claim plausible." See Iqbal v. Hasty, 490 F.3d 143, 155 (2d Cir. 2007) (no heightened pleading standard created by Bell Atlantic in light of (1) Court's express disclaimer of heightened standard; (2) Court's citation with approval to Fed. R. Civ. P. Form 9 for negligence complaints, which contains only a generalized allegation of negligence and does not specify the particular respect in which the defendant is alleged to have been negligent; and (3) Supreme Court's subsequent citation to Bell Atlantic for the proposition that pleading specific facts is unnecessary).

By any standard, the facts set forth above and in the Tardanico Affidavit support a reasonable expectation that discovery will amplify the particulars of the wrongful conduct alleged. Additionally, in ample satisfaction of the pleading standards of Bell Atlantic, SNC has alleged facts that far exceed "plausibility" for the proposition that the purported release was fraudulently procured.

IV.    **Though the issue is not yet ripe for adjudication, SNC has alleged sufficient facts to establish administrative expense priority for certain claims.**

The Estate Representatives are likewise misguided in their argument that SNC cannot possibly claim entitlement to administrative expense priority for its claims. Although SNC has preserved the right to assert administrative expense claims, to date it has not done so, and the issue is accordingly not yet ripe for adjudication. SNC points out, however, that the courts have long awarded administrative expense priority status for damages arising from or in connection with postpetition torts.

Section 503(b) of the Bankruptcy Code sets forth the requirements for the great preponderance of administrative expenses. That section provides, in pertinent part, that —

> (b)    After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including —

- 21 -

(1)(A) the *actual, necessary* costs and expenses of preserving the estate …

(Emphasis added). Courts do not adhere to a narrow reading of the "actual, necessary" standard set forth in Section 503(b)(1)(A) when a claim arises from the tortious acts of a trustee or estate representative. The seminal case awarding administrative priority to such a claim is Reading Company v. Brown, 391 U.S. 471, 482, 485 (1968), a case decided under the Bankruptcy Act, in which the Court held that "actual and necessary" costs include all costs incurred by estate representatives acting to further the debtor's business, including claims arising in tort) awarding priority to claim arising from negligence of receiver leading to damage to claimant's property. Following Reading, courts interpreting the Bankruptcy Code have likewise held that actual, necessary costs include a wide variety of costs in the nature of sanctions for *postpetition* torts. See, e.g., In re Enron Corp., 2003 WL 1562201 (Bankr. S.D.N.Y. March 17, 2003) (awarding administrative expense priority to claim for conversion) (copy attached hereto as Exhibit 2); see In re United Puerto Rican Food Corp., 41 B.R. 565 (Bankr. E.D.N.Y. 1984) (same); see also Alabama Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.), 963 F.2d 1449, 1457 (11th Cir. 1992) (environmental damages); compare 28 U.S.C. § 959(b) (a bankruptcy trustee is required to operate the estate in accordance with applicable law). Other courts have accorded administrative expense priority to claims for breach of contract (such as the Completion Agreement) without relying on the rationale of Reading. See, e.g., Robert M. Hallmark & Assocs., Inc. v. Athens/Alpha Gas Corp. (In re Athens/Alpha Gas Corp.), 332 B.R. 578, 581-82 (B.A.P. 8th Cir. Nov. 4, 2005) (allowing breach of contract claim as administrative expense where debtor's postpetition retention of funds, contrary to the terms of the parties' agreement, constituted a transaction that benefited debtor to the detriment of creditor).

- 22 -

Here, SNC has alleged that the Debtors have engaged in intentional fraud or willful misconduct "at the time of entering into ... the Completion Agreement or thereafter and/or by [Deltak] conducting itself as an alter ego or mere instrumentality of GPEG, or otherwise." Proof of Claim Addendum at ¶ 14. Insofar as SNC can plead and prove such allegations at a trial on the merits, SNC will prove that its Rejection Damage Claim should not be capped pursuant to the Completion Agreement, but may also prove that the Debtors are liable to SNC, in tort or otherwise, for postpetition fraud or willful misconduct; that SNC has been damaged thereby; and that its resulting claims are entitled to administrative expense priority.

V.      **The Estate Representatives fail to respond to SNC's argument concerning the equitable maximum that treats as done that which should be done, but instead posit an incomplete statement of Ontario law regarding the Statute of Frauds.**

With respect to the GPEG guaranty, the Estate Representatives make no effort to respond to SNC's argument concerning the equitable maxim that treats "as done that which should be done". Instead, they present the Court with a recitation of Ontario law on the Statute of Frauds that is best described as incomplete. SNC's claim under the GPEG guaranty is not barred because Ontario law recognizes what is known as the "wider interest rule".

The seminal case regarding the wider interest rule is <u>Travel Machine Ltd. v. Madore</u>, [1983] 143 D.L.R. (3d) 94. That case established the applicable standard, as follows:

> Even where a person clearly does promise to answer for the debt, default, or miscarriage of another, the promise will not be within the section where it is merely an incident to a wider transaction. The question is whether the main object of the parties is that one should guarantee the liability of another, or whether it is to enter into a different sort of transaction altogether. ... The true test, as derived from the cases, is...to see whether the person who makes the promise is, but for the liability which attaches to him by reason of the promise, totally unconnected with the transaction, *or whether he has an interest in it independently of the promise*. In the former case, the agreement is within the statute; *in the latter, it is not.* (Emphasis added.)

- 23 -

The rule is part of a reaction by the courts against the stringency with which the Statute of Frauds had traditionally been applied. "In succeeding centuries the courts in individual cases chafed at times against the rigidity of the Statute of Frauds and not infrequently one sees expressions by the courts regretting that the Statute was being used as an engine of fraud rather than as the curative device that the legislature envisioned." SPX Canada Inc. v. Watts, [1995] A.C.W.S.J. 630732, cited in Ferrell Builders Supply Ltd. v. 1234932 Ontario Ltd. (c.o.b. Megatek Construction Co.), [2003] O.J. No. 2320, at 11-12.

Here, where Deltak is a wholly-owned subsidiary of GPEG, which plainly had an interest in ensuring that SNC awarded the HRSG contract to its subsidiary. That interest is sufficient to take the promised guaranty out of the operation of the Statute. The Court should not entertain a construction of the Statute that would permit it to be used as an engine of fraud.

## VI. The Court should enter an order setting forth an appropriate pre-trial schedule including appropriate discovery deadlines.

In its initial Opposition to the Debtors' Objections, SNC set forth an expedited timeline for discovery. Given that the Debtors sought to proceed to a hearing on SNC's claims and did not accept SNC's offer, and further given that SNC and the Estate Representatives are presently engaged in several other contested matters in these Chapter 11 cases, SNC requests that – should the Court not be inclined simply to deny the Objections – the Court enter an order approving a mutually acceptable discovery plan and schedule for disposition of this contested matter, SNC's objection to the Disclosure Statement and the Debtors' motion for entry of an order approving proposed voting procedures (D.I. #1746).

## RESERVATION OF RIGHTS

The Estate Representatives had the benefit of two full weeks following the Court's September 28, 2007 hearing, through and including October 12, 2007, to prepare a twenty-page

- 24 -

reply memorandum challenging SNC's claims. They served SNC with their Reply by e-mail on Friday, October 12, at 11:36 p.m., effectively leaving SNC only one business day to prepare its surreply. Accordingly, in timely filing this surreply, SNC expressly reserves the right to supplement this response in due course particularly with respect to the recitation of applicable Ontario law.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the SNC Opposition, SNC respectfully requests that the Court deny the Debtors' Objections; allow SNC's claims, in amounts to be proved after a hearing on the merits, and grant such other and further relief as is just and proper.

Dated: October 16, 2007

SNC-LAVALIN POWER ONTARIO, INC.

By its counsel,

*/s/William D. Sullivan*
William D. Sullivan (No. 2820)
WILLIAM D. SULLIVAN, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801
(302) 428-5500

– and –

Patrick P. Dinardo
Pamela Smith Holleman
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800

- 25 -

**TAB 8 – EXHIBIT H**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., *et al.*, | Case No. 06-11045 (BLS) Jointly Administered |
| Debtors. | Related Docket Items: 1579, 1581, 1703, 1732, 1774, 1822, 1825, 1894 & 1897 |

### SUPPLEMENTAL MEMORANDUM OF LAW OF SNC-LAVALIN POWER ONTARIO, INC. AS TO OBJECTIONS TO ITS CLAIM NOS. 1099 AND 1100

SNC-Lavalin Power Ontario, Inc., for itself, its subsidiaries and affiliates (collectively, "SNC"), hereby files its supplemental memorandum of law in connection with its Opposition to Objections to Claim Nos. 1099 and 1100 against the estates of Deltak, L.L.C. ("Deltak") and its affiliated debtor and debtor-in-possession, Global Power Equipment Group Inc. ("GPEG", and collectively with Deltak and their affiliated debtors and debtors-in-possession, the "Debtors"), and the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders (the "Committees", and together with the Debtors, the "Estate Representatives").[1]

### Procedural Posture

The Court held a hearing on the pending Debtors' Objections on September 28, 2007, and thereafter continued that hearing until October 17, 2007. At the conclusion of the October 17

---

[1] SNC hereby incorporates by reference its Reply to Debtors' Objections (D.I. #1579 and #1581) to Claim Nos. 1099 and 1100 (D.I. #1703) (the "SNC Opposition") and its Surreply of SNC-Lavalin Power Ontario, Inc. to the Estate Representatives' Reply to SNC's Opposition to Objections to Claim Nos. 1099 and 1100 (D.I. #1825) (the "SNC Surreply"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the SNC Surreply.

1

DATE *10·29·07*

DOCKET # *1905*

hearing, the Court directed the parties to submit supplemental briefs to the Court with respect to

two specific issues: (i) the scope and extent of allowable discovery as to SNC's allegations of

"willful misconduct and/or intentional fraud" against Deltak, including whether or not SNC is

entitled to investigate alleged prepetition instances of such conduct, as well as alleged

postpetition instances; and (ii) whether GPEG ever executed a written guaranty of Deltak's

obligations under the SNC HRSG Contract and, if not, whether in the absence of such a writing,

the Ontario Statute of Frauds, which requires that all contracts charging any person to answer for

the debt of another be in writing, bars SNC's claims against GPEG as asserted in its Proof of

Claim No. 1100.

　　　　The Estate Representatives take the remarkable position that SNC's Proofs of Claim,

filed in the total amount of at least $55,179,000, can be dismissed without discovery. They do so

notwithstanding SNC's highly particularized allegations of (among other things) a) fraud in the

inducement; b) "willful misconduct and/or intentional fraud" under the language of the relevant

contract; c) concealment of massive intercompany transfers, in violation of bedrock principles of

bankruptcy disclosure; and d) breach of the promise of a GPEG parent guarantee (where the

parent and subsidiary Deltak have, as it *now* appears, operated essentially as one). We are aware

of no law – and the Estate Representatives have pointed to none – to justify disallowing SNC's

Claims on these facts, without allowing any discovery whatsoever.

　　　　As this Court rightly suggested at the October 17 hearing, at this juncture, the Estate

Representatives would have to meet the standards of a motion to dismiss – in other words, every

fact alleged in SNC's pleadings must be taken as true; every inference must be drawn in SNC's

favor. See In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 273 (3d Cir. 2004) (allegations

must be taken as true and all inferences drawn in favor of nonmovants in connection with a

2

motion to dismiss).  Under the circumstances, and based on the law discussed below, the Estate

Representatives cannot seriously contend that SNC must be denied all discovery; that its Proofs

of Claim can be dismissed on this record; and that the charges of fraud, concealment and

misstatement set forth in SNC's filings and supplemented further below, can be swept under the

rug.

## ARGUMENT

I.     **SNC is entitled to full and fair discovery under the rules to investigate its claims of "willful misconduct and/or intentional fraud by Deltak and its affiliates", including prepetition instances of such conduct, as well as alleged postpetition instances.**

As set forth in SNC's initial reply to the Claims Objections, SNC has the right to

investigate (among other things) four substantive factual issues:

(i)     Deltak's and GPEG's actions and inaction regarding the promised GPEG parent guaranty described in the SNC's Proofs of Claim, including why the written guaranty was never delivered despite a written promise to do so;

(ii)    GPEG's impact on Deltak's direction and financial condition in light of substantial intercompany debts, as well as the factors leading to the Debtors' decision to wind down Deltak;

(iii)   the Debtors' interaction and relationships with various parties, insofar as those interactions and relationships had anything to do with how Deltak came to be a supplier to SNC of HRSGs for the Project; and

(iv)    issues surrounding the Debtors' (unsuccessful) effort to use the bankruptcy process to absolve their non-debtor affiliate, Deltak Power Equipment (China) Co. Ltd. ("DPEC"), of its warranty obligations to SNC.

Simply by scrutinizing the public record created by the Debtors to date, and without yet

having had access to *any discovery whatsoever*, SNC has already learned certain extraordinary

facts about the Debtors' actions, including the following:

a)      On September 29, 2006, the Debtors portrayed Deltak as having "little or no going concern value in the absence of a substantial infusion of capital beyond its current ability to raise." See Affidavit of John Matheson in Support of First Day Motions and Applications at ¶ 19, and Debtors' Wind-Down Motion (D.I. #12) at

3

¶ 4 (emphasizing that "the only value" that can be derived from the HRSG Business is "through the cessation of the HRSG Business operations and affairs and the liquidation of its assets"). *The Debtors disclosed nothing in their papers concerning outstanding intercompany payables and receivables.*

b)    On November 27, 2006, in the Global Notes to Debtors' Statements and Schedules, the Debtors stated that the amounts of intercompany transfers as of the Petition Date *"have not been quantified."* The Debtors disclosed nothing concerning any supposed "dispute" relating to the amounts at issue, and did not amend or supplement their disclosures in amendments filed in March, 2007. (On November 27, 2006, Deltak, SNC and the Creditors' Committee were in the midst of round the clock negotiation of the Completion Agreement – a negotiation that, as the Debtors were well aware, would have been significantly affected by disclosure of the intercompany transfers).

c)    On January 8, 2007, in their delayed filing of the "October 2006 Monthly Operating Report", the Debtors disclosed for the first time cash amounts due Deltak from GPEG of approximately $182 million, and a non-cash (corporate overhead) liability from Deltak to GPEG of approximately $54 million. *This left an apparent net liability due Deltak, previously undisclosed, of approximately $128 million as of the Petition Date.* The Debtors conveniently made this disclosure only after 9 of the 10 Completion Agreements they sought in this case were signed.

d)    On September 10, 2007, in the form of the Debtors' proposed Disclosure Statement, the Debtors outlined their detailed cash management system, stating that intercompany transfers between Deltak and GPEG, its parent, were processed manually, and reconciled (and adjusted as necessary) on a monthly basis. *Such monthly reconciliations prove incontrovertibly that the Debtors' sworn statement in the Global Notes of November 27, 2006 is false.*

e)    On October 9, 2007, in the third recital paragraph of the proposed Plan Support Agreement filed with the Debtors' Motion to Approve (D.I. #1803), the Debtors stated that the net intercompany transfers to Deltak from GPEG reflect a liability "in the approximate net amount of $146 million." The Debtors further stated, for the first time, that the "manner of treatment" of the intercompany transfers is "subject to dispute."

f)    On October 26, 2007, in their revised Disclosure Statement relating to the First Amended Plan,[2] at 40, the Debtors referred to the GPEG liability to Deltak as "approximately $134 million", a *$12 million discrepancy* from the figures the Debtors cited just two weeks earlier. The Debtors now suggest that various amounts should be set off against GPEG's liability to Deltak, including 50% or more of the costs of the Debtors' bankruptcy (estimated to total approximately

---

[2] A revised disclosure statement has been circulated, but SNC believes that it has not yet been filed.

$35 million in the aggregate), one third of the Debtors' DIP financing (a total of approximately $20 million), and various other assessments. Setting off these amounts from what is now the $134 million net liability, would *still* leave Deltak with a claim against GPEG of *at least $88 million.*

g)    By virtue of their so-called Rights Offering Plan, the Debtors and their Equity Committee (with the Creditors Committee's assent) seek to compromise GPEG's $88 million liability to Deltak[3] for *at most* $34 million, supposedly because the expense of litigating the newly announced dispute would be prohibitive.[4]

h)    Despite SNC's repeated requests to both the Debtors and the Creditors' Committee for documents concerning the enormous intercompany transfers and any analysis supporting their position regarding the proposed compromise, absolutely no documentation has been offered in support of the positions and statements taken by the Estate Representatives.

i)    Despite assertions in the Debtors' September, 2006 press release that Deltak's large scale HRSG contracts were unprofitable (see Dinardo Affidavit, Exhibit F, at 2), in fact, Deltak's former President Monte Ness (whom SNC seeks to depose) acknowledged to an SNC executive that SNC's HRSG contract was indeed profitable to Deltak. Tardanico Affidavit, at ¶ 8.

j)    Moreover, in the context of Mr. Ness's termination from Debtors' employment, Mr. Ness suggested to SNC's executive that he has knowledge of the Debtors' wrongful business activities. Id. at ¶¶ 2-3.

k)    Less than a week after her appointment, effective September 11, 2006, the Debtors' Senior Vice President and CFO-Elect Mardi De Verges resigned just ten days prior to the Debtors' filing.

Scrutiny of the public record can only carry the inquiry so far, and so, at a minimum,

SNC must be allowed to pursue details, including:

1.    the extent of GPEG's control or domination of Deltak's activities, and whether GPEG was using Deltak as an instrument of fraudulent and/or improper conduct, especially in stripping Deltak of assets and then refusing to stand behind its obligations despite the written promise to do so;

---

[3] A figure that, for the moment, the Debtors are asking creditors (such as SNC) to take "on faith", notwithstanding Debtors' initial concealment, and now constantly shifting positions.

[4] The flimsiness of this reasoning demonstrates once again the effort by GPEG's equity to use these proceedings for its own purposes, all to the detriment of Deltak's unsecured creditors. Why the Creditors' Committee has chosen to be complicit in this effort is unexplained, and perhaps inexplicable.

2.    just exactly what Mr. Ness knows about Debtors' business activities.  If he invokes his right against self-incrimination under the Fifth Amendment, SNC will have its inferences;

3.    how GPEG was able to accrue a cash liability to Deltak of approximately $182 million when Deltak's gross revenues in the three years prior to the bankruptcy averaged less than $150 million per year, and why Deltak's Schedules and Statement of Financial Affairs (sworn to by James P. Wilson, an officer of Deltak) failed to reflect that intercompany receivable;[5]

4.    why amendments to the Debtors' Schedules and Statement of Financial Affairs (filed in March, 2007, and attested to by the Debtors' CFO, Michael Hanson) still failed to reflect, or even to refer to, the substantial intercompany accounts;

5.    why the public record statements on massive intercompany accounts have been a) initially opaque, and then b) constantly shifting, notwithstanding a supposedly rigorous monthly accounting system;

6.    whether the Debtors' willful misconduct and/or intentional fraud asserted by SNC is part of a pattern of such activity, ongoing for a number of years;[6] and

7.    why the Debtors' Senior Vice President and CFO-Elect Mardi De Verges resigned just ten days prior to the Debtors' bankruptcy filing.

As a threshold matter, SNC needs and is entitled to discovery of the above-described information in order to flesh out its Claims of fraud, fraud in the inducement, and willful misconduct, in the face of the Debtors' Objections.  SNC also has an independent right to this information because it goes to the heart of the confirmability of the Debtors' plan of reorganization, to which SNC intends to object, consistent with SNC's previously filed objections to the Debtors' proposed Disclosure Statement (D.I. #1791 and #1816).  The Debtors seek to rush confirmation of their Rights Offering Plan of reorganization, in the hopes that

---

[5] Even though SNC had raised the concealment of the intercompany debt with great sharpness in the SNC Surreply, the Debtors did not even *attempt* an explanation or defense at the hearing on October 17, 2007.

[6] On March 8, 2006, for example, GPEG announced that it had to restate Fiscal 2004 and Quarterly 2005 results based on misreporting gross profits.  Among other things, SNC is entitled to take discovery regarding GPEG's internal control over financial reporting; GPEG management's assessment of such internal control, including audit committee minutes and any underlying material delivered to GPEG's audit committee in anticipation of a material weakness in its internal control system; and related periodic reporting certifications.

6

parties in interest will be foreclosed from airing what the Debtors themselves refer to as their "dirty laundry". See Debtors' Response to SNC's Motion to Lift the Seal on HRSG Completion Agreements (D.I. #1813) at 2. In fact, this is both the time and the place for such an "airing": SNC has plausibly alleged both prepetition and postpetition fraud and willful misconduct by the Debtors, such that discovery into these allegations is entirely relevant and warranted here. Moreover, whether in connection with the alleged fraud in the inducement, or the fraud and willful misconduct carve-out in the Completion Agreement, discovery is essential to SNC's case.

As first pointed out by SNC in its objection to the Debtors' Disclosure Statement, the Rights Offering Plan represents an unabashed attempt by the Debtors to immunize themselves from liability for all postpetition, pre-confirmation acts, including liability for their own willful misconduct or intentional fraud. See Plan at § 8.6 (a section of the Plan that is innocuously labeled "Management").[7] Entry of an order confirming the Rights Offering Plan would operate as res judicata as to issues that are still in the process of being litigated – including the Debtors' Objections to SNC's Proofs of Claim. SNC must be afforded full and fair discovery so that it can build a sufficient record regarding this important issue, which bears directly on the confirmability of the proposed Plan as well as on SNC's Claims.

Needless to say, prompt discovery is also necessary as SNC must file, by December 7, 2007, a motion for temporary allowance of its Claims so as to be able to vote those Claims with respect to the Rights Offering Plan.[8] Accordingly, SNC is entitled to discovery as to all

---

[7] Given the activities that SNC has uncovered to date, the desire of these individuals in the Debtors' management to immunize themselves is understandable but completely inappropriate.

[8] At a minimum, and even crediting the Debtors' arguments, SNC would still have an acknowledged claim of at least CAD $34,996,635 until further projected milestones are passed (if ever). See Debtors' Objection to Proof of Claim No. 1099 (D.I. #1581) and Exhibit A thereto. At this time of year, the probability of freezing temperatures in Ontario will make the required hydrotesting impossible until late Spring, 2008 (at the earliest).

information relevant to: its Proofs of Claim, forthcoming temporary allowance pleadings, the allegations made to date and the integrally related question of plan confirmability.

> **A.    Under the rules, SNC is entitled to broad discovery of *all relevant evidence* with respect to its Claims.**

The Federal Rules of Civil Procedure contemplate broad and liberal discovery. In re Madden, 151 F.3d 125, 128 (3d Cir. 1998) ("Pretrial discovery is ... 'accorded a broad and liberal treatment'") (citations omitted); see also Wright, Miller & Marcus, Federal Practice and Procedure, Civil 2d § 2007 ("rule does allow broad scope of discovery and this has been well recognized by the courts"). Federal Rule of Civil Procedure 26(b)(1), made applicable to this proceeding by Fed. R. Bankr. P. 7026 and 9014(c), sets forth the broad scope of discovery:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

Under the rules, all relevant information and documents are discoverable unless an applicable evidentiary privilege is asserted. Pearson v. Miller, 211 F.3d 57, 64 (3d Cir. 2000) (federal rules governing discovery are intended to provide parties with fullest possible knowledge of issues and facts). Accordingly, discovery rules are to be liberally construed in favor of SNC, the party seeking discovery. Marshall v. Elec. Hose & Rubber Co., 68 F.R.D. 287, 295 (D. Del. 1975). Courts should be extremely hesitant to preclude a litigant's from investigating relevant information. In Stabilus v. Haynsworth, Baldwin, Johnson and Greaves, P.A., 144 F.R.D. 258, 263 (E.D. Pa. 1992), the court succinctly set forth the relevancy standard, as follows: "...[R]elevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleading, or to the merits of the case".

