## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP, INC., *et al.*, | Case No. 06-11045 (BLS) Jointly Administered |
| SNC-LAVALIN POWER ONTARIO, INC., | |
| Appellant, | |
| v. | Cases No. 8-cv-00024 (JFF) |
| GLOBAL POWER EQUIPMENT GROUP, INC., *et al.*, | |
| Appellees. | |

### APPELLANT'S REPLY BRIEF

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
Elihu E. Allinson, III (No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 428-8191

-- and --

SULLIVAN & WORCESTER LLP
Patrick P. Dinardo
Paul E. Summit
Pamela Smith Holleman
One Post Office Square
Boston, MA 02109
Telephone: (617) 338-2800

*Attorneys for Appellant,*
*SNC-Lavalin Power Ontario, Inc.*

Dated:  July 22, 2008
        Wilmington, Delaware

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES ..............................................................................................ii

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT IN REPLY ..............................................................................................1

   A. APPELLEES MISCHARACTERIZE THE ISSUE REGARDING
      DEBTORS' SCHEDULE OMISSION.......................................................................1

     1. The undisputed facts in this record demonstrate that the Debtors
        intentionally withheld information here with an improper motive......................2

     2. A claim is an asset that must be disclosed .........................................................9

     3. The "Business Judgment" Rule is not a defense in cases of
        intentional non-disclosure by a fiduciary...........................................................10

   B. GPEG'S UNDISPUTED PROMISE TO GUARANTEE DELTAK'S
      OBLIGATIONS MUST BE ENFORCED ...............................................................17

     1. The standard of review......................................................................................18

     2. The Bankruptcy Court erred as a matter of law.................................................19

   C. THE RELIEF APPELLANT SEEKS IS AVAILABLE HERE ...............................21

III. CONCLUSION............................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

AT&T Universal Card Services Corp. v. Duplante (In re Duplante),
    215 B.R. 444 (B.A.P. 9th Cir. 1997)....................................................................................10, 13

Adams v. Suozzi, 433 F.3d 220 (2d Cir. 2005) ..............................................................................22

In re Bohrer, 266 B.R. 200 (Bankr. N.D. Cal. 2001)......................................................................13

Boroff v. Tully (In re Tully), 818 F.2d 106 (1st Cir. 1987)............................................................10

In re Bridgeport Holdings, Inc., Bankr. No. 03-12825, Adv. No. 07-51798(PJW), 2008
    WL 2235330 (Bankr. D. Del. May 30, 2008)..........................................................................15

Christiana General Insurance Corp. v. Great America Insurance Co.,
    979 F.2d 268 (2d Cir. 1992).....................................................................................................22

In re Coastal Plains, Inc., 179 F.3d 197 (5th Cir. 1999) ...............................................................6, 7

Commodity Futures Trading Committee v. Weintraub, 471 U.S. 343 (1985) ...............................11

Construction Management Services, Inc. v. Manufacturers Hanover Trust Co.
    (In re Coastal Group, Inc.), 13 F.3d 81 (3d Cir. 1994)..............................................................9

In re eToys, Inc., 331 B.R. 176 (Bankr. D. Del. 2005)...................................................................13

GE HFS Holdings, Inc. v. National Union Fire Insurance Co., Civ. A. No. 05cv11128-
    NG, 2008 WL 2246673 (D. Mass. May 29, 2008) ....................................................................7

Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.),
    284 F.3d 216 (1st Cir. 2002).....................................................................................................6

Henkel v. Green (In re Green), 268 B.R. 628 (Bankr. M.D. Fla. 2001).........................................13

Hideout Records & Distributing v. El Jay Dee, Inc., 601 F. Supp. 1048 (D. Del. 1984)..............19

In re Hyman, 967 F.2d 1316 (9th Cir. 1992) ..................................................................................13

Kane v. National Union Fire Insurance Co., No. 07-30611,
    2008 WL 2721157 (5th Cir. Jul. 14, 2008)...............................................................................9

Krieger v. Gold Bond Building Products, 863 F.2d 1091 (2d Cir. 1988).......................................18

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC, 337 F.3d 314 (3d Cir. 2003)................16

In re Kendavis Industries International, Inc., 91 B.R. 742 (Bankr. N.D. Tex. 1988)....................17

Marrama v. Citizens Bank (In re Marrama), 430 F.3d 474 (1st Cir. 2005)....................................12

In re Marvel Entertainment Group, 140 F.3d 463 (3d Cir. 1998)....................................................11

In re Mazzeo, 167 F.3d 139 (2d Cir. 1999) ....................................................................................18

In re Mohring, 142 B.R. 389 (Bankr. E.D. Cal.1992) ...............................................................12, 13

Momah v. Albert Einstein Medical Ctr., 161 F.R.D. 304 (E.D. Pa. 1995)....................................19

NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) ......................................................................16

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.)......................6, 8, 9, 16

Payless Wholesale Distributings, Inc. v. Alberto Culver (P.R.) Inc.,
    989 F.2d 570 (1st Cir. 1993)......................................................................................................12

Payne v. Wood, 775 F.2d 202 (7th Cir. 1985)................................................................................12

Pruitt v. Levi Strauss & Co., , 932 F.2d 458 (5th Cir. 1991)........................................................18

In re Rolland, 317 B.R. 402 (Bankr. C.D. Cal. 2004)....................................................................12

In re Scott, 172 F.3d 959 (7th Cir. 1999)........................................................................................10

Sphere Drake Insurance Ltd. v. Clarendon National Insurance Co.,
    263 F.3d 26 (2d Cir. 2001)..........................................................................................................22

State Farm Life Insurance Co. v. Swift (In re Swift), 129 F.3d 792 (5th Cir. 1997)........................9

St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler, No. 06 Civ. 688 (SWK),
    2006 WL 2849783 (S.D.N.Y. Oct. 4, 2006)..............................................................................15

Tope v. Beal, 98 F.2d 548 (3d Cir. 1938).......................................................................................18

In re Water's Edge Ltd. Partnership, 251 B.R. 1 (Bankr. D. Mass. 2000)................................11, 17

## STATE CASES

In re Anderson, Clayton Shareholders Litigation, 519 A.2d 669 (Del. Ch. 1986) ........................15

Blue Chip Emerald LLC v. Allied Partners Inc.,
    750 N.Y.S.2d 291 (N.Y. App. Div. 1st Dep't 2002) ....................................................................2

In the Matter of the Liquidation of Union Indemnity Insurance Co. of New York
    (Michigan Nat'l Bank-Oakland v. America Centennial Insurance Co.),
    89 N.Y.2d 94 (1996) ..................................................................................................................22

Malone v. Brincat, 722 A.2d 5 (Del. 1998) ..................................................................................14

Mix v. Neff, 99 A.D.2d 180 (N.Y. App. Div. 1984) ....................................................................22

O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902 (Del. Ch. 1999) ......................................14

Stone v. Ritter, 911 A.2d 362 (Del. 2006) ...................................................................................15

Sumitomo Marine & Fire Insurance Co. v. Dologne Reinsurance Co.,
    75 N.Y.2d 295 (1990) ...............................................................................................................22

Zirn v. VLI Corp., 681 A.2d 1050 (Del. 1996) ............................................................................14

## FEDERAL STATUTES

11 U.S.C. § 541(a) ........................................................................................................................9

11 U.S.C. § 1107(a) ....................................................................................................................11

Fed. R. Bankr.. P. 1009(a) ..........................................................................................................14

Fed. R. Civ. P. 52 .......................................................................................................................18

Fed. R. Civ. P. 56(e)(2) ..............................................................................................................19

## MISCELLANEOUS

Hon. Tina L. Brozman, Chapter 11 Theory & Practice: A Guide to Reorganization,
    Hon. James F. Queenan et al. (eds.), LRP Publications (2003) ...............................................14

## I. **INTRODUCTION**

Appellant SNC-Lavalin Power Ontario, Inc. ("<u>Appellant</u>" or "<u>SNC</u>") submits this brief in reply and response to Appellees' Answering Brief (D.I. 18).