8

Rule 26(b)(1) provides further that discovery need not be confined to matters of admissible evidence, but may encompass that which "appears reasonably calculated to *lead to the discovery of admissible evidence.*" Therefore, discovery requests may be deemed relevant if there is any possibility that the information may be useful in the preparation of the case, even though not directly admissible in evidence. Joseph v. Harris Corp., 677 F.2d 985 (3d Cir. 1982) (mere assertion of broadness and burden is not a sufficient objection); Shaklee Corp. v. Gunnell, 748 F.2d 548 (10th Cir. 1984) (new trial warranted where denial of discovery precluded fair trial even if subject matter of discovery was held not relevant but later became relevant).

The Federal Rules of Civil Procedure in no way limit SNC's ability investigate alleged prepetition instances of such conduct, as well as alleged postpetition instances. As to relevant information, no time limitation is imposed on the scope of discovery. Here, SNC must be permitted to develop evidence as to whether (i) the formation of the Completion Agreement was induced by fraud, and (ii) the Debtors' willful misconduct and/or intentional fraud (as asserted by SNC) is part of a GPEG-directed pattern of such activity, ongoing for a number of years. As to the Completion Agreement, regardless whether it is characterized as a release, an accord and satisfaction, a settlement agreement or otherwise, the Agreement may be invalidated if it was induced by fraud.[9] Under New York law, a finding of fraud will invalidate any signed release. Joint Venture Asset Acquisition v. Zellner, 808 F. Supp. 289, 302-03 (S.D.N.Y. 1992) (waiver, hold harmless and release invalidated by showing fraud in the inducement by preponderance of the evidence); Barrett v. U.S., 660 F. Supp. 1291, 1309 (S.D.N.Y. 1987) (same, as to a release of liability); see also City of Amsterdam v. Goldreyer, Ltd., 882 F. Supp. 1273, 1280 (E.D.N.Y.

---

[9] With the express severability provisions of Section 4.6 of the Completion Agreement, the fraudulently induced "waiver" and "step-down" language in dispute here should be severed as unenforceable and the balance of the Agreement would not be impaired.

9

1995) ("the accord and satisfaction doctrine necessarily implicates questions of fact that must be resolved at trial, not on a motion to dismiss"). Pattern evidence of past and present fraud and willful misconduct is specifically admissible under the rules of civil procedure, and SNC is entitled to develop that evidence in support of its Claims.

**B.    SNC is entitled to broad discovery relevant to opposing the Debtors' objections to SNC's Proofs of Claim.**

On March 25, 2007, SNC timely filed two virtually identical Proofs of Claim in the above-referenced cases, against both Deltak and GPEG. The Debtors have filed what are effectively motions to dismiss SNC's claims (Claim Nos. 1099 and 1100) with the issues now joined in this contested matter. SNC requested discovery from the Debtors concerning various intercompany transactions and certain actions and inaction of Deltak and GPEG giving rise to the instant claims.[10] SNC believes that the information requested will validate its claims for breach of contract, breach of warranty, and its entitlement to relief from the cap and "step-down" of its claims under the Completion Agreement by reason of possible willful misconduct and/or intentional fraud on the part of the Debtors. Further, SNC expects that the requested discovery will elicit evidence that the acts and omissions of Deltak, GPEG and their affiliates directly and proximately caused the loss and damages claimed by SNC; that Deltak and GPEG are liable to SNC on a tort and/or a contract and/or a warranty theory; and that, as a matter of law, the alleged waiver, cap and "step-down" schedule are not enforceable limitations of SNC's remedies against

---

[10] In October 2006, SNC made its initial requests for information to the Creditors' Committee, but the Committee informed SNC at the time that it did not yet have access to the information requested, and subsequently did not produce any information, stating only that SNC should seek this information in any subsequent contested matter. On September 21, 2007, SNC did just that, and served upon the Debtors the First Request for Production of Documents by Claimant SNC-Lavalin Power Ontario, Inc. to the Debtors Global Power Equipment Group Inc. et al. and the First Set of Interrogatories by Claimant SNC-Lavalin Power Ontario, Inc. to the Debtors Global Power Equipment Group Inc. Further requests to the Creditors' Committee for access to information and analysis relevant to the Debtors' proposed settlement of the intercompany accounts have been refused.

10

the Debtors. As such, the information sought is vital to SNC for the purposes of fully responding to the Debtors' objections to its Proofs of Claim. Of course, if the Debtors' objections were to be treated as motions to dismiss, the allegations of SNC's claims (including fraud in the inducement, and fraud and willful misconduct under the Completion Agreement itself) must be taken as true for purpose of the motions.

Alternatively, if the Debtors' objections are treated as motions for summary judgment, it is axiomatic that a party opposing a dispositive motion must be given ample opportunity to discover information essential to its opposition. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Costlow v. U.S., 552 F.2d 560, 563-64 (3d Cir. 1977) (court is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery). "Where ... the facts ... are solely in the possession of [the movant], a motion for a continuance of a motion for summary judgment for purposes of discovery should, we think, ordinarily be granted almost as a matter of course." Ward v. U.S., 471 F.2d 667, 670-71 (3d Cir. 1972) (internal citations omitted). In First Chicago International Corp. v. United Exchange Co., Ltd, 836 F.2d 1375, 1379-80 (D.C. Cir. 1988), the D.C. Circuit reversed a district court's grant of summary judgment on the ground that the plaintiff had not been given an adequate opportunity to conduct discovery. See also Sames v. Gable, 732 F.2d 49, 51-52 & n.3 (3d Cir. 1984) (court erred by granting summary judgment where opposition papers indicated discovery was still underway).

A court's decision to deny a party its right to gather factual information necessary to oppose a dispositive motion is, of course, reversible error. Sutera v. Schering Corp., 73 F.3d 13, 18 (2d Cir. 1995) (held that party opposing summary judgment must be given sufficient opportunity to explore any information needed for opposition to summary judgment) (internal citations and quotation marks omitted); see Fed. R. Civ. P. 56(f) (made applicable to this

11

SA 98

proceeding by Fed. R. Bankr. P. 7056 and 9014(c)). "Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." Hellstrom v. U.S. Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000). The SNC Surreply and Affidavits that SNC has submitted to date clearly identify areas of discovery necessitated by Debtors' objection to SNC's claims and their proposed plan of reorganization.

The SNC Surreply leaves no doubt that discovery is essential to respond to the Debtors' objections to SNC's claims. Additionally, SNC's counsel has emphasized in open court that discovery will provide information as to the extent to which the Debtors engaged in willful misconduct, both prepetition and postpetition, and acted with fraudulent intent when concealing the enormous intercompany debt in order to induce a step-down to zero of the claims by SNC. (Hearing Tr. 10/17/07)

> **C.    SNC is entitled to discovery in connection with objecting to the confirmability of the Rights Offering Plan.**

Consistent with SNC's objection to the Debtors' Disclosure Statement, SNC intends to object to the Debtors' plan as it is not confirmable at present, in view of the Debtors' prepetition and postpetition fraud and willful misconduct. Whereas Bankruptcy Rule 9014 fully authorizes discovery of a "contested matter," which is defined by Bankruptcy Rule 3020 to include plan confirmation, SNC is entitled to discovery in connection with the confirmability of the Rights Offering Plan, SNC's objection thereto and in connection with the temporary allowances that SNC may seek. In re Gilchrist Co., 410 F. Supp. 1070 (E.D. Pa. 1976) (citing with approval bankruptcy judge's decision to allow objecting party to "take appropriate discovery and otherwise prepare for an evidentiary hearing on confirmation", which included the taking of "numerous depositions").

12

Debtors may argue inconvenience (though they have particularized absolutely nothing by way of inconvenience so far). In any event, any inconvenience the discovery requests may impose upon the Debtors, without more, does not rise to any degree of legal significance. To resist discovery, the Debtors would have to demonstrate "that the requested documents either do not come within the broad scope of relevance defined pursuant to Fed. R. Civ. P. 26(b)(1) or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure ...." Morgan v. Havir Mfg. Co., Civ. A. No. 92-5536, 1994 WL 384665 (E.D. Pa. July 18, 1994) (internal quotation marks omitted) (copy attached hereto as Exhibit A); Josephs v. Harris Corp., 677 F.2d 985, 992 (3d Cir. 1982) (finding conclusory statements as to burden inadequate to sustain objection to discovery).

II.     **Even if GPEG did not sign the form of parent guaranty attached to the parties' Purchase Order as Exhibit T, SNC's claims against GPEG are not barred by the Ontario Statute of Frauds.**

Not having had the benefit of any discovery whatsoever in this contested matter (except on the limited issue addressed in GPEG's General Counsel Candace Cheeseman's recently filed Amended Affidavit, issued at the Court's direction), SNC lacks sufficient information to determine the reasons why GPEG never signed a "parent guaranty" as required by the terms of the SNC HRSG contract.[11] This is, however, only the beginning and not the end of the matter. SNC is entitled to discovery to develop the factual record further: (i) to determine whether there exist several writings which, taken together, constitute a sufficient memorandum to satisfy the Ontario Statute of Frauds; (ii) to prove that its claim against GPEG is outside the Statute of Frauds, or (in the alternative) that GPEG is estopped from asserting the statute as a defense; and (iii) finally, to prove its other claims against GPEG, which are not predicated upon the existence

---

[11] This assumes, *arguendo*, that Ms. Cheeseman's conclusion that no such signed document exists is accurate.

13

a signed parent guaranty. The Estate Representatives simply refuse to acknowledge the other

aspects of SNC's Claim, and attempt to sidestep them by focusing on the guaranty issue alone.

> **A.     SNC is entitled to discovery to determine whether there exist several documents which, taken together, constitute a memorandum sufficient for the GPEG guaranty to satisfy the Ontario Statute of Frauds.**

Even if GPEG did not sign the form of parent guaranty attached to the parties' Purchase

Order as Exhibit T, SNC is entitled to investigate whether several documents exist that, taken

together and connected with parol evidence if necessary, constitute a memorandum that satisfies

the Ontario Statute of Frauds. Canadian courts (like U.S. courts) permit the joining together of

two or more documents to form a memorandum sufficient to satisfy the applicable Statute of

Frauds:

> It is clear that no rigid or precise form of memorandum is prescribed by the Statute of Frauds, nor need the entire contract be contained in the writing. What is required is a statement of the essential terms of the contract. Moreover, the statute does not deal with the validity of the contract but with the evidence of its existence … It is also well established that several documents may be connected to each other by reasonable inference, with parol evidence if necessary, to constitute a sufficient memorandum. This principle has been stated in a series of cases … and has been adopted in Canada.

Harvie v. Gibbons, [1980] 109 D.L.R. (3d) 559 (Alta. C.A.), at ¶¶ 16, 19, 22 (check and map

together, connected by parol evidence, satisfied Statute of Frauds) (copy attached hereto as

Exhibit B); cited in Paquette v. Smith, [1989] 70 O.R. (2d) 449 (broker's written evidence, Trade

Record Sheet and telephone records sufficient to satisfy Statute of Frauds notwithstanding that

seller orally accepted but did not sign offer to purchase) (copy attached hereto as Exhibit C).

Here, SNC believes it likely that, given a reasonable opportunity to review discoverable

documents in the Debtors' care, custody and control, including electronic communications, and

to obtain parol evidence as appropriate, it will be able to establish that GPEG was fully aware of

14

Deltak's promise to provide SNC with a parent guaranty, assented to that promise, and thereafter failed to perform its freely undertaken obligation to do so.

**B.    SNC is entitled to discovery to determine whether the Wider Interest Rule or principles of estoppel take the GPEG guaranty out of the Ontario Statute of Frauds.**

Even in the absence of a "writing" sufficient to establish the parent guaranty, SNC may yet prevail on a guaranty claim against GPEG.  With respect to the Ontario Statute of Frauds, it is clear that the "wider interest exception" to the application of the statute is recognized in Canada.  S.M. Waddams in The Law of Contracts, 5th ed. (Toronto: Canada Law Book, 2005) has observed that guarantees that are incidental to a separate transaction of some sort have in a number of cases been excluded from the operation of the statute, including where the guarantor has an interest in property or some business interest, which the guarantor seeks to advance by the guaranty (at p. 162) (copy attached hereto as Exhibit D).  Similarly, J.D. McCamus in The Law of Contracts (Toronto: Irwin Law, 2005) states that guarantees may be excluded from the statute where they may be characterized as mere incidents of a larger contractual relationship, including where the guaranty is given in the context of a larger transaction in order to protect the proprietary interest of the guarantor in an asset (at p. 166) (copy attached hereto as Exhibit E). This is particularly likely where evidence establishes that the guarantor is receiving a benefit in the transaction that can be characterized as more than merely that which accrues by virtue of its shareholding in the debtor company.[12]

The continuing existence and vitality of the wider interest exception was recognized by the British Columbia Court of Appeal in Pullano v. Yellowhead Timber Ltd., [1994] B.C.J. No.

---

[12] As previously noted in the SNC Surreply on this point, Ontario law makes clear that the Statute of Frauds must not be allowed to be used as an "engine of fraud".  SNC Surreply at 24.

1317 at ¶¶ 16-18 (QL) (copy attached hereto as Exhibit F), where the court rejected the argument

that a change to the wording of the relevant B.C. statute had rendered this exception inapplicable

in B.C. The court commented that at the heart of the exception lies the pursuit of an objective

beyond that of simply guaranteeing the debt, that is, the guaranty is incidental to a larger purpose

sought to be accomplished by the promisor (at ¶ 20). At least one Ontario court has further held

that the wider interest exception applies to an oral guaranty given by the sole shareholder who

was one of two officers of the debtor company on the basis that the guarantor had a personal

property interest in the company to protect by making the promise. See Active Customs Brokers

Ltd. v. Sack, [1987] O.J. No. 1082 at 2 (Div. Ct.) (QL) (copy attached hereto as Exhibit G).

Moreover, a recent decision of the House of Lords in England considering virtually

identical language to the relevant parts of § 4 of the Ontario Statute of Frauds addressed the

application of estoppel to preclude an alleged guarantor from relying on the statute:

Actionstrength Ltd. v. International Glass Engineering IN.GL.EN SpA, [2003] 2 All E.R. 615

(copy attached hereto as Exhibit H). While the court applied the statute to an oral guaranty in

that case, the various opinions appeared to accept that a defendant might be estopped from

relying on the statute where the plaintiff assumed itself to be the beneficiary of an effective

guaranty, *the defendant induced or encouraged the making of that assumption and it would be*

*unconscionable for the defendant to rely on the statute.* See, e.g., ¶ 8 (Lord Bingham), ¶ 34

(Lord Clyde). Accordingly, SNC is also entitled to develop the factual record that will show that

GPEG's role in Deltak's promise to deliver the parent guaranty, and its subsequent failure to do

so, such that GPEG is estopped from asserting the Statute of Frauds as a bar to SNC's claim.

16

SA 103

**C.     SNC is entitled to develop evidence to support its claims against GPEG that are not predicated upon the execution of a parent guaranty alone.**

Finally, regardless of whether GPEG is liable to SNC on a guaranty theory, SNC is entitled to discovery in support of its *other* claims against GPEG. It is noteworthy that, in *none* of their objections to SNC's claims do any of the Estate Representatives make any effort to respond to SNC's contention that, as a court of equity, this Court should apply the well-established equitable maxim which treats "as done that which should be done" in order to relieve a victim of the consequences of a wrongdoer's failure to act. See SNC Opposition at ¶ 17, and cases cited therein.

In its Proofs of Claim, SNC specifically reserved rights against Deltak and GPEG not only with respect to the promised parent guaranty, but other causes of action as well. Thus, in ¶ 14 of each of its filed Proofs of Claim (#1099 and #1100), as follows:

14.     SNC reserves all rights it may have, in law and equity, *including but not limited to* —

- to amend its Proofs of Claim as necessary with the passage of time to reflect exchange rate gains in converting claims calculated in CAD to USD, additional sums to be owed or any applicable credits or duplicated information;
- to assert additional claims against the Debtors, including, but not limited to, administrative expense claims, rights of set-off, and other claims or rights;
- to challenge the applicability of the step-down schedule set forth in § 2.2 of the Completion Agreement, based upon a showing that Deltak committed willful misconduct, including, e.g. by its statements or omissions at the time of entering into the Executory Contract, the Completion Agreement or thereafter *and/or by conducting itself as an alter ego or mere instrumentality of GPEG, or otherwise*; and
- against DPEC, Hongdu or other third parties concerning the transactions and occurrences that gave rise to the instant claim.

[Emphasis added].

Under U.S. law, it is well-established that the corporate veil may be "pierced" and alter ego liability imposed where the totality of the circumstances so warrant. See, e.g., Plastipak

17

Packaging, Inc. v. DePasquale, 75 Fed. Appx. 86, 88 (3d Cir. 2003) (under Pennsylvania law,

totality of circumstances warranted piercing corporate veil where, among other things, debtor

was grossly undercapitalized and provided creditor with unaudited and inaccurately overstated

financial statements).  For example, as one Delaware bankruptcy court recently observed:

> This Court can accept as a basis for veil piercing that a creditor has been misled in
> some manner into reliance upon the parent corporation for the subsidiary's debts
> ... because this, of course, is but another form of fraud, ... which fraud goes to
> the use of a subsidiary's corporate form.

Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.), 290 B.R. 229, 238 (Bankr. D. Del.

2003) (internal quotations and citations omitted).[13]  There is no definitive test for imposing such

liability, and the inquiry invariably looks to the facts and circumstances of the particular case.

See id.; accord InSite Servs. Corp. v. American Elec. Power Co. (In re InSite Servs. Corp.), 287

B.R. 79, 96 (Bankr. S.D.N.Y. 2002) ("There are an 'infinite variety of situations' that might call

for disregarding the corporate veil, and the ultimate question of veil piercing must be decided by

'considering the totality of the evidence.'"), quoting William Passalacqua Builders, Inc. v.

Resnick Devs. South, Inc., 933 F.2d 131, 138 (2d Cir. 1991).  Consequently, discovery is

essential where – as here – an alter ego theory is pleaded.  See Proofs of Claim at ¶ 14

(preserving claims that Deltak has conducted itself as an alter ego or mere instrumentality of

GPEG).

      Similarly, Ontario law recognizes a veil-piercing theory.  Under Canadian law, a parent

corporation may be liable for the acts of its subsidiary where there is complete control by the

parent of the subsidiary so that it does not function independently and the subsidiary has been

---

[13] The court goes on to say that such a theory is applicable where a parent corporation engages in misleading
conduct vis-à-vis a subsidiary corporation's creditors, and the creditors act to their detriment because of such
misleading conduct.  Upon completion of discovery, SNC has every reason to believe that it will establish both
elements of this theory.

incorporated for a fraudulent or improper purpose or used by the parent as a shield for improper

activity. See 642947 Ontario Ltd. v. Fleischer (2001), 56 O.R. (3d) 417 (copy attached hereto as

Exhibit I). It may also be possible for a parent to be liable for the acts of its subsidiary where

there is a principal-agent relationship between the two corporations. See Transamerica Life Ins.

Co. of Canada v. Canada Life Assurance Co. (1996), 28 O.R. (3d) 423 at 9 (Gen. Div.) (QL),

affirmed, [1997] O.J. No. 3754 (C.A.) (QL) (copy attached hereto as Exhibit J). In 642947

Ontario Ltd., the Ontario Court of Appeal discussed the circumstances under which the corporate

veil may be pierced as follows:

> ...To pierce the corporate veil is to disregard the separate legal personality of a
> corporation, a fundamental principle of corporate law recognized in Salomon v.
> Salomon & Co., [1897] A.C. 22, [1895-9] All E.R. Rep. 33. Only exceptional
> cases -- cases where applying the Salomon principle would be "flagrantly" unjust
> -- warrant going behind the company and imposing personal liability. Thus, in
> Clarkson Co. v. Zhelka, [1967] 2 O.R. 565 at p. 578, 64 D.L.R. (2d) 457 (H.C.J.),
> Thompson J. held that instances in which the corporate veil has been pierced
> "represent refusals to apply the logic of the Salomon case where it would be
> *flagrantly opposed to justice*". Similarly, Wilson J. observed in Kosmopoulos v.
> Constitution Insurance Co., [1987] 1 S.C.R. 2 at p. 10, 34 D.L.R. (4th) 208, that
> the law on when the corporate veil can be pierced "follows no consistent
> principle. The best that can be said is that the "separate entities" principle *is not
> enforced when it would yield a result "too flagrantly opposed to justice,
> convenience or the interests of the Revenue*": L.C.B. Gower, Modern Company
> Law (4th ed. 1979), at p. 112.
>
> Typically, the corporate veil is pierced when the company is incorporated for an
> illegal, fraudulent or improper purpose. But it can also be pierced if when
> incorporated "those in control expressly direct a wrongful thing to be done":
> Clarkson Co. v. Zhelka at p. 578. Sharpe J. set out a useful statement of the
> guiding principle in Transamerica Life Insurance Co. of Canada v. Canada Life
> Assurance Co. (1996), 28 O.R. (3d) 423 at pp. 433-34 (Gen. Div.), aff'd [1997]
> O.J. No. 3754 (C.A.): "the courts will disregard the separate legal personality of a
> corporate entity *where it is completely dominated and controlled and being used
> as a shield for fraudulent or improper conduct*."

19

SA 106

Id. at ¶¶ 67-68 [Emphasis added].  Thus, while the separate legal personality is not lightly set aside, decisions to pierce the corporate veil are highly dependent on the facts and circumstances of the particular case.  See id. at ¶ 69.

In these circumstances, and in all fairness, SNC must have full discovery into GPEG's domination and control of Deltak (evidenced not least by the enormous intercompany transfers, which left Deltak incapable of performing its obligations), all of which has resulted in substantial damages accruing to SNC.

20

## CONCLUSION

WHEREFORE, SNC respectfully requests that the Court deny the Debtors' Objections;

allow SNC's claims, in amounts to be proved after a hearing on the merits, and grant such other

and further relief as is just and proper, including discovery into all aspects of the conduct of

GPEG, Deltak and their affiliates insofar as it relates to SNC's allegations of fraud, fraud in the

inducement and willful misconduct.

Dated: October 29, 2007                    SNC-LAVALIN POWER ONTARIO, INC.