## II. **ARGUMENT IN REPLY**

### A.    **APPELLEES MISCHARACTERIZE THE ISSUE REGARDING DEBTORS' SCHEDULE OMISSION**

Clinging to the illusion that the intercompany accounts were not "quantified" (perhaps as the only way they can think of to distinguish the controlling Third Circuit case law), Appellees mischaracterize the Schedule omission issue in this matter, as if the sole question here is whether the Debtors properly exercised their business judgment. To be sure, the Bankruptcy Court deferred to the Debtors' business judgment in approving their decision to withhold the details of Deltak's $182 million claim for cash transfers to its corporate parent, GPEG. App. at Vol. I, A-789. Appellees seize on that reasoning and flaunt the Bankruptcy Court's ruling and reasoning over and over again in their Brief:

> the Debtors made, as the Bankruptcy Court found, a "legitimate business and judgment call" to include an explanatory note in their schedules of assets and liabilities stating intercompany balances were not "quantified."

Answering Brief at 3; <u>see</u> Opinion at A-789. Again, they say: "The decision to include the Global Note was a sound exercise of the Debtors' business judgment." Answering Brief at 15. And again: "[The Bankruptcy Court] found that the use of the Global Note was appropriate and reflected a 'legitimate business and judgment' decision . . ." <u>Id.</u> at 24, 26, 27. But, as a matter of law, and in the undisputed factual circumstances of this case, the Debtors were not entitled to any such deference, and there was nothing "legitimate" about their decision to withhold information on Deltak's claim.

Quite the contrary, given their admitted omission and clear motive in withholding the

information (which was well known and understood by the Debtors, and their advisors at all

relevant times), the presumption and inferences are *just the opposite*. The Bankruptcy Court and

the Appellees never address the inference of the Debtors' "bad faith" to which SNC was entitled,

according to the edicts of Krystal Cadillac, In re Coastal Group, and Oneida Motor Freight. See

Appellant's discussion of these cases in the Opening Brief at 30 to 39.[1]  That inference strikes at

the very heart of the presumption of good faith implicit in the business judgment rule. Ironically,

in the Appellees' view, these controlling Third Circuit cases – which are the centerpiece of

Appellant's argument on appeal – merit no greater mention than a footnote and a few lines on

pages 33-34 of the Answering Brief acknowledging their existence. Apart from paying lip

service to the governing case law, however, the Appellees refuse to acknowledge how it applies

here to the undisputed facts.

1.  The undisputed facts in this record demonstrate that the Debtors intentionally withheld information here with an improper motive.

Consistent with the views expressed by Appellant's expert witness, Stephen B. Darr

(App. at Vol. II, A-999 *et seq.*), the Bankruptcy Court specifically found as a matter of fact that

the figures reflecting the intercompany claims were in the Debtors' accounting records and

obvious to all with access to them in November of 2006. App. at Vol. I, A-786. This finding

stands in stark contrast to the Debtors' statement in the Global Notes: "The respective

---

[1] Appellees spend pages of the Answering Brief seeking to distinguish some of the cases cited by SNC for the proposition that a defrauded beneficiary is entitled to inferences in its favor in an action against its fiduciary. See Answering Brief at 20 *et seq.*, *35*. Appellees would have the Court adopt a rule – contrary to law – whereby the fact that a beneficiary is sophisticated and well-represented is tantamount to an invitation to its fiduciary to violate the terms of the trust. That is not the law – particularly where material information is controlled by the fiduciary. See, e.g., Blue Chip Emerald LLC v. Allied Partners Inc., 750 N.Y.S.2d 291, 294-95 (N.Y. App. Div. 1st Dep't 2002) (noting that neither New York and Delaware law "give effect to a waiver of a fiduciary's duty of full disclosure that the fiduciary obtained by means of its breach of that very duty, even where the party that gave the waiver was ... commercially sophisticated and advised by its own counsel").

intercompany accounts payable and receivable as of the Petition Date have not been quantified." See App. at Vol. I, A-172.

There is in fact no evidence that the accounts could not be expressed in numbers as of the bankruptcy filing at the end of September 2006, and it could not be otherwise, particularly for a publicly-traded group of companies with regular accounting procedures, such as the Debtors had at all relevant times. App. at Vol. II, A-1003. See also App. at Vol. I, A-305 for a description of the Debtors' cash management system. GPEG's cash sweeps out of Deltak were done manually, and obviously the accountants kept track. Id. at Vol. I, A-306; App. at Vol. II, A-1057. Nor was there any "dispute" reflected on the Company's books about the treatment of these accounts. See Supplemental Appendix ("Supp. App.") at SA-153 (GPEG's CFO Hanson states: "Within the company prior to filing we never had any dispute or disagreement as to how to treat those [intercompany accounts] . . . I don't remember any dispute.").

Shifting the focus of the inquiry, the Appellees talk about "uncertainties" in calculating the exact intercompany liability, the potential for non-cash offsets, and the risk of putting bad information into the public domain. Answering Brief at 13. This position simply does not square with the evidence because the decision to withhold this pivotal information was made "whether or not" the Debtors' books were closed.[2] App. at Vol. II, A-2198. Nor was there any evidence of a real dispute about the numbers themselves, particularly as to Deltak. App. at Vol. I, A-697 (figures out of balance by only a "few hundred dollars"); App. at Vol. II, A-1057 (no "significant adjustments" required). See also App at Vol. II, A-1057 (according to GPEG's

---

[2] What is clear from the record is that the Debtors' attorneys and advisors "helped" the Debtors make this decision. Supp. App. at SA-152; App. at Vol. III, A-2198.

Controller Lavarnway: "we have comfort in our daily cash procedures and have continued to monitor them diligently throughout the entire bankruptcy process."); Supp. App. at SA-153.

Quite tellingly, all these "uncertainties" evaporated in early January 2007 (just weeks after having filed their Schedules at the end of November 2006), when the Debtors filed an overdue Monthly Operating Report (for the month ending October 31, 2006) with the Court. All the supposedly "unquantified" figures reflecting intercompany "accounts payable" and "receivable" are contained in that October Operating Report and denominated as such. See App. at Vol. I, A-253 ("Amounts Shown as Receivable/(Payable); $ in 000s").