                                           By its counsel,

                                           /s/ William D. Sullivan
                                           William D. Sullivan (No. 2820)
                                           WILLIAM D. SULLIVAN, LLC
                                           4 East 8th Street, Suite 400
                                           Wilmington, DE  19801
                                           (302) 428-5500

                                           – and –

                                           Patrick P. Dinardo
                                           Pamela Smith Holleman
                                           SULLIVAN & WORCESTER LLP
                                           One Post Office Square
                                           Boston, MA  02109
                                           (617) 338-2800

*Of counsel with respect*
*to Ontario law matters:*

J. Thomas Curry
Perry Hancock
LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP
2600-130 Adelaide Street West
Toronto, Ontario M5H 3P5
Tel: (416) 865-3092

21

**TAB 9 – EXHIBIT I**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP | ) Case No. 06-11045 (BLS) |
| INC., et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Objection Deadline: November 30, 2007 at 4:00 p.m.** |
| | ) **Hearing Date: December 7, 2007 at 1:00 p.m.** |
| | ) |
| | ) |

### NOTICE OF MOTION

**TO:** Counsel to SNC-Lavalin Power Ontario Inc., the Office of the United States Trustee, counsel to the Official Committee of Unsecured Creditors, counsel to the Official Committee of Equity Security Holders, and all parties who filed a notice of appearance pursuant to Bankruptcy Rule 2002

Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession have filed the attached **Joint Motion of Estate Parties Pursuant to Bankruptcy Rule 3018 to Determine the Temporarily Allowed Amount of SNC-Lavalin Power Ontario, Inc. Claim No. 1099 for Plan Voting Purposes** (the "Motion").

Responses or objections to the Motion, if any, are to be filed on or before **November 30, 2007 at 4:00 p.m.** At the same time, you must serve a copy of the objection or response on the undersigned attorneys.

If any responses are timely filed in accordance with this Notice, a hearing on the Motion on will be held on **December 7, 2007 at 1:00 p.m.**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 5, 2007                    THE BAYARD FIRM

By: _____

Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Kathryn D. Sallie (No. 4600)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

Attorneys to the Debtors and
Debtors in Possession          Date: 11.5.07

                               Docket #: 1943

674885-1                       SA 109

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GLOBAL POWER EQUIPMENT | : | Case No. 06-11045 (BLS) |
| GROUP INC., et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | Hearing Date: December 7, 2007 |
| | : | at 1:00 pm |
| | : | Objection deadline: November 30, 2007 |

-------------------------------------------------x

### JOINT MOTION OF ESTATE PARTIES PURSUANT TO BANKRUPTCY RULE 3018 TO DETERMINE THE TEMPORARILY ALLOWED AMOUNT OF SNC-LAVALIN POWER ONTARIO, INC. CLAIM NO. 1099 FOR PLAN VOTING PURPOSES

Global Power Equipment Group Inc. ("GPEG") and its affiliated debtors and debtors in possession (collectively, the "Debtors" [1]), the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Official Committee of Equity Security Holders (the "Equity Committee") (collectively, the Debtors, the Creditors' Committee and the Equity Committee, the "Estate Parties") through the undersigned counsel, hereby file this motion (the "Motion"), pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to determine the temporarily allowed amount for plan voting purposes of SNC-Lavalin Power Ontario, Inc. ("SNC") Claim No. 1099 against Deltak LLC ("Deltak"), a Debtor, and respectfully state as follows:

---

[1]         In addition to GPEG, the Debtors include Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC and WSServices, L.P.

## FACTUAL BACKGROUND

1.      On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.* (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108. On October 10, 2006, the Office of the United States Trustee appointed the Creditors' Committee. Subsequently, on November 9, 2006, the Office of the United States Trustee appointed the Equity Committee.

2.      On October 31, 2007, the Court approved the Disclosure Statement (the "Disclosure Statement") Relating to the First Amended Joint Chapter 11 Plan of Reorganization for Global Power Equipment Group, Inc. and its Affiliated Debtors (the "Plan").

3.      SNC is a Canadian corporation engaged in the business of delivering engineered equipment and building projects, including energy projects, to commercial and governmental purchasers worldwide.

4.      On or about March 25, 2007, SNC filed two virtually identical proofs of claim against both Deltak and GPEG (the "Proofs of Claim"). The claims described in the Proofs of Claim generally relate to the prepetition contract (the "Prepetition Contract") in which Deltak undertook to supply SNC with heat recovery steam generating units ("HRSGs") that form a portion of SNC's construction project for the Sithe Global Power Goreway ULC Project in the City of Brampton, Ontario, Canada.

2

5.    The Prepetition Contract required Deltak to supply three HRSGs to SNC, initially on a fixed price basis prior to the commencement of these cases.  As of the Petition Date, Deltak had not completed its obligations under the Prepetition Contract.  Thereafter, by order of the Court dated December 4, 2006 [Docket No. 458], the Prepetition Contract was rejected.  The work continued subsequently, on a cost reimbursable basis, by means of a completion agreement dated as of November 30, 2006 (the "Completion Agreement"), also approved by Order of the Court on December 4, 2006 [Docket No. 457].

6.    On or about August 29, 2007, the Debtors filed objections to SNC's Proofs of Claim, seeking to disallow and expunge in its entirety Claim No. 1100 (filed against GPEG), and seeking to reduce Claim No. 1099 (filed against Deltak) in accordance with the terms of the Completion Agreement.  SNC has filed an opposition to both objections.

7.    The Completion Agreement provides for an initial maximum claim cap of CDN $ 46,662,179 and further provides for a series of step-downs of the claim cap to zero  upon the achievement of certain milestones as follows:

| Milestone | Step-Down Amount |
| --- | --- |
| After Bankruptcy Court approval of Completion Agreement; | 25% of the Maximum Rejection Damage Claim |
| After the satisfaction of the "Hydro Test" for at least one HRSG Unit; | 35% of the Maximum Rejection Damage Claim |
| After the satisfaction of the "Hydro Test" for at least two HRSG Units; | 50% of the Maximum Rejection Damage Claim |
| After the satisfaction of the "Hydro Test" for all three of the HRSG Units; | 70% of the Maximum Rejection Damage Claim |
| After the satisfaction of "Steam Blow;" | 80% of the Maximum Rejection Damage Claim |
| After the satisfaction of "ASME Stamping" of all three  HRSG Units | 85% of the Maximum Rejection Damage Claim |

3

| Milestone | Step-Down Amount |
|---|---|
| and delivery of all Documentation related thereto; | |
| After the satisfaction of thermal performance, pursuant to SNC-Lavalin specifications, for all three HRSG Units; and | 95% of the Maximum Rejection Damage Claim |
| Upon expiry of one (1) year subsequent to the satisfaction of thermal performance, pursuant to the Specifications, for all three HRSG Units | 100% of the Maximum Rejection Damage Claim |

8.     As a result of the December 4 Orders, the initial step-down under the Completion Agreement has already occurred, thereby reducing the maximum SNC claim against Deltak to CDN $34,996,634.  Moreover, Deltak is currently performing all of its obligations under the Completion Agreement and, as contemplated by the Plan and described in the Disclosure Statement, will continue performing those obligations under the Completion Agreement until all step-down milestones are achieved.  Accordingly, the Estate Parties reasonably believe that SNC will have no ultimate allowed claim against Deltak and that the Court can reasonably reduce the amount of any SNC claim at this time for plan voting purposes.[2]

## JURISDICTION

9.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e), and 157 (b)(2).  This proceeding is brought in accordance with Section 502 of the

---

[2]     As the Court is aware, SNC has been attempting to rescind the Completion Agreement in the context of the pending objection to Claim No. 1099, and the Estate Parties seek for that matter to be heard and resolved concurrently with this Motion.  The Estate Parties intend to obtain SNC's consent to, or Court approval of, a discovery order with respect to this Motion, the objections to SNC's Proofs of Claim and SNC's anticipated objection to confirmation of the Plan.

4

Bankruptcy Code, Bankruptcy Rule 3018(a), and this Court's Order entered on October 31, 2007 [Docket No. 1913] (the "Voting Procedures Order").[3]

## RELIEF REQUESTED

10.    By this Motion, the Estate Parties seek a determination of a temporary allowed amount for SNC's Proof of Claim No. 1099 for Plan voting purposes pursuant to Bankruptcy Rule 3018.[4]

## BASIS FOR RELIEF

**A.    Temporary Allowance Pursuant To Bankruptcy Rule 3018.**

11.    While generally only the holder of a claim that has been allowed pursuant to section 502 of the Bankruptcy Code is entitled to vote to accept or to reject a debtor's plan and claims that are the subject of pending objections are not allowed claims under section 502(a), Bankruptcy Rule 3018(a) provides that the "court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."

12.    Consequently, disputed claims may be voted in an estimated amount if it is not possible to finally resolve the applicable objections prior to a plan voting deadline.  See <u>Kane v.</u>

---

3    The full caption of the Voting Procedures Order is:  Order (i) Approving the Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization for Global Power Equipment Group Inc. and its Affiliated Debtors; (ii) Approving (a) Form of Ballots and Proposed Solicitation and Tabulation Procedures for the Plan and (b) the Subscription Forms for Purposes of the Rights Offering and Private Placement; (iii) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice of Distribution Thereof; (iv) Establishing Procedures for (a) Voting in Connection with the Plan Confirmation Process and (b) Temporary Allowance of Claims Related Thereto; and (v) Scheduling a Hearing on Plan Confirmation.

4    The Estate Parties reserve the right to supplement this Motion, prior to the hearing, as facts are more fully developed through expedited discovery.

5

<u>Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 843 F.2d 636, 646 (2d Cir. 1988);  <u>see also</u>

<u>In re ABB Lummus Global Inc.</u>, 2006 WL 2052409, at *1 (Bankr. D. Del. June 29, 2006) (noting

that court had jurisdiction under, <u>inter alia</u>, Bankruptcy Rule 3018(a) to estimate the value of

claims for purposes of voting); <u>In re Kovalchick</u>, 175 B.R. 863, 876 (Bankr. E.D. Pa. 1994)

("When claims are objected to by a debtor . . . it is quite proper for the debtor, the claimant, or

another party in interest to ask the court to estimate the claim for voting purposes."). Bankruptcy

Rule 3018 was designed "to give all creditors, even those holding disputed claims, the

opportunity to vote and provided the means of accomplishing this." <u>In re Century Glove, Inc.</u>,

88 B.R. 45, 46 (Bankr. D. Del. 1988).

       13.    The determination whether to temporarily allow a claim for voting purposes lies

within the discretion of the bankruptcy court. See <u>In re Ralph Lauren Womenswear, Inc.</u>, 197

B.R. 771, 775 (Bankr. S.D.N.Y. 1996). Estimation for voting purposes is "at best an imprecise

and uncharted process." <u>In re Frascella</u>, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007). In carrying

out estimation in temporary allowance cases, courts often turn to cases decided under

Bankruptcy Code Section 502(c) for guidance, particularly <u>Bittner v. Borne Chem. Co.</u>, 691 F.2d

134 (3d Cir. 1982) – the "seminal estimation case" in the Third Circuit. See <u>Frascella</u>, 360 B.R.

at 458 n. 48. In <u>Bittner</u>, the Third Circuit explained the estimation process as follows:

> Despite the lack of express direction on the matter, we are persuaded that
> Congress intended the procedure to be undertaken initially by the bankruptcy
> judges, using whatever method is best suited to the particular contingencies at
> issue. The principal consideration must be an accommodation to the underlying
> purposes of the Code. It is conceivable that in rare and unusual cases arbitration
> or even a jury trial on all or some of the issues may be necessary to obtain a
> reasonably accurate evaluation of the claims. Such methods, however, usually
> will run counter to the efficient administration of the bankrupt's estate and where

there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value. In so doing, the court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code.

691 F.2d 134, 135-36 (internal citations omitted).

14.    The burden of proof with respect to the estimation process should be consistent with the burden of proof in claim litigation. See Frascella, 360 B.R. at 458. Pursuant to Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the rules of procedure constitutes *prima facie* evidence of the validity and amount of the claim. The objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim. If the objecting party succeeds in overcoming the *prima facie* effect of the proof of claim, the ultimate burden of persuasion then rests on the claimant. See Frascella, 360 B.R. at 458 n. 49.

15.    Ultimately, any estimation should ensure that the claimant's voting power is commensurate with its economic interests in the case. See Frascella, 360 B.R. at 457-58 ("In the end, the goal of estimation is to fix a value on the claim that will ensure that voting power is commensurate with the claimant's economic interest."); Pension Benefit Guaranty Corp. v. Enron Corp., 2004 WL 2434928, at *5-6 (S.D.N.Y. Nov. 1, 2004) ("The rule specifically and elastically provides that a court may, for purposes of voting, temporarily allow a claim or interest *in an amount which the court deems proper*. . . . the bankruptcy court has utilized its estimation authority to ensure voting power was commensurate with economic interest.").

16.    Thus, courts have, pursuant to Bankruptcy Rule 3018(a), estimated claims for

voting purposes at amounts less than the face amounts of such claims to ensure the claimant's

voting power was commensurate with its economic interest.  See In re LJSC, Ltd., 2006 WL

2038640, at *7 (Bankr. D. Kan. May 4, 2006) (estimating breach of contract claim with a face

amount of $3,107,960.83 at $482,537.71 for voting purposes where extrinsic evidence and

applicable state law concerning breach of contract claims pointed to a significantly lower

damages amount); In re CGE Shattuck, LLC, 2000 WL 33679410, at *4 (Bankr. D. N.H. Nov.

30, 2000) (estimating $26,000 claim for unpaid services at $10,000 for voting purposes; in light

of contradicting accounts of the relevant facts and circumstances concerning the work

performed, the court determined that it would be inequitable to allow the claim in the full

amount); In re Hydrox Chem. Co., 194 B.R. 617, 628-29 (Bankr. N.D. Ill. 1996) (determining

that RICO claims should be allowed at only two (rather than three) times the base amounts after

considering the likelihood that the claimants could successfully recover under the RICO statute,

in particular, the uncertainty regarding whether the requisite pattern of racketeering activity

could be established); In re Zolner, 173 B.R. 629, 632-35 (Bankr. N.D. Ill. 1994)  (estimating

certain pension liability claims at 5% of face value because the claimants were very likely

independent contractors and not employees and estimating certain other pension liability claims

at 45% of face value because the claims for such employees were based on estimates and not

actual records); see also Bittner, 691 F.2d at 136 (affirming bankruptcy court's estimation of

certain claims at zero for voting purposes where the bankruptcy court determined that the

claimants could not establish their case by a preponderance of the evidence);  In re Southern

Humboldt Community Healthcare District, 254 B.R. 758, 761 (Bankr. N.D. Cal. 2000)

8

(estimating bank's claim at zero for voting purposes where claim was clearly unenforceable under applicable state law); In re Orosco, 77 B.R. 246, 251 (Bankr. N.D. Cal. 1987) (temporarily disallowing claim in its entirety for plan voting purposes where claimant made no attempt to allocate amount of claim among various causes of action alleged and no detail was provided regarding the claimant's contentions); In re Continental Airlines Corp., 60 B.R. 903, 905 (Bankr. S.D. Tex. 1987) (temporarily disallowing contingent claim and valuing same at zero for voting purposes and holding that the value, if any, of the claim should be determined through pending existing proceedings independent of the reorganization proceeding).

**B.    SNC's Claim Should Be Substantially Reduced  For Voting Purposes To Reflect SNC's Real Economic Interest Under the Controlling Completion Agreement.**

17.    The starting point for estimating the allowable amount of the SNC claim must be the Completion Agreement and its governing cap and step-down provisions.  As much as SNC apparently now regrets having entered into the comprehensive settlement and novation represented by the Completion Agreement, it remains the controlling legal agreement to estimate the allowed amount of the SNC claim until and unless SNC meets its burden of demonstrating otherwise.  As already noted by the parties and the Court in the context of proceedings on the SNC Claim Objection, this burden is indeed steep, if not impossible.  The Estate Parties have no doubt that SNC's efforts to undo the Completion Agreement will fail under the test of an evidentiary hearing when SNC's heretofore loose, constantly changing and untimely unsworn allegations of  fraud and willful misconduct must come to rest and be supported by competent evidence.

9

18.    Under the governing Completion Agreement, as set forth in paragraph 8 above, there are seven remaining step-down milestones, and as each of these milestones are achieved the maximum amount of the SNC claim will be reduced in successive, specified increments until reaching zero upon achievement of the last milestone. As the Estate Parties will demonstrate, achievement of the substantial majority of these milestones is a near certainty, and the achievement of all seven of the step-down milestones is so highly probable that the estimated allowed claim of SNC, as in Zolner, should be determined, at best, to be a nominal amount.

19.    Under the controlling case law standards for considering a Rule 3018 Motion, it is the likely allowed amount of a creditor's claim that is relevant for determining the creditor's real "economic interest" for plan voting purposes. In particular, a creditor should not be allowed to wield disproportionate voting power by virtue of a contingent or unliquidated claim in relation to other creditors whose claims are fixed. Pursuant to the Voting Procedures Order, SNC's contingent, objected-to claim must be estimated, just like all other contingent, objected-to claims, if it is to be voted at all. Thus, a primary purpose of the Rule 3018 determination is to assess the likely finally allowed amount of the contingent and/or unliquidated claim at issue. Under the circumstances present here, and in light of the nearly certain operation of the Completion Agreement, it would clearly distort SNC's economic interest in relation to other Deltak unsecured creditors if it was allowed to vote, if at all, anything other than a nominal claim amount.

20.    SNC's desperate, scatter shot effort to undo the Completion Agreement and seek to exercise leverage over the Plan voting process should be recognized for what it is and should

10

not be tolerated. By engaging in 20-20 hindsight and reconstructionist history, SNC has

developed a severe case of "settler's remorse" and now seeks, with a vengeance, to play the role

of spoiler to extract economic concessions that it previously agreed to settle and release. What is

particularly disingenuous about this latest SNC tactic, however, is that it comes at a time when

SNC has already obtained nearly all of the benefits of Deltak's performance under the

Completion Agreement. Nowhere among its mantra of horribles to undo the Completion

Agreement is SNC heard to complain about the fact that it was through Deltak's performance of

the Completion Agreement that SNC has now received delivery of all the completed HRSG units

that formed the very basis for its entering into the settlement – nor does SNC indicate it will give

back those HRSG units if it "undoes" the Completion Agreement.[5]  Clearly, SNC wants it both

ways – to retain the benefits of the Completion Agreement settlement but to ignore its claim

limitation provisions.

21.    The Estate Parties anticipate that SNC will seek temporary allowance of its Proof

of Claim No. 1099 in its full amount to put SNC in a position to skew the voting of the Deltak

general unsecured creditor class. That SNC would seek to disrupt the Plan process at this late

stage by seeking to abrogate the controlling Completion Agreement and thus asserting the right

to vote a claim vastly disproportionate to its real economic interest as a creditor of Deltak is

particularly egregious in light of the history of these Chapter 11 cases. All parties placed

significant and justifiable reliance on the successful implementation of the HRSG wind-down

program in formulating the Plan. Indeed, the HRSG wind-down program and the substantial

---

[5]    Pursuant to Section 1.7 of the Completion Agreement, SNC must give notice if it wishes to terminate the
Completion Agreement. No such notice has been given.

11

attendant efforts of all parties to enter into and perform completion agreements has been at the core of these Chapter 11 cases and the subject of thorough inquiry and attention as well as Court authorization and approval every step along the way.[6] As the Court is well aware, Deltak negotiated completion agreements with ten HRSG contract customers pursuant to the Court's Wind Down Order at the outset of these proceedings and has been performing in good faith under all such completion agreements since then. The Plan, through the new money proceeds of the rights offering, proposes to create a fund for Deltak creditors in an amount which, based on the Debtors' estimates and giving effect to the likely successful performance of all HRSG completion agreements, will be sufficient to pay in full all allowed Deltak unsecured claims. SNC cannot now be allowed to go back and re-write the history of these cases to allow it to disproportionately participate as a Deltak creditor or extract leverage as a spoiler voting an unjustifiably large claim.

## CONCLUSION

22.    For the foregoing reasons, the Court should temporarily allow SNC's claim under Bankruptcy Rule 3018(a) for voting purposes, if at all, only in a substantially reduced amount reflecting the likely achievement of all or substantially all Completion Agreement step-down milestones.

---

[6]    This Court's wind down order entered October 26, 2006 [Docket No. 195] (the "Wind Down Order") specifically authorized the Debtors "to negotiate with customers to reach accommodations for the completion of certain HRSG Contracts (the "Accommodations") in exchange for such customer's agreement, at a minimum, to . . . (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project."

12

WHEREFORE, the Estate Parties respectfully request that the Court (i) grant the Motion, (ii) allow SNC's claim for voting purposes, if at all, only in a substantially reduced amount reflecting the likely achievement of all or substantially all Completion Agreement step-down milestones, (iii) grant the Estate Parties such other relief as is just and proper.

Dated: November 5, 2007

THE BAYARD FIRM

By: _____

Jeffrey M. Schlerf (No. 3047)
Kathryn D. Sallie (No. 4600)
Scott G. Wilcox (No. 3882)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

- and -

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

COUNSEL FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

- and -

Howard L. Siegel, Esquire
BROWN RUDNICK BERLACK ISRAELS LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402

Steven D. Pohl, Esquire
John C. Elstad, Esquire
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111

COUNSEL FOR OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS

# 1526497 v3

# TAB 10 – EXHIBIT J

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP | ) Case No. 06-11045 (BLS) |
| INC., et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Related to Docket Nos. 1579, 1581, 1732, 1774, |
| | 1822, 1825, 1900 & 1904 |

## ESTATE REPRESENTATIVES' SUPPLEMENTAL
## OBJECTION TO CLAIM NOS. 1099 AND 1100

Global Power Equipment Group Inc. ("Global Power") and its affiliated debtors and

debtors in possession (collectively, the "Debtors"),[1] together with the Official Committee of

Unsecured Creditors and the Official Committee of Equity Security Holders (the "Committees"),

hereby file this joint supplement to their respective objections to SNC-Lavalin Power Ontario,

Inc.'s ("SNC") Proofs of Claim Nos. 1099 and 1100, and respectfully represent as follows:

### Preliminary Statement

This supplement addresses only SNC's ever-shifting assertions and/or claims that the

Completion Agreement should be rescinded (or rewritten by the Court) because SNC was

allegedly fraudulently induced to enter into the agreement based on (i) the Debtors' deliberate

concealment of information regarding an intercompany "debt" owed to Deltak, LLC ("Deltak")

by its parent, Global Power; (ii) the Debtors' intentional delay in disclosing the imperfections in

four out of approximately 13,000 tubes to be used in SNC's HRSGs (which imperfections were

---

[1]    In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden
Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc.,
Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC,
Williams Plant Services, LLC, and WSServices, LP.

10541853.2

Date: 11·5·07

Docket #: 1944

quickly remedied to SNC's apparent satisfaction); and (iii) Deltak's purported conducting of business "as an alter ego or mere instrumentality" of Global Power. Although the Debtors believe that there are no facts known today – nor are there any facts that will or even can be adduced through discovery – that support SNC's theory that it was fraudulently induced to enter into the Completion Agreement, SNC has failed to properly raise these allegations. The Completion Agreement was approved by a final and non-appealable order of this Court [Docket No. 457]. As a result, SNC cannot seek to invalidate it except by filing a motion under Federal Rule of Civil Procedure 60(b), made applicable to these proceedings by Bankruptcy Rule 9024. Regardless of the procedural posture, SNC must be held to the Rule 60 standard, which requires SNC to demonstrate, with clear and convincing evidence, that SNC reasonably and detrimentally relied upon a misrepresentation intentionally or recklessly made by Debtors to induce SNC to execute the Completion Agreement. SNC cannot satisfy the heightened evidentiary burden.