The record is clear that nothing changed in the intervening weeks between Debtors' filing their Schedules and the October 2006 Operating Report except that Debtors had finished negotiating their "completion agreements" with Deltak's HRSG customers (SNC included), and the object of their fraud was complete. There is simply no evidence that anything was done in the December 2006 timeframe to reconcile the Debtors' accounting records that was not or could not have been done at least a month earlier. See, e.g., App. at Vol. II, A-1057 (GPEG's Lavarnway promising the completed reconciliations by mid-November 2006); App. at Vol. II, A-1448. The Debtors' financial advisors in charge of the accounting issues, Alvarez & Marsal, were first engaged by the Debtors ten months earlier, *in February of 2006*, as Appellees note in their Answering Brief at 7. The Debtors' month-end reconciliations were typically done within 45 days of each month and were complete through July 2006 (App. at Vol. I, A-306; Vol. II, A-1004, A-1443). Thus the only possible explanation for the delay in reconciling the intercompany data for August and September 2006 is that it was a fig leaf to hide the real reason for Debtors' failure to produce this information in a timely fashion, *i.e.*, to continue to mislead HRSG

- 4 -

creditors about the potential for recovery.[3] That is exactly the "strategic behavior" that the Bankruptcy Court alluded to in its decision. App. at Vol. I, A-789.

The central fallacy of Appellees' argument is exposed by the fact that the Schedule omission was but the capstone of a fundamental misrepresentation of the true state of Deltak's financial affairs, and not the sole basis for SNC's fraud claim (as Appellees try to suggest). Everything that the Debtors put forth regarding Deltak (prior to obtaining the ten completion agreements) was calculated to portray a lifeless entity, lacking the "financial wherewithal" to meet its obligations, and against whom unsecured claims were worthless. See Appellant's Opening Brief at 11 to 13. The Schedule omission was only the last item in a long line of misrepresentations, albeit one particularly violative of the Debtors' disclosure obligations, all directed to creating that false impression.[4] And the fact that the Debtors had an internal analysis (one of several different scenarios, of course), showing that Deltak's unsecured creditors (including HRSG claimants) stood to gain an 86% return on their claims (while GPEG equity holders got zero) if the intercompany claims were settled up, shows that the Debtors *fully understood* the "plan implications" of disclosing that information "prematurely". See App. at Vol. I, A-714. Of course, that analysis was never publicly disclosed either.

It is true that the Debtors and their respective Creditors' and Equity Committees later debated the accounting treatment of these claims, and whether or not it might be appropriate to

---

[3] With the Creditors' Committee clamoring for this information throughout October and November 2006, the Debtors' delay was all the more brazen. See Opening Brief at 17, *et seq.*, fn.21. But the delay in reconciling accounts had little to do with why the information was intentionally withheld. See App. at Vol. II, A-1055 (information on intercompany liabilities withheld due to "plan implications"); App. at Vol. III, A-2198.

[4] The fact that SNC's CFO did not personally see the Schedules immediately upon their filing is irrelevant. There was nothing to see in a "void of information", as the Bankruptcy Court put it (App. at Vol. I, A-788); the Debtors had successfully hidden the asset. Conversely, if the Schedules actually had disclosed the $182 million asset, and the summaries showed a solvent Deltak, that fact would not have escaped notice. Such a disclosure would have been entirely at odds with the premise of the Debtors' bankruptcy.

recharacterize the intercompany accounts from debts to "dividends" (see App. Vol. I, A-311), but the undisputed evidence shows that the figures reflecting intercompany payables and receivables were available in the Debtors' books, and were not unquantified.[5] As a matter of law, characterization of the intercompany accounts is utterly irrelevant to the Debtors' duty to disclose the intercompany claims on their books to their creditors. Even if the intercompany transfers were not "debts" but "dividends" made to the parent, Deltak would still have had a right of action against the parent to avoid and recover the purported "dividends" as fraudulent transfers, since a dividend to a parent given for no value, made while the transferor is admittedly insolvent, is fraudulent as to creditors under § 548 and § 550 of the Bankruptcy Code and applicable state law. Regardless of its classification, the account was a material asset that Deltak had a statutory and fiduciary duty to disclose to creditors, including SNC, in a timely fashion.

The alleged factual dispute as to whether or not GPEG had offsetting "non-cash" claims against Deltak is likewise irrelevant to the Debtors' duty to disclose. The integrity of the bankruptcy system depends on *full* and honest disclosure by debtors of *all* of their assets. In re Coastal Plains, Inc., 179 F.3d 197, 208 (5th Cir.), reh'g denied, 192 F.3d 128 (5th Cir. 1999), cert. denied sub nom. Mims v. Browning Mfg., 528 U.S. 1117 (2000) ("Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized"), citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.), cert. denied, 488 U.S. 967 (1988).[6] Nothing contained in Krystal

---

[5] Mr. Darr did not address the "dividend" issue because nothing in the Debtors' Global Notes suggested that that was the issue, nor was there any basis for such a change in the accounting treatment reflected in the Debtors' financial records themselves. Supp. App. at SA-153. The Notes simply say the intercompany claims were not "quantified," openly stating that the accounts were not capable of being expressed in numbers. Because the numerical information was in fact available, the Debtors' statement was plainly false.

[6] Compare Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.), 284 F.3d 216, 229-30 (1st Cir. 2002) (As a matter of law, good faith requires full and honest disclosure to permit a disinterested decisionmaker to

Cadillac or other binding Third Circuit precedent justifies a debtor's self-serving decision to withhold information regarding a known cause of action (a "potential Asset" in the Debtors' parlance, App. at Vol. I, A-310) simply because the debtor believes the defendant may assert a counterclaim or affirmative defense. As a federal District Court recently observed:

> The duty to disclose continues throughout the pendency of the bankruptcy [case] and extends to all potential causes of action that the petitioner may have ... The debtor need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information ... to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed ... Any claim must be disclosed, even if it is contingent, dependent, or conditional.

GE HFS Holdings, Inc. v. Nat'l Union Fire Ins. Co., Civ. A. No. 05cv11128-NG, 2008 WL 2246673, at *3 (D. Mass. May 29, 2008), citing, e.g., Coastal Plains, 179 F.3d at 208 (internal citation and quotations omitted).