## FACTS

This Court is already familiar with the relevant facts, as they previously have been set forth in the Debtors' Objection to Proof of Claim No. 1100 Filed by SNC-Lavalin Power Ontario, Inc. [Docket No. 1579]; the Debtors' Objection to Proof of Claim No. 1099 Filed by SNC-Lavalin Power Ontario, Inc. [Docket No. 1581] (collectively, the "Claims Objections"), in the Debtors' Reply to SNC Opposition to Objections to Claim Nos. 1099 and 1100 [Docket No. 1822], and in the Debtors' Supplemental Memorandum in Support of Objections to Claim Nos. 1099 and 1100 [Docket No. 1904], each of which is incorporated by reference herein. As such, only those facts relevant to the legal issues implicated by this supplement are discussed below.

### The Completion Agreement

SNC and Deltak were parties to a January 26, 2006 purchase order (the "Pre-Petition Contract") under which Deltak agreed to, on a fixed-price basis, (i) build and sell three heat recovery steam generators ("HRSG"), accessories and other equipment to SNC, and (ii) provide certain technical and related services to SNC in connection therewith. After filing for bankruptcy, Deltak filed a motion pursuant to 11 U.S.C. §§ 105, 363 and 365 authorizing it to (i) wind down the HRSG business segment; (ii) reject certain executory contracts in connection with the HRSG unit; and (iii) implement procedures for the orderly completion of work in progress on such contracts, which the Court granted in part. The Court's order granting that motion in part authorized Deltak to negotiate with its HRSG customers to reach accommodations for the completion of certain executory contracts for Deltak's delivery of HRSG units to these customers.

On November 30, 2006, Deltak and SNC entered into such an accommodation (the "Completion Agreement"). The Completion Agreement superseded the Pre-Petition Contract. On December 4, 2006, after proper notice and a hearing on the motion to approve the Completion Agreement, the Court entered a formal Order approving the Completion Agreement.

### The Tubes Dispute

After approval of the Completion Agreement, a dispute arose between SNC, Deltak and Deltak's non-debtor affiliate, Deltak Power Equipment (China) Co. Ltd. ("DPEC"), regarding the conformity of four out of approximately 13,000 tubes that were to be used to construct SNC's HRSGs. SNC alleged that Deltak and DPEC failed to inform SNC of the faulty tubes until several weeks or months after leaks were discovered. In March 2007, SNC negotiated and entered into a settlement agreement regarding the purportedly faulty tubes with both Deltak and

DPEC, which the Court approved by Order dated April 19, 2007 (the "Settlement Agreement")
[Docket Nos. 992, 1072]. Under the terms of the Settlement Agreement, upon delivery of the
repaired tubes and the balance of the tubes required under the Completion Agreement, SNC was
to have three months to inspect them and twenty days to commence binding arbitration if it was
dissatisfied with the tubes.

### SNC's Claim For Fraud in the Inducement

In SNC's October 16, 2007 Surreply to the Estate Representatives' Reply to SNC's
Opposition to Objections to Claim Nos. 1099 and 1100 (the "Surreply"), SNC raised *for the very
first time*[2] an allegation that the Debtors deliberately failed to disclose the existence of an
approximately $128 million "intercompany debt"[3] owed by Global Power to Deltak. Surreply at
3. SNC alleged:

> the Debtors knowingly withheld from SNC material information about the net
> $128 million inter-company debt owed to Deltak by [Global Power]. The
> fraudulent concealment of this information from SNC was intended to induce
> SNC to release its claims and suffer injury thereby, under the mistaken belief that
> its claims against Deltak were worthless.

Id. at 18-19. Then, in its Supplemental Memorandum of Law as to Objections to Its Claims Nos.
1099 and 1100 (the "SNC Supplemental Memorandum"), SNC listed as the first issue on which
it needed discovery "whether . . . the formation of the Completion Agreement was induced by
fraud." SNC Supplemental Memorandum at 9.

---

[2]    The Debtors reserve any and all rights to argue if SNC does file a motion pursuant to Bankruptcy Rule
9024 and contend that it should be permitted to amend its Proofs of Claim that SNC was aware of the information it
now relies upon as the basis for its fraudulent inducement claim before it filed its Proofs of Claim on March 24,
2007. While SNC did seek to reserve rights in Paragraph 14 of the Addendum to each of its Proofs of Claim to
make certain allegations, such reservations related only to challenging the applicability of the Completion
Agreement's step-down schedule – not to rescind the entire Completion Agreement.

[3]    SNC continues to mislead this Court by using the term "intercompany debt" to describe the general ledger
balance between Deltak and GPEG. As the Disclosure Statement makes clear, there is significant uncertainty
regarding whether such transfers should be properly characterized as debt or equity.

Additionally, SNC also appears to suggest that Deltak's conduct in connection with the disclosure of the four defective tubes, Surreply at 9-10, and by "conducting itself as an alter ego or mere instrumentality" of Global Power, Surreply at 23, played a part in Deltak's purported fraudulent inducement of SNC.

## ARGUMENT

### I.    As the Completion Agreement Was Approved by Formal Order of This Court, Any Attempt to Void It Must Be Made by Motion Under Bankruptcy Rule 9024

In its Supplemental Memorandum, SNC argues that a contract may be invalidated if it was induced by fraud. SNC Supplemental Memorandum at 9. While this general statement of the law is correct, the Federal Rules impose specific procedures for seeking the rescission of a final order of a federal court, such as this Court's December 4, 2006 order approving the Completion Agreement. SNC has failed to follow these procedures and has failed to even approach the strict showing necessary to obtain the relief it seeks.

Federal Rule of Civil Procedure 60(b), made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9024, governs when a party may obtain relief from a judgment or order of a federal court. Under Rule 60(b), a federal court may relieve a party from a final judgment or order for a variety of reasons, including "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Rule 60(b) requires that the party seeking relief from the order must make its motion not more than one year after the judgment or order was entered.

A party seeking to vacate an order based on fraud in the inducement has the burden to demonstrate reasonable and detrimental reliance on a misrepresentation intentionally or recklessly made to induce action or inaction. MBIA Ins. Corp. v. Royal Indemnity Co., 426 F.3d 204, 211 (3d Cir. 2005). Such a showing must be made by clear and convincing evidence. In re

J.B. Winchells, Inc., 106 B.R. 384, 389 (Bankr. E.D.Pa. 1989), citing Brown v. Penn. Railroad Co., 282 F.2d 522, 527 (3d Cir. 1960). Indeed, the remedy provided by Rule 60(b) "is extraordinary, and special circumstances must justify granting relief under it." Page v. Schweiker, 786 F.2d 150, 158 (3d Cir. 1986).

　　　　Finally, the Estate Parties request that in light of this Court's decision at the October 31, 2007 hearing on the Estate Parties' contractual interpretation argument regarding the Completion Agreement and the filing today by the Estate Parties of a motion pursuant to Bankruptcy Rule 3018 to determine the temporary allowed amount of SNC's claims for voting purposes, that the Court consider this Supplemental Objection concurrent with the Rule 3018 motion. In so doing, this Court should deny any relief SNC seeks and leave the Completion Agreement intact because SNC has not even filed a motion pursuant to Rule 9024 alleging fraudulent inducement. Furthermore, should the Court consider SNC's fraudulent inducement allegations, SNC must be held to the Rule 60 standard and demonstrate that it reasonably and detrimentally relied upon a misrepresentation intentionally or recklessly made by Deltak to induce SNC's action through a showing of clear and convincing evidence.

## CONCLUSION

　　　　WHEREFORE, for the foregoing reasons, the Debtors and the Committees respectfully request that the Court grant the Claims Objections and grant such other and further relief as is just and necessary.

Dated: November 5, 2007

By:　THE BAYARD FIRM

Jeffrey M. Schlerf (No. 3047)
Kathryn D. Sallie (No. 4600)
Scott G. Wilcox (No. 3882)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

10541853.2

6

Counsel to the Debtors and
Debtors in Possession


Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

- and -

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Brian T. Kohn, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Counsel for Official Committee of
Unsecured Creditors

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

- and -

Howard L. Siegel, Esquire
BROWN RUDNIC BERLACK ISRAELS
LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402

Counsel for Official Committee of Equity
Security Holders

10541853.2

7

**TAB 11 – EXHIBIT K**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------x
                                          :
In re:                                    :
                                          :
GLOBAL POWER EQUIPMENT                    :
GROUP INC., et al.,                       :
                                          :
                                          :
                           Debtors.       :
                                          :
------------------------------------------x
```

Chapter 11

Case No. 06-11045 (BLS)
(Jointly Administered)


Related To Docket No. 1975

**ORDER SETTING: (1) ADMINISTRATIVE CLAIM BAR DATE FOR SNC-LAVALIN
POWER ONTARIO, INC. ("SNC"); (2) SCHEDULE FOR DISCOVERY IN
CONNECTION WITH PENDING OBJECTIONS TO CLAIM NOS. 1099 AND 1100
OF SNC, PENDING BANKRUPTCY RULE 3018 MOTION CONCERNING SNC
CLAIM NO. 1099, POTENTIAL ADMINISTRATIVE CLAIMS OF SNC, AND
POTENTIAL FUTURE SNC PLAN CONFIRMATION OBJECTIONS; AND (3)
CONSOLIDATED HEARING DATE**

WHEREAS, the Court has determined that it is in the best interests of all parties that

discovery in connection with the hearing to consider the pending Objections to SNC. Claim Nos.

1099 and 1100 and the pending Bankruptcy Rule 3018 Motion concerning SNC. Claim No.

1099 (collectively, the "SNC Claims Contested Matters") as well as any potential future SNC

administrative claim and/or potential future SNC plan confirmation objection be conducted in an

efficient, coordinated and orderly manner given the similarity of issues involved in said matters

and the importance of timely resolution of discovery and hearings with respect to all said

matters; and

WHEREAS, the Court has set a consolidated hearing date with respect to the SNC

Claims Contested Matters and any SNC administrative claim to commence on December 14,

2007 and the hearing on confirmation of the Plan is scheduled to commence on December 20,

2007;

DATE 11-15-07

DOCKET # 2000

NOW, THEREFORE, this Court orders as follows:

1.    The bar date for the filing by SNC of any administrative claims shall be November 29, 2007 at 4:00 p.m. EST.

2.    This Order applies to any party in interest seeking discovery in connection with the SNC Claims Contested Matters and shall also govern and constitute the exclusive schedule for discovery in connection with any SNC objection to confirmation of the Debtors' currently proposed plan.

3.    All dates set forth in this discovery schedule are subject to modification only upon agreement of the parties or by order of the Court for good cause shown.

4.    Any party that seeks discovery from a party must serve upon counsel for said party and all other parties any and all discovery requests, other than notices of deposition, no later than November 16, 2007 (and except for discovery directed to SNC in connection with any administrative claims SNC may file on or before the bar date for same, which discovery must be served within two (2) business days following the date any such administrative claim is filed by SNC); all notices of deposition (including third-party deposition notices) shall be similarly served no later than November 27, 2007.

5.    Nothing herein shall be deemed to affect in any way any applicable laws or rules governing the service and response to interrogatories and requests for production, except that responses shall be due within ten (10) business days of the date of service and except that responses to interrogatories requesting identification of persons as potential deposition and trial witnesses shall be due within seven (7) calendar days of the date of service (except that SNC may have until November 16, 2007 to identify witnesses in response to the currently pending interrogatories). With respect to the discovery requests previously served upon the Debtors by

SNC, the date of service of same for the purpose of this Order shall be deemed to be November 1, 2007, the day following the day the Court vacated the stay of discovery in regard to the pending SNC claim objections.

6.    Unless otherwise ordered by the Court, all depositions shall be limited to no more than seven (7) hours and shall, to the extent practicable, take place in one day.

7.    All parties shall begin to produce documents as soon as practicable after service of a request for production, including production on a "rolling basis" as reasonable.

8.    Any witnesses to be designated under Rule 7030(b)(6) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), shall be identified by all parties no later than November 21, 2007, together with a list of available dates for such witnesses' depositions.

9.    The depositions of all fact witnesses, including 7030(b)(6), as well as other witnesses, sought by any party shall be completed by December 7, 2007 with the exception of non-party witnesses who, notwithstanding reasonable, good-faith efforts, cannot be deposed by said date.

10.    Initial expert reports by all parties in regard to the SNC Claims Contested Matters shall be exchanged on December 7, 2007.

11.    Depositions of expert witnesses in regard to the SNC Claims Contested Matters shall be completed by December 11, 2007.

12.    Rebuttal expert reports, if any, in regard to the SNC Claims Contested Matters shall be exchanged on December 13, 2007.

13.    All parties are to use their good faith efforts to present their initial case in regard to the SNC Claims Contested Matters to the other parties on December 11, 2007 including

identification of all of their witnesses and exhibits for the hearing and their designations of deposition testimony.

14.    All parties are to serve their objections to exhibits and designations of deposition testimony, their counter-designations of deposition testimony and proposed stipulation of facts in regard to the SNC Claims Contested Matters on December 13, 2007.

15.    The parties shall prepare and file with the Court a joint pre-trial statement in regard to the SNC Claims Contested Matters on or before December 13, 2007.

16.    All motions in limine in regard to the SNC Claims Contested Matters shall be filed by December 13, 2007.

17.    Any objections with respect to discovery must be raised in a timely fashion and the failure to raise a timely objection shall constitute a waiver of such objection. The parties must, in the first instance, make a good faith effort to resolve any discovery disputes without court intervention. In the event a resolution is not reached, the party seeking discovery shall raise the issue with the Court promptly. Failure to seek timely judicial relief with respect to any dispute shall constitute a waiver by the party seeking discovery.

18.    Any party that fails to serve a discovery request by the scheduled deadlines shall be precluded from seeking such discovery thereafter and from participating in discovery with respect to such request, including, if applicable, conducting examinations at any deposition.

Dated: November 14, 2007


_____
UNITED STATES BANKRUPTCY JUDGE

**TAB 12 – EXHIBIT L**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP | ) | Case No. 06-11045 (BLS) |
| INC., *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | *Contested Matter Re: Debtors'* |
| | ) | *Objections to Claim Nos. 1099 and* |
| | ) | *1100 filed by SNC-Lavalin Power* |
| | ) | *Ontario, Inc.* |

## Designation by the Estate Representatives of the Deposition Testimony of Michael Edward Hanson

## Designations Offered in Support of Estate Representatives Objections to Claims 1099 and 1100 of SNC-Lavalin Power Ontario, Inc. and in Support of their Motion Pursuant to Rule 3018 to Determine the Temporary Allowed Amount of Claim 1099

## Confidential Pursuant to Confidentiality Agreement Dated November 19, 2007

Estate Representative's Designation of Deposition Testimony for
Michael Edward Hanson

| PAGE | LINE |
|------|------|
| 3 | 5–7, 24 |
| 4 | 1, 5–18 |
| 5 | 15–17, 23–24 |
| 6 | 1–6 |
| 17 | 7–19 |
| 27 | 5–24 |
| 28 | 1–2 |
| 58 | 4–10 |
| 60 | 15–24 |
| 61 | 1–16, 23–24 |
| 62 | 1–8, 13–24 |
| 63 | 1–7 |
| 75 | 5–24 |
| 76 | 1–3 |
| 77 | 1–16 |
| 91 | 7–13 |
| 99 | 6–24 |
| 100 | 1–19 |
| 101 | 22–24 |
| 102 | 1–10, 15–24 |
| 103 | 1–24 |
| 104 | 1–13 |
| 105 | 7–24 |
| 106 | 1–10 |

Dated: December 12, 2007        THE BAYARD FIRM

By: _Kath D Sallie_____

Jeffrey M. Schlerf (No. 3047)
Scott G. Wilcox (No. 3882)
Kathryn D. Sallie (No. 4600)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone:  (302) 655-5000

Counsel to the Debtors and
Debtors in Possession

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

- and -

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Curt Weidler, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Counsel for Official Committee of
Unsecured Creditors


Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

- and -

Howard L. Siegel, Esquire
BROWN RUDNICK BERLACK ISRAELS LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402

Counsel for Official Committee of Equity
Security Holders

# 1532445 v2 - FORSTENC - 028475/0016

```
         ** C O N F I D E N T I A L **


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------x
In re:

GLOBAL POWER EQUIPMENT              Chapter 11
GROUP INC., et al.,           Case No. 06-11045
                              Jointly Administered


              Debtors.
-----------------------------------x

                      December 3, 2007
                      11:35 a.m.


        Deposition of MICHAEL HANSON, at the
offices of Sullivan & Worcester LLP, 1290
Avenue of the Americas, New York, New York,
before Roberta Caiola, a Shorthand Reporter
and Notary Public within and for the State
of New York.
```

*Michael Hanson*                                        *12/03/2007*

## CONFIDENTIAL

```
1
     A P P E A R A N C E S:
2
3    THE BAYARD FIRM
     Attorneys for the Debtor
4           222 Delaware Avenue
            Suite 900
5           P.O. Box 25130
            Wilmington, Delaware 19899
6
     BY:   JEFFREY M. SCHLERF, ESQ.
7           SCOTT G. WILCOX, ESQ.
8
9    SULLIVAN & WORCESTER LLP
     Attorneys for SNC-Lavalin Power Ontario, Inc.
10          One Post Office Square
            Boston, Massachusetts 02109
11
     BY:   PATRICK P. DINARDO, ESQ.
12
13
     BROWN RUDNICK
14   Attorneys for the Equity Committee
            One Financial Center
15          Boston, Massachusetts 02111
16   BY:   STEVEN D. POHL, ESQ.
17
18   SCHULTE ROTH & ZABEL LLP
     Attorneys for Creditors' Committee
19          919 Third Avenue
            New York, New York 10022
20
     BY:   JEFFREY S. SABIN, ESQ.
21
22
23
24
```

*Michael Hanson*                                                    *12/03/2007*

## CONFIDENTIAL

```
1                          INDEX
2

3
     WITNESS            EXAMINATION BY          PAGE
4
     Michael Hanson    Mr. Dinardo               3
5                      Mr. Pohl                 99
                       Mr. Sabin               102
6                      Mr. Dinardo             106

7
8                    E X H I B I T S

9
     HANSON
10
     1     Excerpt from the disclosure statement that
11         was filed in the Global Power bankruptcy
           page 21
12
     2     Document entitled "Global Power Equipment
13         Group, Inc. Inter-Company Account
           Reconciliations," dated 9/30/2006, Bates
14         stamped D 939 through page D 953, page 32
15   3     Document Bates stamped in the lower right
           corner EQ 000071 through EQ 000078
16         page 42
17   4     Document entitled "GPEG Inter-Company Cash
           Account Summary" from March 16, 2007,
18         Bates stamped EQ 00015 through EQ 000033,
           page 48
19
     5     Letter dated March 15, 2007, page 52
20
     6     Three-page document entitled "Deltak,
21         LLC," then below that "Global Notes and
           Statement of Limitations Methodology and
22         Disclaimer Regarding Debtors Schedules and
           Statements," page 56
23
     7     Monthly operating report for October of
24         2006, page 61
```

*Michael Hanson*

*CONFIDENTIAL*

```
 1                      INDEX

 2                 E X H I B I T S

 3
 4    HANSON
 5    8       Press release announcing Chapter 11
              page 71
 6
      9       First page from the Global Power Equipment
 7            Group 2004 Annual Report, page 83
 8    10      Multipage document, page 110
 9
10
              DOCUMENTS AND INFORMATION REQUESTED:
11
                  PAGE      LINE
12                 14        7
                   15        9
13
14
15
16
17
18
19
20
21
22
23
24
```

*Merrill Legal Solutions*
*(617) 542-0039*

**CONFIDENTIAL**

1    Michael Hanson, having been duly sworn by the

2    Notary Public, (Roberta Caiola), was examined

3    and testified as follows:

4    EXAMINATION BY MR. DINARDO:

5        Q.    Mr. Hanson, would you state your

6    full name for the record?

7        A.    Michael Edward Hanson.

8        Q.    Could I see some ID first before we

9    proceed?

10       A.    (Complying.)

11       Q.    You just handed me your Oklahoma

12   driver's license?

13       A.    Yes.

14       Q.    Showing your address is 2911 East

15   102nd Street, Tulsa, Oklahoma.  Is that your

16   current address, sir?

17       A.    Yes.

18       Q.    Could you describe for the record

19   please your background and education?

20       A.    I attended the University of Tulsa

21   in Tulsa, Oklahoma from 1988 to 1992 and I have

22   a bachelor's degree in accounting, and no

23   further formal education beyond that.

24       Q.    Are you a CPA, sir?

CONFIDENTIAL

1       A.      [Yes, licensed in Oklahoma.]

2       Q.      When did you achieve your CPA

3   status?

4       A.      I think I got that in 1994.

5       Q.      [I take it you're a CPA in good

6   standing?

7       A.      Yes.

8       Q.      Could you describe for me your

9   occupational history, starting from today

10  backwards?

11      A.      Today I'm Chief Financial Officer

12  with Global Power Equipment Group.  I've been

13  doing that for about a year.  I was formally

14  with Global Power, the Chief Accounting Officer,

15  from March of 2006 to November of 2006.  Then

16  prior to that I was the corporate controller

17  with Global Power from November 2003 to March of

18  2006.]

19          Prior to that I was the controller

20  for Xeta Corporation, X E T A, in Tulsa,

21  Oklahoma, that was from about December of 2000

22  to November of 2003.  Prior to that which was

23  May 1992 to December of 2000 I was an auditor

24  with Arthur Andersen in Tulsa, Oklahoma.

*Michael Hanson*                                    *12/03/2007*

### CONFIDENTIAL

1    That's.

2         Q.      Why did you leave Arthur Andersen?

3         A.      I just felt like I got the

4    experience I needed out of public accounting and

5    didn't really desire to be a partner, so I

6    decided to start looking around for a job.  The

7    opportunity at Xeta came to me and I took that.

8         Q.      Is Xeta Corporation a public

9    company?

10        A.      Yes.

11        Q.      To the extent that you have a

12   specialty as a CPA is that your specialty,

13   public accounting?

14        A.      Yes, accounting matters, correct.

15        Q.      So you became CFO with Global Power

16   in November of last year?

17        A.      November of 2006, correct.

18        Q.      Just tell me for the reporter,

19   sometimes we call it GPEG, it's Global Power

20   Equipment Group.  Sometimes we'll call it Global

21   Power but you understand what GPEG means, right?

22        A.      Yes.

23        Q.      When you became CFO of GPEG in

24   November of 2006 who was your immediate

*Michael Hanson*

**CONFIDENTIAL**

1  predecessor as CFO?

2       A.      Jim Wilson.

3       Q.      Did Mr. Wilson resign at that time?

4       A.      Yes.

5       Q.      Do you know why he resigned?

6       A.      I think just for personal reasons.

7       Q.      Did you ever talk to him about why

8  he resigned?

9       A.      Yes, we had discussions on that.

10      Q.      What do you recall him telling you

11 about why he resigned?

12      A.      Just generally I don't think he

13 really enjoyed being the CFO of the company,

14 just with the stress and demands on his life.

15      Q.      Was there some issue that was

16 causing him stress relating to his role as CFO

17 of GPEG?

18      A.      I would say it was stressful in

19 general, due to the fact that we were filing

20 bankruptcy and just some of the issues we were

21 having with our credit agreement in 2006.

22      Q.      Did Mr. Wilson ever tell you that

23 he was unhappy with the way GPEG's accounting

24 practices and procedures were implemented?

*Michael Hanson*

**CONFIDENTIAL**

1    drafting of the so-called completion agreements

2    that were proposed to HRSG customers?

3         A.    No.

4         Q.    So nobody asked you your opinion

5    about a draft of any of those documents?

6         A.    No.

7         Q.    Do you know who devised the

8    strategy which entailed the completion

9    agreements?

10        A.    I believe it was our advisers and

11   attorneys.

12        Q.    At White & Case?

13        A.    Yes.

14        Q.    When you say advisers and

15   attorneys, are you referring to White & Case or

16   are you referring to White & Case and someone

17   else?

18        A.    White & Case and Alvarez & Marsal

19   and the Blackstone Group.

20        Q.    Blackstone and Alvarez & Marsal are

21   engaged in the bankruptcy, correct?

22        A.    Correct.

23        Q.    When was Alvarez & Marsal first

24   engaged by GPEG?

*Michael Hanson*

*CONFIDENTIAL*

1    A.    Yes.

2    Q.    You saw Alvarez & Marsal's reports

3    and inter-company cash transfers, right?

4    A.    Correct.

5    Q.    Can you tell me during 2006 how

6    cash sweeps from Deltak to GPEG were

7    effectuated.  You said they were done manually

8    but how was that processed?

9    A.    The process, Deltak had their bank

10   accounts with US Bank.  In 2006 Global Power had

11   its bank accounts with Bank of America.  So each

12   day somebody, an accounting person at Deltak

13   would prepare a summary of what their cash

14   position was in their accounts, plus their needs

15   to wire money out that day.

16        So at Global we took all of that

17   into consideration and also considered their

18   outstanding checks, and made a determination

19   whether there was excess cash at Deltak, or if

20   Deltak needed cash that day.

21        Then we were able to move the money

22   either out of their US Bank accounts or to the

23   US Bank accounts typically by just phoning

24   somebody at either bank.  With the US Bank I

*Michael Hanson*

**CONFIDENTIAL**

1   think we had to do it by phone, just ask for the

2   transfer.

3        Q.      When you say "we" you mean someone

4   at GPEG?

5        A.      Someone at Global Power, yes.

6        Q.      Would that have been you?

7        A.      No.  I think Y Reed did most of

8   those transfers.  Then Brian Lavarnway who was

9   our corporate controller I believe also had the

10  ability to do that as a backup person.

11       Q.      What was Y's position?

12       A.      She was director of financial

13  reporting.  She was hired in originally as the

14  corporate accountant and then we promoted her to

15  director of financial reporting.

16       Q.      Brian?

17       A.      Lavarnway, L A V A R N W A Y.

18       Q.      What was his position?

19       A.      He was brought in initially as the

20  Director of Financial Reporting and then he was

21  promoted to Corporate Controller in March of

22  2006.

23       Q.      Corporate controller of?

24       A.      Of Global Power.

*Michael Hanson*                                      *12/03/2007*

## CONFIDENTIAL

1    detail was in preparation for the hearing that I

2    had, I forget the name of the hearing, with the

3    U.S. Trustee.

4         Q.    Were you interviewed by the U.S.

5    Trustee in connection with the inter-company

6    accounts?

7         A.    We had discussions with them,

8    conference calls to discuss the format of how

9    they would like the inter-company accounts to be

10   presented in the monthly operating reports.

11        Q.    Who were you speaking with from the

12   U.S. Trustee's office?

13        A.    Their legal counsel Michael and I'm

14   not sure I know his last name, I can't quite

15   recall.  I believe there was one or two other

16   accounting people with the U.S. Trustee.  There

17   was at least one called but I don't recall their

18   exact names.

19        Q.    So at least a legal counsel from

20   the U.S. Trustee's office Michael, you don't

21   remember his last name, and then an accounting

22   person as well?

23        A.    Yes.

24        Q.    Is it a male or a female?

*Michael Hanson*

*CONFIDENTIAL*

```
 1   Trustee's office?