Even in the Answering Brief, Appellees portray a Deltak unable to fund the completion of its various HRSG projects due to circumstances beyond its control, forced to threaten rejection in order to convert fixed price supply contracts into ones based on time and materials. Answering Brief at 6-9. But the Debtors were not satisfied with that conversion alone, and aggressively pressed for a concomitant waiver of any HRSG rejection damages claims, showing the true motivation and goal in the bankruptcy, *i.e.*, to wipe out legitimate HRSG creditor claims in favor of GPEG's equity. While the goal of minimizing claims is perhaps not improper in the abstract, the means by which the Debtors achieved it here were. Nowhere (prior to obtaining the claim waivers) did Debtors breathe a word of the existence or the magnitude of the intercompany claim Deltak had on its parent. Indeed, of the $182 million in cash transfers admittedly swept

---

exercise informed judgment; "[a] director plainly violates his duty of loyalty if his disclosure [of a corporate opportunity] is misleading, inaccurate, and materially incomplete.") (internal citations omitted).

out of Deltak by its parent, GPEG, approximately $30 million was taken out in just the last nine months prior to bankruptcy.[7] Of course Deltak was left financially incapable of meeting its contractual obligations by September 2006; GPEG made it so and then hid that fact until after HRSG claim waivers could be secured.

As in Krystal Cadillac, Oneida Motor Freight, and Coastal Group (all involving undisclosed claims in litigation), the claim Deltak had on its parent GPEG was admittedly a known asset (App. at Vol. I, A-310), and one left off the Schedules "intentionally." App. at Vol. II, A-1055; see Opening Brief at 30-31. That omission in the context of everything the Debtors had said about Deltak's financial condition completed the Debtors' fraud, and was essential to it.

To suggest, as Appellees do, that there was no harm, because using Deltak to complete SNC's HRSG units was SNC's "only practical option," begs the question. The issue is not whether SNC was intensely interested in obtaining such an agreement but rather on what terms the completion agreement would have been finalized if SNC had been fully informed. Given Debtors' fraudulent omissions concerning the true state of Deltak's affairs (which had the very real and intended effect of inducing SNC to believe its claim against Deltak was worthless), we are only left to speculate what might have been; though of course as Mr. Tardanico testified, we know the disclosure would have transformed the negotiation (at the very least, with respect to the claim waiver being sought). See App. at Vol. I, A-271-72; Vol. II, A-808. The Bankruptcy Court acknowledged as much. App. at Vol. I, A-784.

---

[7] That nine month timeframe coincides almost exactly with the prepetition tenure of the SNC's HRSG Purchase Order with Deltak, which was signed in January 2006. During those nine months, SNC paid Deltak over $20 million [CAD], including a prepayment of over $3.5 million that the Debtors induced just days prior to the filing. App. at Vol. I, A-3; App. at Vol. II, A-943. Thus, SNC effectively funded a large part of GPEG's operations in 2006 while GPEG struggled to develop a reorganization plan, which makes GPEG's refusal to recognize its guarantee obligations all the more unscrupulous.

This is not a case of "buyer's remorse" as Appellees claim; SNC is pleased to see the HRSG units finally nearing completion. This dispute is rather the result of Debtors' *overreaching* in seeking a result well beyond simply causing Deltak's HRSG customers to fund the completion of their units; the Debtors sought and secured a claim waiver and used a fraudulent omission to obtain it.[8] The controlling precedent in this Circuit makes that omission indefensible, and the waiver unenforceable.

    2.    <u>A claim is an asset that must be disclosed.</u>

The linchpin of Appellees' argument in defense of the Debtors' non-disclosure is their assertion that the claim Deltak had against GPEG was not a "known" asset. It goes without saying, however, that a claim in and of itself is an "asset." A debtor's assets include all "causes of action belonging to the debtor at the commencement of the bankruptcy case." <u>Kane v. Nat'l Union Fire Ins. Co.</u>, No. 07-30611, 2008 WL 2721157, at *3 (5th Cir. Jul. 14, 2008), <u>citing</u> 11 U.S.C. § 541(a)(1); <u>State Farm Life Ins. Co. v. Swift (In re Swift)</u>, 129 F.3d 792 , 795 (5th Cir. 1997)). A debtor must disclose all such claims, even if they are just potential claims. <u>Kane</u>, 2008 WL 2721157 at *3. If there is a possibility of recovering additional assets for the estate, a debtor must disclose this to creditors "early on." <u>Constr. Mgmt. Servs., Inc. v. Mfrs. Hanover Trust Co. (In re Coastal Group, Inc.)</u>, 13 F.3d 81, 86 (3d Cir. 1994); <u>cf.</u> <u>Oneida Motor Freight</u>, 848 F.2d at 418 (holding that reorganization plan that failed to disclose potential claim to creditors was "informationally deficient").

Given the undisputed magnitude of the claim at issue here ($182 million, less potential offsets for non-cash overhead of approximately $54 million, giving rise to a net claim of more

---

[8] The Debtors' overreaching and other willful misconduct was not limited to seeking a claim waiver. <u>See, e.g.</u>, Supp. App. at SA-72; App. at Vol. I, A-396, A-401.

than $128 million, see App. at Vol. I, A-253), SNC had every right to expect that Deltak's schedules would disclose it. The Debtors' failure to disclose the claim is fatal to their defenses here, even subject to the irrelevant *post hoc* rationalization that its "treatment" was in dispute (which is in fact contrary to the evidence). See Supp. App. at SA-153 (within the Debtors, the accounting treatment was not in dispute). As noted in the Opening Brief, that claim was more than twice the $61 million figure for Deltak's "Total Assets" listed in its Summary of Schedules. App. at Vol. I, A-170. As a matter of law, it cannot be contended that accounts of such magnitude were not material to creditors.[9]

      3.     The "Business Judgment" Rule is not a defense in cases of intentional non-disclosure by a fiduciary.

Try as they might, Appellees cannot evade the truism that, as a matter of law, the Debtors had a statutory and fiduciary obligation to disclose the true state of their financial condition to creditors as a *quid pro quo* for seeking bankruptcy relief. Here, the Bankruptcy Court made a factual finding that "[t]he Debtors clearly knew or should have known of the line item for intercompany claims. It was there in their financial statements." App. at Vol. I, A-786. The record contains no evidence whatsoever to put in doubt, and the Bankruptcy Court found no reason to question, the basic accuracy of the accounting of intercompany cash transactions

---

[9] Creditors are not required to sift through documents and attempt to reconstruct the flow of a debtor's assets, or to risk the withholding of assets by a debtor under cover of a purportedly incomplete set of books and records. In re Scott, 172 F.3d 959, 969 (7th Cir. 1999) (denying discharge). Where – as here – "debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better recordkeeping." See Scott, 172 F.3d at 970. SNC made efforts to ascertain the financial details of Deltak's HRSG business but was frustrated at every turn. See Opening Brief at 16-19; App. at Vol. I, A-542-43; Vol. II, A-903, A-908. See also AT&T Universal Card Servs. Corp. v. Duplante (In re Duplante), 215 B.R. 444, 447 n.8 (B.A.P. 9th Cir. 1997) (creditors not required to "ferret out the truth" or conduct a Rule 2004 examination to ascertain debtor's true financial condition); Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight"); compare Fed. R. Bankr. P. 2004 (examinations available only with court order upon motion). And, if the Creditors' Committee could not gain access to the information in October and November 2006, there was no way SNC was going to be able to obtain it from the Debtors, with the Debtors' opposition expected – particularly since SNC did not know what it did not know, and could not focus the inquiry any better than it did.

between Deltak and GPEG. See App. at A-786-87. Any factual dispute as to whether or not

GPEG had counterclaims or offsetting accounts receivable is purely a red herring. Appellees

cannot deny that the Debtors failed to make an essential disclosure of a known "potential" asset –

Deltak's claim against GPEG – which they were required to do in accordance with binding Third

Circuit precedent.