 2         A.     Yes.

 3         Q.     Counsel refers to it as the 341

 4   meeting?

 5         A.     Right.

 6         Q.     Were there more than one of those

 7   meetings?

 8         A.     I was only in one of them.

 9         Q.     You were only at one at you said

10   just before Christmas 2006?

11         A.     Yes.

12         Q.     As far as you know the proceeding

13   was taped?

14         A.     Yes.

15         Q.     So the Trustee's office was asking

16   you some questions, giving you some directions

17   about how they wanted to receive the monthly

18   operating reports?

19         A.     That hearing was really for them to

20   have an opportunity to ask me any questions

21   about the SOFA or the SOAL schedules.  The

22   separate conversations we had about

23   inter-company reporting were either before or

24   after that meeting via conference call, off the
```

*Michael Hanson*                                                     *12/03/2007*

*CONFIDENTIAL*

1    record.

2          Q.      I take it from your earlier

3    testimony you came away with the notion that

4    there was some prescribed format for the monthly

5    operating reports, is that it?

6          A.      Yes.

7          Q.      Do you recall what you were told in

8    terms of how to present the information?

9          A.      Well, the way we've been doing it

10   probably for all of '07 is all of the format

11   they agreed to, they wanted to see on a

12   legal-entity by legal-entity basis, foreign

13   companies and U.S. debtors, the inter-companies

14   in a matrix format.  They showed the activity

15   for the month and the resulting monthly

16   balances.

17              MR. SCHLERF:  Can we go off the

18   record.

19              (Discussion off the record.)

20              (Monthly operating report for

21   October of 2006, marked Hanson Exhibit 7

22   for identification.)

23          Q.      Let's pick up the thread of where

24   we were.  We were looking at Exhibit 6 which is

*Michael Hanson*

***CONFIDENTIAL***

1    the Global notes and the language about the

2    inter-company transactions.  I'm going to ask

3    you when you first saw it and you were saying in

4    connection with the hearing at the U.S.

5    Trustee's office which turned out to be a 341

6    meeting, right?

7        A.    Yes.  I reviewed it prior to that

8    meeting but in preparation, yes.

9        Q.    Have you ever talked to anybody at

10   GPEG about this language?

11       A.    I don't recall any specific

12   conversations about it, about that language.

13       Q.    Do you know who decided that the

14   statement would be made that "The inter-company

15   accounts payable and receivable as of the

16   petition date have not been quantified"?

17       A.    I believe our advisers and

18   attorneys helped us make that decision.

19       Q.    Do you know who specifically?

20       A.    I don't know who specifically.

21       Q.    You're saying you weren't involved

22   in that decision?

23       A.    Not that I recall.

24       Q.    Do you agree with that assertion

*Michael Hanson*

*CONFIDENTIAL*

1   that the numbers were not quantified?

2       A.      I agree that I believe that there

3   were some slight out of balances and that they

4   needed to be reviewed.  Obviously from our

5   financial statements you can see that we did

6   report and had inter-company balances and we

7   knew the numbers and those type of things.

8       Q.      Is there some dispute over the

9   treatment of inter-company accounts at this

10  point?

11      A.      No.

12      Q.      Wasn't there a dispute at some

13  point about the treatment of inter-company

14  accounts?

15      A.      Within the company prior to filing

16  we never had any dispute or disagreement as to

17  how to treat those.  We just had our process of

18  sending cash back and forth and certain

19  inter-company charges back and forth, but that

20  was about it.  I don't remember any dispute.

21      Q.      Do you think your treatment at GPEG

22  was consistent with generally accepted

23  accounting principles?

24      A.      I haven't really researched that

*Michael Hanson*

**CONFIDENTIAL**

1    purchase order, approximately, as one of the

2    larger purchase orders that Deltak would have

3    received in the past few years?

4         A.    Yes.

5         Q.    Could you tell me what Deltak's

6    revenues were during 2005, gross revenues?

7         A.    I would say, I don't know the exact

8    amount, probably 150 to 170 million.

9         Q.    Had Deltak's revenues been a lot

10   higher at one point?

11        A.    I believe in the earlier 2000s.

12   Maybe 2001 through 2003 the revenues were much

13   higher on an annual basis, I don't recall the

14   exact amounts.

15        Q.    Do you know why the numbers fell

16   off as of 2006?

17        A.    I think that we had a boom in the

18   United States back in the early 2000s where

19   there was just a lot of demand for those

20   products.  That fell off after 2003 and Deltak

21   had to go more international to find new

22   projects and there just wasn't as much a demand

23   out there.

24        Q.    Did the falloff in demand have

*Michael Hanson*

*CONFIDENTIAL*

1    anything to do with the quality of Deltak's

2    product?

3         A.    Not that I am aware of.

4         Q.    The power plant that's being built

5    in Ontario by SNC that this equipment is being

6    incorporated into is owned by an entity called

7    Sithe.  Have you ever heard of that entity

8    before?

9         A.    I've heard of the name, yes.

10        Q.    Has any equipment ever been sold by

11   any of GPEG or its affiliates to Sithe or any

12   Sithe affiliates?

13        A.    I'm not aware of any.

14        Q.    I believe you said you had some

15   familiarity with the Sithe name?

16        A.    I've just heard the name, yes, in

17   connection with talking about that project and

18   that name has come up.

19        Q.    Have you ever talked to anyone from

20   Sithe?

21        A.    No.

22        Q.    The next sentence after the

23   sentence I just read to you about the escalating

24   losses refers to Global Power's inability to

*Michael Hanson*

*CONFIDENTIAL*

1    access its credit facility; do you see that?

2         A.    Yes.

3         Q.    Why did that happen?

4         A.    Well after we didn't file our 2005

5    10-K on time, which it was due I think March 31

6    of 2006, that was a violation of our credit

7    agreement with Bank of America.  To the best of

8    my recollection they would not let us borrow on

9    the revolving credit facility, and we had very

10   limited access to the letter of credit facility.

11         I believe each time we had to issue

12   a letter of credit we had to ask them for

13   permission and get an okay.  Then actually

14   post-collateral, I believe in at least 100

15   percent we had to post as cash collateral or we

16   would get issued new LCs.

17         Q.    Who at Bank of America was in

18   charge of that relationship with GPEG?

19         A.    Once we started in April it moved

20   to their workout group in Chicago, and Ronald

21   Prince became the main contact point at Bank of

22   America.

23         Q.    Had you ever spoken to Mr. Prince

24   yourself?

*Michael Hanson*                                *12/03/2007*
**CONFIDENTIAL**

1    about the fact that we were going to get paid in

2    Canadian dollars, and he knew that we would

3    probably need to hedge that and have a

4    deliverable forward contract in place.  So

5    that's I believe the extent of my discussion

6    with Scott.

7         Q.    Did Scott ever talk to you about

8    any request for a parent guarantee?

9         A.      No, not that I recall.

10        Q.      Did anyone else ever talk to you

11   about a parent guarantee request being made by

12   SNC?

13        A.      No.

14        Q.      Would the files in which a parent

15   guarantee were kept be under your control as CFO

16   at this point in time?

17        A.      I don't think so.  I'm not aware of

18   any files for parental guarantees.  My best

19   guess is that our legal department would keep

20   those type of documents.

21        Q.      You know that GPEG has issued

22   parent guarantees and signed them, right?

23        A.      Yes.

24        Q.      Do you know on how many instances

*CONFIDENTIAL*

1          MR. DINARDO:  I'm not finished.  I

2    would rather have a transcript where you have

3    had an opportunity to ask some questions.  So

4    why don't you do that now.

5    EXAMINATION BY MR. POHL:

6          Q.     Mr. Hanson, earlier you were asked

7    a couple of questions on the so-called Global

8    notes, do you know what I'm referring to?

9          A.     Yes.

10         Q.     It was passed around.  There was a

11   section on inter-company balances; do you recall

12   that?

13         A.     Yes.

14         Q.     You were asked whether or not at

15   the time the schedules were filed in November

16   2006, whether the inter-company balances were

17   quantified at that time; do you recall that

18   discussion?

19         A.     Yes.

20         Q.     Did you have any role in

21   determining when, if ever, those inter-company

22   balances would be set forth in the schedules?

23         A.     No.

24         Q.     There was another set of questions

*Michael Hanson*

*CONFIDENTIAL*

1  relating to whether the inter-company balances,

2  for example the Deltak inter-company balance

3  which reflected an amount due from GPEG, whether

4  that would be considered an asset; do you

5  remember that?

6      A.      Yes, I remember.

7      Q.      Did you in the case ever make a

8  determination as to whether that type of

9  inter-company "asset" would be treated as a

10  claim in a bankruptcy case?

11      A.      No.

12      Q.      Or whether it would be treated as

13  equity in a bankruptcy case?

14      A.      No.

15      Q.      Do you know whether Global Power

16  itself, as the debtor, has taken a position in

17  the case on those issues?

18      A.      No, we haven't taken a case or

19  position, sorry.

20      Q.      You were also asked a series of

21  questions, or maybe one question, I apologize,

22  about whether financial statements for

23  subsidiaries were prepared; do you remember

24  that?

*Michael Hanson*

**CONFIDENTIAL**

Page 101
*12/03/2007*

1   A.    Yes.

2   Q.    I don't recall your answer off the

3   top of my head, so could you please again answer

4   whether financial statements were prepared on a

5   subsidiary-by-subsidiary basis, by that I'm not

6   referring to audited financial statements, I'm

7   referring to either audited or unaudited?

8   A.    We had audited financial statements

9   for the subsidiaries of Williams, balance sheet

10   only.  Braden also on a balance sheet only, as I

11   said before.  In addition, each year we have to

12   have a Braden Europe audit for statutory

13   purposes, a DPEC audit.  Braden Mexico.  Then

14   what we refer to as GPESH, and that stands for

15   Global Power Equipment Shanghai.

16          In addition, as we were going

17   through due diligence and doing our bank deal

18   with the Bank of America and Morgan Stanley we

19   did provide financial information, meaning

20   financials for each company without footnotes

21   accompanying them.

22   Q.    When you do a business plan, in

23   other words is it a four-year type forecast or a

24   five-year type forecast, does that include

*Michael Hanson*

**CONFIDENTIAL**

1  information down to the level of subsidiary?

2      A.      Yes.

3      Q.      Does it include only forecast

4  information?

5      A.      It has actual as well.

6      Q.      Are you aware of whether anyone on

7  behalf of SNC, in connection with the initial

8  purchase order, requested financial information

9  from GPEG or Deltak?

10      A.      I'm not aware of any requests.

11      MR. POHL:  I'm going to pass the

12  witness.

13      MR. SABIN:  I have a few questions.

14  EXAMINATION BY MR. SABIN:

15      Q.      During the bankruptcy and prior to

16  the filing of the objection to the claim of SNC,

17  are you aware of any requests, formal or

18  informal, from SNC to any of the debtors with

19  respect to information regarding the so-called

20  inter-company accounts?

21      A.      I'm not aware of any.

22      Q.      Could you refer to Exhibit 7

23  please, in particular page 20 of page 23.

24      A.      Okay.

*CONFIDENTIAL*

1      Q.      In particular, the third line from
2  the top, referring to the words "amounts shown
3  as receivable/(payable)," to the best of your
4  knowledge what does that mean?
5      A.      That just means as the entity they
6  have an amount due from one of the other
7  entities or amount payable to one of the other
8  entities as a result of cash transferred between
9  the company, or paying some type of invoice such
10  as insurance for one of the companies.
11      Q.      To your knowledge, at any time as
12  part of the reconciliation process that you
13  described or otherwise, was there ever a payment
14  with respect to these so-called receivables and
15  payables?
16      A.      One probably between Braden and
17  Braden Europe.  Those were settled on a certain
18  basis at certain times.
19      Q.      With respect to that, do you know
20  whether there were any kind of written -- any
21  written documentation, whether a promissory note
22  or otherwise, other than these general ledger
23  accounts entries that evidence these things
24  called receivables or payables?

*Michael Hanson*

*CONFIDENTIAL*

1      A.      [Are you referring to a note, loan
2    agreements?
3      Q.      Yes.
4      A.      I believe between Braden and Braden
5    Mexico there is an agreement and Braden and
6    Braden Europe.
7      Q.      As between GPEG and Deltak are
8    there any such documents, whether they are notes
9    or anything else?
10     A.      I am not aware of any, no.
11     Q.      Are you aware of any kind of
12   payments of any kind between GPEG?
13     A.      No.]
14     Q.      Are you aware of any analysis with
15   respect to the solvency of Deltak at any time
16   prior to the commencement of these bankruptcy
17   cases?
18     A.      Does that include valuations or are
19   you saying an assessment as of just solvency?
20     Q.      Solvency and/or valuations?
21     A.      The only thing close to that that
22   we've done is for each audit we have to evaluate
23   the good will at each reporting unit, Braden,
24   Deltak and Williams.  For 2004 and 2005 we hired

*Michael Hanson*

***CONFIDENTIAL***

1    a company called CBIZ to prepare that analysis.

2         One of the things they do is they

3    have to do a valuation of each reporting unit

4    and then compare that value to the net assets of

5    that reporting unit to determine if a good will

6    impairment is required I believe under FASB 141.

7         Q.    [ At any time prior to the

8    commencement of these bankruptcies was there a

9    good will impairment charge taken with respect

10   to Deltak?

11        A.    No.

12        Q.    Could you now look at Exhibit 4

13   please, and in particular page 8 of Exhibit 4.

14        A.    "Historic GPEG Net Activity"?

15        Q.    Yes.  In particular I'm looking at

16   lines beginning under the far left cumulative

17   net change, the lines beginning with "GPEG I/C

18   payable/receivable"?

19        A.    Yes.

20        Q.    Then I'm focusing you on the line

21   called Deltak.

22        A.    Yes.

23        Q.    At least from 1999 through 2004,

24   can you explain those numbers and/or the ]

*CONFIDENTIAL*

1    increase and the decrease in those numbers?

2         A.    Well, it increased from '99 all the

3    way to 2000 -- well 2003 and a slight decrease

4    in '04.  Really based on the fact that they had

5    a lot of profitability at Deltak for specialty

6    boiler and HRSG in those years.  Those amounts

7    should represent the gross profit from the

8    projects less their operating expenses, and of

9    course net it against any charges from Global

10   Power back to them.

11              MR. SABIN:  I have no further

12   questions.

13   CONTINUED EXAMINATION BY MR. DINARDO:

14        Q.    Staying with that page that Mr.

15   Sabin asked you questions about.

16              MR. DINARDO:  Mr. Schlerf, do you

17   have any questions that you would like to ask

18   today?

19              MR. SCHLERF:  No.

20        Q.    Staying with that same page in

21   Hanson Exhibit 4, the "Historic GPEG Net

22   Activity."  We see that from 2004 to 2005 the

23   cash flow was reversed, so that the number went

24   from 178 million and change down to 151 million

**TAB 13 – EXHIBIT M**

CONFIDENTIAL

CONFIDENTIAL / DRAFT
For Discussion Purposes Only



# GLOBAL POWER
### A GLOBAL POWER EQUIPMENT GROUP

## GPEG Inter-Company Non-Cash Account
## Summary
### April 6, 2007



ALVAREZ & MARSAL

EQ 000034

EXHIBIT 5
LH 12Julo7 D4cc



GLOBAL
POWER

**Table of Contents**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

CONFIDENTIAL

ALVAREZ & MARSAL

| I.   | GPEG I/C Non-Cash Overview                      | 2  |
| II.  | GPEG I/C Non-Cash Activity                      | 5  |
| III. | GPEG I/C Non-Cash Components                    | 11 |
|      | Corporate Administrative & Interest             | 12 |
|      | Management Incentive Compensation               | 16 |
|      | Insurance                                       | 17 |
|      | Tax Payments                                    | 18 |
|      | Letters-of-Credit Fee Payments                  | 19 |
|      | Professional Fees                               | 20 |
|      | Transactions                                    | 21 |
|      | Corporate Expense Paid by Subsidiary            | 23 |
|      | Stock Option Fees                               | 24 |
| IV.  | Exhibits                                        | 25 |
|      | A. Quarterly GPEG I/C Non-Cash Activity         | 26 |
|      | B. Corporate Administrative & Interest Detail   | 29 |

EQ 000035

SA 167

CONFIDENTIAL



EQ 000036

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

1.   GPC I/C Non-Cash Overview

CONFIDENTIAL


ALVAREZ & MARSAL

3

GL⬤BAL
POWER

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

I/C Non-Cash Accounts

**1. GPEG I/C Non-Cash Overview**

Overview

- Since its inception, the Company has maintained a corporate overhead function separate from its subsidiaries. Corporate ("Global Power Equipment Group Inc." or "GPEG") has provided to the subsidiaries shared services including executive management, legal, treasury, accounting, tax, finance, risk management and human resource activities.

- The costs and expenses incurred by the corporate functions have traditionally been allocated and/or passed along to Braden Manufacturing ("Braden"), Deltak LLC ("Deltak"), CFI Inc. ("CFI") and Williams Industrial Service Group ("WISG") through the inter-company ("I/C") non-cash accounts. Additionally, there have been I/C non-cash transactions relating to subsidiary payments made on behalf of GPEG and assets and/or liabilities transfers between GPEG and its subsidiaries. These various items are discussed further below.

- The Company's accounting and document retention practices for it's I/C non-cash activity have varied over the years presented herein. Consequently, there are periods (primarily in 2001 and 2002) where the nature of journal entries ("JEs") and transactions posted to I/C non-cash accounts are unknown. Where direct evidential matter has been obtained, these items have been classified and presented accordingly; however, as of the date of this report the net sum of JEs for which the source of the transaction is unknown is approximately $2.1 million.