Appellees mischaracterize SNC's position as imposing upon a debtor in possession "a

duty to disclose all material facts to an individual creditor before entering into a contract with it".

See Answering Brief at 34. That is not SNC's position. It is undisputed that a debtor in

possession essentially wears two hats and, in certain contexts, is permitted to prefer its own

interests. Thus, in negotiating a plan – the ultimate contract between debtor and creditors – a

debtor in possession need not disclose the maximum amount it is willing to pay. See In re

Water's Edge Ltd. P'ship, 251 B.R. 1, 7-8 (Bankr. D. Mass. 2000).[10] In crucial respects,

however, the Code treats the debtor in possession as a trustee, with fiduciary responsibilities

taken from the law of trusts. In re Marvel Entm't Group, 140 F.3d 463, 474 (3d Cir. 1998)

(debtor in possession assumes same fiduciary duties as an appointed trustee with respect to

"open, honest and straightforward disclosure to the Court and creditors"), citing 11 U.S.C.

§ 1107(a) (with limited exceptions, "a debtor in possession shall … perform all the functions and

duties … of a trustee"); compare Commodity Futures Trading Comm. v. Weintraub, 471 U.S.

343, 355 (1985) ("if a trustee is not appointed -- the debtor's directors bear essentially the same

---

[10]  A disclosure statement promulgated by a debtor as plan proponent formalizes a process of bargaining between the debtor and its various constituencies, which (if successful) culminates in a confirmed plan, which operates as a contract binding upon all parties in interest with notice. Accordingly, a disclosure statement – unlike a bankruptcy petition or the debtor's schedules – is not signed under penalty of perjury, and Section 1125 of the Code requires only that the disclosure statement contain "adequate information … of a kind, and in sufficient detail, as far as is reasonably practicable … that would enable [] a hypothetical investor … to make an informed judgment about the plan".

fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"). In reciting that debtors have "freedom of contract", Appellees completely ignore the fiduciary aspects of a debtor in possession's role in ensuring the accuracy of the information contained in its schedules. Instead, they are asking the Court to place its imprimatur on a *laissez faire* policy permitting debtors to pick and choose the circumstances under which they will honor their fiduciary duties, in direct contravention of the controlling case law.

Audaciously, Appellees ask the Court to adopt a novel rule exempting corporate debtors from obligations of disclosure that bind the humblest consumer debtor, who bears no fiduciary burdens. As already noted, "[f]ull and comprehensive disclosure is critical to the integrity of the bankruptcy process," and therefore a debtor has an "absolute duty to file complete and accurate schedules". See, e.g., In re Rolland, 317 B.R. 402, 413 (Bankr. C.D. Cal. 2004); accord In re Mohring, 142 B.R. 389, 394 (Bankr. E.D. Cal.1992), aff'd, 153 B.R. 601 (9th Cir. BAP 1993), aff'd, 24 F.3d 247 (9th Cir.1994) ("proper 'operation of the bankruptcy system depends on honest reporting'."), quoting Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985), cert. denied, 475 U.S. 1085 (1986). As the First Circuit Court of Appeals recently stated:

> Those who seek the shelter of the bankruptcy code [must] not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, [t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.

Marrama v. Citizens Bank (In re Marrama), 430 F.3d 474, 478 (1st Cir. 2005), judg. aff'd, 549 U.S. 365 (2007) (internal quotation omitted); compare Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc., 989 F.2d 570, 571 (1st Cir. 1993) (court "will not tolerate, even passively", the "palpable fraud" of corporate debtor's strategy to "[c]onceal your claims; get rid

of your creditors on the cheap, and start over with a bundle of rights") (internal citation omitted);

In re eToys, Inc., 331 B.R. 176, 187 (Bankr. D. Del. 2005) ("Disclosure goes to the heart of the

integrity of the bankruptcy system.") (internal quotation omitted).

On this record, it is indisputable that the Debtors failed to file complete financial

schedules or to amend those schedules notwithstanding an absolute duty to do so.  Appellees

admit that the Debtors' schedules were incomplete, but it is undisputed that the Debtors never

saw fit to amend them to include the asset.  See App. at Vol. I, A-258.  Schedules and statements

of financial affairs are signed under penalty of perjury; it is no defense for a debtor to allege that

its schedules are not precise and correct.  In re Duplante, 215 B.R. at 447 n.8; accord In re

Bohrer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001).  A debtor has a duty to prepare schedules

"carefully, completely, and accurately", and where schedules are incomplete, the debtor must

amend them.  Mohring, 142 B.R. at 394 (collecting cases); compare In re Hyman, 967 F.2d

1316, 1319 n.6 (9th Cir. 1992) ("Given that the debtor controls the schedules, we construe any

ambiguity therein against him").  "Thus, amendments are liberally permitted and can be

demanded by the court."  Mohring, 142 B.R. at 394, citing Fed. R. Bankr. P. 1009(a).  Standing

alone, the Debtors' failure to promptly amend their schedules to correct errors and omissions

made under oath is "tantamount to fraud".  See Henkel v. Green (In re Green), 268 B.R. 628, 648

(Bankr. M.D. Fla. 2001).  In failing to complete and timely file, or even later amend, their

bankruptcy schedules where they had an absolute duty to do so, the Debtors continuously failed

to act in good faith.

The disclosure obligations of a debtor in possession are consistent with Delaware corporate law, but not in the way Appellees claim.[11]  Delaware law imposes upon corporate directors fiduciary duties of due care, good faith and loyalty that encompass a duty of "complete candor" in disclosing "accurate and complete information material to a transaction".  E.g., Malone v. Brincat, 722 A.2d 5, 10-11 (Del. 1998) (a board may breach its fiduciary duty of good faith by issuing false public statements that injure the corporation or individual shareholders).  A disclosure violation may implicate one or more of these duties.  Id. at 12.  Where the violation is made "in bad faith, knowingly or intentionally", the violation implicates the duty of loyalty.  O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 915 (Del. Ch. 1999), citing Zirn v. VLI Corp., 681 A.2d 1050, 1061-62 (Del. 1996).  The business judgment rule cannot be invoked to shield a fiduciary who in bad faith, knowingly or intentionally violates a duty to disclose.  In re Bridgeport Holdings, Inc., Bankr. No. 03-12825, Adv. No. 07-51798 (PJW), 2008 WL 2235330, at *16 (Bankr. D. Del. May 30, 2008) (bad faith failure to disclose triggers entire fairness review).