- The cumulative activity comprising the September 28, 2006 I/C non-cash balance reflects a net GPEG I/C balance due from subsidiaries approximating $85.7 million.

EQ 000037

SA 169

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

# I/C Non-Cash Accounts

CONFIDENTIAL



ALVAREZ & MARSAL

GLOBAL POWER

## 1. GPEG I/C Non-Cash Overview

### Overview, continued

- Since 1998, GPEG has periodically replaced and upgraded its general ledger systems. With each significant change, new account numbers for each of I/C accounts were established and the general ledger ("GL") classification changed (as reflected below). When preparing monthly financial statements for submission to Corporate Accounting, each subsidiary classified these I/C accounts in different sections of the balance sheets. However, upon preparing the consolidated financial statements, Corporate Accounting has consistently reclassified these I/C accounts as a component of equity in each subsidiary's balance sheet in the consolidating financial statements. The information presented herein is as it exists in the general ledger of GPEG and does not reflect any reclassification.

| | I/C Non-Cash GL Account Number Summary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Pre-January 2004** | | | **January 2004 to March 2006** | | | **Post-March 2006** | | |
| Acct. Number | G/L Account | Entity | Acct. Number | G/L Account | Entity | Acct. Number | G/L Account | Entity |
| 2940-4000 | Liability | Braden | 80-30087-40-00 | Equity | Braden | 80-10187-30-00 | Asset | Braden |
| 2940-0450 | Liability | CFI | 80-30087-45-00 | Equity | CFI | 80-10187-10-00 | Asset | Deltak |
| 2940-0460 | Liability | CFI Holdings | 80-30087-46-00 | Equity | CFI Holdings | 80-10187-50-00 | Asset | WISG |
| 2940-3000 | Liability | Deltak | 80-30087-30-00 | Equity | Deltak | | | |
| | | | 80-30087-50-00 | Equity | WISG | | | |

4

EQ 000038

EQ 000039

CONFIDENTIAL


GLOBAL
POWER

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**II.  GPEG I/C Non-Cash Activity**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## I/C Non-Cash Overview



GLOBAL POWER

ALVAREZ & MARSAL

**II.  GPEG/I/C Non-Cash Activity**

### Annual I/C Non-Cash Activity by Subsidiary

- The September 28, 2006 GPEG I/C non-cash balance due from from subsidiaries approximated $85.7 million, and reflects cumulative G/L activity occurring for the period October 1, 1998 through September 28, 2006 (bankruptcy filing date).

$ in 000s

| | Q4 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Sept 28; 2006 |
|---|---|---|---|---|---|---|---|---|---|
| **Net Change** | | | | | | | | | |
| Braden | $29 | $6,015 | ($4,202) | $10,052 | $5,950 | $4,307 | $4,656 | $1,504 | $211 |
| CFI (Note 2) | - | - | 1,219 | 3,136 | 4,359 | 4,906 | 65 | - | - |
| CFI Holdings (Note 2) | - | - | (1,127) | 1,022 | 6,429 | (104) | 16,819 | 646 | 1,324 |
| Deltak | (497) | 6,405 | (5,070) | 7,384 | 4,341 | 3,853 | | 376 | 1,643 |
| Williams | | | | | | | | | |
| Total | ($468) | $12,419 | ($9,180) | $21,593 | $21,078 | $12,963 | $21,540 | $2,527 | $3,178 |
| | | | | | | | | | |
| **Cumulative Net Change** | ($468) | $11,951 | $2,771 | $24,364 | $45,442 | $58,405 | $79,945 | $82,472 | $85,650 |
| | | | | | | | | | |
| **Net I/C Balance** | | | | | | | | | |
| Braden | $29 | $6,043 | $1,841 | $11,893 | $17,843 | $22,150 | $26,806 | $48,215 | $48,426 |
| CFI (Note 2) | - | - | 1,219 | 4,354 | 8,713 | 13,619 | 13,684 | - | - |
| CFI Holdings (Note 2) | - | - | (1,127) | (105) | 6,324 | 6,220 | 33,234 | -33,880 | 35,205 |
| Deltak | (497) | 5,908 | 838 | 8,221 | 12,562 | 16,415 | 33,234 | 376 | 2,019 |
| Williams | | | | | | | | | |
| **Due From/(To) Subsidiaries** | ($468) | $11,951 | $2,771 | $24,364 | $45,442 | $58,405 | $79,945 | $82,472 | $85,650 |

Note 1: A quarterly summary of the historic GPEG I/C activity is presented in Exhibit A.
Note 2: CFI & CFI Holding outstanding balances and activity with GPEG were consolidated into Braden's balances in 2005.

EQ 000040



CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**I/C Non-Cash Overview**

ALVAREZ & MARSAL

CONFIDENTIAL

7

GLOBAL POWER

II. GPEG I/C Non-Cash Activity

## I/C Non-Cash Components

• As presented below, the nature of transactions giving rise to the $85.7 million net GPEG I/C non-cash balance consists of several items. For presentation, discussion and analytic purposes, the JEs supporting the I/C non-cash balances have been classified by major categories (as presented below). The classification of I/C activity is based on JE descriptions, supporting documentation and management discussions. This preliminary classification is subject to change as further information becomes available.

*Non-Cash Component Summary*
*(Total JE Activity from October 1998 to September 2006)*

| Due From/(To) Subsidiaries, $ in 000s | Braden | CFI (Note 1) | CFI Holdings | Deltak | WISG (Note 3) | Total |
|---|---|---|---|---|---|---|
| Corporate Expense Allocations | $43,560 | $9,148 | - | $36,024 | - | $88,732 |
| Insurance Premium Payments | 7,364 | 1,036 | 21 | 3,297 | 1,638 | 13,355 |
| Tax Payments | 1,434 | 2,850 | (104) | 358 | - | 4,539 |
| LC Fee Payments | 863 | 6 | - | 2,814 | 260 | 3,937 |
| Professional Fees | 1,876 | - | - | 523 | 30 | 2,435 |
| Miscellaneous | 905 | 52 | 996 | (997) | 91 | 1,047 |
| Unknown Transactions | (1,795) | 822 | 193 | (1,310) | - | (2,089) |
| Stock Option Tax Payments | (2,253) | (169) | - | (1,177) | - | (3,599) |
| Corporate Expenses Paid by Subsidiaries | (3,886) | - | - | (41) | - | (3,927) |
| MIC Payments by Subsidiaries (Note 2) | (4,297) | - | - | (2,920) | - | (7,717) |
| Transaction Related | (14,750) | (61) | 5,114 | (1,366) | - | (11,064) |
| **Total** | **$28,521** | **$13,684** | **$6,220** | **$35,205** | **$2,019** | **$85,650** |

Note 1: At September 29, 2006, the Braden, CFI and CFI Holdings balances are consolidated into the I/C non-cash balance with Braden.
Note 2: Reflects reversal entries for MIC allocations included as a component-of corporate expense allocations.
Note 3: GPEG's acquisition of WISG occurred subsequent to the 2005 and 2006 deferral of the corp. expense allocation process.

EQ 000041

GLOBAL POWER

**II.  GPEG I/C Non-Cash Activity**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**I/C Non-Cash Overview**

CONFIDENTIAL

ALVAREZ & MARSAL

8

## I/C Non-Cash Balance Roll Forward

*Due From/(To) Subsidiaries; $ in 000s*

| | Brullen | CFI | CFI Holdings | Deltak | Williams | Total |
|---|---|---|---|---|---|---|
| **September-98** | | | | | | |
| Allocations to Subsidiaries | 594 | - | - | 1,100 | - | 1,694 |
| Allocations from Subsidiaries | (566) | - | - | (1,597) | - | (2,162) |
| **December-98** | 29 | - | - | ($497) | - | ($468) |
| Allocations to Subsidiaries | 7,068 | - | - | 6,890 | - | 13,958 |
| Allocations from Subsidiaries | (1,054) | - | - | (485) | - | (1,539) |
| **December-99** | $6,043 | - | - | $5,908 | - | $11,951 |
| Allocations to Subsidiaries | 14,329 | 1,596 | 20,250 | 8,536 | - | 44,710 |
| Allocations from Subsidiaries | (18,531) | (377) | (21,377) | (13,606) | - | (53,891) |
| **December-00** | $1,841 | $1,219 | ($1,127) | $838 | - | $2,771 |

Note: A quarterly summary of the historic GPEG I/C activity is presented in Exhibit A.

EQ 000042

GL🌐BAL POWER

II. GPEG I/C Non-Cash Activity

CONFIDENTIAL / DRAFT
For Discussion Purposes Only
I/C Non-Cash Overview

ALVAREZ & MARSAL

9

## I/C Non-Cash Balance Roll Forward

| Due From/(To) Subsidiaries; $ in 000s | Braden | CFI | CFI Holdings | Deltak | Williams | Total |
|---|---|---|---|---|---|---|
| **December-00** | $1,841 | $1,219 | ($1,127) | $838 | - | $2,771 |
| Allocations to Subsidiaries | 13,515 | 3,984 | 1,109 | 10,217 | - | 28,826 |
| Allocations from Subsidiaries | (3,463) | (849) | (87) | (2,834) | - | (7,232) |
| **December-01** | $11,893 | $4,354 | ($105) | $8,221 | - | $24,364 |
| Allocations to Subsidiaries | 2,480 | 4,423 | 6,435 | 6,250 | - | 19,588 |
| Allocations from Subsidiaries | (2,008) | (64) | (6) | (1,909) | - | (3,988) |
| **December-02** | $12,365 | $8,713 | $6,324 | $12,562 | - | $39,964 |
| Allocations to Subsidiaries | 12,107 | 5,738 | - | 5,476 | - | 23,322 |
| Allocations from Subsidiaries | (2,322) | (832) | (104) | (1,624) | - | (4,881) |
| **December-03** | $22,150 | $13,619 | $6,220 | $16,415 | - | $58,405 |

Note: A quarterly summary of the historic GPEG I/C activity is presented in Exhibit A.

EQ 000043

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

I/C Non-Cash Overview

CONFIDENTIAL

ALVAREZ & MARSAL

10

GLOBAL POWER

II.  GPEG I/C Non-Cash Activity

## I/C Non-Cash Balance Roll Forward

*Due From/(To) Subsidiaries; $ In 000s*

| | Braden | CFI | CFI Holdings | Deltak | Willims | Total |
|---|---|---|---|---|---|---|
| **December-03** | $22,150 | $13,619 | $6,220 | $16,415 | - | $58,405 |
| Allocations to Subsidiaries | 7,239 | 164 | - | 17,780 | - | 25,183 |
| Allocations from Subsidiaries | (2,583) | (99) | - | (962) | - | (3,643) |
| **December-04** | $26,806 | $13,684 | $6,220 | $33,234 | - | $79,945 |
| Allocations to Subsidiaries | 2,311 | - | - | 1,294 | 376 | 3,981 |
| Allocations from Subsidiaries | (807) | - | - | (647) | - | (1,454) |
| **December-05** | $28,310 | $13,684 | $6,220 | $33,880 | $376 | $82,472 |
| Allocations to Subsidiaries | 1,989 | - | - | 1,478 | 1,651 | 5,118 |
| Allocations from Subsidiaries | (1,778) | - | - | (154) | (8) | (1,940) |
| **September 28, 2006** | $28,521 | $13,684 | $6,220 | $35,205 | $2,019 | $85,650 |

Note: A quarterly summary of the historic GPEG I/C activity is presented in Exhibit A.

EQ 000044

CONFIDENTIAL



GLOBAL POWER

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

III. GPEH I/G Non-Cash Components

EQ 000045

GL○BAL
P○WER

RE: **GPEG I/C Non-Cash Components**

CONFIDENTIAL
For Discussion Purposes Only

12

CONFIDENTIAL

△
ALVAREZ & MARSAL

## I/C Non-Cash Component Summary

### Corporate Administrative & Interest

- As part of the Company's normal accounting practices, all corporate expenses with the exception of federal taxes, management fees and board fees are allocated annually to the subsidiaries. The allocation of GPEG's expenses has been performed annually for the years 1999[1] to 2004. Presently, management is developing an allocation estimate for 2005 and YTD September 28, 2006.

- As illustrated below, the total amount of GPEG administrative and interest costs allocated from 1999[1] to December 2004 approximated $88.7 million[2].

| $ in 000s | 1999 (Note 1) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | YTD 09/06 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Braden | $6,133 | $10,363 | $11,057 | $5,478 | $4,833 | $5,696 | - | - | $43,560 |
| CFI (Note 3) | - | 478 | 2,757 | 2,630 | 3,284 | - | - | - | 9,148 |
| Deltak | 6,097 | 7,028 | 8,228 | 4,723 | 4,288 | 5,660 | - | - | 36,024 |
| **Total** | **$12,230** | **$17,869** | **$22,042** | **$12,830** | **$12,405** | **$11,356** | **-** | **-** | **$88,732** |

Note 1: Approximately $4.15 million of GPEG allocations attributable to 1998 were posted during 1999. For presentation purposes, these amounts are reflected in 1999 consistent with the general ledger presentment.

Note 2: Corporate expense allocations relating to the subsidiary MIC obligations are reversed as part of the MIC entries. Adjusting for this reversal the corporate expense allocation approximates $80.9 million. Further discussion of this reversal is presented below under MIC.

Note 3: Approximately $9.2 million of GPEG expense allocation to CFI I/C non-cash accounts were consolidated with Braden I/C non-cash accounts beginning in January 2005.

EQ 000046

GLOBAL POWER
II. GPEG I/C Non-Cash Components

CONFIDENTIAL / DRAFT
For Discussion Purposes Only
I/C Non-Cash Component Summary

CONFIDENTIAL
ALVAREZ & MARSAL

13

## Corporate Administrative & Interest

### Allocation Components

- As illustrated below, GPEG's expense allocations include corporate interest expense, general and administrative and management incentive compensation ("MIC") paid to subsidiary[1] and executive management teams.

| Due From/(To) Subsidiaries; $ in 000s | Corporate Admin & Interest Allocation by Entity (Total Allocations from 1998 to 2004) | | | |
| --- | --- | --- | --- | --- |
| | Brudun | CFI | Detalis | Total |
| Interest Allocations | $25,104 | $2,113 | $18,258 | $45,475 |
| G&A Allocations | 12,283 | 6,162 | 12,320 | 30,765 |
| Subsidiary MIC Allocations (Note 1) | 4,496 | - | 3,423 | 7,918 |
| Executive MIC Allocations | 1,644 | 873 | 2,059 | 4,576 |
| Total 1998 through 2004 - Support | $43,527 | $9,148 | $36,059 | $88,734 |
| Miscellaneous (Note 2) | 33 | (0) | (35) | (2) |
| Total GPEG Allocation - Per G/L | $43,560 | $9,148 | $36,024 | $88,732 |

Note 1: Corporate expense allocations relating to the subsidiary MIC obligations are reversed as part of the MIC entries. Adjusting for this reversal the corporate expense allocation approximates $80.9 million. Further discussion of this reversal is presented below under MIC.

Note 2: Minor reconciliation differences were noted between the general ledger entries and the supporting allocation schedules. These are reflected above as miscellaneous items.

EQ 000047

GL⦵BAL
P⦵WER

**III.  GPEG I/C Non-Cash Components**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**I/C Non-Cash Component Summary**

CONFIDENTIAL

ALVAREZ & MARSAL

14

**Corporate Administrative & Interest**

**Allocation Methodology**

- The posting of GPEG expense allocations is performed annually with the underlying components consolidated into single entries for each subsidiary. The allocation methodology and frequency of calculation varies by the underlying component:

  o *Interest Expense* – Interest expense is allocated based on the monthly average stockholders' equity balance by each respective subsidiary and adjusted for the impact of the 2000 recapitalization transaction.

  o *General & Administrative* – Allocated corporate general & administrative expenses excluded management fees and board expenses. Through 2003, actual quarterly corporate expenses were allocated equally among the subsidiaries. Beginning in 2004, corporate expenses were allocated based on subsidiary sales levels, which closely approximated historic practices.

  o *Subsidiary MIC* – Subsidiary MIC expense allocations are calculated quarterly and are based on the MIC expense for the respective subsidiary. Subsidiary MIC allocations are subsequently reversed to reflect the payment by the respective subsidiaries.

  o *Executive MIC* – Prior to 2004, executive MIC expense allocations were allocated equally among the subsidiaries. Beginning in 2004, executive MIC expense allocations were allocated based on the EBITDA of the respective subsidiaries.

EQ 000048

SA 180



GL**O**BAL
P**O**WER
III.  GPEG I/C Non-Cash Components

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

I/C Non-Cash Component Summary



ALVAREZ & MARSAL

15

## Corporate Administrative & Interest

### Accounting Policies & Procedures

- The corporate allocation is posted annually in journal entry form after the preparation of the annual consolidating financial statements. Consequently, the monthly, quarterly and annual income statements do not reflect the allocation of the current period's corporate expenses.

- Corporate expenses are allocated by debiting GPEG's I/C non-cash balance sheet account (by subsidiary) and crediting a "contra-expense" account titled "allocation to Subsidiaries." As this entry is made after the preparation of the annual financial statements, the monthly, quarterly and annual balance sheet accounts (i.e. I/C non-cash and retained earnings) do not reflect the allocation of either the current period or YTD expenses.

- The payment of subsidiary MIC obligations is typically made by the subsidiaries. As a result, the GPEG balance created by the corporate MIC allocation is subsequently reversed through a credit entry at the time payment is made by the subsidiary. Further discussion of these entries is presented in Management Incentive Compensation.

- Pre-December 2004 – As part of the annual financial close process, the corporate controller calculated the corporate allocation amount and communicated the corresponding journal entry to each subsidiary. The accuracy of each subsidiary's entry was verified by Corporate Accounting during the subsequent month's comparison of the I/C balances between GPEG and the subsidiaries.

- Post-December 2004 – The corporate expense allocation process has not been performed for the accounting periods subsequent to December 2004. However, management is currently developing an allocation estimate for 2005 and YTD September 28, 2006.

EQ 000049

SA 181

# GLOBAL POWER

## III. GPEG I/C Non-Cash Components

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## I/C Non-Cash Component Summary

CONFIDENTIAL

ALVAREZ & MARSAL

18

### Management Incentive Compensation

- As illustrated below, from 2000 to 2005, approximately $7.9 million of credits were posted to I/C non-cash accounts primarily to reverse subsidiary MIC allocations posted previously during the corporate administrative and interest allocation process.

  o MIC expenses for the corporate and subsidiary management teams are posted to the GPEG general ledger and subsequently transferred to the subsidiaries though the annual corporate administrative and interest allocation entry. The impact of this entry creates an I/C GPEG balance due from the subsidiary.

  o The payment of the subsidiary MIC obligation is typically made by the subsidiaries. As a result, a reversal or credit is required to eliminate the GPEG I/C non-cash balance.

**MIC Related Cost Allocation Entries: GPEG (Payable)/Receivable**

| $ in 000s | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Braden | $66 | ($413) | ($1,638) | ($954) | ($1,086) | ($748) | ($24) | -- | ($4,797) |
| Deltak | -- | (275) | (1,175) | (932) | (627) | -- | 89 | -- | (2,920) |
| Total | $66 | ($688) | ($2,813) | ($1,886) | ($1,713) | ($748) | $64 | -- | ($7,717) |

Miscellaneous Debit Entries: 154
Adjusted Total: ($7,871)

EQ 000050

GL⊗BAL
P⊗WER

**III. GPEG I/C Non-Cash Components**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## I/C Non-Cash Component Summary

CONFIDENTIAL ENTRIES

ALVAREZ & MARSAL

17

### Insurance

- Insurance policies purchased by GPEG for the benefit of the Company are allocated monthly to subsidiaries through the I/C non-cash account. For insurance policies covering specific subsidiaries, the premium amount is expensed directly to the subsidiary. For policies providing blanket coverage (i.e. commercial general and umbrella liability), premiums are allocated based on forecasted sales of the respective subsidiaries.

- The insurance policies included in the monthly corporate insurance allocation include:

  o Commercial General Liability;
  o Workers Compensation;
  o Umbrella Liability;

  o Property Insurance;
  o Automotive; and
  o Employee Practices Liability.

- The total amount of insurance premiums allocated to subsidiaries approximated $13.4 million for the period October 1998 through September 28, 2006 (filing date):

| Corporate Insurance Allocations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $ in 000s | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
| Braden | $31 | $362 | $1,030 | $1,401 | $1,131 | $820 | $776 | $1,063 | $751 | $7,364 |
| CFI | - | - | - | 367 | 313 | 206 | 150 | - | - | 1,036 |
| CFI Holdings | - | - | - | 21 | - | - | - | - | - | 21 |
| Deltak | 123 | 123 | 310 | 135 | 746 | 402 | 458 | 471 | 528 | 3,297 |
| WISG | - | - | - | - | - | - | - | 276 | 1,362 | 1,638 |
| Grand Total | $154 | $485 | $1,340 | $1,924 | $2,189 | $1,428 | $1,384 | $1,810 | $2,641 | $13,355 |

EQ 000051

GL☉BAL POWER

III. GPEG I/C Non-Cash Components