Courts apply the business judgment test to oversight of business decisions, where the courts' expertise is necessarily limited.  See generally "Corporate Governance", § 3.03 ("Limitations on the Debtor in Possession"), Hon. Tina L. Brozman, Chapter 11 Theory & Practice: A Guide to Reorganization, Hon. James F. Queenan, et al. (eds.), LRP Publications

---

[11] Appellees welcome analogies to Delaware corporate law when they seek to avail themselves of the protection of the business judgment rule.  See Answering Brief at 26 ("The fiduciary duties that a debtor owes the creditors in a chapter 11 case are comparable to the duties owed by directors under Delaware corporate law").  Perhaps unsurprisingly, they abruptly lose interest in the comparison when seeking to disavow their fiduciary (and statutory) duty to disclose.  See id. at 35 ("no authority ... equating the disclosure obligations of a board of directors seeking shareholder action under Delaware law with the disclosure obligations of a debtor in possession").  Under Delaware law, however, duties of care, loyalty and good faith require honest disclosure by corporate directors even where shareholder action is not requested.  See, e.g., Malone, 722 A.2d at 12.

(2003) (hereafter "Brozman").[12]  The test affords no protection with respect to decisions that the Court is well-suited to evaluate on its own – such as the Debtors' intentional omission from their bankruptcy schedules of even a hint of the magnitude of their intercompany accounts.

The Delaware Chancery court has had occasion to consider the applicability of the "business judgment" rule in cases involving intentional failure to disclose material information, and declined to find it applicable.  In re Anderson, Clayton Shareholders Litig., 519 A.2d 669, 675 (Del. Ch. 1986).  As one court has observed:

> … [A] director's decision to include materially misleading declarations or omissions in a proxy statement in contravention of federal and state law would presumably be evaluated without the presumption of propriety afforded by the business judgment rule.  In addition, a board's decision as to whether a particular statement or omission was materially misleading would also be denied the protection of the business judgment rule because this decision involves a question of materiality, which courts are well suited to answer on their own.

St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler, No. 06 Civ. 688 (SWK), 2006 WL 2849783, at *5 (S.D.N.Y. Oct. 4, 2006) (interpreting Delaware law), citing Anderson, 519 A.2d at 675.  The courts reason that "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  In re Bridgeport Holdings, 2008 WL 2235330, at *12, quoting Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006).[13]

In particular, the business judgment test has no application where the Bankruptcy Code imposes another standard:  here, the statutory and fiduciary duty of a debtor in possession to disclose to its creditors in its schedules *all* assets of the bankruptcy estate – even "potential

---

[12] Even where the "business judgment test" is properly applied, of course, a debtor in possession is not free of judicial scrutiny and oversight.  "Although section 1108 authorizes a debtor in possession to operate the business, business operations in bankruptcy are hardly unfettered."  *Brozman* at 3:6.

[13] Notably, even where loss results from a breach of the duty of care, the protection of the business judgment rule does not apply in cases of director inaction.  Bridgeport Holdings, 2008 WL 2235330, at *17.

- 15 -

assets", as the Third Circuit has repeatedly held.  Krystal Cadillac-Oldsmobile GMC Truck, Inc.

v. GMC, 337 F.3d 314, 325 (3d Cir. 2003); Oneida Motor Freight, 848 F.2d at 415.  As the late

Judge Tina Brozman explained in a leading treatise, discussing the rights and obligations of a

debtor in possession:

> Chapter 11 tends to favor oversight of business judgment rather than its
> supplantation.  As a result, most courts will approve a debtor's exercise of its
> business judgment so long as there exists no evidence of incompetence, insider
> dealing, some other form of wrongdoing or a detrimental effect on a class of
> creditors that outweighs the proposed transaction's benefits to the estate.  This
> test, known as the business-judgment test, *is nowhere to be found in the statute*.
> It is consistent with the state law standards imposed on directors under the
> business-judgment rule, which bars judicial inquiry into the actions of corporate
> directors taken in good faith and in the exercise of honest judgment for the
> furtherance of lawful corporate purposes.  The rationale for adopting much the
> same test in bankruptcy, *in the absence of special circumstances or a specific
> Code provision imposing a different standard*, is that more exacting scrutiny
> would slow the administration of the debtor's estate and increase its costs,
> interfere with the Bankruptcy Code's provision for private control of
> administration of the estate and threaten the court's ability to control the case
> impartially.
>
> Business judgment will carry a debtor in possession only so far.  *If, under the
> guise of making a business decision, the debtor's course of action will impinge
> upon fundamental rights granted to parties by the Code, the court will override
> the debtor's business judgment*.

*Brozman* at 3:7-3:8 (internal quotations and citations omitted) (emphases added).[14]  Thus,

bankruptcy does not free a debtor in possession of the requirements of other law – including

securities laws – "unless that law is preempted by the Code or conflicts with a fundamental

bankruptcy precept".  Id. at 3:11.

---

[14] Appellees may take the position that, as a factual matter, it was a sound exercise of the Debtors' business judgment to reject fixed price contracts with their HRSG customers and enter into completion agreements on a time and materials basis with the same creditors.  Assuming that to be true, rejection of those executory contracts would be a permissible exercise of business judgment.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984).  In hindsight, of course, rejection of Deltak's prepetition contract with SNC – which, unlike the Debtors' other HRSG contracts, *was indisputably profitable* – may not even have satisfied the business judgment test.  See App. at Vol. I, A-272.

While it may well be true that Debtors' fiduciary obligations run to the creditor body as a whole, and not to any one creditor in a specific negotiation, SNC is not asserting a claim for breach of fiduciary duty, but rather one of fraud in the fiduciary context. Appellees' own citation for this proposition about a debtor's "bargaining" room in negotiations with creditors (In re Water's Edge Ltd. Partnership) acknowledges that "[t]here are nevertheless limits to what counsel can do in his efforts on the debtor's plan." 251 B.R. 1, 7-8 (Bankr. D. Mass. 2000), citing In re Kendavis Indus. Int'l, Inc., 91 B.R. 742 (Bankr. N.D. Tex. 1988) (compensation of debtor's counsel reduced by 50% due in part to various actions of counsel designed to benefit debtor's principals, including the unsuccessful proposal of a plan beneficial to principal's non-debtor corporation, opposing creditors' committee plan which proposed 100% dividend and intentionally delaying chapter 11 case under a "scorched earth" strategy). Indeed, Water's Edge stands for the limited proposition that a debtor need not disclose the maximum amount it is prepared to pay under a plan – not that a debtor may conceal the assets from which the payments will be made. See id.[15]

## B.    GPEG'S UNDISPUTED PROMISE TO GUARANTEE DELTAK'S OBLIGATIONS MUST BE ENFORCED

The section of Appellees' Answering Brief dealing with GPEG's promised parent guarantee has much the same "through-the-looking-glass" quality as Appellees' arguments

---

[15] Appellees' reliance on cases such as Duke Energy Trading and Marketing, L.L.C. v. Enron Corporation is misplaced. See Answering Brief at 36. Duke Energy is a standing case, where the court prohibited individual creditors from asserting claims on behalf of the estate as a whole. Here, SNC indisputably has standing to bring a cause of action for fraud in the inducement of a release and waiver of SNC's particular claims. Another case cited by Appellees, Daniggelis v. Eastern Air Lines, Inc. (In re Ionosphere Clubs), involved a movant's efforts to challenge a debtor's decision regarding a business proposal – clearly a business decision having nothing to do with the breach of statutory and fiduciary duty by the Debtors here. Likewise, In re Pinnacle Brands, Inc. addressed an issue of contract assumption or rejection, which is completely inapposite here: SNC does not challenge the Debtors' right to reject their prepetition contract with SNC, but merely their fraud in inducing SNC to release its resulting rejection damages claim.

concerning the Schedule omission. It simply does not square with the applicable law or the evidence adduced at trial, acknowledged by the Bankruptcy Court as credible.