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## I/C Non-Cash Component Summary

ALVAREZ & MARSAL

18

**Tax Related**

- Through the corporate tax department, federal and state tax compliance, accounting and payment activities are typically performed for Braden, CFI, CFI Holding, Deltak and Williams. Tax related I/C non-cash items consist primarily of state tax allocations and the past transfer of tax obligations from the subsidiaries to corporate.
  - o Federal tax returns are filed on a consolidated basis with the resulting federal tax expense or refund not allocated to the subsidiaries.
  - o State tax returns are filed individually by entity by state with the resulting state tax expense or refunds passed along monthly to the individual subsidiaries.

| $ in 000s | Tax Related Allocations: GPEG (Payable)/Receivable | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
| Braden | - | $53 | - | $639 | $744 | $12 | ($12) | ($2) | $1,434 |
| CFI | - | - | 1 | 1,406 | 1,431 | 12 | - | - | 2,850 |
| CFI Holdings | - | - | - | - | (104) | - | - | - | (104) |
| Deltak | 110 | 366 | (13) | (446) | 141 | 199 | 2 | - | 358 |
| Grand Total | $110 | $419 | ($12) | $1,599 | $2,212 | $223 | ($10) | ($2) | $4,539 |

Note 1: Sales and property tax compliance and payments are typically performed by the individual subsidiaries. These amounts are not posted to I/C non-cash accounts, but are recorded directly by the subsidiaries as operating expenses.

EQ 000052



CONFIDENTIAL
19

ALVAREZ & MARSAL

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

GL0BAL P0WER

**III. GPEG I/C Non-Cash Components**

# I/C Non-Cash Component Summary

## LC Fee Payments

- Letter-of-Credit ("LC") management, processing and origination services are provided by GPEG for Braden, Deltak and WISG.

  o As part of the LC process, fees are paid directly by GPEG with the resulting expense posted to the subsidiaries monthly through an I/C non-cash journal entry.

  o The allocation of the LC fee I/C charge for each subsidiary is based on the actual LC costs. Each subsidiary is billed for their originated and/or outstanding LC commitments associated with the specific LC issued on behalf of each subsidiary.

- As illustrated below, from 1999 to September 2006, LC fee allocations to the GPEG subsidiaries approximated $3.9 million.

| $ in 000s | LC Fee Cost Allocations: GPEG (Payable)/Receivable | | | | | | | |
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Braden | $146 | $124 | $111 | $89 | $67 | $70 | $155 | $101 | $863 |
| Deltak | 189 | 478 | 468 | 308 | 397 | 344 | 433 | 197 | 2,814 |
| WISG | - | - | - | - | - | - | 32 | 228 | 260 |
| **Total** | **$334** | **$602** | **$578** | **$398** | **$464** | **$413** | **$620** | **$527** | **$3,937** |

EQ 000053

CONFIDENTIAL

20

ALVAREZ & MARSAL

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## I/C Non-Cash Component Summary

GLOBAL POWER

### II. GPEG I/C Non-Cash Components

#### Professional Fees

- Professional fees paid by GPEG for the use and benefit of the Company are allocated to the individual subsidiaries through the I/C non-cash account.

- The professional fees included in the allocation primarily consist of legal, accounting and consulting related fees.

- Professional fees allocated to subsidiaries approximated $2.4 million for the period beginning December 1999 and ending September 2006.

| Professional Fee Cost Allocations: GPEG (Payable/Receivable) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $ in 000s | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
| Braden | $6 | $18 | $12 | $10 | $1 | $371 | $1,005 | $453 | $1,876 |
| CFI | - | - | - | - | 6 | - | - | - | $6 |
| Deltak | 10 | 37 | 18 | 14 | 4 | 120 | 44 | 276 | $523 |
| WISG | - | - | - | - | - | - | - | 30 | $30 |
| Total | $15 | $55 | $30 | $24 | $11 | $491 | $1,049 | $759 | $2,435 |

EQ 000054

CONFIDENTIAL / DRAFT
For Discussion Purposes Only
## I/C Non-Cash Component Summary



GLOBAL POWER

**III. GPEG I/C Non-Cash Components**



ALVAREZ & MARSAL

CONFIDENTIAL

21

### Transaction Related

- As illustrated below, approximately $11.1 million of net transaction entries were posted to the GPEG I/C non-cash accounts.

| $ in 000s | Transaction Related | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | JE Date | Braden | CFI | CFI Holdings | Deltak | Total |
| **Sawmill Capital / Harvest Partners Transaction Payout of Options** | Aug-00 | ($13,586) | $0 | $0 | ($12,057) | $25,644 |
| **CFI Acquisition** | | | | | | |
| Payments to Owners, Incurred Debt & Escrow Payments | Nov-00 | - | - | (21,000) | - | (21,000) |
| Transfer of Payments to CFI Holdings I/C Cash | Nov-00 | - | - | 18,877 | - | 18,877 |
| Sub-total, Net | | - | - | (2,123) | - | (2,123) |
| **Subsequent CFI Acquisition Related** | | | | | | |
| CFI Seller Note pay-off | Jun-02 | - | 6,435 | - | - | 6,435 |
| CFI IRB pymt | Dec-00 | - | 741 | - | - | 741 |
| Sub-total, Net | | - | 7,176 | - | - | 7,176 |
| Purchase of DPEC | Sep-04 | - | - | - | 10,691 | 10,691 |
| CFI Facility Sale | Jun-06 | - | (1,164) | - | - | (1,164) |
| **Total** | | ($13,586) | $6,012 | ($2,123) | ($1,366) | $11,064 |

EQ 000055

CONFIDENTIAL

22

ALVAREZ & MARSAL

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

I/C Non-Cash Component Summary

GLOBAL POWER

IV.  GPEG I/C Non-Cash Components

## Transaction Related

### Sawmill Capital / Harvest Partners Transaction

- In connection with the August 2000 acquisition of GEEG Holdings (predecessor to GPEG and parent company to Braden and Deltak) by Harvest Partners, Inc., Braden and Deltak paid to its employees the monetary value of outstanding stock options. The $25.6 million payment by the subsidiaries for the outstanding stock options reduced (credited) the I/C non-cash balance.

### CFI Acquisition & Subsequent CFI Acquisition Related

- In October 2000, GEEG Holdings, Inc. acquired CFI Holdings and its subsidiary Consolidated Fabricators, Inc. ("CFI"). Payments to the owners, incurred debt, escrow payments and the booking of an earn out accrual by CFI Holdings on behalf of GEEG Holdings, Inc. approximated $21.0 million. The cash related items, approximating $18.9 million, were subsequently reclassified as I/C cash items. Subsequent to the acquisition of CFI Holdings and CFI, GEEG/GPEG paid off a $6.4 million seller note and a $741,000 industrial revenue bond ("IRB").

### DPEC Acquisition

- The acquisition payment for Deltak Power Equipment (China) Co. Ltd. ("DPEC") was paid by GPEG for the benefit of Deltak. Accordingly, the payment increased the I/C non-cash balance due from Deltak.

### CFI Facility Sale

- In June 2006, GPEG received the cash payment for the sale of a CFI facility.                    ut reduced the I/C non-cash balance due from CFI.

EQ 000056

SA 188



CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**I/C Non-Cash Component Summary**

GLOBAL
POWER

III. GPEG I/C Non-Cash Components

**Corporate Expenses Paid by Subsidiaries**

- Corporate expenses paid by the subsidiaries for the benefit of GPEG are credited to the I/C non-cash account. These corporate expenses include among other costs telephone, electric and rent expense.

- Approximately $3.9 million in credits have been allocated to the business units for the period beginning 1998 and ending September 28, 2006.

| $ in 000s | Corporate Expense Paid by Subsidiary Allocations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
| Braden | ($121) | ($459) | ($720) | ($932) | ($222) | ($299) | ($317) | ($425) | ($391) | ($3,886) |
| Deltak | - | - | 82 | (11) | (9) | (62) | (32) | (9) | - | (41) |
| Grand Total | ($121) | ($459) | ($639) | ($943) | ($232) | ($360) | ($348) | ($433) | ($391) | ($3,927) |

23

ALVAREZ & MARSAL

EQ 000057



GL⊕BAL P⊕WER

**III. GPEG I/C Non-Cash Components**

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

**I/C Non-Cash Component Summary**

CONFIDENTIAL

24

ALVAREZ & MARSAL

## Stock Options

- The exercise of stock options by employees results in a tax obligation by the Company. Typically, the Company's tax obligation is paid by the subsidiary and expensed by GPEG. Accordingly, the subsidiary's payment on behalf of GPEG is reflected as a reduction in the I/C non-cash balance.

- As illustrated below, approximately $3.6 million of stock option tax credits have been posted to the I/C non-cash accounts for the period beginning October 2002 and ending September 2005.

| $ in 000s | Stock Option Cost Allocations | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | Total |
| Braden | - | ($862) | ($1,250) | ($141) | ($2,253) |
| CFI | - | (70) | (99) | - | (169) |
| Deltak | (32) | (612) | (525) | (7) | (1,177) |
| **Total** | ($32) | ($1,545) | ($1,874) | ($148) | ($3,599) |

EQ 000058



EQ 000059

CONFIDENTIAL / DRAFT
For Discussion Purposes Only



GLOBAL POWER
Exhibit A

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## Quarterly GPEG I/C Non-Cash Account Activity



CONFIDENTIAL

25

ALVAREZ & MARSAL

$ in 000's

| | Q1 1998 | Q1 1999 | Q2 1999 | Q3 1999 | Q4 1999 | 1999 | Q1 2000 | Q2 2000 | Q3 2000 | Q4 2000 | 2000 | Q1 2001 | Q2 2001 | Q3 2001 | Q4 2001 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Allocations to Subsidiaries** | | | | | | | | | | | | | | | | |
| Braden | $594 | 214 | 1,755 | 256 | 4,844 | 57,068 | 140 | 2,715 | 547 | 10,928 | 14,329 | 1,181 | 310 | 416 | 11,609 | 13,515 |
| CFI | - | - | - | - | - | - | - | - | - | 1,596 | 1,596 | 57 | 68 | 949 | 2,911 | 3,984 |
| CFI Holdings | 1,100 | 92 | 2,702 | 206 | 3,890 | 6,890 | 121 | 268 | 662 | 20,230 | 20,230 | 110 | 139 | 59 | 802 | 1,109 |
| Deltak | - | - | - | - | - | - | - | - | - | 7,485 | 8,536 | 278 | 266 | 1,080 | 8,554 | 10,217 |
| Williams | | | | | | | | | | | | | | | | |
| **Total** | $1,694 | 306 | 4,456 | 462 | 8,734 | 13,958 | 261 | 2,983 | 1,209 | 40,258 | 44,710 | 1,624 | 783 | 2,504 | 23,915 | 28,826 |
| **Cumulative Allocations** | $1,694 | | | | | 15,652 | | | | | 60,363 | | | | | 89,188 |
| **Allocations from Subsidiaries** | | | | | | | | | | | | | | | | |
| Braden | (366) | (543) | (123) | (127) | (262) | (1,054) | (994) | (2,743) | (14,636) | (248) | (18,531) | (1,964) | (208) | (937) | (354) | (33,463) |
| CFI | - | - | - | - | - | - | - | - | - | (377) | (377) | - | - | (47) | (802) | (849) |
| CFI Holdings | (1,597) | (316) | (47) | (3) | (27) | (485) | (483) | (13) | (13,134) | (21,377) | (21,377) | (645) | (87) | - | (37) | (97) |
| Deltak | - | - | - | - | - | - | - | - | - | (271) | (13,606) | (159) | - | (759) | (2,834) | (2,834) |
| Williams | | | | | | | | | | | | | | | | |
| **Total** | (32,162) | (951) | (169) | (130) | (289) | (1,539) | (1,393) | (7,255) | (27,670) | (22,272) | (53,891) | (2,699) | (454) | (1,451) | (1,234) | (57,272) |
| **Cumulative Allocations** | (32,162) | | | | | (53,701) | | | | | (557,592) | | | | | (564,824) |
| **GPEG Net Change** | | | | | | | | | | | | | | | | |
| Braden | 529 | (328) | 1,632 | 129 | 4,582 | 6,015 | (765) | (28) | (14,089) | 10,679 | (4,202) | (783) | 102 | (322) | 11,255 | 810,032 |
| CFI | - | - | - | - | - | - | - | - | - | 1,219 | 1,219 | 57 | 68 | 901 | 2,109 | 3,136 |
| CFI Holdings | (497) | (316) | 2,653 | 203 | 3,863 | 6,405 | (367) | 255 | (12,172) | (1,137) | (1,137) | 110 | 52 | 59 | 802 | 1,022 |
| Deltak | - | - | - | - | - | - | - | - | - | 7,214 | (5,070) | (368) | 107 | (370) | 8,015 | 7,386 |
| Williams | | | | | | | | | | | | | | | | |
| **Total** | (465) | (3,565) | 4,287 | 332 | 8,445 | 12,419 | (1,132) | 3,228 | (26,261) | 17,505 | (9,180) | (985) | 339 | 69 | 22,181 | 821,592 |
| **Cumulative Net Change** | (466) | | | | | 11,951 | | | | | 517,505 | | | | | 814,364 |
| **GPEG I/C Balance** | | | | | | | | | | | | | | | | |
| Braden | 529 | (300) | 1,252 | 1,461 | 6,043 | 56,043 | 5,279 | 5,251 | (4,838) | 1,841 | 3,841 | 1,038 | 1,160 | 638 | 11,893 | 11,893 |
| CFI | - | - | - | - | - | - | - | - | - | 1,219 | 1,219 | 1,275 | 1,344 | 2,245 | 4,354 | 4,354 |
| CFI Holdings | (497) | (813) | 1,842 | 2,045 | 5,908 | 5,908 | 5,541 | 5,796 | (6,376) | (1,127) | (1,127) | (1,018) | (966) | (907) | (105) | (105) |
| Deltak | - | - | - | - | - | - | - | - | - | 838 | 838 | 470 | 577 | 207 | 8,221 | 8,221 |
| Williams | | | | | | | | | | | | | | | | |
| **Total** | (466) | (1,413) | 3,174 | 3,596 | 11,951 | 11,951 | 10,830 | 11,047 | (15,214) | 2,771 | 2,771 | 1,786 | 3,415 | 2,183 | 24,364 | 24,364 |

EQ 000060

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

# Quarterly GPEG I/C Non-Cash Account Activity

ALVAREZ & MARSAL

GLOBAL POWER
Exhibit A

$ in 000s

| | Q1 2002 | Q2 2002 | Q3 2002 | Q4 2002 | 2002 | Q1 2003 | Q2 2003 | Q3 2003 | Q4 2003 | 2003 | Q1 2004 | Q2 2004 | Q3 2004 | Q4 2004 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Allocations to Subsidiaries** | | | | | | | | | | | | | | | |
| Braden | 408 | 866 | 252 | 934 | 2,480 | 6,497 | 277 | 268 | 5,085 | 12,107 | 285 | 638 | 289 | 6,027 | 7,239 |
| CFI | 94 | 294 | 294 | 3,612 | 4,423 | 1,901 | 77 | 64 | 3,697 | 5,738 | 62 | 91 | — | 12 | 164 |
| CFI Holdings | — | — | — | — | 6,435 | — | — | — | — | — | — | — | — | — | — |
| Deltak | 294 | 288 | 5,043 | 6,250 | 6,250 | 435 | 263 | 234 | 4,534 | 5,476 | 489 | 247 | 10,957 | 6,087 | 17,780 |
| Williams | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total | 796 | 7,733 | 834 | 9,359 | 19,588 | 8,854 | 617 | 565 | 13,315 | 23,322 | 836 | 976 | 11,246 | 12,126 | 25,183 |
| Cumulative Allocations | 89,188 | | | | 108,776 | | | | | 132,098 | | | | | 157,281 |
| **Allocations from Subsidiaries** | | | | | | | | | | | | | | | |
| Braden | (1,109) | (597) | (79) | (231) | (32,006) | (1,167) | (498) | (336) | (101) | (32,322) | (1,663) | (113) | (82) | (724) | (32,593) |
| CFI | — | (6) | (7) | (81) | — | (70) | (70) | — | (32) | (832) | (99) | — | — | — | (99) |
| CFI Holdings | — | — | — | — | (6) | (104) | (426) | (50) | (462) | (104) | — | — | — | — | — |
| Deltak | (1,015) | (41) | (25) | (837) | (1,909) | (935) | — | — | — | (1,624) | (733) | (134) | (27) | (67) | (962) |
| Williams | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total | (2,124) | (536) | (103) | (1,119) | (33,983) | (2,659) | (994) | (677) | (624) | (34,881) | (2,495) | (248) | (109) | (791) | (33,653) |
| Cumulative Allocations | (564,824) | | | | (568,812) | | | | | (375,693) | | | | | (377,330) |
| **GPEG Net Change** | | | | | | | | | | | | | | | |
| Braden | (701) | 397 | 173 | 704 | 3,472 | 5,330 | (220) | (289) | 4,984 | 9,785 | (1,378) | 525 | 207 | 5,303 | 4,656 |
| CFI | 94 | 423 | 231 | 3,531 | 4,359 | 1,201 | 6 | 64 | 3,635 | 4,906 | (37) | 91 | — | 12 | 65 |
| CFI Holdings | — | (6) | — | — | 6,429 | (104) | — | — | — | (104) | — | — | — | — | — |
| Deltak | (721) | 383 | 262 | 4,215 | 4,341 | (239) | (163) | 184 | 4,062 | 3,853 | (244) | 113 | 10,930 | 6,020 | 16,819 |
| Williams | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total | (1,329) | 7,733 | 726 | 8,470 | 15,500 | 6,198 | (377) | (41) | 12,661 | 18,440 | (1,659) | 729 | 11,137 | 11,334 | 21,340 |
| Cumulative Net Change | 24,364 | | | | 33,564 | | | | | 58,605 | | | | | 79,945 |
| **GPEG I/C Balance** | | | | | | | | | | | | | | | |
| Braden | 11,192 | 11,489 | 11,662 | 12,365 | 12,365 | 17,695 | 17,474 | 17,166 | 22,150 | 22,150 | 20,771 | 21,296 | 21,503 | 26,806 | 26,806 |
| CFI | 4,448 | 4,871 | 5,162 | 4,713 | 4,713 | 9,914 | 9,921 | 9,984 | 13,619 | 13,619 | 13,582 | 13,673 | 13,673 | 13,684 | 13,684 |
| CFI Holdings | (103) | 6,324 | 6,324 | 6,324 | 6,324 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 | 6,220 |
| Deltak | 7,500 | 8,083 | 8,347 | 12,562 | 12,562 | 12,333 | 12,170 | 12,353 | 16,415 | 16,415 | 16,172 | 16,284 | 27,214 | 33,234 | 33,234 |
| Williams | 9,211 | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total | 23,035 | 34,749 | 31,495 | 39,954 | 39,964 | 46,162 | 45,785 | 45,744 | 58,405 | 58,405 | 56,745 | 57,474 | 68,611 | 79,945 | 79,945 |

EQ 000061



28

**CONFIDENTIAL / DRAFT**
For Discussion Purposes Only

## Quarterly GPEG I/C Non-Cash Account Activity

GLOBAL POWER
Exhibit A

*$ in 000's*

| | 2004 | Q1 2005 | Q2 2005 | Q3 2005 | Q4 2005 | 2005 | Q1 2006 | Q2 2006 | Q3 2006 | Sept 20, 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Allocation to Subsidiaries** | | | | | | | | | | |
| Braden | $7,239 | 256 | 311 | 711 | 1,033 | 2,311 | 667 | 696 | 627 | $1,989 |
| CBI | 164 | - | - | - | - | - | - | - | - | - |
| CBI Holdings | - | - | - | - | - | - | - | - | - | - |
| Deltak | 17,780 | 290 | 283 | 252 | 468 | 1,294 | 460 | 552 | 466 | 1,478 |
| Williams | - | - | 118 | 119 | 140 | 376 | 493 | 612 | 546 | 1,651 |
| **Total** | $25,183 | 545 | 713 | 1,083 | 1,640 | $3,981 | 1,620 | 1,839 | 1,639 | $5,118 |
| **Cumulative Allocations** | $157,281 | | | | | $161,262 | | | | $166,380 |
| **Allocation from Subsidiaries** | | | | | | | | | | |
| Braden | (32,583) | (233) | (146) | (204) | (233) | (807) | (172) | (1,438) | (188) | (31,718) |
| CBI | (99) | - | - | - | - | - | - | - | - | - |
| CBI Holdings | - | - | - | - | - | - | - | - | - | - |
| Deltak | (962) | (483) | (119) | (33) | (13) | (647) | (83) | (66) | (5) | (154) |
| Williams | - | - | - | - | - | - | - | - | (8) | (8) |
| **Total** | (33,643) | (706) | (266) | (237) | (246) | (1,454) | (255) | (1,504) | (181) | (31,940) |
| **Cumulative Allocations** | (577,336) | | | | | (578,790) | | | | (580,730) |
| **GPEG Net Change** | | | | | | | | | | |
| Braden | $4,656 | 33 | 165 | 507 | 799 | $1,504 | 494 | (743) | 439 | $211 |
| CBI | 65 | - | - | - | - | - | - | - | - | - |
| CBI Holdings | - | - | - | - | - | - | - | - | - | - |
| Deltak | 16,819 | (193) | 164 | 219 | 456 | 646 | 377 | 486 | 461 | 1,324 |
| Williams | - | - | 118 | 119 | 140 | 376 | 493 | 612 | 538 | 1,645 |
| **Total** | $21,540 | (160) | 447 | 845 | 1,395 | $2,527 | 1,365 | 335 | 1,458 | $3,178 |
| **Cumulative Net Change** | $79,945 | | | | | $82,471 | | | | $85,650 |
| **GPEG I/C Balance** | | | | | | | | | | |
| Braden | $26,806 | 46,744 | 46,909 | 47,416 | 48,215 | 48,215 | 48,709 | 47,967 | 48,426 | $48,426 |
| CBI | 13,684 | - | - | - | - | - | - | - | - | - |
| CBI Holdings | 6,220 | - | - | - | - | - | - | - | - | - |
| Deltak | 33,234 | 33,041 | 33,205 | 33,424 | 33,880 | 33,880 | 34,258 | 34,743 | 35,205 | 35,205 |
| Williams | - | - | 118 | 237 | 376 | 376 | 870 | 1,482 | 2,019 | 2,019 |
| **Total** | $79,945 | 79,785 | 80,232 | 81,077 | 82,472 | $82,472 | 83,837 | 84,192 | 85,650 | $85,650 |



ALVAREZ & MARSAL

EQ 000062



GLOBAL POWER
Exhibit B

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## Annual Corporate Administrative and Interest Detail
### (By Component, By Entity)

CONFIDENTIAL

ALVAREZ & MARSAL

29

| GPSG Due From/(To); $ In 000s | Benton | GPI | Deluth | Total |
|---|---|---|---|---|
| **September-98** | $0 | $0 | $0 | $0 |
| Interest Allocations | 1,036 | - | 1,949 | 2,985 |
| G&A Allocations | 269 | - | 269 | 538 |
| Subsidiary MIC Allocations | 340 | - | 340 | 681 |
| Executive MIC Allocations | - | - | - | - |
| **December-98** | $1,645 | $0 | $2,559 | $4,204 |
| Interest Allocations | 2,543 | - | 1,589 | 4,133 |
| G&A Allocations | 568 | - | 568 | 1,135 |
| Subsidiary MIC Allocations | 768 | - | 475 | 1,243 |
| Executive MIC Allocations | 628 | - | 941 | 1,569 |
| **December-99** | $6,151 | $0 | $6,132 | $12,283 |
| Interest Allocations | 8,851 | 371 | 5,545 | 14,766 |
| G&A Allocations | 784 | 92 | 784 | 1,660 |
| Subsidiary MIC Allocations | 598 | - | 569 | 1,167 |
| Executive MIC Allocation | 130 | 15 | 130 | 275 |
| **December-00** | $16,514 | $478 | $13,160 | $30,152 |
| Interest Allocations | 8,556 | 1,226 | 5,798 | 15,580 |
| G&A Allocations | 1,244 | 1,244 | 1,244 | 3,731 |
| Subsidiary MIC Allocations | 965 | - | 900 | 1,865 |
| Executive MIC Allocations | 287 | 287 | 287 | 860 |
| **December-01** | $27,566 | $3,235 | $21,388 | $52,188 |

EQ 000063



GLOBAL POWER
Exhibit 5

CONFIDENTIAL / DRAFT
For Discussion Purposes Only

## Annual Corporate Administrative and Interest Detail
### (By Component, By Entity)

CONFIDENTIAL
ALVAREZ & MARSAL
30