    1.    The standard of review.

As noted in the Opening Brief (at 28), the Bankruptcy Court's conclusions of law are subject to plenary review and should be considered *de novo* by this Court. Whether an agreement comes within the statute of frauds is a "question of law." Pruitt v. Levi Strauss & Co., 932 F.2d 458, 463 (5th Cir. 1991); Tope v. Beal, 98 F.2d 548, 549 (3d Cir. 1938).[16] Here, that task is simplified by the fact that Gregory Tardanico's specific testimony regarding the GPEG guarantee (which the Bankruptcy Court found "credible" (App. at Vol. I, A-780)) was simply not disputed.

Tardanico's counterpart in the negotiations (Monte Ness) could not respond to Mr. Tardanico's notes of their conversation "one way or the other." See App. at Vol. III, A-1787 (notes); App. at Vol. III, A-1620. Appellees do not discuss Ness' inability to refute Tardanico's specific evidence of Ness' promise on behalf of GPEG; instead they assert general denials elicited by leading questions and cite to assertions of various individuals not involved in the parties' discussions. Answering Brief at 41. Nevertheless, a party can never simply rest on conclusory statements or general denials in the face of evidence setting forth specific facts. See,

---

[16] Thus, contrary to Appellees' assertion, SNC has not misrepresented the standard of review on appeal. Likewise, SNC correctly stated in its Opening Brief that the Bankruptcy Court failed to consider several of SNC's claimed exceptions to the Statute of Frauds. A bankruptcy court order following trial is governed by Fed. R. Bankr. P. 7052, which incorporates Fed. R. Civ. P. 52. Under Rule 52(a), "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." They "need not include 'punctilious detail [] or slavish tracing of the claims issue by issue and witness by witness," In re Mazzeo, 167 F.3d 139, 142 (2d Cir. 1999), citing Krieger v. Gold Bond Bldg. Prods., 863 F.2d 1091, 1097 (2d Cir. 1988), but "must…at least be sufficient to permit meaningful appellate review…." Id. (internal citations omitted). A bankruptcy court's failure to mention applicable law and the factors that apply thereto, or making only "sparse factual findings," constitutes conclusory analysis insufficient to withstand review. Mazzeo, 167 F.3d at 143.

e.g., Fed. R. Civ. P. 56(e)(2); Hideout Records & Distrib. v. El Jay Dee, Inc., 601 F. Supp. 1048, 1053 (D. Del. 1984); see also Momah v. Albert Einstein Med. Ctr., 161 F.R.D. 304, 307 (E.D. Pa. 1995).

### 2.    The Bankruptcy Court erred as a matter of law.

There are, in addition, numerous documents confirming or reflecting the promise which the Bankruptcy Court either misconstrued or misapprehended. See discussion in Appellant's Opening Brief at 42 to 44. In light of the undisputed evidence of GPEG's promise and at least six documents reflecting the guarantee (or discussion concerning it), the Bankruptcy Court erred as a matter of law in refusing to enforce GPEG's obligations. The terms of the parties' contract stating a requirement for financial security are plain to see. App. Vol. II, A-822 (listing various forms of "financial security", including the parent guarantee in the form attached as Exhibit T thereto, App. at Vol. II, A-889-90). These terms are acknowledged by GPEG's Ness to reflect a "contract deliverable" in the form of the parent guarantee. App. at Vol. III at A-1547. There is simply no evidence to the contrary. Indeed, the record establishes that "financial security" was an essential element of the contract SNC awarded to Deltak, but without the parent guarantee, *there is none.* App. at Vol. II, A-942, A-1308; Vol. III, A-1546.[17]

Appellees make much of alleged deficiencies in the proposed form of the Parent Company Guarantee Agreement (App. at Vol. II, A-888, *et seq.*), but the essence of GPEG's undertaking is plainly stated in the form:

---

[17] Certainly other means of "financial security" were considered and SNC preferred a letter of credit, but Deltak and GPEG preferred otherwise, as the parent guarantee cost nothing out of pocket to deliver. App. at Vol. II, A-1403. As GPEG acknowledged, such security is standard in the industry in large HRSG contracts. See App. Vol. III at A-1956; see also infra at fn.18. Moreover, GPEG CFO Wilson could not recall ever telling Ness not to promise the GPEG guarantee. App. at Vol. II, A-1409.

> (1) In consideration of the Beneficiary entering into the Contract with the Contractor, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary due performance by the Contractor of all of its obligations and liabilities under and in accordance with the Contract.
>
> If at any time the Contractor fails or has failed to perform any of its obligations under the Contract, the Guarantor shall perform (or procure the performance of) the Contractor's obligations under the Contract and shall pay any sums that may be payable under the Contract in consequence of the non-performance of the Contractor of any of its obligations thereunder.

App. at Vol. II, A-889. With such a simple and straightforward undertaking, it is not surprising that there is no evidence of any negotiations regarding the form.

Contrary to what Appellees say about this two-page document *now*, Debtors had "no comments" on it when presented with the form in January of 2006. App. at Vol. I, A-738; Vol. III, A-1551, A-1663. It is in fact a basic form, acknowledged as such by GPEG's General Counsel (App. Vol. III at A-1995) and the blanks it contains simply reflect that fact.[18] The inclusion of the company name "Alstom" in error just before the text "[insert company name]" in the first "Whereas" clause of the form (App. at Vol. II, A-889) reflects nothing but that Deltak snatched the supply contract at the last minute from its competitor, Alstom. App. at Vol. III, A-1554-55 (competitor's name mis-transcribed as "Alsthon"); App. at Vol. II, A-943. A meaningless error occurred in failing to delete that name from the form being prepared to attach to the purchase contract with Deltak. App. at Vol. II, A-889. Of more compelling significance, but entirely ignored by Appellees, is Ness' testimony that despite acknowledging the guarantee as a "deliverable," he had "no idea" why it was not signed and delivered. App. Vol. III, at A-1563.

---

[18] It is also entirely consistent with the two page form of parent guarantee GPEG signed for another HRSG counterparty. App. at Vol. II, A-1530-31. It is undisputed that GPEG signed at least ten other such parent guarantees of Deltak's obligations. See App. at Vol. II, A-1494.