| GPEG Due From/(To); $ In 000s | Braxton | CFI | Delisle | Total |
|---|---|---|---|---|
| **December-01** | | | | |
| Interest Allocations | 2,048 | 322 | 1,784 | 4,153 |
| G&A Allocations | 1,964 | 1,964 | 1,964 | 5,893 |
| Subsidiary MIC Allocations | 1,122 | - | 631 | 1,753 |
| Executive MIC Allocations | 344 | 344 | 344 | 1,031 |
| | $27,566 | $3,235 | $21,388 | $52,188 |
| **December-02** | | | | |
| Interest Allocations | 1,065 | 194 | 812 | 2,071 |
| G&A Allocations | 2,862 | 2,862 | 2,862 | 8,586 |
| Subsidiary MIC Allocations | 679 | - | 387 | 1,066 |
| Executive MIC Allocations | 227 | 227 | 227 | 682 |
| | $33,043 | $5,864 | $26,111 | $65,019 |
| **December-03** | | | | |
| Interest Allocations | 1,005 | - | 780 | 1,786 |
| G&A Allocations | 4,592 | - | 4,630 | 9,222 |
| Subsidiary MIC Allocations | 24 | - | 120 | 144 |
| Executive MIC Allocations | 29 | - | 130 | 159 |
| | $37,876 | $9,148 | $30,399 | $77,424 |
| **December-04** | | | | |
| | $43,527 | $9,148 | $36,059 | $89,734 |

EQ 000064



# TAB 14 – EXHIBIT N

# Goreway Station

## Deltak
## Bankruptcy Recovery Plan





# Deltak PO Facts

- PO Amount to Deltak: $ 46,662,179 CAD
- Payments made against PO:$20,835,118 CAD
- GST Payment to Deltak: $1,416,866 CAD
- Equipment Delivery Nov 2006–April 2007
- 108 PO's let by Deltak
  - $25.4mmUSD to Deltak Subs
- $5.12mmUSD paid to date to Deltak Subs

# Bankruptcy filing highlights

- Bankruptcy Filing Date: Sept 29, 2006
  - Global Power Equipment Group — Parent and subsidiaries
    - Braden Group — PO with to GE
    - Williams Group — Power/Industrial Contractor
    - Deltak Group — Specialty Boilers and Heat Recovery Boilers
  - Court ruling:
    - wind down operation
    - T&M work to completion
    - Waiver of all claims (including any bank or surety)

# Current Status

- Hired 8 Deltak employees (Engineers)
- J.Terranova (commercial lead) & R.Tassin (Eng) initially assigned in Deltak's Plymouth MN
- D.Grimm (PM) and S.Faghih (PEM) assigned to Deltak offices currently
- Engineering approx 80% complete
- Fabrication approx 20% complete

# Deltak PO facts

- Awarded: January 26, 2006
- Buyer: SNC-Lavalin Power Ontario Inc
- Seller: Deltak
- Scope: Furnish/Deliver (DDP Jobsite) 3x 7FB HRSG's in C-Section pre-assembled including Stacks and all site TA's and Training
- Delivery:

| | |
|---|---|
| Unit #1 Ducts | 21-Nov-06 |
| Unit #2 Ducts | 19-Dec-06 |
| Unit #3 Ducts | 31-Jan-07 |
| Unit #1 C-Section inclusive of SCR and Firing Duct | 15 Jan 07 |
| Unit #2 C-Section inclusive of SCR and Firing Duct | 15 Feb 07 |
| Unit #3 C-Section inclusive of SCR and Firing Duct | 15 Mar 07 |
| Unit #1 Drums | 15-Feb-07 |
| Unit #2 Drums | 15-Mar-07 |
| Unit #3 Drums | 15-Apr-07 |
| Unit #1 Piping Spools inclusive of associated hangers – Initial Delivery Package 1 0f 10 | 10 FEB 07 |
| Unit #1 Piping Spools inclusive of associated hangers – Final Delivery of all remaining packages | 31-Mar-07 |
| Unit #2 Piping Spools inclusive of associated hangers – Initial Delivery Package 1 0f 10 | 10 MAR 07 |
| Unit #2 Piping Spools inclusive of associated hangers – Final Delivery of all remaining packages | 30-Apr-07 |
| Unit #3 Piping Spools inclusive of associated hangers – Initial Delivery Package 1 0f 10 | 10 APR 07 |
| Unit #3 Piping Spools inclusive of associated hangers – Final Delivery of all remaining packages | 31-May-07 |

# Deltak PO Facts – Financial

- PO Amount to Deltak: $ 46,662,179 CAN
- Invoices received:$24,566,998
- Payments made:$22,251,985
  - Last payment made Sept 18, 2006
- Retainage withheld:$2,315,013

# Bankruptcy filing highlights

- Bankruptcy Filing Date: Sept 29, 2006
- Companies included in Filing:
  - Global Power Equipment Group – Parent – Tulsa OK
  - Braden Group – subsidiary – Tulsa OK - Turbine Inlet Air and Exhaust Systems
  - Williams Group – subsidiary – Atlanta GA – Power/Industrial Contractor
  - Deltak Group – subsidiary - Plymouth MN - Specialty Boilers and Heat Recovery Boilers



# Bankruptcy filing highlights — con't

- Global Power, Braden, Williams and Deltak Speciality Boiler div – restructuring to emerge from BK

- Deltak Heat Recovery division – winding down

- Filing rejects all executory (client) contracts

- Anticipates rejection of all PO/Contracts/obligations of downstream contracts – within 20 days of Court's acceptance of the motion (Oct 23, 2006)

- Provides for Deltak HR to put in place, at no cost or liability to the Estate, an HRSG Completion Program for the approx 12 client contracts having remaining work to go



# Post Petition – Actions taken

- Secured 8 of the non-retained former Deltak employees (Engineers) – essential to completing the Engineering of the Goreway HRSG's – on SNC-Lavalin Constructors payroll as Full Time Temp Employees

- Placed Jack Terranova in Plymouth MN offices to engage/liase with Deltak Management in a completion program, gain intelligence, act as the temporary SNC-L employer for our former Deltak employees



# Post Petition – what we've learned

- 108 PO's let – Commitments of $25.4mmUSD
- $20.2mmUSD left to pay out of the commitments
- Engineering approx 80% complete
- Fabrication approx 20% complete

# Post Petition – what we've learned con't

**Deltak represents the following – but will not guarantee:**

- **2.0mmUSD** (Engineering, Project Management, Deltak Plymouth fab shop fabrications (14,000mhs for Baffles, module splices, LP Drums)

- **3.6mmUSD** (External Pipe, Supports, misc valves, etc)

- **4.8mmUSD** (Freight)

- **1.0mmUSD** (Contingency)

- **31.6mmUSD - HRSG contract costs to go**



# Post Petition – what we've learned con't

- Note this value DOES NOT include the G&A portion of the Completion Program (prorata share of office, overheads, etc.) if one assumes this to be valued at 250kUSD/month….add another 1.5mm USD for 6 months.



# Deltak PO's issued to date

## Project PO's for SNC Goreway project



| Where used | PO No | Vendor | PO Amt Ordered / Job | PO Amt Rec'vd / Job | Amount Open | % complete |
|---|---|---|---|---|---|---|
| Drums at Deltak shop | E1719 | EDMONTON EXCHANGERS & MFG | $48,336.00 | $48,336.00 | $48,336.00 | 100.00% |
| Drums at Deltak shop | E3224 | HESECO | $2,340.00 | $0.00 | $2,340.00 | 0.00% |
| Drums at Deltak shop | E3246 | HESECO | $6,348.00 | $0.00 | $9,348.00 | 0.00% |
| Drums at Deltak shop | E2033 | RASMUSSEN CO., INC. | $97,098.00 | $81,888.00 | $97,098.00 | 84.34% |
| Drums at Deltak shop | E3702 | REQUEST FOR QUOTATION - Drum Internal | $0.00 | $0.00 | $0.00 | 0.00% |
| Drums at Deltak shop | E2607 | U.S. METALS, INC. | $16,581.00 | $16,581.00 | $16,581.00 | 100.00% |
| Drums at Deltak shop | E1720 | WAGNER PLATE WORKS | $110,004.00 | $110,004.00 | $110,004.00 | 100.00% |
| Drums at Deltak shop | E3249 | WEST CENTRAL STEEL, INC. | $3,277.00 | $3,277.00 | $3,277.00 | 100.00% |
| Duct Burner | E2094 | FORNEY CORPORATION | 755450 | 0 | 755450 | 0.00% |
| Ducts | E2479 | TATE-JONES INC. | $9,810.00 | $9,810.00 | $9,810.00 | 100.00% |
| Field Assembly | E3556 | BERGEN POWER PIPE SUPPORTS | $9,048.00 | $0.00 | $9,048.00 | 0.00% |
| Field Assembly | E3133 | BERGEN POWER PIPE SUPPORTS | $13,024.68 | $0.00 | $13,024.68 | 0.00% |
| Field assembly | E3558 | BUILDING FASTENERS | $28.08 | $0.00 | $28.08 | 0.00% |
| Field assembly | E3394 | BUILDING FASTENERS | $49.11 | $0.00 | $49.11 | 0.00% |
| Field assembly | E3552 | CLASS C COMPONENTS | $22,637.52 | $154.89 | $22,637.52 | 0.68% |
| Field assembly | E3399 | COX INDUSTRIES | $34.20 | $34.20 | $34.20 | 100.00% |
| Field assembly | E3571 | COX INDUSTRIES | $388.80 | $0.00 | $388.80 | 0.00% |
| Field assembly | E2752 | EXPANSION JOINT SYSTEMS | $49,388.00 | $0.00 | $49,388.00 | 0.00% |
| Field assembly | E3496 | FLEXONICS | $4,089.00 | $0.00 | $4,089.00 | 0.00% |
| Field assembly | E3487 | INFRA-METALS CO. | $124.82 | $124.82 | $124.82 | 100.00% |
| Field assembly | E3559 | JETSON INCORPORATED | $3,205.20 | $0.00 | $3,205.20 | 0.00% |
| Field assembly | E2816 | TANI DIVISION - B.D. SCHIFFLER | $35,320.00 | $0.00 | $35,320.00 | 0.00% |
| Field assembly | E3661 | WEST CENTRAL STEEL, INC. | $528.68 | $528.68 | $528.68 | 100.00% |
| Field assembly | E3473 | WEST CENTRAL STEEL, INC. | $1,311.67 | $1,311.67 | $1,311.67 | 100.00% |
| Field assembly | E3852 | WEST CENTRAL STEEL, INC. | $1,598.51 | $0.00 | $1,598.51 | 0.00% |
| Field assembly - Module truss | E2961 | BELL CAMP MANUFACTURING INC. | $96,832.00 | $0.00 | $96,832.00 | 0.00% |
| Flow Model | E1532 | NELS INC. | $21,800.00 | $21,800.00 | $21,800.00 | 100.00% |



| Description | Code | Vendor | Amount | Amount | Amount | Percent |
|---|---|---|---|---|---|---|
| Freight | T04608 | ADCOM WORLDWIDE | $1,287.00 | $1,287.00 | $0.00 | 100.00% |
| Freight | T04660 | CLIPPER ELITE CARRIERS(AM) INC | $242,875.00 | $0.00 | $242,875.00 | 0.00% |
| Freight | T04595 | SEKO WORLDWIDE | $769.00 | $769.00 | $0.00 | 100.00% |
| Freight | T04614 | SEKO WORLDWIDE | $1,330.00 | $1,330.00 | $0.00 | 100.00% |
| Freight | T04628 | SEKO WORLDWIDE | $10,085.00 | $10,485.00 | $0.00 | 103.97% |
| Freight | T04661 | TRANSOCEANIC | $4,682.00 | $4,682.00 | $0.00 | 100.00% |
| Freight | T04558 | TRANSOCEANIC | $54,468.00 | $45,582.00 | $0.00 | 83.69% |
| HP drum internals | E3435 | NORTHERN METAL FAB, INC. | 62186.25 | 0 | 62186.25 | 0.00% |
| HP steam drum | E1995 | EDMONTON EXCHANGERS & MFG | $993,027.00 | $487,960.00 | $993,027.00 | 49.14% |
| HP steam drum | E2101 | HOOPER WELDING ENTERPRISES LIM | 1587170 | 0 | 1587170 | 0.00% |
| HRSG Modules | E3207 | CHICAGO TUBE & IRON COMPANY | $41.70 | $0.00 | $41.70 | 0.00% |
| HRSG Modules | E3203 | CHICAGO TUBE & IRON COMPANY | $91.60 | $0.00 | $91.60 | 0.00% |
| HRSG Modules | E3197 | CHICAGO TUBE & IRON COMPANY | $1,112.70 | $0.00 | $1,112.70 | 0.00% |
| HRSG Modules | E2699 | CHICAGO TUBE & IRON COMPANY | $2,694.30 | $2,694.30 | $2,694.30 | 100.00% |
| HRSG Modules- Access doors | E2830 | DELTAK POWER EQUIPMENT CHINA | $856.00 | $0.00 | $856.00 | 0.00% |
| HRSG Modules | E1641 | DELTAK POWER EQUIPMENT CHINA | $10,319,680.97 | $993,163.00 | $5,744,946.57 | 9.62% |
| HRSG Modules | E3216 | FEDERAL STEEL SUPPLY | $1,183.02 | $1,183.02 | $1,183.02 | 100.00% |
| HRSG Modules | E2434 | FERGUSON PVF MIDWEST INC. | $5,371.20 | $5,371.20 | $5,371.20 | 100.00% |
| HRSG Modules | E2842 | GUY METALS INC. | $2,498.50 | $2,498.50 | -$64.06 | 100.00% |
| HRSG Modules | E3201 | RADNOR ALLOYS INC. | $6,450.00 | $6,450.00 | $6,450.00 | 100.00% |
| HRSG Modules | E1970 | RADNOR ALLOYS INC. | $663,940.34 | $665,349.40 | $663,940.34 | 100.21% |
| HRSG Modules | E1331 | SUMITOMO CORP. OF AMERICA | $190,328.21 | $190,328.21 | -$0.01 | 100.00% |
| HRSG Modules | E0849 | SUMITOMO CORP. OF AMERICA | $1,232,634.22 | $1,232,634.22 | $0.00 | 100.00% |
| HRSG Modules | E2809 | TIOGA PIPE SUPPLY CO., INC. | $60,617.50 | $61,232.50 | $60,617.50 | 101.01% |
| HRSG Modules | E2895 | TIOGA PIPE SUPPLY CO., INC. | $129,712.00 | $111,542.00 | $129,712.00 | 85.99% |
| Inlet Ducts | E1463 | GUANGZHOU DELSUN STEEL | 1434564 | 358641 | 1434564 | 25.00% |
| Inlet Expansion jt | E1057 | FLEXTOR INC. | 83865 | 0 | 83865 | 0.00% |



| Description | Part No. | Vendor | Amount | Tax | Total | % |
|---|---|---|---|---|---|---|
| Outlet Stacks | E2955 | BELL CAMP MANUFACTURING INC. | $1,164,000.00 | $0.00 | $1,164,000.00 | 0.00% |
| Piping | E2269 | JONAS INC. | 73200 | 0 | 73200 | 0.00% |
| Piping | E3703 | REQUEST FOR QUOTATION | $0.00 | $0.00 | $0.00 | 0.00% |
| Piping | D7031 | TEAM INDUSTRIES, INC. | 397000 | 0 | 397000 | 0.00% |
| Pump- Recirculation | E1677 | PSI ENGINEERNG, LLC | 163350 | 0 | 163350 | 0.00% |
| SCR Catalyst | E0400 | HALDOR TOPSOE, INC. | 630000 | 0 | 630000 | 0.00% |
| SCR Fan | E1060 | CLARAGE | $344,731.97 | $0.00 | $344,731.97 | 0.00% |
| SCR Frame | E2953 | GUANGZHOU DELSUN STEEL | 57204 | 0 | 57204 | 0.00% |
| SCR Hoist | E3525 | REQUEST FOR QUOTATION SCR HOIST | 0 | 0 | 0 | 0.00% |
| SCR Lances at Deltak | E3416 | REQUEST FOR QUOTATION | $15,600.00 | $0.00 | $15,600.00 | 0.00% |
| SCR system | E2361 | CRANE MFG. | $118.41 | $0.00 | $118.41 | 0.00% |
| SCR system | E2162 | EXPANSION JOINT SYSTEMS | $9,996.00 | $0.00 | $9,996.00 | 0.00% |
| SCR system | E2144 | SIMONE ENGINEERING INC. | $5,684.91 | $1,295.92 | $5,684.91 | 22.80% |
| SCR Trim and Inst. | E2275 | NORTHERN FILTRATION | $1,386.00 | $0.00 | $1,386.00 | 0.00% |
| SCR Trim and Inst. | E2151 | NORTHERN FILTRATION | $2,679.00 | $348.00 | $2,679.00 | 12.99% |
| Stack Damper | E1058 | FLEXTOR INC. | 110289 | 0 | 110289 | 0.00% |
| Stack Igniting | E3357 | REQUEST FOR QUOTATION - Approx $50,000 | $0.00 | $0.00 | $0.00 | 0.00% |
| Stack Silencer | E1676 | CCI FLUID KINETICS CORPORATION | $177,725.02 | $0.00 | $177,725.02 | 0.00% |
| Steam silencer | E1675 | CCI FLUID KINETICS CORPORATION | $267,627.89 | $0.00 | $267,627.89 | 0.00% |



| | | | | | | |
|---|---|---|---|---|---|---|
| Trim and Instr | E2157 | BERG-JOHNSON | $1,356.12 | $0.00 | $1,356.12 | 0.00% |
| Trim and Instr | E2363 | BERG-JOHNSON | $55,577.97 | $0.00 | $55,577.97 | 0.00% |
| Trim and Instr | E2663 | BERG-JOHNSON | $75,780.00 | $75,780.00 | $0.00 | 100.00% |
| Trim and Instr | E2159 | CRANE SUPPLY CANADA | $28,668.00 | $0.00 | $0.00 | 0.00% |
| Trim and Instr | E2935 | CRANE SUPPLY CANADA | $190,403.70 | $0.00 | $190,403.70 | 0.00% |
| Trim and Instr | E2355 | CROSBY VALVE | $355,344.00 | $0.00 | $355,344.00 | 0.00% |
| Trim and Instr | E2155 | DUNCAN COMPANY | $1,732.60 | $1,168.60 | $1,732.60 | 67.45% |
| Trim and Instr | E2274 | DUNCAN COMPANY | $4,317.10 | $0.00 | $4,317.10 | 0.00% |
| Trim and Instr | E2154 | DUNCAN COMPANY | $13,975.60 | $0.00 | $13,975.60 | 0.00% |
| Trim and Instr | E2161 | DUNCAN COMPANY | $25,560.00 | $0.00 | $25,560.00 | 0.00% |
| Trim and Instr | E2158 | FERGUSON THRALL DISTRIBUTION | $10,650.00 | $10,650.00 | $10,650.00 | 100.00% |
| Trim and Instr | E2160 | FERGUSON THRALL DISTRIBUTION | $13,632.00 | $0.00 | $13,632.00 | 0.00% |
| Trim and Instr | E2934 | FERGUSON THRALL DISTRIBUTION | $1,281,711.00 | $0.00 | $1,281,711.00 | 0.00% |
| Trim and Instr | E2146 | FISHER | $12,231.78 | $12,231.78 | $12,231.78 | 100.00% |
| Trim and Instr | E2147 | FISHER | $27,122.00 | $0.00 | $27,122.00 | 0.00% |
| Trim and Instr | E2356 | FISHER | $199,401.54 | $12.00 | $199,385.17 | 0.01% |
| Trim and Instr | E2358 | FOSSIL STEAM TECHNOLOGIES INC | $115,902.00 | $0.00 | $115,902.00 | 0.00% |
| Trim and Instr | E2156 | MUELLER SALES | $717.75 | $717.75 | $717.75 | 100.00% |
| Trim and Instr | E2362 | MUELLER SALES | $1,236.00 | $0.00 | $1,236.00 | 0.00% |
| Trim and Instr | E2654 | PACIFIC VALVES | $168,898.00 | $23,452.00 | $168,898.00 | 13.89% |
| Trim and Instr | E2148 | ROSEMOUNT INC. | $8,841.88 | $0.00 | $8,841.88 | 0.00% |
| Trim and Instr | E2145 | ROSEMOUNT INC. | $7,554.24 | $0.00 | $7,554.24 | 0.00% |
| Trim and Instr | E2149 | ROSEMOUNT INC. | $36,866.13 | $0.00 | $36,866.13 | 0.00% |
| Trim and Instr | E2372 | ROSEMOUNT INC. | $227,233.00 | $0.00 | $227,233.00 | 0.00% |
| Trim and Instr | E2153 | SWANSON FLO-SYSTEMS COMPANY | $480.00 | $480.00 | $1.00 | 100.00% |
| Trim and Instr | E2152 | SWANSON FLO-SYSTEMS COMPANY | $6,149.00 | $2.00 | $6,149.00 | 0.03% |
| Trim and Instr | E2359 | SWANSON FLO-SYSTEMS COMPANY | $10,925.30 | $0.00 | $10,925.30 | 0.00% |
| Trim and Instr | E2150 | TRIAD MEASUREMENT & EQUIPMENT | $6,735.00 | $75.00 | $6,735.00 | 1.11% |
| Trim and Instr | E2357 | TRIAD MEASUREMENT & EQUIPMENT | $25,980.00 | $0.00 | $25,980.00 | 0.00% |
| Trim and Instr | E3308 | YARWAY TYCO VALVES & CONTROLS | $161,424.00 | $0.00 | $161,424.00 | 0.00% |
| Walkays in China | E1464 | DEIBERT DRAFTING | $25,560.00 | $0.00 | $25,560.00 | 0.00% |
| Walkays in China | E2952 | UNITED STEEL STRUCTURES LTD | $497,463.01 | $0.00 | $497,463.01 | 0.00% |
| | G06003 Total | | $25,420,231.70 | $4,603,243.66 | $20,224,407.93 | 18.11% |

# Recovery Plan A con't

- Assume all the existing PO's (including all $20.2mmUSD not paid). SLPO controls the funds.

- Utilize Deltak facilities and Management to complete the Engineering (using SNC employees in Deltak facility)

- Utilize Deltak's Procurement/Expediting personnel to administer the existing/new PO's

- Utilize Deltak's requisitioning process for all remaining materials to be purchased

- Issue all new PO's on SLPO paper



# Recovery Plan A con't

- Place SLPO surveillance in all fabrication facilities to monitor progress

- SLPO Manage all Freight through Global Procurement Group – Montreal

- SLPO provide Field Services - eliminate any Field Services from Deltak

- SLPO provide Field Training to client – eliminate any Field Training from Deltak



# Recovery Plan A con't

- **Range of "To Go" Costs** – (based on Deltak's current information)
  - Hard Costs of Completion - $31.6mm
  - Estate "Soft Costs - $1.5mm
  - Site Services (TA's and Training) $1.5mm
  - SLPO Internal Oversight $.5mm
  - **Total To-Go HRSG cost approx $35.1mm**

- Time to Complete: 8 months – 2 months beyond existing schedule
- No warranties – only those with the assumed PO's
- No performance guarantees
- No indemnification



# Recovery Plan B

**Buy out Deltak engineering and use 3rd Party HRSG OEM:**

- Pay Deltak for Engineering done to date: 5mm
- Renegotiate Existing rejected contracts: 25mm
- Hire 3rd Party HRSG OEM to complete balance of Engineering: 4mm
- SLPO Procure balance of goods: 5mm
- <u>SLPO Procure manage Freight: 5mm</u>
- **Total Additional to go HRSG costs to project: 44mm**

- Time to complete: 10 months (deliver) – 5 months beyond current contract date
- Some potential Warranty
- Performance Guarantees – although probably minimal (10% cap)
- Some minimal indemnification



# Recovery Plan C

## Start over with new HRSG OEM:

- **New Contract Value: 52mm**
- Time to complete: 15 months (deliver) – 10 months beyond current contract date
- Market Warranty
- Market Performance Guarantees
- Market Indemnification



# Analysis of Recovery Plans

## Plan A

- Cost to Go:$38mmCAN
- Sunk costs:$23mmCAN
- Delay LD's: non – absorbed into schedule
- **Total Plan A: $83mm CAN**
- (vs. Plan of $47mmCAN)

- **Project hit of $36mmCAN**



# Analysis of Recovery Plans

## Plan B

- Cost to Go: $44mmCAN
- Sunk costs: $23mmCAN
- Delay LD's: $55mmCAN (150 days)
- **Total Plan B: $122mm CAN**

(vs. Plan of $47mmCan)

- Recovery from Estate (4–5years later): $12mm (assuming 10%)
- **Total Final cost: $110mm CAN**

## Project hit of $63mmCAN



# Analysis of Recovery Plans

## Plan C

- Cost to Go:$52mmCAN
- Sunk costs:$23mmCAN
- Delay LD's:$109mmCAN (300 days)
- Total Plan A: $184mm CAN

(vs. Plan of $47mmCan)

- Recovery from Estate (4-5 years later): 18mm (assuming 10%)
- Total Final cost: $166mm CAN

## Project hit of $119mmCAN

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, hereby certify that on the 7th day of July, 2008, I caused a copy of the

**Supplemental Appendix of Exhibits to Appellees' Answering Brief** to be served upon the

parties listed below in the manner indicated.

**_VIA_ ELECTRONIC MAIL AND
U.S. FIRST CLASS MAIL**

Howard Siegel, Esquire
*Brown Rudnick LLP*
City Place I
185 Asylum Street
Hartford, CT 06103-3402

Jeffrey Sabin, Esquire
David Hillman, Esquire
Meghan M. Breen, Esquire
*Schulte Roth & Zabel, LLP*
919 Third Avenue
New York, NY 10022

Steven Pohl, Esquire
John C. Elstad, Esquire
*Brown Rudnick LLP*
One Financial Center
Boston, MA 02111

Patrick P. DiNardo, Esquire
Paul E. Summit, Esquire
Pamela Smith Holleman, Esquire
*Sullivan & Worcester LLP*
One Post Office Square
Boston, MA  02109

**_VIA_ ELECTRONIC MAIL AND
HAND DELIVERY**

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
*Landis Rath & Cobb LLP*
919 Market Street, Suite 600
Wilmington, DE  19801

Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
*Saul Ewing LLP*
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801

William D. Sullivan, Esquire
*Sullivan Hazeltine Allinson LLC*
4 East 8th St., Suite 400
Wilmington, DE 19801

David M. Klauder
*Office of the United States Trustee*
844 King North King Street, Suite 2207
Wilmington, DE 19801

Eric M. Sutty (No. 4007)