The Appellees also seek to rely on the Bankruptcy Court's findings that there is a lack of evidence in the records as to the "process for approving and granting a GPEG guaranty." See Answering Brief at 39. But the undisputed evidence from GPEG's General Counsel is again to the contrary; Ms. Cheeseman specifically stated that there was no "formal procedure" at GPEG for such guarantees (App. at Vol. III, A-1990); though she admitted being consulted on the form, she could not recall any comments on the form "one way or the other". App. at Vol. I, A-733; Vol. III, A-1992-95. There was no other "procedure". See App. at Vol. II, A-1413. In promising GPEG's guarantee, Ness did what he had to do to win the contract for Deltak in a spirited bidding process. App. at Vol. III, A-1546-47, A-1555; App. at Vol. II, A-1300. For the Appellees to deny it now, and suggest that "a letter of credit was the favored option" (Answering Brief at 43), flies in the face of Ness' admissions. App. at Vol. III, A-1546 (admitting the "need," and GPEG's "preference" for the guarantee "because it did not have a cost associated of an LC.").

## C.    THE RELIEF APPELLANT SEEKS IS AVAILABLE HERE

Among other things, SNC is seeking here in this appeal to strike the claim waiver as unenforceable, which is that portion of the Completion Agreement (as amended and restated) (§§ 2.1 and 2.2) that the Debtors obtained by fraud. This relief is entirely consistent with the express terms of the parties' Completion Agreement. Section 4.6 states specifically:

> If all or any part [of] the provisions of this Agreement is or becomes invalid, illegal or enforceable in any jurisdiction, the remaining parts or provisions of this Agreement will be, as to such jurisdiction, severable and: (a) the validity, legality or enforceability of such remaining parts or provisions will not in any way be affected or impaired by the severance of the parts or provisions severed; and (b) the invalidity, illegality or unenforceability of all or any part of any provisions of this Agreement in any jurisdiction will not affect or impair such part or provision or any other provisions that preserves, to the extent possible, the original agreement of the Parties.

- 21 -

App. at Vol. II, A-928.

Appellees argue that if SNC could prove fraud in the inducement, its sole remedy would be to void the contract *ab initio*. Answering Brief at 37. The case relied upon by Debtors, however, is wholly inapposite. In the Matter of the Liquidation of Union Indem. Ins. Co. of New York (Michigan Nat' Bank-Oakland v. Am. Centennial Ins. Co.), 89 N.Y.2d 94 (1996), states the rule in New York for the voiding of reinsurance contracts. The doctrine of *uberrimae fidei*, or "utmost good faith," is one that is applied specially to reinsurance contracts, not to general claims of fraud. Matter of Liquidation, 89 N.Y.2d at 106. Under this doctrine, a "reinsured is obliged to disclose to potential reinsurers all 'material facts' concerning the original risk, and failure to do so generally entitled the reinsurer to rescission of its contract." Matter of Liquidation, 89 N.Y.2d at 102 quoting Sumitomo Marine & Fire Ins. Co. v. Cologne Reins. Co., 75 N.Y.2d 295, 303 (1990). The reinsurer's "failure to disclose need not be fraudulent or even intentional." Christiana Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 279 (2d Cir. 1992). In contrast, the applicable rule of law in New York for fraud-in-the-inducement claim is that contracts entered into through fraud in the inducement are voidable, as opposed to void. See Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005), Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31 (2d Cir. 2001), Mix v. Neff, 99 A.D.2d 180, 183 (N.Y. App. Div. 1984).[19] Appellees cannot now be heard to complain about the relief available to SNC as it seeks to remedy the Debtors' fraud.

---

[19] Appellees also suggest that SNC (and perhaps Deltak) was so constrained by the limitations of the Bankruptcy Court order entered on the so-called "Wind-down Motion" (the "Wind-Down Order") [Bankr. D.I. 195] that no Completion Agreement could have been formed absent a complete waiver of rejection damages by SNC. See Answering Brief at 9 ("each customer would have to agree to … waive rejection damages"). Any such inference misstates the record. Even Appellees recognize, id. at 10, that the Completion Agreement between SNC and Deltak was approved by separate order of the Bankruptcy Court dated December 4, 2006 [Bankr. D.I. 457] which does not reference the Wind-Down Order.

## III. **CONCLUSION**

For all of the foregoing reasons and the reasons set forth in the Opening Brief, Appellant

respectfully requests that the Court enter an order reversing the Bankruptcy Court's Claims

Order issued on December 21, 2007, remanding this matter with instructions that the Bankruptcy

Court (i) excise the waiver and step-down provisions of §§ 2.1 and 2.2 from the Completion

Agreement as unenforceable, (ii) make findings as to SNC's money damages against Deltak and

GPEG arising from the Debtors' breach of the HRSG Purchase Order and their failure to deliver

the promised parent guarantee, without regard to any alleged waiver or step-down, and (iii) grant

such other and further relief as is just and proper.

Dated:  July 22, 2008
Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC


William D. Sullivan (No. 2820)
Elihu E. Allinson, III (No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 428-8191

and

SULLIVAN & WORCESTER LLP

Patrick P. Dinardo
Paul E. Summit
Pamela Smith Holleman
One Post Office Square
Boston, MA 02109
Telephone: (617) 338-2800

*Attorneys for Appellant,*
*SNC-Lavalin Power Ontario, Inc.*

## CERTIFICATE OF SERVICE

    I, Elihu E. Allinson, III, do hereby certify that I am not less than 18 years of age and that on this 22nd day of July 2008, I caused a copy of the foregoing *Appellant's Reply Brief* to be served upon the parties listed below in the manner indicated.

| | |
|---|---|
| **HAND DELIVERY**<br>Jeffrey M. Schlerf, Esq.<br>Eric M. Sutty, Esq.<br>Mary E. Augustine, Esq.<br>THE BAYARD FIRM<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE 19801 | **FIRST CLASS MAIL**<br>Steven D. Pohl, Esq.<br>BROWN RUDNICK BERLACK ISRAELS LLP<br>One Financial Center<br>Boston, MA 02111 |
| **HAND DELIVERY**<br>Adam G. Landis, Esq.<br>John H. Strock, Esq.<br>LANDIS RATH & COBB LLP<br>919 Market Street, Suite 600<br>Wilmington, DE 19801 | **FIRST CLASS MAIL**<br>Howard L. Siegel, Esq.<br>BROWN RUDNICK BERLACK ISRAELS LLP<br>City Place I<br>185 Asylum Street<br>Hartford, CT 06103 |
| **HAND DELIVERY**<br>Mark Minuti, Esq.<br>Jeremy Ryan, Esq.<br>SAUL EWING LLP<br>222 Delaware Avenue, Suite 1200<br>Wilmington, DE 19801 | **FIRST CLASS MAIL**<br>Jeffrey S. Sabin, Esq.<br>David M. Hillman, Esq.<br>SCHULTE ROTH & ZABEL LLP<br>919 Third Avenue<br>New York, NY 10022 |
| **HAND DELIVERY**<br>David M. Klauder, Esq.<br>UNITED STATES TRUSTEE<br>844 King Street, Suite 2207<br>Wilmington, DE 19801 | |

    Under penalty of perjury, I declare that the foregoing is true and correct.

*July 22, 2008*
Date

*/s/ Elihu E. Allinson, III*
Elihu E. Allinson, III